**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------- x

DEIRDRE MACNAMARA, DEEPA MAJMUDAR,
ELIZABETH FLEISCHMAN, REBECCA STONEBACK, x
JASON BARRUS, CHRIS KORNICKE, RANDALL
STEKETTE, WENDY STEFANELLI,  DANIELLE        x
WALSH, WILLIAM HOBBS, JULIA COHEN, SIMON
HARAK, SONIA CHANDRA, CELINE MELANUM,        x
ERIKA BIDDLE, DIANA RAIMONDI, RACHEL
HEINOLD, NOAH CHARNEY, STACY COTLER,         x
BARBARA and  LEONARD FRIEDMAN,  as parents
and natural guardians of EMILY FRIEDMAN, a minor, x
ALI GHAHREMANI, as parent and natural guardian of
SHAHRZAD GHAHREMANI,, WILLIAM STEYERT        x
JR., CHRISTOPHER THOMAS, KATE ESPOSITO,
individually, and on behalf of a  class of all others x
similarly situated,

                                             x

                    Plaintiffs,
                                             x

        -against-
                                             x

THE CITY OF NEW YORK, a municipal entity;
MICHAEL BLOOMBERG, Mayor of the City of  New x
York; RAYMOND KELLY, New York City  Police
Commissioner; JOSEPH ESPOSITO, Chief of      x
Department, New York City Police Department;
THOMAS GRAHAM; Commander, Disorders Control  x
Unit, New York City Police Department; BRUCE
SMOLKA, Assistant Chief, Patrol Borough Manhattan x
South; TERRENCE MONAHAN, Deputy Chief, Patrol
Borough Bronx; JOHN J. COLGAN, Deputy Chief and x
Commanding Officer, Pier 57;  New York Police
Supervisor  MICHAEL INGRAM;  New York Police  x
Supervisor ROMAN; New York City Police Officers
MONA PHILLIPS, NELSON, RODRIGUEZ, Shield No. x
21015,MICHAEL FILOSETA, KEVIN SAM, STEVEN
CHOINSKI, TYRONE RIGGAN, DAN MALLOY,         x
BOYLE, DIEZ, Shield No. 4285, MICHAEL BALICKI,
ANTHONY MASON, BAITY  and MELISSA ROMAN;     x
New York City Police Supervisors and Commanders
RICHARD ROEs 1-50; New York City Police Officers x
JOHN DOEs 1-50, individually and in their official
capacities, jointly and severally,           x

**04 Civ.  9216 (KMK)**
**ECF CASE**
**CLASS ACTION**
**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

Defendants.                    x

------------------------------------------------------------------- x

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which the named plaintiffs, DEIRDRE
MACNAMARA, DEEPA MAJMUDAR, ELIZABETH FLEISCHMAN, REBECCA
STONEBACK, JASON BARRUS, CHRIS KORNICKE, RANDALL STEKETTE, WENDY
STEFANELLI,  DANIELLE WALSH, WILLIAM HOBBS, JULIA COHEN, SIMON HARAK,
SONIA CHANDRA, CELINE MELANUM, ERIKA BIDDLE, DIANA RAIMONDI, RACHEL
HEINOLD, NOAH CHARNEY, STACY COTLER, BARBARA and  LEONARD FRIEDMAN,
as parents and natural guardians of EMILY FRIEDMAN, a minor, ALI GHAHREMANI, as parent
and  natural  guardian  of  SHAHRZAD  GHAHREMANI,,  WILLIAM  STEYERT  JR.,
CHRISTOPHER THOMAS, KATE ESPOSITO, individually, and on behalf of a class of all others
similarly situated,  seek relief for themselves for various constitutional violations, including, *inter
alia*, false arrest and excessive force, and, as to claims for (1) excessively and unreasonably
prolonged, unnecessary and punitive detention, (2) excessive, unnecessary and punitive conditions
of confinement that were shocking to the conscience and inflicted on the plaintiffs and others
similarly situated because of their exercise of First Amendment protected speech activity and (3)
subjection to mass arrests without individualized determinations that there was probable cause to
arrest them at or in the vicinity of demonstrations before and during the Republican National
Convention ("the RNC" or "the relevant period"), on behalf of themselves and for a class or subclass
of similarly situated individuals for defendants' violation, under color of state law, of their rights,

2

privileges and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. §1983, the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of New York.

2.     The defendants in this action, THE CITY OF NEW YORK, a municipal entity; MICHAEL BLOOMBERG, Mayor of the City of New York; RAYMOND KELLY, New York City Police  Commissioner; JOSEPH ESPOSITO, Chief of the New York Police Department; THOMAS GRAHAM, Commander, Disorder Control Unit, New York City Police Department; BRUCE SMOLKA, Chief, Patrol Borough Manhattan South, New York City Police Department; TERRENCE MONAHAN, Assistant Chief of the Bronx Borough Command; JOHN J. COLGAN, Deputy Chief, New York City Police Department; MICHAEL INGRAM, New York City Police Supervisor ROMAN; New York City Police Officers MONA PHILLIPS, (FNU, "First Named Unknown") NELSON, ("FNU") RODRIGUEZ, Shield No. 21015, MICHAEL FILOSETA, KEVIN SAM, STEVEN CHOINSKI, TYRONE RIGGAN, DAN MALLOY, ("FNU") BOYLE, ("FNU") DIEZ, Shield No. 4285, MICHAEL BALICKI, ANTHONY MASON, ("FNU") BAITY  and MELISSA ROMAN;  New York City Police Supervisors and Commanders RICHARD ROEs 1-50; New York City Police Officers JOHN DOEs 1-50, acting individually and in their official capacities, jointly and severally,  implemented, enforced, encouraged, sanctioned and/or ratified policies, practices and/or customs to punish peaceful protest during the RNC by, *inter alia,* engaging in mass arrests which were unlawful and without probable cause, instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC, and subjecting those arrested to intolerable and cruel and inhumane conditions, including denying them access to family members and to legal counsel for an inordinate and unreasonable amount of time.

3

3.      In promulgating and implementing these policies, defendants clearly knew that during the relevant period many thousands of people from New York City and around the country would converge in New York City to demonstrate their opposition to the military, foreign and domestic policies of the current United States government and to the nominee for president from the Republican Party, George W. Bush.  Although some chose to engage in acts of civil disobedience to express their opposition to these policies and to the President, the overwhelming majority of those arrested during the relevant period expressed such opposition within the law and in a manner that followed the instructions and directions of NYPD police officers.

4.      In addition to bringing the foregoing claims on behalf of themselves and all others similarly situated, the named plaintiffs herein bring individual claims arising out of their respective individual arrests - false arrest, false imprisonment, malicious prosecution, malicious abuse of criminal process, excessive force and excessive detention.

5.      The plaintiff class seeks (i) a permanent injunctive relief enjoining the defendants from continuing to implement the policies, practices and/or customs described herein, including the policy, custom and practice of suspicionless and baseless mass arrests as a means of crowd control and retaliation against individuals engaged in political protest in New York City.  This policy is a continuation of a policy directed at political demonstrators, and previously identified in prior litigation, see *Haus et al. v. City of New York, et al.,* 03 CV 4915 (RWS) and *Larsen, et al. v. City of New York*, *et al.,* 04 Civ. 0665 (RWS);  (ii) a declaratory judgment that the policies, practices and/or customs described herein violate the First, Fourth, Fifth, Sixth and Fourteenth Amendments; (iii) compensatory damages for the injuries caused by defendants' unlawful conduct; (iv) punitive damages assessed against the individual defendants to deter such intentional or reckless deviations

4

from well-settled constitutional law; (v) an award of attorneys' fees and costs; and (vi) such other

relief as this Court deems equitable and just. In bringing these claims for injunctive relief, plaintiffs

allege that they have been and will in the future be irreparably harmed by the denial of and/or the

threat of future violations of their rights to free speech and assembly.

## JURISDICTION

6.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4),

as this action seeks redress for the violation of plaintiffs' constitutional and civil rights.

7.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§

2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

8.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28

U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the

claims within the original jurisdiction of this Court that they form part of the same case or

controversy.

## VENUE

9.     Venue is proper in the United States District Court for the Southern District of New

York pursuant to 28 U.S.C. § 1391 (a), (b) and (c).

## JURY DEMAND

10.     Plaintiffs demand a trial by jury in this action on each and every one of their damage

claims.

## PARTIES

### Named Plaintiffs

11.     Plaintiff DEIRDRE MACNAMARA, one of the named plaintiffs representing the

class, resides in New York.

12.     Plaintiff DEEPA MAJMUDAR, one of the named plaintiffs representing the class, resides in New York.

13.     Plaintiff ELIZABETH FLEISCHMAN, one of the named plaintiffs representing the class, resides in Brooklyn, New York.

14.     Plaintiff REBECCA STONEBACK, one of the named plaintiffs representing the class, resides in New Jersey.

15.     Plaintiff CHRIS KORNICKE one of the named plaintiffs representing the class, resides in New Jersey.

16.     Plaintiff JASON BARRUS, one of the named plaintiffs representing the class, resides in Brooklyn, New York.

17.     Plaintiff RANDALL STEKETTE, one of the named plaintiffs representing the class, resides in New York.

18.     Plaintiff WENDY STEFANELLI, one of the named plaintiffs representing the class, resides in New York.

19.     Plaintiff DANIELLE WALSH, one of the named plaintiffs representing the class, resides in New York.

20.     Plaintiff WILLAIM HOBBS, one of the named plaintiffs representing the class, resides in New York.

21.     Plaintiff JULIA COHEN, one of the named plaintiffs representing the class, resides in New York.

22.     Plaintiff SIMON HARAK, one of the named plaintiffs representing the class, resides

in New York.

23.     Plaintiff SONIA CHANDRA, one of the named plaintiffs representing the class, resides in New York.

24.     Plaintiff CELINE MELANUM, one of the named plaintiffs representing the class, resides in New York.

25.     Plaintiff ERIKA BIDDLE, one of the named plaintiffs representing the class, resides in New York.

26.     Plaintiff DIANA RAIMONDI, one of the named plaintiffs representing the class, resides in New York.

27.     Plaintiff RACHEL HEINOLD, one of the named plaintiffs representing the class, resides in New York.

28.     Plaintiff NOAH CHARNEY, one of the named plaintiffs representing the class, resides in Massachusetts.

29.     Plaintiff STACY COTLER, one of the named plaintiffs representing the class, resides in New York.

30.     Plaintiffs BARBARA and LEONARD FRIEDMAN, as parents and natural guardians of EMILY FRIEDMAN, one of the named plaintiffs representing the class, reside in New York.

31.     Plaintiff ALI GHAHREMANI, as parent and natural guardian of SHAHRZAD GHAHREMANI, one of the named plaintiffs representing the class, reside in New York.

32.     Plaintiff WILLIAM STEYERT, Jr., one of the named plaintiffs representing the class, resides in New York.

33.     Plaintiff CHRISTOPHER THOMAS, one of the named plaintiffs representing the class, resides in Victoria, British Columbia, Canada.

34.     Plaintiff KATE ESPOSITO, one of the named plaintiffs representing the class, resides in New Jersey.

## Named and Un-Named Defendants

35.     Defendant CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

36.     Defendant MICHAEL BLOOMBERG is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its departments, including the New York City Police Department ("NYPD") and is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein.  He is sued in both his individual and official capacities.

37.     Defendant RAYMOND KELLY is and was at all times relevant herein, the Police Commissioner for the City of New York, and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein.  He is sued individually and in his official capacity.

38.     Defendant JOSEPH ESPOSITO is and was at all times the Chief of Department of the NYPD, and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein.  He

is sued individually and in his official capacity.

39.     Defendant THOMAS GRAHAM is the Commanding Officer of the Disorder Control Unit of the NYPD and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein.  He is sued individually and in his official capacity.

40.     Defendant BRUCE SMOLKA is an Assistant Chief of the NYPD and the Chief of Patrol Borough Manhattan South and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein.  He is sued individually and in his official capacity.

41.     Defendant JOHN J. COLGAN, is a Deputy Chief in the NYPD and was the senior official overseeing the NYPD's operations at Pier 57 and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein.  He is sued individually and in his official capacity.

42.     Defendant TERRENCE MONAHAN is an Assistant Chief in the NYPD and the Chief of the Bronx Borough Command and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein.  He is sued individually and in his official capacity.

43.     Defendant Command and Supervisory officers INGRAM, New York City Police Supervisor ROMAN; New York City Police Officers MONA PHILLIPS, (FNU, "First Named Unknown") NELSON, ("FNU") RODRIGUEZ, Shield No. 21015, MICHAEL FILOSETA, KEVIN SAM, STEVEN CHOINSKI, TYRONE RIGGAN, DAN MALLOY, ("FNU") BOYLE, ("FNU") DIEZ, Shield No. 4285, MICHAEL BALICKI, ANTHONY MASON, ("FNU") BAITY   and

MELISSA ROMAN;  New York City Police Supervisors and Commanders RICHARD ROEs 1-50;

New York City Police Officers JOHN DOEs 1-50, are NYPD Command and Police Officers

involved in the arrests of the plaintiffs and all of the actions and conduct associated therewith,

including, *inter alia*, the use of force, the preferring of charges, the approval of charges, the

prosecution of the plaintiffs, the abuse of criminal process, the cruel and inhumane conditions to

which those arrested were subjected, the excessive and unnecessary detention, and the

implementation of the challenged policies and practices in question herein.  They are sued

individually and in their official capacities.

44.    Defendants BLOOMBERG, KELLY, ESPOSITO, GRAHAM, SMOLKA,

MONAHAN, COLGAN, INGRAM, ROMAN, MONA PHILLIPS, NELSON, RODRIGUEZ,

FILOSETA, SAM, CHOINSKI, RIGGAN, MALLOY, BOYLE, DIEZ, BALICKI, MASON,

BAITY, ROMAN, DOES and ROES are employees and/or agents of the City of New York.  They

include the individuals who directed and/or authorized the interference with, and/or prevention of,

the plaintiffs' expression of speech, protest, assembly and association, the use of unreasonable and

excessive force, unreasonable arrests and detentions and/or who actually arrested the plaintiffs, all

without probable cause, and who implemented the policies, practices and procedures to unreasonably

detain the plaintiffs.

45.    At all times relevant herein, defendants BLOOMBERG, KELLY, ESPOSITO,

GRAHAM, SMOLKA, MONAHAN, COLGAN, INGRAM, ROMAN, MONA PHILLIPS,

NELSON, RODRIGUEZ, FILOSETA, SAM, CHOINSKI, RIGGAN, MALLOY, BOYLE, DIEZ,

BALICKI, MASON,  BAITY, ROMAN, DOES and ROES,  have acted under color of state law in

the course and scope of their duties and functions as agents, employees, and officers of the City

and/or the NYPD in engaging in the conduct described herein.  At all times relevant herein, defendants have acted for and on behalf of the City and/or the NYPD with the power and authority vested in them as officers, agents and employees of the City and/or the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the City and/or the NYPD.

46.     At all times relevant herein, defendants BLOOMBERG, KELLY, ESPOSITO, GRAHAM, SMOLKA, MONAHAN, COLGAN, INGRAM, ROMAN, MONA PHILLIPS, NELSON, RODRIGUEZ, FILOSETA, SAM, CHOINSKI, RIGGAN, MALLOY, BOYLE, DIEZ, BALICKI, MASON,  BAITY, ROMAN, DOES and ROES, have violated clearly established constitutional standards under the First, Fourth, Fifth, Sixth, and the Fourteenth Amendments of which a reasonable police officer and/or public official under their respective circumstances would have known.

## CLASS ACTION ALLEGATIONS

47.     Pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, the named plaintiffs seek to represent three certified plaintiff classes as follows:

A.     All those persons who were arrested during the relevant period who were subjected to the defendants' policy, practice and custom of unreasonably prolonged, excessive, unnecessary and punitive detention in violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

B.     All those persons who were arrested during the relevant period who were subjected to unreasonable, unnecessary and punitive conditions of confinement in violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United

States Constitution and the Constitution and laws of the State of New York.  These conditions included, but were not limited to, the following: 1) excessively tight handcuffs applied for excessive periods of time; 2) unreasonable overcrowding; 3) inadequate facilities for sleeping and sitting, forcing plaintiffs, and those similarly situated, to come into intimate contact with noxious substances, including, on information and belief, toxic chemicals; 4)  deliberately indifferent denial of access to necessary medication and medical attention to those suffering from medical conditions and illness; 5) deliberately indifferent exposure to dangerous chemicals in the air and on the walls and floor of "Pier 57," including asbestos, and, on information and belief, chloronated hydrocarbons, benzene and others, some of which are carcinogenic, mutagenic, teratogenic, and hepatogenic and which cause many other diseases and conditions and have caused, in the case of the class representatives and all persons similarly situated, fear of cancer and other unknown disease at some time in the future; 6) notwithstanding the extensive levels of toxic chemicals and dirt, among other things, the deliberately indifferent refusal to provide adequate sanitation; 7) the deliberately indifferent denial, in many instances of adequate food, often due to the incredibly unsanitary conditions, and of water; 8) refusal of access to counsel for many hours, and in some cases, for up to two days.

C.     All those persons who were subjected during the relevant period to the defendants' mass arrest policy, i.e., the policy of arresting, without probable cause, individuals who were otherwise engaged in, observing or in the vicinity of those engaging in lawful, protected and peaceful expressions of their First Amendment

rights in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

48.     The members of each class, believed to number in the hundreds of individuals, are so numerous as to render joinder impracticable.

49.     In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court.  Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.  Moreover, many class members who have been victimized by the defendants' unconstitutional policies and practices may not bring individual claims.   There is no adequate avenue for the protection of the class members' constitutional rights other than a class action.

50.     The class members share a number of questions of law and fact in common, including but not limited to the following:

a.     Whether the defendants engaged in a policy, practice or custom whereby individuals who attempted to protest governmental policy and the RNC during the relevant period were systematically prevented from doing so and/or unreasonably encumbered in so doing and/or retaliated against for so doing.

b.     Whether this policy violated the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

c.     Whether the defendants engaged in a policy, practice or custom whereby those arrested for engaging in protest against the RNC or who were in the vicinity of such protests during the relevant period were detained for unreasonably

prolonged, excessive and unnecessary periods of time.

d.      Whether this policy violated the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

e.      Whether the defendants engaged in a policy, practice or custom whereby those arrested for engaging in protest against the RNC or who were in the vicinity of such protests during the relevant period were subjected to unreasonable, inhumane, excessive, unnecessary and punitive terms and conditions of detention and confinement.

f.      Whether this policy violated the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

g.      Whether the defendants engaged in a policy, practice or custom of mass arrests without probable cause, and/or individualized determinations thereof, as a means of controlling and/or discouraging lawful and peaceful political protest against the RNC or being in the vicinity of such protests during the relevant period.

h.      Whether this policy violated the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

i.      Whether the actions and conduct on the part of the defendants during the relevant period were motivated by a desire to suppress lawful and peaceful political protest in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

j.      Whether the inter-related policies, practices and customs of the defendants as alleged herein violated the constitutional rights of class members.

k.       Whether there is a likelihood that the violations of rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution which occurred during the relevant period will be repeated in the future, as to these named plaintiffs and persons similarly situated.

l.       Whether the conduct of the defendants violated the plaintiffs' rights under the Constitution and laws of the State of New York.

51.     These common questions of fact and law all flow from the same policies, enacted by the named and unnamed defendants, and implemented by the same named and unnamed defendants. They were enacted and implemented through concerted efforts by the defendants and were intended to punish the plaintiffs, and those similarly situated, merely for their expression of opposition to the foreign, military and domestic policies of the U.S. government and the policies of the Republican Party.  In addition to punishment, these concerted efforts were further intended to eliminate and/or diminish political protest during the period of the RNC, as evidenced by the widespread arrests of protesters and non-protester bystanders alike.   These policies of punishing and diminishing protest were effectuated through the use of false and unfounded arrests, excessive and unreasonable conditions of detention, and unreasonably prolonged detention.  All named plaintiffs and class members were victimized by these same policies, and thus the foregoing common questions of law and fact greatly predominate over any questions affecting only individual members, including legal and factual issues relating to damages.

52.     The claims of the named plaintiffs are typical of those of the class in that, at the time their constitutional rights were violated, they were engaging and attempting to engage in activities protected by the First Amendment or were simply observing or in the vicinity of such conduct as

15

bystanders; they were the victims of the defendants' policy of arresting, without individualized determinations of probable cause and indeed without probable cause in general, individuals engaged in lawful political protest; they were detained excessively and unnecessarily for unreasonably prolonged periods of time; and they were detained under conditions that were unreasonable, inhumane, excessive and punitive, all in violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

53.     The legal claims for which the named plaintiffs seek declaratory and injunctive relief are the same as or similar to those on which all members of each class will rely, and the harms suffered by the named plaintiffs are typical of the harms suffered by the class members.

54.     The named plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the plaintiff class, and will fairly and adequately protect the interests of the class.  Moreover, many of the named plaintiffs reside in the New York area, where the defendants' unconstitutional policies, practices and customs are implemented, and therefore remain at high risk of being unconstitutionally harmed in the future pursuant to these policies, practices and customs.

55.     The named plaintiffs are represented by the undersigned counsel, among whom are many experienced civil rights lawyers who have litigated a wide range of civil rights, class action lawsuits.  Counsel for the plaintiffs have the resources, expertise, and experience to prosecute this action.  Counsel for the plaintiffs know of no conflicts among members of the class or between the attorneys and members of the class.

56.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  The class is readily defined and prosecution of a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims which in some instances may not be large enough to warrant the expense of individual litigation.

57.     The plaintiff class and subclasses should be certified pursuant to Rule 23(b)(2), because defendants have acted on grounds generally applicable to the class, thereby making final injunctive and declaratory relief appropriate with respect to the class as a whole; and pursuant Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual class members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FACTUAL ALLEGATIONS

### Facts Applicable to All Plaintiffs

58.     The National Republican Party held its nominating convention, the RNC, in New York from August 30, 2004, to September 2, 2004.  Well in advance of the RNC, the defendants were aware that numerous demonstrations, both large and small, were planned to coincide with the RNC.  In addition to knowledge gained from the fact that many groups applied to the City for permits to engage in protest during the relevant period, the defendants were in possession through their own intelligence, as well as intelligence from other law enforcement agencies, that provided them extensive knowledge about what plans were being made by various groups and individuals to demonstrate during the relevant period.

59.     Months before the start of the RNC, the City of New York, through its various agencies in the criminal justice system, began to prepare for any arrests and prosecutions which might follow political demonstrations during the RNC.  Both defendant Police Commissioner

Raymond Kelly and District Attorney Robert Morgenthau publicly stated the potential for more than 1,000 arrests a day during the RNC.

60.    In anticipation of the possibility for mass arrests, the Office of Court Administration ("OCA")  more than doubled arraignment capacity, staffing four day arraignment parts, four night arraignment parts, and a midnight shift.  The New York County District Attorney's ("NYCDA") office added additional staff and agreed to keep its complaint room open extra hours.  The defense bar, including volunteer lawyers affiliated with the National Lawyers Guild, also committed to fully staffing the additional arraignment parts during the RNC and to act as legal observers in the streets.

61.    Like OCA and the NYCDA, the NYPD developed contingency plans for responding to the public protests and demonstrations that were expected to take place.  Unlike those of OCA and the NYCDA, the plans developed by the NYPD were designed and intended to slow down the processing of those arrested during the RNC so as to maximize the amount of time that people arrested would be held in detention.   The defendants also adopted arrest procedures and tactics, including, *inter alia,* mass arrests of individuals without probable cause, the use of nets to corral people for arrest without regard to whether they had committed or were about to commit any crime or violation, the use of an inadequately equipped and environmentally hazardous detention facility, and prolonged and unnecessary detention under cruel and inhumane conditions, which were designed and intended to punish and retaliate against individuals who were engaging in political protest, or simply observing people engaged in political protest.  In addition to being punitive, the procedures and policies adopted by the defendants during the RNC were designed and intended to discourage political protest, freedom of expression and freedom of speech.

62.    The tone was set for these policies and procedures adopted by the defendants during

18

the RNC to punish and discourage dissent by statements made by the defendants in the period leading up to the RNC which portrayed those who chose to engage in political protest in the most negative light.   This "criminalization" or "demonization" of those engaged in political protest was clearly communicated to NYPD police officers and supervisors through the public statements by NYPD officials, including Police Commissioner Kelly, who made statements about the threat posed to New York City by "hard-core" and "dangerous" protestors.   It was reiterated, summarized and ratified in the  public statements of defendant BLOOMBERG in which he identified the plaintiffs and those similarly situated as "terrorists" and "guilty" criminals.

63.   The fact that 1,000 arrests per day might occur during the RNC and would have to be processed by the NYPD, the District Attorney's Office and the Courts was not an exigent circumstance that would justify even a temporary interference with the constitutional and state law rights of those people who might be arrested.  In a city with the largest municipal police force in the country, sufficient resources clearly were present and within the control of the defendants to timely process the expected numbers of arrestees during the RNC.  In fact, while the total number of arrests on the evening of August 31, 2004 - 1,128 - was quite high for any borough, it was lower in number than those arrested at other demonstrations in the past, for example on June 14, 1982, when over 1,600 protesters were arrested within several hours, largely processed on busses and mostly released within the same day, often within several hours.

**The Policy to Excessively Detain People Arrested for Minor Offenses**

64.   During the RNC, defendants CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, GRAHAM, SMOLKA, MONAHAN, COLGAN and ROEs 1-50 implemented a policy, practice or custom of detaining the plaintiffs, and members of the plaintiff class, without

19

justification, for unnecessary and prolonged periods of time in unhealthy and dangerous conditions, thereby preventing them from participating in further demonstration or protest activity, or from simply going on with their lives. In particular, the defendants implemented arrest procedures which were intended to and did in fact unreasonably prolong and extend the period of time that plaintiffs, and those similarly situated, would be held in custody following their arrests. These included, *inter alia*, the use of Pier 57 as an intermediate holding facility without fingerprinting or LiveScan capability; the detailed listing of the possessions of all those arrested, with everything being, in the words of defendant COLGAN "itemized, line by line"; fingerprinting of all those arrested, even for minor offenses for which fingerprinting is unnecessary; and having counsel from the NYPD's Legal Affairs Office review each case before it was then sent for review to the Office of the District Attorney. All these procedures were intended to, and did, unnecessarily and unreasonably extend and prolong the period of time that plaintiffs, and those similarly situated were held in custody.

65.     Rather than attempt to use existing resources, such as Old Central Booking, Central Booking or the numerous precincts throughout the City as the reception point for people arrested during the relevant period – including the at least twenty (20) precincts in Manhattan, all of which are capable of adequately processing arrestees – the defendants deliberately devised a plan that was intended to unreasonably lengthen the stay in custody of anyone arrested during the RNC and to make the terms of confinement difficult, intimidating and unsafe. This deliberate plan was intended to punish people who chose to demonstrate on the streets during the RNC. This deliberate plan also was intended to discourage others from engaging in demonstration activity, or even observing demonstration activity.

66.     That deliberate course of conduct included the use of a facility completely unfit for

human occupancy as a detention facility, at Pier 57, exclusively for RNC protesters and those arrested in the vicinity of RNC protests.  This detention facility was located on the west side of Manhattan, and was used as a storage and repair facility for Metropolitan Transit Authority busses prior to the convention.   Not until July 28, 2004, did defendants Bloomberg, Kelly and the City of New York and others enter into an agreement to use this filthy, hazardous and dangerous setting as a detention facility, knowing that it would be unfit for human occupancy by the time of the RNC.

67.     The defendants constructed multiple holding cells inside Pier 57 using chain-link fence topped with razor wire.  Each cell had two sections, one in which arrestees were kept, and another, buffer zone, which contained a portable toilet.  Upon arrival at Pier, 57, detainees were searched, had their property confiscated, and were placed in one of the holding cells.  According to published reports, three environmental inspections of Pier 57 in 2001 and early 2004 uncovered safety and health hazards including easily disturbed asbestos particles, lack of adequate fire protection systems, and floors covered with black oily soot.  Detainees could not sit on the floor without becoming covered in the filth.  There were generally not enough benches for the number of arrestees in each cell.  Many arrestees got rashes or blisters from the substance on the floor.  The air quality was poor, and many arrestees developed coughs or had difficulty breathing.  At night, the facility was kept very cold, and the detainees, who were dressed for a hot summer day in New York, were not provided with any blankets, nor was there any heat.

68.     In addition to the unsanitary and unsafe conditions of Pier 57, the facility lacked any equipment, such as LiveScan machines, for taking and transmitting fingerprints, which would have permitted the processing and arraignment of individuals immediately following their arrest. Without such capability, and given that the defendants insisted on fingerprinting everyone arrested in

violation of state law, none of the individuals who were arrested were able to be evaluated for release with a summons or a Desk Appearance Ticket ("DAT") for many hours, and in most cases, for well over a day.  Processing for release with either a DAT or an arraignment before a judge could not begin until those detained were transported from Pier 57 to Central Booking or some other facility where their fingerprints could be taken.  As a result, the plaintiffs, and those similarly situated, were detained at Pier 57 for lengthy and unnecessary periods of time for no justifiable or legitimate reason.

69.     While at Pier 57, and later at Central Booking, the plaintiffs and members of the plaintiff class were denied access to attorneys.  In addition, many people, including plaintiff Chris Kornicke, had their cameras seized and never returned to them.

70.     Most of the more than 1,800 people who were arrested during the period just before and during the RNC were arrested for minor violations, such as disorderly conduct and parading without a permit, which, under state law, did not require the taking of their fingerprints prior to their release with a summons or a Desk Appearance Ticket.  The defendants' decision to fingerprint all those arrested during the RNC, including those arrested for minor offenses, resulted in excessive delays in their release and the improper entry of fingerprints into government databases.

71.     The unconstitutional arrests of large numbers of individuals who were not in violation of any laws or regulations of the State or City of New York, were designed to create a pretext for the lengthy and punitive detentions of people arrested.

72.     Further evidence of the defendants' policies, practices and custom of excessively detaining individuals arrested during the RNC is found in the defendants' wilful and deliberate defiance of the decisions of not one but two New York State Supreme Court justices during the RNC.  The defendants presently face criminal and civil contempt proceedings before one of those

judges for their willful and deliberate defiance of a lawful court order.

73.     Following the arrests of people prior to and during the RNC, the defendants implemented a policy and procedure of refusing those individuals access to counsel.  In response, a proceeding was brought in New York State Supreme Court to obtain access.  On September 1, 2004, the Honorable Emily Jane Goodman issued an order directing the City to allow defense lawyers access to their clients "forthwith."  Despite this clear directive, the City defendants willfully and deliberately continued to deny lawyers access to the plaintiffs and those similarly situated, then in City custody.

74.     Because of the extended periods of time those arrested on August 31 had been detained, a second state judge, Acting Supreme Court Justice John Cataldo, ordered  the City to either bring demonstrators before the court or release them.  After the City failed to comply, the judge held the City in contempt for failing to release or have ready for arraignment approximately 560 people.  These contempt proceedings are still pending.

75.     One of the defendants' pretexts for these preventive detentions and unnecessary delays has been that it took "five or six hours to get the fingerprints from Albany," referring to criminal history records maintained by the state.  In fact, the State of New York sent 94 percent of the fingerprint reports to the City in one hour or less. Only one set of fingerprints – of 3,620 processed by the state from Aug. 30 to Sept. 3 – took as long as five hours to return to New York City authorities.

**The Conditions at Pier 57 Were Cruel and Inhumane**

76.     During the RNC, defendants CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, GRAHAM, SMOLKA, MONAHAN, COLGAN and ROEs 1-50 implemented policies,

practices or customs of detaining the plaintiffs, and members of the plaintiff class, without justification, in conditions that were deliberately cruel, inhumane, unhealthy and dangerous.

77.     The plaintiffs were held for many hours, some for as long as two nights, in cages that lacked adequate benches or other means whereby to adequately sit, rest and/or sleep, forcing them onto the floor, under conditions which were cold, loud and uncomfortable, due to the continuous use of large fans which ran at top speeds, which, given the presence of numerous toxic chemicals present at Pier 57, was particularly inappropriate.

78.     On information and belief, the floors of the cages in Pier 57 were covered with numerous highly toxic chemicals and substances, including, on information and belief, those known to be carcinogenic, mutagenic, teratogenic, hepatogenic, and immunotoxic, and to cause other diseases, including but not limited to friable asbestos, aromatic hydrocarbons and xeno hormones. The dangers and risks from the asbestos and other toxins were exacerbated by the use of the fans referenced above.   The floors of the cages in Pier 57 were also covered in other dirt and grime.

79.     Medical attention and necessary medication were routinely denied to the named plaintiffs and persons similarly situated.

80.     Plaintiffs and class members who were physically disabled were routinely denied accommodation by way of facilities suited to their disabilities.  Further, they were humiliated and embarrassed by NYPD personnel when they complained of the lack of such accommodation.

81.     Throughout their stay in Pier 57, the plaintiffs, and others similarly situated, were taunted and verbally abused by NYPD personnel who told them, inter alia, that they were being held until George Bush left town.

82.     On information and belief, at no time did the defendants ever obtain a certificate of

24

occupancy for Pier 57 which would have permitted the holding of human beings therein.

83.     In addition, the plaintiffs and members of the plaintiff class were subjected to excessive and unnecessary handcuffing, including the continued handcuffing and tightening of handcuffs of individuals even after they were lodged in the detention facility at Pier 57.

### Defendants' Unconstitutional Mass Arrest Policy

84.     During the RNC, defendants CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, GRAHAM, SMOLKA, MONAHAN, COLGAN and ROEs 1-50 implemented policies, practices or customs of indiscriminately arresting without just or probable cause large groups of people who were peacefully assembled and who were either participating in, were observing or were in the vicinity of demonstrations and protests.

85.     This mass arrest policy was a refinement of the tactic employed recently by the defendants at other demonstrations which have recently taken place in the City, including, *inter alia,* the February 15, 2003 anti-war march, *see Haus, et al., v. City of New York, et al.,* 03 Civ. 4915 (RWS), and the April 7, 2003 Carlyle Group protest, see *Larsen, et al., v. City of New York, et al.* 04 Civ. 665 (RWS)*,* of using mass arrests to unlawfully suppress protected First Amendment conduct.

86.     During the RNC, the defendants extended and employed this policy, practice or custom, in an arbitrary and capricious manner, and in the absence of probable cause, to arrest entire groups of people who were lawfully engaged in protected First Amendment activity or were observing such activity, or were simply passing by at the time arrests were being made.

87.     The locations and dates when the plaintiffs and members of the plaintiff class were subjected to the defendants' unconstitutional mass arrest policy include, but are not limited to, the

following:

      A.   On August 27, 2004, the defendants, pursuant to the unconstitutional mass arrest policy, arrested numerous individuals who were participating or perceived by the defendants as having participated in protests on bicycles at various points in Manhattan, including 35th Street between Tenth Avenue and Dyer, 7th Avenue near 34th Street and 10th Street and Second Avenue.  On that date, the defendants indiscriminately arrested anyone seen riding a bicycle or standing with a bicycle for allegedly having participated in a bike event known as "Critical Mass," even though they were not engaged in any unlawful behavior and even though such bike events had been ongoing and sanctioned by the defendants on a monthly basis for years prior to the RNC.  To effectuate these unlawful arrests, the defendants used orange nets to trap and arrest scores of people participating in a bicycle event that the defendants had allowed to take place for nearly one and one-half hours before the mass arrests were made without warning.  Plaintiffs JULIA COHEN and ELIZABETH FLEISCHMAN were arrested at or near the 35th Street location.  Plaintiff RANDALL STEKETEE was arrested at or near the 10th Street location.  All those arrested were detained at Pier 57 before they were taken to Central Booking for either release pursuant to a Desk Appearance Ticket or arraignment before a judge.

      B.     On August 29, 2004, the defendants again employed the mass arrest policy, including the use of orange nets, to arrest groups of people lawfully standing on sidewalks in Times Square, including legal observers and members of the media.  Following their arrest, the members of the plaintiff class were transported to Pier

C.     On August 31, 2004, the defendants again employed the mass arrest policy, including the use of orange nets, to arrest participants in a demonstration organized by the War Resisters League at Fulton Street between Church Street and Broadway in Lower Manhattan.  In this case, the demonstrators negotiated with and were specifically told by NYPD officers and supervisors that they would be allowed to march north from Fulton Street and Broadway toward Madison Square Garden, the site of the RNC, so long as the participants walked two abreast, in order to keep sidewalks clear, and did not block traffic at intersections.  A videotape of the event specifically shows police officials informing demonstrators that the march could proceed in the fashion described above.   Almost immediately after the march began and before it had even proceeded one full block, NYPD officers and supervisors, on the orders of defendant Assistant Chief Terence Monahan, halted the march, surrounded over 200 people, again utilizing the orange nets, and arrested them all, even though they had remained on the public sidewalk, were not blocking the sidewalk, and had made every effort to comply with police instructions.  Those arrested were given no meaningful opportunity to disperse.  Plaintiffs SIMON HARAK and DIANA RAIMONDI were arrested at this location.  On October 6, 2004, the Manhattan District Attorney's office announced that it would dismiss 227 prosecutions arising out of the August 31st arrests on Fulton Street.  Following their arrest, the plaintiffs and other members of the class were transported to Pier 57.

D.     Again, on August 31, 2004, the defendants employed the mass arrest policy, including the use of orange nets, to arrest individuals who were either

participating in, observing, or were merely in the vicinity of a march which began in Union Square.   As with other arrests during the RNC, the demonstrators were directed by defendant NYPD police officers to walk on a sidewalk on 16th Street between Union Square East and Irving Place.  When they arrived at Irving Place, they were told that they could go no further.  When they turned around to leave the area, fearing arrest, they observed that the entire street had been blocked off and they could not leave.  Everyone on this block, whether they were protestors, or observers, or just happened to be in the area, was then arrested.  Prior to their arrest, the participants in this march had complied with all orders given to them by the police.  At no time were they given an order to disperse or advised that they were in violation of any law or ordinance of the State or City of New York.  Plaintiffs DEEPA MAJMUDAR, SONIA CHANDRA, CELINE MELANUM, DANIELLE WALSH, ERIKA BIDDLE and EMILY FRIEDMAN were arrested at this location.   Following their arrest the plaintiffs and other members of the plaintiff class were transported to Pier 57.

E.     On August 31, 2004, the defendants again employed the mass arrest policy, including the use of orange nets, to arrest individuals who were either participating in, observing, or merely in the vicinity of a march that was proceeding down 17th Street between Broadway and Fifth Avenue.  As with other arrests during the RNC, the demonstrators at this location were walking down the sidewalk in an orderly fashion, pursuant to the direction of NYPD officers who werre monitoring the march.  When the march got to the corner of Broadway and 17th Street, the marchers were directed to proceed west on 17th Street toward Fifth Avenue.  When they arrived

28

at Fifth Avenue, they were told that they could go no further.  When they turned around to leave *via* Broadway as they had come, they were again blocked off by the NYPD and were then arrested.  At no time were they given an order to disperse or advised that they were in violation of any law or ordinance of the State or City of New York.  Plaintiffs DEIRDRE MACNAMARA, REBECCA STONEBACK and CHRIS KORNICKE were arrested at this location.  Following their arrest, the plaintiffs and members of the plaintiff class were transported to Pier 57.

F.      On August 31, 2004, the defendants again employed the mass arrest policy, to arrest individuals who were either participating in, observing, or were merely in the vicinity of a march on Park Avenue between 26th and 27th Streets, at approximately the same time as the arrests were being made on 16th and 17th Streets. The marchers, who had been at Union Square, were walking in an orderly and law abiding fashion on Park Avenue, carrying signs and wearing buttons protesting the RNC.  Without warning or any order to disperse, the plaintiffs, which includes both those participating in this particular march as well as others who just happened to be in the area, were arrested.  At no time were they given an order to disperse or advised that they were in violation of any law or ordinance of the State or City of New York Plaintiffs WENDY STEFANELLI and STACY COTLER were arrested at or near this location.  Following their arrests, the plaintiffs and members of the plaintiff class were transported to Pier 57.

G.      On August 31, 2004, the defendants again employed the mass arrest policy to arrest individuals who were either participating in, observing, or were merely

in the vicinity of a march at 35th Street between Fifth Avenue and Sixth Avenue.  As with other arrests during the RNC, the protesters and others walked on the sidewalk when so directed by the NYPD and they were never ordered to disperse.  They turned onto 35th Street at the direction of the NYPD.  As they traveled east, they were confronted by a line of police motor scooters and were told that they could go no further.  When they turned around to leave whence they had come, they were again blocked off by the NYPD and were then arrested. At no time were they given an order to disperse or advised that they were in violation of any law or ordinance of the State or City of New York.  Plaintiffs JASON BARRUS, WILLIAM HOBBS, RACHEL HEINOLD and NOAH CHARNEY were arrested at or near this location.  Following their arrests, the plaintiffs and members of the plaintiff class were transported to Pier 57.

H.    Again, on August 31, 2004, the defendants employed the mass arrest policy to arrest individuals who were either participating in, observing, or were merely in the vicinity of a demonstration relating to the RNC.  This demonstration occurred near  the steps of the New York Public Library on Fifth Avenue between 42nd Street and 40th Street.  During the demonstration, plaintiff CHRISTOPHER THOMAS, who was visiting New York with his son and was not participating in the demonstration, was arrested for asking a question of an NYPD officer. At no time was the plaintiff violating any order by the police or any law or ordinance of the State or City of New York.  Following his arrest, the plaintiff, and others who were arrested at this location, were transported to Pier 57.

88.     The mass arrest policy utilized by the defendants just before and during the RNC substantially chills the exercise of First Amendment rights.  When the police arrest large numbers of people engaged in lawful activity at or near demonstrations, those arrested are far less likely to be comfortable engaging in future protest activity.  Moreover, when such arrests take place at such a highly publicized event as the RNC, the public at large is given the message that participation in protest activity is criminal and likely to lead to arrest.  This "criminalization" of dissent and protest lies at the heart of the defendants' mass arrest policy and the other policies alleged herein.

89.     The policies, practices or customs of defendants  CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, GRAHAM, SMOLKA, MONAHAN, COLGAN and ROEs 1-50 of making mass arrests of persons lawfully participating in or observing demonstrations, of detaining those arrested on minor offenses for prolonged and excessive periods of time, and of detaining them in a facility which was unhealthy and unsafe and which was not suitable for the detention of prisoners, violated the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, their counterpart provisions in the New York State Constitution, and New York statutory and common law.  In addition to declaratory and injunctive relief against the defendants unconstitutional policies and practices as outline above, the plaintiffs, and those they seek to represent, seek compensatory and punitive damages for the emotional and physical injuries they suffered which were proximately caused by the defendants' unconstitutional conduct, and an award of attorneys fees and costs.

## Facts Applicable to the Named Plaintiffs

### Plaintiff Deirdre MacNamara

90.     Plaintiff DEIRDRE MACNAMARA is a resident of the City of New York and an

31

actress and medical technician.  She was arrested on August 31, 2004, at approximately 9:00 p.m., on 17th Street between Broadway and 5th Avenue.  At the time of her arrest, MacNamara was not violating any law or order from a police officer.  Her arrest was totally without any probable cause. She was held for a total of approximately 45-50 hours before she was released.

91.     Before her arrest she had been browsing at Barnes & Noble on Union Square and 16th Street.  Thereafter she headed north on Broadway intending to go to a restaurant.  As she walked up Broadway she noticed others walking on the sidewalk who appeared to be engaged in a march relative to the RNC.  When she got to 17th Street, barricades prevented her from continuing north. She was directed by police officers of the NYPD to turn west on 17th Street, which she did.   When she got near Fifth Avenue, she was stopped by barricades that the police had erected on 17th Street and Fifth Avenue.  NYPD police officers in full riot gear were stationed at the Fifth Avenue barricades.  At that point, an NYPD supervisor told her and others to wait while he made a call so that he could direct them further.  The plaintiff and the others waited while this call was made. While at this location, MacNamara observed that barricades had been erected by the NYPD at the other end of 17th Street, which meant that the plaintiff, and approximately 40-50 people other people, were effectively trapped.  Police officers then came into the crowd on motor scooters and on foot and ordered the group to sit down, which they did.

92.     Shortly thereafter, MacNamara was arrested and handcuffed and placed into a city bus.  Plaintiff MacNamara was arrested and handcuffed by defendant police officer NELSON.  The handcuffs were excessively tight and when she complained about the tightness to defendant Nelson, he told her that nothing could be done.

93.     Following her arrest, MacNamara remained handcuffed for 4-5 hours, causing a

swollen left hand for approximately 3 weeks, numbness, which is persistent, pain, and extreme discomfort. MacNamara was transported to Pier 57, where she was housed in cold, overcrowded wire cages for many hours. Because of the lack of adequate facilities, MacNamara had to sit or lie on the floor in order to rest or sleep. Because the floor and walls were covered with chemicals, substances and dirt, which included asbestos and possibly other carcinogens, she suffered chemical burns and contact dermatitis and folliculitis and a bronchospastic response. While she was detained, the plaintiff was denied adequate toilet and sanitary facilities. There were far too few toilets for the numerous people held in the various cages where she was held, no toilet paper and no place to wash or cleanse herself of the filth and toxic chemicals and other substances that were in the cages even before prisoners were placed there.

94.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, MacNamara has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Deepa Majmudar

95.    Plaintiff DEEPA MAJMUDAR is a vice-president at J.P. Morgan and holds a Ph.d. from Columbia University in astrophysics. She was arrested on August 31, 2004 between 7:00 and 8:00 p.m. at 16th Street between Union Square East and Irving Place.   At the time of her arrest, Majmudar was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 45-50 hours.

96.    On August 31, 2004, Majmudar, who had the day off from work, went to a bookstore on Fifth Avenue near 14th Street, then went to Union Square and enjoyed an afternoon reading. After a few hours, at approximately 7 p.m., she headed east to catch an uptown bus to go home. When she

got to 16th Street between Union Square East and Irving Place she observed between 50-100 RNC protesters peacefully gathered at the same place.  As she got to Irving Place, she was not allowed to proceed further due to a line of NYPD officers on motor scooters, blocking her way and refusing to allow her to proceed.  She then turned back but found her way blocked at Union Square by more NYPD officers.

97.     Shortly thereafter, Majmudar was ordered to sit on the sidewalk where she was arrested and handcuffed, despite the total absence of any probable cause for her arrest.  When one of the protesters attempted to argue with a police officer that the plaintiff was merely an innocent bystander, one NYPD officer defendant shouted, "You fucked up punks! It's because of you punks that they are being arrested."  In fact, one police officer admitted that there was no basis for her arrest, stating: "Sorry but you were at the wrong place at the wrong time." Later, defendant police officer TYRONE RIGGAN signed a criminal complaint accusing Majmudar of acts he did not witness and that she did not do.

98.     Following her arrest, Majmudar remained handcuffed for many hours, causing extreme pain and discomfort in her left shoulder, which persists to this day, and swelling in her hand. She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Because the floor and walls were contaminated and filthy, Majmudar developed skin rashes and irritation.  She was denied adequate toilet and sanitary facilities.

99.     As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Majmudar has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

**Plaintiff Elizabeth Fleischman**

100.    Plaintiff ELIZABETH FLEISCHMAN is a former vice president at Morgan Stanley, and a survivor of the World Trade Center attack. She was arrested on August 27, 2004 at approximately 9:30 p.m. at 35th Street, between Tenth Avenue and Dyer. Her arrest was totally without any probable cause. She was held for approximately 20 hours.

101.    On August 27, 2004, Fleischman had decided to participate, as she had done on several occasions in the past, in the Critical Mass bike event which takes place on the last Friday of every month. She rode in the event on an average of three times per year. Although the event in August, 2004, had a political tone to it because of the RNC, it was as it always was, an event to heighten awareness to alternative forms of transportation. At no time in the past had she ever experienced any problems with participating in this event. The bike event started at approximately 7:30 p.m in Union Square. One and one-half hours later, at approximately 9:00 p.m., she and several hundred riders were directed by their police escorts to head west on 35th Street. During the prior one and one-half hours the plaintiff was not informed by the police that the assembly she was involved in was illegal nor was she informed that she should discontinue her participation in that event.

102.    Shortly after being directed into 35th Street between 10th Avenue and Dyer the police barricaded both the entrances and exits to 35th Street at both 10th Avenue and Dyer, thus preventing the plaintiff from leaving the scene. Shortly thereafter, Fleischman was arrested. Defendant ANTHONY MASON, although he did not personally witness Fleischman violate any laws, was assigned as her arresting officer. The plaintiff was then handcuffed, her bicycle was confiscated, and she was then transported to the detention facility at Pier 57.

103.    Following her arrest, Fleischman remained handcuffed for many hours, causing

extreme pain and discomfort.  She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Because the floor and walls were contaminated and filthy, Fleischman was exposed to what she fears may be some illness related to exposure to toxic chemicals and substances.  She was denied adequate toilet and sanitary facilities.

104.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Fleischman has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Rebecca Stoneback

105.    Plaintiff REBECCA STONEBACK is a glass artist and jewelry designer.  She was arrested on August 31, 2004 at approximately 9:00 p.m., on 17th Street between Fifth Avenue and Broadway.  At the time of her arrest, Stoneback was not violating any law or order from a police officer.  Her arrest was totally without any probable cause.  She was held for approximately 45-50 hours.

106.    On August 31, 2004, Stoneback had come into the City from her home in Asbury, New Jersey, to lawfully and peacefully protest against the domestic, foreign and military policies of the Bush Administration.  She was in the company of her friend Chris Kornicke, another plaintiff and class representative herein.  They went to Union Square and joined with a group of other demonstrators who wanted to walk to the official "protest zone" that had been established in the vicinity of Madison Square Garden.  They were told by police officers to walk north away from Union Square, which they did, at all times walking on the sidewalk.  When they came to a barricade, they asked an NYPD supervisor, one of the defendant ROEs herein, where they should go to get back

to the protest zone.  He advised them to head west on 17th Street, which they did, again at all time walking on the sidewalk.  At 17th Street and Fifth Avenue they were again stopped by barricades and police officers.  When they turned back, they saw that there were barricades at the other end of 17th Street and that they were effectively trapped.

107.     Shortly thereafter, Stoneback was ordered to sit down, which she did, whereupon she was arrested, handcuffed and placed into a city bus.  Plaintiff Stoneback was handcuffed by defendant MONA PHILLIPS who was designated the arresting officer by defendant NYPD Supervisor ROMAN.  She was charged with parading without a permit and two counts of disorderly conduct, notwithstanding the complete absence of any cause, let alone probable cause, to arrest her for these or any other criminal charges.  Stoneback agreed to accept an adjournment in contemplation of dismissal when she was finally brought before a judge for her arraignment.

108.     Following her arrest, Stoneback was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort.  She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Because the floor and walls were contaminated and filthy, Stoneback developed and continues to suffer from skin rashes and irritation.  She was also denied adequate toilet and sanitary facilities.

109.     As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Stoneback has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Chris Kornicke

110.     Plaintiff CHRIS KORNICKE is an artist.  He was arrested on August 31, 2004 at

approximately 9:00 p.m., on 17th Street between Fifth Avenue and Broadway.  At the time of his arrest, Kornicke was not violating any law or order from a police officer.  His arrest was totally without any probable cause.  He was held for approximately 45-50 hours.

111.    On August 31, 2004, Kornicke had come into the City from his home in Asbury, New Jersey, to lawfully and peacefully protest against the domestic, foreign and military policies of the Bush Administration.  He was in the company of his friend Rebecca Stoneback, another plaintiff and class representative herein.   They went to Union Square and joined with a group of other demonstrators who wanted to walk to the official "protest zone" that had been established in the vicinity of Madison Square Garden.  They were told by police officers to walk north away from Union Square, which they did, at all times walking on the sidewalk.  When they came to a barricade, they asked an NYPD supervisor, one of the defendant ROEs herein, where they should go to get back to the protest zone.  He advised them to head west on 17th Street, which they did, again at all time walking on the sidewalk.  At 17th Street and Fifth Avenue they were again stopped by barricades and police officers.  When they turned back, they saw that there were barricades at the other end of 17th Street and that they were effectively trapped.

112.    Shortly thereafter, Kornicke was ordered to sit down,  which he did, whereupon he was arrested, handcuffed and placed into a city bus.  Plaintiff Kornicke was handcuffed by defendant MONA PHILLIPS who was designated the arresting officer by defendant NYPD Supervisor ROMAN.  He was charged with parading without a permit and two counts of disorderly conduct, notwithstanding the complete absence of any cause, let alone probable cause, to arrest him for these or any other criminal charges.  Kornicke agreed to accept an adjournment in contemplation of dismissal when he was finally brought before a judge for his arraignment.

38

113.    Following his arrest, Kornicke was ubjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort.  He was transported to Pier 57 where he was herded into extremely cold, overcrowded wire cages for many hours and where he had to sit or lie on the floor in order to rest or sleep.  Because the floor and walls were contaminated and filthy, Kornicke developed skin rashes and irritation  He was also denied adequate toilet and sanitary facilities.

114.    In addition, although he advised his jailors early on that he was an epileptic and had a seizure disorder, the Doe and Roe defendants delayed giving him any medical attention.  He was finally transported to Bellevue Hosptial.  On the way to the hospital, and because he had complained about the lack of medical attention, the Doe and Roe defendants handcuffed him excessively tightly, causing him extreme pain.  In addition, representatives of the NYPD refused to accept medication brought to Central Booking for the plaintiff.

115.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Kornicke has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

**Plaintiff Jason Barrus**

116.    Plaintiff JASON BARRUS is employed as a packaging development engineer.  He was arrested on August 31, 2004 at approximately between 8:00 - 9:00 p.m. on 35th Street between Sixth and Fifth Avenue.  At the time of his arrest, Barrus was not violating any law or order from a police officer.  His arrest was totally without any probable cause.  He was held for approximately 46 hours.

117.    On the day of his arrest, Barrus arrived in the Herald Square vicinity to lawfully and

39

peacefully protest the RNC.  The plaintiff was directed by the police to move down 35th Street heading from Sixth Avenue to Fifth Avenue.  A line of  NYPD police officers, containing some of the DOE and ROE defendants headed east on 35th Street from Sixth Avenue, ahead of him.  They pushed the crowd east, and the plaintiff turned around and moved east along with the rest of the crowd.  At the same time, when he got about two-thirds of the way down the block, toward Fifth Ave, another line of police officers and supervisors including some of the DOE and ROE defendants, on mopeds, blocked 35th Street, at Fifth Avenue.  These two NYPD actions on 35th Street created a pincer effect, causing the crowd to stand still and become highly congested.  Once he, and the others on 35th Street were surrounded, they were not allowed to leave even though he asked to do so.

118.    Shortly thereafter, the plaintiff was  handcuffed by one of the Doe defendants, assigned to an "arresting officer," and charged with disorderly conduct, notwithstanding the complete absence of *any* cause, let alone probable cause, to arrest him for these or any other criminal charges. Further, the arresting officer never saw the plaintiff engage in any of the alleged acts, notwithstanding that he attested to the fact that he had.

119.    Following his arrest, Barrus was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort.  He was transported to Pier 57 where he was herded into extremely cold, overcrowded wire cages for many hours and where he had to sit or lie on the floor in order to rest or sleep.  Because the floor and walls were contaminated and filthy, Barrus developed and continues to suffer from skin rashes and irritation.  He was also denied adequate toilet and sanitary facilities.  Because of the conditions he was detained under, Barrus was unable to eat or sleep.  He was also taken to the hospital during his confinement as a result of the injuries he suffered from his arrest and detention.

120.     As a direct and proximate result of the defendants' unconstitutional conduct, Barrus has and continues to suffer serious emotional and psychological trauma resulting in headaches, anxiety, depression, exhaustion and other consequences.  He also suffers from fear of cancer and other unknown diseases at some time in the future.

**Plaintiff Randall Steketee**

121.     Plaintiff RANDALL STEKETEE is a paralegal at a large Wall Street law firm.  He was arrested on August 27, 2004 at approximately 10:00 p.m., at the corner of 9th Street and 2nd Avenue.  At the time of his arrest, Steketee was not violating any law or order from a police officer.  His arrest was totally without any probable cause.  He was held for approximately 33 hours.

122.     On August, 31, 2004, Steketee rode his bike to work.  After work he rode his bike to attend a play with friends on 54th Street between Eighth and Ninth Avenues.  After the play, he rode his bike home where he was going to meet his friends who had attended the play with him.  Steketee lives near the corner of 7th Street and 2nd Avenue.  When he got to the corner of 8th Street and 2nd Avenue he observed la large group of people on 2nd Avenue between 9th and 10th Street and he went to observe what was going on.  He rode up 2nd Avenue to 9th Street and when he saw that there were numerous police officers present he decided to leave and continue on to his home.  When he went to leave, he found his path blocked by a row of police officers, who refused to let him pass even though he explained to them that he was not part of whatever was going on and was on his way home.

123.     Shortly thereafter, he was arrested by a John Doe defendant.  He was handcuffed and his bike was confiscated.  He was charged with parading without a permit and two counts of disorderly conduct, notwithstanding the complete absence of any cause, let alone probable cause, to

arrest him for these or any other criminal charges. Although defendant Michael Balicki swore out the complaint against him, the first time Steketee saw Balicki was at Pier 57.

124.     Following his arrest, Steketee remained handcuffed for several hours, causing extreme pain, discomfort and numbness which persists to this day and for which he has sought medical attention. He was transported to Pier 57 where he was herded into extremely cold, overcrowded wire cages for many hours and where he had to sit or lie on the floors, which were contaminated and filthy, in order to rest or sleep. He was denied adequate toilet and sanitary facilities. He was also denied the right to contact his family or an attorney concerning his arrest.

125.     As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Steketee has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Wendy Stefanelli

126.     Plaintiff WENDY STEFANELLI is an artist and costume designer. She was arrested on August 31, 2004 , at approximately 8:30 p.m. on Park Avenue between 26th and 27th Street. At the time of her arrest, Stefanelli was not violating any law or order from a policy officer. Her arrest was totally without probable cause. She was held for approximately 45-50 hours.

127.     On August 31, 2004, Stefanelli had just gotten out of work and had met a friend for a drink. They were in the vicinity of Park Avenue and 26th Street when she observed people who appeared to be protesters walking on Park Avenue. They also observed a number of police officer in the same area. Shortly after Stefanelli began observing this scene, she saw a police officer pushing the head of one of the demonstrators whom the officer had apprehended very forcefully into the pavement. She went over to the officer and asked, "Please don't hurt this man."

128.    Following the above quoted statement, Stefanelli was arrested almost immediately by one or more of the DOE/ROE defendants.  The actual complaint against her states that defendant MELISSA ROMAN, acting on order from supervisory police officer defendant INGRAM, was the arresting officer, although it is plaintiff's belief that neither Roman nor Ingram was present when she was arrested nor did they ever observe her violate any law or regulation of the State or City of New York.

129.    Following her arrest, Stefanelli was subjected to excessively tight handcuffing on two occasions.  The first time was for 4 to 5 hours following her initial arrest and the second for several more hours when she was transported from Pier 57 to Central Booking.  The two periods of excessive handcuffing caused her extreme pain, discomfort and numbness.  She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Because the floors and walls were contaminated and filthy, Stefanelli was exposed to what she fears may be some illness related to exposure to toxic chemicals and substances.  She was denied adequate toilet and sanitary facilities.

130.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Stefanelli has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

**Plaintiff William Hobbs**

131.    Plaintiff WILLIAM HOBBS is employed as a real estate agent.  He was arrested on August 31, 2004 at approximately 9:00 p.m. on 35th Street between Fifth and Sixth Avenues.  At the time of his arrest, Hobbs was not violating any law or order from a policy officer.  His arrest was totally without probable cause.  He was held for approximately 36 hours.

132.     On August 31, 2004, Hobbs left his work and decided to observe the political protests which were occurring between Union Square and Herald Square.  After spending a couple hours in the Herald Square vicinity, he went to Herald Square, where he found himself on 35th Street, not far from Fifth Avenue.  He decided to go down 35th Street.  At some point when he was in between Fifth and Sixth Avenues, he observed rows of Doe and Roe police officers who were blockading 35th Street at both Fifth Avenue and Sixth Avenue.  Upon realizing that he was trapped, Hobbs asked for permission from Doe and Roe police officers to leave, but that was refused.

133.     Shortly thereafter, Hobbs was handcuffed and arrested by defendant Doe or Roe, although defendant RODRIQUEZ, Shield Number 21015,  was "assigned" as the arresting officer.  Defendant Rodriquez never saw the plaintiff engage in any of the alleged offenses he was accused of committing.

134.     Following his arrest, Hobbs remained handcuffed for many hours. He was transported to Pier 57 where he was herded into extremely cold, overcrowded wire cages for approximately 14 to 15 hours and where he had to sit or lie on the floor in order to rest or sleep.  Because the floor and walls were contaminated and filthy, Hobbs was exposed to what he fears may be some illness related to exposure to toxic chemicals and substances.  He was denied adequate toilet and sanitary facilities.

135.     As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Hobbs has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

**Plaintiff Julia Cohen**

136.     Plaintiff JULIA COHEN is an attorney in private practice in New York City.  She was

44

arrested on August 27, 2004 at approximately 8:45 p.m. at 34th Street and Seventh Avenue.  At the time of her arrest, Cohen was not violating any law or order from a police officer.  Her arrest was totally without any probable cause.  She was held in custody for approximately 16 hours.

137.   On August 27, 2004, Cohen was acting as a volunteer legal observer for the National Lawyers Guild ("NLG") at a mass bicycle event which included people demonstrating in connection with the RNC.  She was wearing a bright green baseball cap which identified her as a legal observer for the NLG.   Her function as a legal observer was to observe events, talk to representatives of the NYPD if necessary, observe arrests, take notes and report the names of persons arrested at mass protest situations, so that attorneys could provide legal assistance to those arrested.  Such observers were wearing bright green baseball caps and were both well known and readily identifiable to the NYPD and the defendants herein.  She was in the vicinity of a bicycle event and was standing with her bicycle on the northeast corner of 34th Street and Seventh Avenue immediately prior to her arrest.  She had observed arrests and was attempting to use her mobile phone to report the arrests to the NLG so that it could provide lawyers for those arrested.   As she was dong this, defendant STEVE CHOINSKI instructed her to put down her phone and she was handcuffed and arrested along with the participants in the bike event.  The only basis for this arrest was the fact that the plaintiff was acting as a legal observer and attempting to provide legal assistance for people who were being arrested.  There was, at no time, probable cause for her arrest.

138.   Following her arrest, Cohen remained handcuffed for several hours.  She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to set or lie on the floor in order to rest or sleep.  Because the floor and walls were contaminated and filthy, Cohen was exposed to what she fears may be some illness

related to exposure to toxic chemicals and substances.  She was denied adequate toilet and sanitary

facilities.

139.    As a direct and proximate result of the defendants' wrongful policies, practices,

customs and/or usages complained of herein, Cohen has suffered physical, mental and emotional

injury and pain, mental anguish, suffering, humiliation and embarrassment. She is also fearful of

offering her volunteer legal services to others in the future.

**Plaintiff Simon Harak**

140.    Plaintiff SIMON HARAK is a Jesuit Priest and an active member of the War

Resisters League.  He was arrested on August 31, 2004, between approximately 4:00 and 4:30 p.m.

at Fulton Street near the site of the former World Trade Center.  At the time of his arrest, Harak was

not violating any law or order from a police officer.  His arrest was totally without any probable

cause.  He was held for approximately 20-25 hours.

141.    On August 31, 2004, Father Harak was an active member of the War Resisters

League.  In that capacity, he and others had planned and announced a vigil at the site of the World

Trade Center for the afternoon of August 31, 2004.  After that vigil, the group planned to walk north

on Broadway to the vicinity of the RNC, where they planned to engage in further protest against the

domestic, foreign and military policies of the Bush government.  The group held its vigil at the site

of the World Trade Center and then assembled on Fulton Street to march up Broadway.   Prior to

beginning any march, the demonstrators negotiated with and were specifically told by NYPD officers

and supervisors that they would be allowed to march north from Fulton Street and Broadway toward

Madison Square Garden, the site of the RNC, so long as the participants walked two abreast, in order

to keep sidewalks clear, and did not block traffic at intersections.  A videotape of the event

46

specifically shows police officials informing demonstrators that the march could proceed in the fashion described above.

142.   Almost immediately after the march began and before it had even proceeded one full block, NYPD officers and supervisors, on the orders of defendant Assistant Chief Terence Monahan, halted the march, surrounded over 200 people, again utilizing the orange nets, and arrested them all, even though they had remained on the public sidewalk, were not blocking the sidewalk, and had made every effort to comply with police instructions.  Those arrested were given no meaningful opportunity to disperse.  At the time that plaintiff HARAK was arrested by defendant, Police Officer MICHAEL FILOSETA, there was absolutely no cause, let alone probable cause, to arrest him.  All charges against those arrested at this location were subsequently dropped by the Manhattan District Attorney.

143.   Following his arrest, Father Harak was handcuffed and transported to Pier 57.  The handcuffs were left on for many hours, causing him extreme pain and discomfort.  At Pier 57, he was herded into extremely cold, overcrowded wire cages for many hours where he had to sit or lie on the floor in order to rest or sleep.  Because the floor and walls were contaminated and filthy, Father Harak was exposed to what he fears may be some illness related to exposure to toxic chemicals and substances.  He was denied adequate toilet and sanitary facilities.

144.   As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Harak has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

**Plaintiff Sonia Chandra**

145.   Plaintiff SONIA CHANDRA is a production assistant at Time, Inc.  She was arrested

on August 31, 2004, at approximately 7:00 p.m. on 16th Street between Union Square East and Irving

Place. At the time of her arrest, Chandra was not violating any law or order from a police officer.

Her arrest was totally without any probable cause. She was held for approximately 35-40 hours.

146.    On the evening of her arrest, Chandra had left work to meet a friend in the Union

Square area for a drink. When she got there she heard a band on 16th Street between Union Square

East and Irving Place. She and her friend, plaintiff CELINE MALANUM, walked over to 16th Street

to observe. There were between 50-100 RNC protesters peacefully gathered at the same place. As

she got to Irving, she was not allowed to proceed further due to a line of DOE and ROE defendants

on motor scooters, blocking her way and refusing to allow her to proceed. She the turned back and

found her way blocked at Union Square, by more DOE/ROE defendants, NYPD officers. She, and

others, were ordered to sit on the sidewalk where they were handcuffed.   There was no cause, let

alone probable cause for her arrest. Nonetheless, she was arrested by defendant KEVIN SAM.

147.    Following her arrest, Chandra was subjected to excessively tight handcuffing, for

many hours, causing numbness, pain, and extreme discomfort. She was transported to Pier 57 where

she was herded into extremely cold, overcrowded wire cages for many hours and where she had to

sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, she

was forced to have contact with and to breathe in potentially hazardous chemicals and dirt. She was

also denied adequate toilet and sanitary facilities. Upon leaving Pier 57 to be transported to Central

Booking where she was again subjected to excessively tight handcuffing, for many hours, causing

numbness, pain, and extreme discomfort. Further, during the time she was incarcerated, she was

subjected to sexual harassment by defendants DOEs and ROEs.

148.    In addition, Chandra was denied of medical care and medication for her chronic

asthma condition.  As a result of being denied her inhaler, she had extreme difficulty breathing for many hours and continues to suffer from respiratory symptoms as a result.

149.     As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Chandra has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Celine Malanum

150.     Plaintiff CELINE MALANUM is a student and works in a restaurant.  She was arrested on August 31, 2004, at approximately 7:00 p.m. on 16th Street between Union Sqaure East and Irving Place.  At the time of her arrest, Malanum was not violating any law or order from a police officer.  Her arrest was totally without any probable cause.  She was held for approximately 35-40 hours.

151.     On the evening of her arrest, Malanum went to the Union Square area to meet her friend plaintiff SONIA CHANDRA for a drink.  When she got there she heard a band on 16th Street between Union Square East and Irving Place.  She and her friend, plaintiff Malanum, walked over to 16th Street to observe.  There were between 50-100 RNC protesters peacefully gathered at the same place.  As she got to Irving, she was not allowed to proceed further due to a line of DOE and ROE defendants on motor scooters, blocking her way and refusing to allow her to proceed.  She the turned back and found her way blocked at Union Square, by more DOE/ROE defendants, NYPD officers.  She, and others, were ordered to sit on the sidewalk where they were handcuffed.   There was no cause, let alone probable cause for her arrest.  Nonetheless, she was arrested by defendant KEVIN SAM.

152.     Following her arrest, Malanum was subjected to excessively tight handcuffing, for

many hours, causing numbness, pain, and extreme discomfort.  She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals and dirt.  She was also denied adequate toilet and sanitary facilities.  There were far too few toilets for the numerous people held in the various cages where she was held and often no place to wash or cleanse herself of the filth and toxic chemicals and other substances that were in the cages even before prisoners were placed there.  As a result, she was unable to touch her eyes, as she needed to do, in order to remove her contact lenses. Further, she was subjected to sexual harassment by defendants DOEs and ROEs.

153.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Malanum has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### **Plaintiff Erika Biddle**

154.    Plaintiff ERIKA BIDDLE is employed as an editor and proofreader and is also a freelance editor and videographer.  She was arrested on August 31, 2004, at approximately 7:00 p.m. on 16th Street between Union Sqaure East and Irving Place.    At the time of her arrest, Biddle was not violating any law or order from a police officer.  Her arrest was totally without any probable cause.  She was held for approximately 50 - 52 hours.

155.    During the RNC, and on August 31, 2004, Biddle volunteered as a legal observer during the anticipated protests.  Her duties primarily consisted of observing and videotaping the protest activities and interactions between the protesters and the police.  On the evening in question

she received a phone call requesting that she go and observe activities in the Union Square area. When she arrived at the Union Square area she commenced videotaping a large group of people who were going north on Union Square East. On 16th Street between Union Square East and Irving she was surrounded by police officers and prevented from leaving the area as the NYPD had blocked off 16th Street at Irving Place and at Union Square East.

156.    Shortly thereafter, Biddle was arrested by defendant police officer BAITY, who had no cause whatsoever to arrest her, let alone probable cause.

157.    Following her arrest Biddle was subjected to excessively tight handcuffing, which caused numbness, pain, discomfort and discoloration and injury to her wrist. She was transported to Pier 57 where she was herded into extremely overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. As a consequence she stood throughout the many hours that she was housed at Pier 57. Since the plaintiff's right leg is partially amputated, this imposed a great strain on plaintiff's residual limb which resulted in swelling and/or edema.

158.    Further, as a result of her perceived disability, she was subjected to degrading and humiliating actions on the part of the defendants and their agents, including but not limited to, derogatory remarks, such as being repeatedly referred to as a "crip," a more intrusive and aggressive personal search and pat-down and isolation from other detainees. Because the floor and walls were contaminated and filthy, Biddle dermatitis and/or chemical burns on and around her face. She was also denied adequate toilet and sanitary facilities.

159.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Biddle has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

**Plaintiff Diana Raimondi**

160.     Plaintiff DIANA RAIMONDI is a children's librarian. She  was arrested on August 31, 2004, at approximately 4:00 to 4:30 p.m, on Fulton Street, between Church Avenue and Broadway, near the site of the World Trade Center.  At the time of her arrest, Raimondi was not violating any law or order from a police officer.  Her arrest was totally without any probable cause. She was held for approximately 50-52 hours.

161.     On the day of her arrest, Raimondi decided to the RNC by attending a vigil at the site of the World Trade Center scheduled for that afternoon.  After that vigil, the group assembled on Fulton Street, between Church Avenue and Broadway, to march up Broadway, which they had been explicitly permitted to do by one of the Defendants ROE, who was responsible for NYPD operations at that time and location.   Suddenly another  ROE  defendant  screamed  and  NYPD  officers surrounded the group, including the plaintiff RAIMONDI, as well as non-protesting bystanders, with plastic orange netting and proceeded to handcuff everyone and transport them to Pier 57.  At no time was the group or the plaintiff RAIMONDI ever ordered to disperse.  At the time that plaintiff RAIMONDI was arrested by defendant police officer BOYLE, there was absolutely no cause, let alone probable cause, to arrest her.

162.     Following her arrest, Raimondi was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort.  She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals.  She was also denied adequate toilet and sanitary facilities.

163.   As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Raimondi has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Rachel Heinold

164.   Plaintiff RACHEL HEINOLD teaches art at SUNY New Paltz. She was arrested on August 31, 2004, at approximately 8:30 to 9:00 p.m., at 34th Street and Broadway. At the time of her arrest, Heinold was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 36 hours.

165.   Before her arrest, plaintiff HEINOLD was attempting to protest the RNC by chanting political statements. She was standing on the sidewalk at all times and never blocked vehicular or pedestrian traffic. At all times, she followed the directions of NYPD police officers. At no time was the group or the plaintiff RAIMONDI ever ordered to disperse. Indeed when it appeared that police officers were massing in the area she attempted to leave but was unable to do so. She was arrested by defendant DOE, badge #19599, who at no time had any cause whatsoever to arrest her, let alone probable cause.

166.   Following her arrest, Heinold was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort. She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep. Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals. She was also denied adequate toilet and sanitary facilities.

167.   As a direct and proximate result of the defendants' wrongful policies, practices,

53

customs and/or usages complained of herein, Heinold has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Noah Charney

168.     Plaintiff NOAH CHARNEY is a physics teaching fellow at Amherst College.  He was arrested on August 31, 2004 at approximately 8:30 to 9:30 p.m. at 34th Street and Broadway.  At the time of his arrest, Charney was not violating any law or order from a police officer.  Her arrest was totally without any probable cause He was held for approximately 48 hours.

169.     Before his arrest, plaintiff CHARNEY attempting to protest the RNC by chanting political statements.  He was standing on the sidewalk at all times and never blocked vehicular or pedestrian traffic.  At all times, he followed the directions of NYPD police officers.  At no time was the group or the plaintiff CHARNEY ever ordered to disperse.  Indeed when it appeared that police officers were massing in the area he attempted to leave but was unable to do so.  He was arrested by defendant DOE, who at no time had any cause whatsoever to arrest her, let alone probable cause.

170.     Following his arrest, Charney was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort.  He was transported to Pier 57 where he was herded into extremely cold, overcrowded wire cages for many hours and where he had to sit or lie on the floor in order to rest or sleep.  Given the filthy condition of the floor and walls, he was forced to have contact with and to breathe in potentially hazardous chemicals.  He was also denied adequate toilet and sanitary facilities.

171.     As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Charney has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

54

**Plaintiff Stacy Cotler**

172.    Plaintiff STACY COTLER works for a Jewish service organization in New York City. She was arrested on August 31, 2004, at approximately 8:30 p.m., on Park Avenue at or near 27th Street. At the time of her arrest, Cotler was not violating any law or order from a police officer. Her arrest was totally without any probable cause. She was held for approximately 45 hours.

173.    Before her arrest, Cotler was walking with three friends on the sidewalk on Park Avenue when they observed numerous police officers running down the street. Cotler and her friends stopped to ascertain and observe the situation, but quickly became afraid of the police, who were acting aggressively toward them for no reason. In an attempt to avoid any confrontation, Cotler and her friends stepped into the doorway of a nearby building. Without any basis for suspecting that Cotler and her friends were engaging or were about to engage in criminal activity, NYPD officers DOE/ROE surrounded them and began violently shoving them, along with others. When ordered by an NYPD supervisor ROE to let Cotler and the others go, the DOE officers told them to "get the fuck out." As Cotler and the others attempted to comply, the officers began assaulting and battering them. One DOE/ROE officer hit Cotler several times in the back with a night stick. Upon being ordered again by an NYPD supervisor ROE to let the individuals leave, the DOE officers simply continued their wholly unjustified battery of Cotler and others. One DOE officer grabbed Cotler by the hair and threw her to the ground, and handcuffed her. There was absolutely no cause, let alone probable cause, for her arrest, and the force used against her was unreasonable and excessive given the circumstances then and there prevailing.

174.    Following her arrest, Cotler was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort. She was transported to Pier 57 where she

55

was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals.  She was also denied adequate toilet and sanitary facilities.

175.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Cotler has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Emily Friedman

176.    EMILY FRIEDMAN, the minor daughter of plaintiffs BARBARA and LEONARD FRIEDMAN, by whom she is acting herein, is a 16-year-old student at Fiorello H. LaGuardia High School of Music & Art and Performing Arts in Manhattan.  EMILY FRIEDMAN was arrested on August 31, 2004, between 7:00 and 8:00 p.m., on 16th Street between Union Square East and Irving Place.  At the time of her arrest, Friedman was not violating any law or order from a police officer.  Her arrest was totally without any probable cause.  She was held for approximately 45-50 hours.

177.    Along with scores of other individuals, including those protesting the RNC as well as observers and bystanders, all of whom were peacefully gathered in the area, EMILY FRIEDMAN was trapped on 16th Street between Union Square East and Irving Place by lines of DOE/ROE defendants at either end of the block.  EMILY FRIEDMAN and others were ordered to and did sit on the sidewalk, where they were handcuffed.  There was absolutely no cause, let alone probable cause, for her arrest.

178.    Following her arrest, Friedman was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, extreme discomfort, and injury to her wrists and shoulder.  She

was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals and dirt, and suffered rashes.  She was also denied adequate toilet and sanitary facilities.   Her repeated requests to contact her parents were denied.

179.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Emily Friedman has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff Shahrzad Ghahremani

180.    Plaintiff SHAHRZAD GHAHREMANI, a minor acting herein through her father and natural guardian ALI GHAHREMANI, is a 15 year old high school student.  She was arrested on August 31, 2004, approximately between 8:30 and 9:00 p.m.  At the time of her arrest, Ghahremani was not violating any law or order from a police officer.  Her arrest was totally without any probable cause.  She was held in custody for approximately four hours.

181.    At the time of her arrest, SHAHRZAD GHAHREMANI was on her way to a movie with a friend.  The movie was playing at a theater on 34th Street between 8th and 9th Avenue.  When Ghahremani and her friend arrived at 34th Street and 6th Avenue they observed a group of protesters on the sidewalk.  When she asked a police officer where she could go to avoid the protest, she was instructed to go north on 6th Avenue.  However when they attempted to get away from that intersection, NYPD police officer defendant DOE officers refused to allow them to leave and arrested them.  Ghahremani was taken to Pier 57 where she remained several hours and from there taken to a juvenile detention facility where she was released to her father.  She was never charged

with a crime or violation and there was absolutely no cause, let alone probable cause for her arrest.

182.    Following her arrest, Ghahremani was subjected to excessively tight handcuffing. She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages. While at Pier 57, Ghahremani was denied medical care or attention, despite the fact that as a diabetic she needed insulin.  Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals.  She was also denied adequate toilet and sanitary facilities.

183.    As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Ghahremeni has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

### Plaintiff William Steyert, Jr.

184.    Plaintiff WILLIAM STEYERT JR. is a 61 year old disabled Vietnam veteran.  He was arrested on August 31, 2004 on Fulton Street between Church Street and Broadway.  At the time of his arrest, Steyert was not violating any law or order from a police officer.  His arrest was totally without any probable cause.  He was held in custody for approximately 16 -17 hours.

185.    On the day of his arrest, Steyert wished to engage in peaceful protest against the RNC. As a result he attended a vigil at the site of the World Trade Center.  After that vigil, he planned to walk north on Broadway where, when he arrived at the vicinity of the RNC, he intended to engage in further protest against the domestic, foreign and military policies of the Bush government.  The group held its vigil at the site of the World Trade Center and then assembled on Fulton Street to march up Broadway which they had been explicitly told by one of the Defendants ROE, who responsible for NYPD operations at that time and location, that they were permitted to do.  Suddenly

58

another ROE defendant shouted "Arrest them all!" At this point the NYPD surrounded the group, including the plaintiff STEYERT, as well as non-protesting bystanders, with plastic orange netting and proceeded to handcuff everyone and transport them to Pier 57. At the time that plaintiff STEYERT was arrested by defendant, one of the Police Officer DOES, there was absolutely no cause, let alone probable cause, to arrest him.

186. Following her arrest, Steyert was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort. He was transported to Pier 57 where he was herded into extremely cold, overcrowded wire cages for many hours and where he was unable to sit or rest, due to the filthy and potentially toxic conditions of the floor. Given the filthy condition of the floor and walls, he was forced to have contact with and to breathe in potentially hazardous chemicals. He was also denied adequate toilet and sanitary facilities.

187. As a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein, Steyert has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

**Plaintiff Christopher A. Thomas**

188. Plaintiff CHRISTOPHER A. THOMAS is a 55 year old art history professor at the University of Victoria in Victoria, British Columbia, Canada. He is a noted scholar of American Art History and is the author of the standard history book on the subject of the Lincoln Memorial entitled *The Lincoln Memorial and American Life.*. He was arrested on August 31, 2004 at approximately 6:00 p.m. in front of the New York Public Library, at 42nd Street and Fifth Avenue. At the time of his arrest, Thomas was not violating any law or order from a police officer. His arrest was totally without any probable cause. He was held in custody for approximately 15 to 16 hours.

189.     On August 31, 2004, Thomas and his eighteen year old son were visiting New York City on vacation, and, after visiting the Empire State Building in route to the subway to leave for Yankee Stadium, where they had tickets to the ball game, they walked past the New York Public Library at Fifth Avenue and 41st Street so his son could photograph the library.  As Thomas and his son approached the front steps to the Library around 6:00 p.m., they stopped to observe some activity between police officers and RNC demonstrators on the Library's high treed plaza.  Standing with other onlookers in disbelief and observing the police arrest demonstrators with what appeared to be unnecessary force, Thomas was approached by a police officer who shouted, "Get outta here, you're blockin' the street."  Thomas was not blocking the street and noted to the officer that the officer was "blocking the steps" to the Library to which the officer instantly replied, "That's it! You're under arrest.  You're goin' in, you're a collar."

190.     Thomas explained to the officer that he was a tourist from Canada with his young son who was unfamiliar with New York City and requested that he be permitted to speak with his son to insure his safety, which request was denied.

191.     Following his arrest, Thomas was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort.  He was transported to Pier 57 where he was herded into extremely cold, overcrowded wire cages for many hours and where he was unable to sit or rest, due to the filthy and potentially toxic conditions of the floor.  Given the filthy condition of the floor and walls, he was forced to have contact with and to breathe in potentially hazardous chemicals.  He was also denied adequate toilet and sanitary facilities.  His repeated requests for permission to call his son were denied by the guards.

192.     As a direct and proximate result of the defendants' wrongful policies, practices,

customs and/or usages complained of herein, Thomas has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.  Further, although his speciality is American art history, he reasonably fears that this arrest will make it more difficult to cross the border and thereby engage in his profession.

### Plaintiff Kate Esposito

193.    Plaintiff KATE ESPOSITO, a 50-year-old counselor at a women's shelter, was arrested on August 31, 2004 on Broadway just south of 28th Street.  At the time of his arrest, Thomas was not violating any law or order from a police officer.  His arrest was totally without any probable cause.  She was held for approximately 45 -50 hours.

194.    Unlike almost all of the plaintiffs and those similarly situated, Esposito was engaging in civil disobedience at the time of her arrest.  She was lying down in the street, intentionally obstructing traffic in order to convey her message of opposition to the RNC and the policies of the current administration.  She agrees that there was probable cause to arrest her.  Nonetheless, she was held far longer than was necessary or reasonable, and in cruel and inhumane conditions, as part of defendants' policies, practices and custom of punishing peaceful political protest.

195.    Following her arrest, Esposito was subjected to excessively tight handcuffing, for many hours, causing numbness, pain, and extreme discomfort.  She was transported to Pier 57 where she was herded into extremely cold, overcrowded wire cages for many hours and where she had to sit or lie on the floor in order to rest or sleep.  Given the filthy condition of the floor and walls, she was forced to have contact with and to breathe in potentially hazardous chemicals and dirt.  She was also denied adequate toilet and sanitary facilities.

196.    As a direct and proximate result of the defendants' wrongful policies, practices,

customs and/or usages complained of herein, Esposito has suffered physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

197.    The plaintiffs reiterate paragraph 1 through 196 and incorporate such by reference herein.

198.    By implementing, enforcing, encouraging, sanctioning and/or ratifying policies, practices and/or customs to punish peaceful protest during the RNC by, *inter alia,* engaging in mass arrests which were unlawful and without probable cause, instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC, and subjecting those arrested to intolerable and cruel and inhumane conditions, the defendants, acting under pretense and color of state law and in their individual and official capacities and within the scope of their employment and have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

199.    As a direct and proximate result of the misconduct and abuse of authority described above, each and every plaintiff and members of the plaintiff class have suffered and will continue to suffer injury and damages including, *inter alia*, physical and mental  pain, suffering and mental anguish.

200.    If the defendants' policies, practices and/or customs to punish mostly peaceful protest are not enjoined, the named plaintiffs and the members of the plaintiff class will be subjected to

immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiff class will suffer continued violations of their rights under the First and Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION

201.    The plaintiffs reiterate paragraph's 1 through 200 and incorporate such by reference herein.

202.    By implementing, enforcing, encouraging, sanctioning and/or ratifying policies, practices and/or customs to punish peaceful protest during the RNC by, *inter alia,* engaging in mass arrests which were unlawful and without probable cause, instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC, and subjecting those arrested to intolerable and cruel and inhumane conditions, the defendants, acting under pretense and color of state law and in their individual and official capacities and within the scope of their employment and have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983.

203.    As a direct and proximate result of the misconduct and abuse of authority described above, each and every plaintiff and members of the plaintiff class have suffered and will continue to suffer injury and damages including, *inter alia*, physical and mental  pain, suffering and mental anguish.

204.    If the defendants' policies, practices and/or customs to punish mostly peaceful protest are not enjoined, the named plaintiffs and the members of the plaintiff class will be subjected to

immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiff class will suffer continued violations of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### THIRD CAUSE OF ACTION

205.     The plaintiffs reiterate paragraph's 1 through 204 and incorporate such by reference herein.

206.     By implementing, enforcing, encouraging, sanctioning and/or ratifying policies, practices and/or customs to punish peaceful protest during the RNC by, *inter alia,* engaging in mass arrests which were unlawful and without probable cause, instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC, and subjecting those arrested to intolerable and cruel and inhumane conditions, the defendants, acting under pretense and color of state law and in their individual and official capacities and within the scope of their employment and have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983.

207.     As a direct and proximate result of the misconduct and abuse of authority described above, each and every plaintiff and members of the plaintiff class have suffered and will continue to suffer injury and damages including, *inter alia*, physical and mental  pain, suffering and mental anguish.

208.     If the defendants' policies, practices and/or customs to punish mostly peaceful protest are not enjoined, the named plaintiffs and the members of the plaintiff class will be subjected to

immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiff class will suffer continued violations of their rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

### FOURTH CAUSE OF ACTION

209.    The plaintiffs reiterate paragraph's 1 through 208 and incorporate such by reference herein.

210.    By implementing, enforcing, encouraging, sanctioning and/or ratifying policies, practices and/or customs to punish peaceful protest during the RNC by, *inter alia,* engaging in mass arrests which were unlawful and without probable cause, instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC, and subjecting those arrested to intolerable and cruel and inhumane conditions, the defendants, acting under pretense and color of state law and in their individual and official capacities and within the scope of their employment and have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of rights guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

211.    As a direct and proximate result of the misconduct and abuse of authority described above, each and every plaintiff and members of the plaintiff class have suffered and will continue to suffer injury and damages including, *inter alia*, physical and mental  pain, suffering and mental anguish.

212.    If the defendants' policies, practices and/or customs to punish mostly peaceful protest are not enjoined, the named plaintiffs and the members of the plaintiff class will be subjected to

immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiff class will suffer continued violations of their rights under the Fourteenth Amendment to the United States Constitution.

## FIFTH CAUSE OF ACTION

213.    The plaintiffs reiterate paragraphs 1 through 212 and incorporate such by reference herein.

214.    The actions and conduct and the policies, practices and customs of the defendants in subjecting the individually named plaintiffs to false arrest, malicious prosecution, malicious abuse of criminal process, excessive and unreasonable force, including excessive and unreasonable handcuffing, and excessive and unreasonable seizure, excessive detention, cruel and inhumane conditions of detention, denial of medical care, denial of access to counsel, and/or failure to accommodate disabilities, violated the plaintiffs' constitutional and civil rights as guaranteed under the Civil Rights Act of 1871, 42 U.S.C. §1983, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

215.    As a direct and proximate result of the misconduct and abuse of authority described above, each of the individually named plaintiffs has suffered and will continue to suffer injury and damages including, *inter alia*, physical and mental  pain, suffering and mental anguish.

**WHEREFORE**, plaintiffs respectfully requests that this Court:

A.    Enter an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23 (a), (b)(2) and (b)(3) for the plaintiff class described herein and naming plaintiffs as the class representatives.

B.    Enter a judgment declaring that defendants' policies, practices and/or customs to

punish peaceful protest during the RNC by, *inter alia,* engaging in mass arrests which were unlawful and without probable cause, instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC, and subjecting those arrested to intolerable and cruel and inhumane conditions, are unconstitutional.

C.      Issue an order enjoining defendants' policies, practices and/or customs to punish peaceful protest during the RNC by, *inter alia,* engaging in mass arrests which were unlawful and without probable cause, instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC, and subjecting those arrested to intolerable and cruel and inhumane conditions.

D.      Award the named plaintiffs and members of the plaintiff class compensatory damages in an amount to be determined at trial.

E.      Award the named plaintiffs and members of the plaintiff class punitive damages against the individual defendants in an amount to be determined at trial.

F.      Award the named plaintiffs and members of the plaintiff class reasonable attorneys' fees and costs.

G.      Grant such other and further relief as this Court shall find as appropriate and just.

Dated:      New York, New York
            November 22, 2004

                                    Respectfully submitted,

                                    _____
                                    JONATHAN C. MOORE (JM 6902)
                                    WILLIAM H. GOODMAN (WG 1241)
                                    DAVID MILTON (DM 1853)
                                    MOORE & GOODMAN, LLP
                                    740 Broadway at Astor Place

New York, New York 10003
(212) 353-9587

OF COUNSEL:

Daniel L. Alterman, Esq.
Alterman & Boop, P.C.
35 Worth Street
New York, New York 10013
(212) 226-2800

Bruce K. Bentley, Esq.
National Lawyers Guild
New York City Chapter
143 Madison Avenue, 4th Floor
New York, New York 10016
(212) 679-6018

Bradford D. Conover, Esq.
Conover Law Offices
800 Third Ave (30th Fl)
New York, New York 10022
(212) 588-9080

Elizabeth M. Fink, Esq.
Margaret Ratner Kunstler, Esq.
13 Gay Street
New York, New York 10014
(718) 783-3682

Jeffrey Fogel, Esq.
Rachel Meeropol, Esq.
Center for Constitutional Rights
666 Broadway - 7th Floor
New York, New York   10003
(212) 614-6427

Yetta G. Kurland, Esq.
The Law Office of Yetta G. Kurland
304 Park Avenue South  - Suite 207
New York, New York 10010
(212) 253-6911

Alan Levine, Esq.

c/o PRLDEF
99 Hudson St. - 14th Floor
New York, New York   10013

Alan D. Levine, Esq.
80-02 Kew Gardens Road - Suite 1010
Kew Gardens, NY 11415
(718) 793-6363

Daniel L. Meyers, Esq. (DLM 1496)
350 Broadway -  Suite 308
New York, New York 10013
(212) 226-4106

James I. Meyerson, Esq.
396 Broadway - Suite 601
New York, New York   10013
(212) 226-3310

Gideon Orion Oliver, Esq.
Oliver & Oliver
c/o 328 East 11th Street #3
New York, New York  10003
(646) 602-9242

Shebitz Berman & Cohen
800 Third Avenue, 30th Floor
New York, New York   10022
(212) 832-2797

Martin Stolar, Esq
351 Broadway
New York, New York 10013
(212) 219-1919

Susan Taylor, Esq.
575 Madison Avenue
New York, New York   10022
(212) 605-0305

Rose Weber, Esq.
225 Broadway
New York, New York   10007
(212) 758-3355