```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
DEIRDRE MACNAMARA, DEEPA MAJMUDAR, : 04 Civ. 9612 (KMK) (JCF)
ELIZABETH FLEISCHMAN, REBECCA      :
STONEBACK, JASON BARRUS, CHRIS     :
KORNICKE, RANDALL STEKETTE, WENDY  :
STEFANELLI, DANIELLE WALSH,        :
WILLIAM HOBBS, JULIA COHEN, SIMON  :
HARAK, SONIA CHANDRA, CELINE       :
MELANUM, ERIKA BIDDLE, DIANA       :
RAIMONDI, RACHEL HEINOLD, NOAH     :
CHARNEY, STACY COTLER, BARBARA and :
LEONARD FRIEDMAN, as parents and   :
natural guardians of EMILY         :
FRIEDMAN, a minor, ALI GHAHREMANI, :
as parent and natural guardian of  :
SHAHRZAD GHAHREMANI, WILLIAM       :
STEYERT, JR., CHRISTOPHER THOMAS,  :
KATE ESPOSITO, individually, and   :
on behalf of a class of all others :
similarly situated,                :
                                   :
                Plaintiffs,        :        MEMORANDUM
                                   :        AND  ORDER
                                   :
      - against -                  :
                                   :
THE CITY OF NEW YORK, a municipal  :
entity; MICHAEL BLOOMBERG, Mayor   :
of the City of New York; RAYMOND   :
KELLY, New York City Police        :
Commissioner; JOSEPH ESPOSITO,     :
Chief of Department, New York City :
Police Department; THOMAS GRAHAM,  :
Commander, Disorders Control Unit, :
New York City Police Department;   :
BRUCE SMOLKA, Assistant Chief,     :
Patrol Borough Manhattan South;    :
TERRENCE MONAHAN, Deputy Chief,    :
Patrol Borough Bronx; JOHN J.      :
COLGAN, Deputy Chief and           :
Commanding Officer, Pier 57; New   :
York Police Supervisor MICHAEL     :
INGRAM; New York Police Supervisor :
ROMAN; New York City Police        :
Officers MONA PHILLIPS, NELSON     :
RODRIGUEZ, Shield No. 21015,       :
```

1

```
MICHAEL FILOSETA, KEVIN SAM,        :
STEVEN CHOINSKI, TYRONE RIGGAN,     :
DAN MALLOY, BOYLE, DIEZ, Shield     :
No. 4285, MICHAEL BALICKI, ANTHONY  :
MASON, BAITY and MELISSA ROMAN;     :
New York City Police Supervisors    :
and Commanders RICHARD ROEs 1-50;   :
New York City Police Officers JOHN  :
DOEs 1-50, individually and in      :
their official capacities, jointly  :
and severally,                      :
                                    :
                    Defendants.     :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

        This case is one of many arising from the arrests of approximately 1,800 people during the Republican National Convention ("RNC") in New York City in the summer of 2004. The plaintiffs have sued individually and as representatives of a class of individuals who were arrested during the RNC, alleging, among other things, that they were arrested without probable cause pursuant to a policy of pre-emptive mass arrests, subjected to excessive force, detained in substandard conditions, and subjected to unnecessarily complex and time-consuming post-arrest processing.

        In June 2006, plaintiffs' counsel in the numerous RNC-related lawsuits made a consolidated request to the City of New York ("the City") for production of documents for all RNC arrestees, regardless of whether they are parties to these lawsuits. The City has produced or agreed to produce a number of these documents but objects to many of the plaintiffs' requests. The City also contends that New York Criminal Procedure Law ("CPL") § 160.50

prohibits the release of the names and arrest numbers of the approximately 1,200 non-party arrestees and has therefore redacted them from all documents produced thus far.

The plaintiffs now seek an order unsealing the names and arrest numbers of non-party arrestees and compelling the City to produce various categories of arrest-related documents for all 1,800 arrestees.  The plaintiffs also seek an order pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure compelling the New York County District Attorney's Office ("DANY"), which is not a party to this action, to produce certain documents pursuant to a subpoena delivered on May 31, 2006.

Background

A. Plaintiffs' Discovery Requests

In response to the plaintiffs' June 2006 consolidated request, the City produced a number of police logs, having redacted identifying information regarding non-party arrestees.  The City contends that CPL § 160.50 prohibits it from producing unredacted copies of these documents in the absence of a court order or authorization from the non-party arrestees themselves.[1]  (Letter of

---

[1] CPL § 160.50(1) provides, in relevant part, that "[u]pon the termination of a criminal action or proceeding against a person in favor of such a person . . . all official records and papers . . . relating to the arrest or prosecution" shall be sealed, and shall "not [be] made available to any person or public or private agency . . . but only to the person accused or to such person's designated agent."  The purpose of the provision is to ensure "that one who is charged but not convicted of an offense suffers no stigma as a result of his having once been the object of an unsustained

3

Gerald S. Smith dated July 27, 2006 ("Smith 7/27/06 Letter"), attached as Exh. C to Letter of Jonathan C. Moore and Clare Norins dated Aug. 18, 2006 ("Moore and Norins 8/18/06 Letter"), at 2).

In addition to the logs, the plaintiffs also sought an additional 42 categories of documents for all party and non-party RNC arrestees. (Letter of Jonathan C. Moore and Clare Norins dated June 27, 2006 and E-mail of Jeffrey A. Rothman dated June 29, 2006, attached as Exh. B to Moore and Norins 8/18/06 Letter). The City agreed to produce several categories of printouts from the Booking/Arraignment/Disposition Inquiry System ("BADS") as well as the PASS Data Intake Sheets[2] (collectively, "the BADS/PASS documents") for all arrestees, but with identifying information regarding non-party arrestees redacted. (Smith 7/27/06 Letter at 1). The City also stated that it had produced or would produce a number of the other requested documents for party arrestees but that it would not produce these additional documents for non-party arrestees because "they contain information that is duplicative of the information contained in the documents . . . which Defendants have already agreed to produce." (Smith 7/27/06 Letter at 2). With regard to the remainder of the plaintiffs' requests, the City

---

accusation." <u>Matter of Hynes v. Karassik</u>, 47 N.Y.2d 659, 662, 419 N.Y.S.2d 942, 944 (1979).

[2] RNC arrestees were detained at three separate locations in Manhattan: PASS (Pier 57), MAPC (125 White Street), and MCS (100 Centre Street).

objected to production for party and non-party arrestees alike. (Defendants' Response to Plaintiffs' Consolidated Request for the Production of Documents ("Def. Resp."), attached as Exh. C to Moore and Norins 8/18/06 Letter).

    B. <u>DANY Subpoena</u>

On May 31, 2006, the plaintiffs delivered a subpoena on DANY seeking "[a]ll documents pertaining to individuals who were criminally charged and/or prosecuted by [DANY] in connection with" the RNC. (Subpoena, attached as Exh. A to Letter of Patricia J. Bailey dated Sept. 20, 2006 ("Bailey 9/20/06 Letter")).   The plaintiffs subsequently provided DANY with the specific arrest dates and locations for which it was seeking documents. (Letter of Clare Norins dated June 6, 2006, attached as Exh. B to Bailey 9/20/06 Letter).  On August 9, 2006, DANY objected to the subpoena on the grounds that it was overbroad and unduly burdensome, sought information not relevant to the plaintiffs' claims, and requested documents that had been sealed pursuant to CPL § 160.50.   DANY also noted that since the plaintiffs could not provide the names of non-party arrestees, DANY was unable to locate any documents relating to them. (Letter of Patricia J. Bailey dated Aug. 9, 2006 ("Bailey 8/9/06 Letter"), attached as Exh. C to Bailey 9/20/06 Letter).

The plaintiffs have now narrowed the scope of the subpoena to include only certain types of documents for each RNC arrestee.

5

These include four types of documents that the City has stated it is unable to produce, but which the plaintiffs believe may be contained in DANY's files,[3] and two types of documents allegedly created and maintained by DANY.[4]   (Letter of Clare Norins dated Sept. 28, 2006 ("Norins 9/28/06 Letter"), attached as Exh. D to Letter of Jonathan C. Moore and Clare Norins dated Oct. 10, 2006 ("Moore and Norins 10/10/06 Letter"), at 2).   DANY maintains that the subpoena remains unduly burdensome.   (Letter of Patricia J. Bailey dated Oct. 4, 2006 ("Bailey 10/4/06 Letter"), attached as Exh. E to Moore and Norins 10/10/06 Letter).   As a result, the plaintiffs seek an order pursuant to Rule 45(c)(2)(B) compelling DANY to produce the requested documents, and DANY has filed a motion to quash the subpoena in its entirety.

Discussion

   A. Motion to Unseal Names of Non-Party Arrestees

   DANY and the City take the position that they cannot release information sealed by the state criminal courts pursuant to CPL § § 160.50.   Accordingly, the plaintiffs have brought a motion to unseal the arrest records of non-party RNC arrestees.

   In its opposition to the plaintiffs' motion, the City

---

   [3] These are the Desk Appearance Tickets ("DAT"s), Polaroid Photos of Arresting Officers with each Arrestee, Decline to Prosecute Documents, and Prisoner Movement Slips.

   [4] These are the Criminal Court Complaint and the DA Data Sheet.

"appear[s] to imply that [this Court] should simply apply the statutory sealing provisions wholesale to bar [the] plaintiffs' [discovery] requests." Haus v. City of New York, No. 03 Civ. 4915, 2006 WL 1148680, at *2 (S.D.N.Y. April 24, 2006). However, automatic application of a state law privilege in a federal question case is inappropriate. "As an initial matter, it should be emphasized that New York State law does not govern discoverability and confidentiality in federal civil rights actions." Cruz v. Kennedy, No. 97 Civ. 4001, 1997 WL 839483, at *1 (S.D.N.Y. Dec. 19, 1997) (citing King v. Conde, 121 F.R.D. 180, 187 (E.D.N.Y. 1988)); accord Woodard v. City of New York, No. 99 Civ. 1123, 2000 WL 516890, at *3 (S.D.N.Y. March 10, 2000); Daniels v. City of New York, No. 99 Civ. 1695, 2001 WL 228091, at *1 (S.D.N.Y. March 8, 2001) (questions of privilege in federal question cases are governed by federal common law). Rather, the privilege created by CPL § 160.50 "must be construed narrowly, and 'must yield when outweighed by a federal interest in presenting relevant information to a trier of fact.'" Daniels, 2001 WL 228091, at *1 (quoting United States v. One Parcel of Property at 31-33 York Street, 930 F.2d 139, 141 (2d Cir. 1991)).

Certainly, CPL § 160.50 protects "important privacy interests, and 'a strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal

substantive and procedural policy.'" <u>King</u>, 121 F.R.D. at 187 (quoting <u>Lora v. Board of Education</u>, 74 F.R.D. 565, 576 (E.D.N.Y. 1977)).  However, state privilege rules should not be permitted to "frustrate the important federal interests in broad discovery and truth-seeking and the interest in vindicating important federal substantive policy such as that embodied in section 1983." <u>King</u>, 121 F.R.D. at 187.   This Court must therefore "balance the deference to be accorded [the privilege created by CPL § 160.50] with the need for the information sought to be protected by the privilege." <u>Daniels</u>, 2001 WL 228091, at *1.

The court addressed a similar problem in <u>Haus v. City of New York</u>, a case arising from arrests at a demonstration against the impending war in Iraq on February 15, 2003.  The plaintiffs in <u>Haus</u> asserted claims similar to those advanced here, and they requested that the City produce arrest documents for approximately 300 party and non-party arrestees.   The Court pointed out that the "overriding aim" of the sealing requirement of CPL § 160.50 is "to ensure confidentiality for people who are arrested and thereby to avoid attaching any public stigma to them," and found that this goal could be achieved by the redaction of identifying information regarding non-party arrestees.   <u>Haus</u>, 2006 WL 1148680, at *2 (citing <u>Harper v. Angiolillo</u>, 89 N.Y.2d 761, 766, 658 N.Y.S.2d 229, 232 (1997)).  The court noted, however, that "the federal courts, when addressing demands for production of . . . arrest documents,

8

have commonly rejected confidentiality arguments premised on [CPL § 160.50] even without redaction." <u>Haus</u>, 2006 WL 1148680, at *3 (citing cases).

The plaintiffs in this case contend that they need the names of non-party arrestees in order to assemble the arrest documents into a "time line" of each person's time in custody. This time line would assist them in substantiating their claim that the defendants implemented a needlessly complex and time-consuming arrest processing procedure during the RNC. (Letter of Jonathan C. Moore and Clare Norins dated Sept. 27, 2006 ("Moore and Norins 9/27/06 Letter") at 3). The plaintiffs have submitted examples of redacted arrest documents that support their claim that without the names and arrest numbers of the non-party arrestees, the documents "become merely a collection of disjointed, largely meaningless fragments of information."[5] (Moore and Norins 9/27/06 Letter at 4; Excerpts from Photo Intake Log, Telephone Call Logs, RNC DAT Release Log, and Court Detention Pen Record, attached as Exh. 7 to Moore and Norins 9/27/06 Letter). Furthermore, the plaintiffs point out that third parties, including DANY, cannot comply with

---

[5] The obvious alternative to releasing non-party arrestee names is a coding system, where each arrestee would be assigned a number and each document pertaining to that arrestee (including documents obtained from third parties) labeled with that number. Both parties agree, however, that the development of such a coding system would be unduly burdensome. (Moore and Norins 8/18/06 Letter at 5; Letter of Gerald S. Smith dated Sept. 15, 2006 ("Smith 9/15/06 Letter"), at 4 n.5).

the plaintiffs' subpoenas unless the plaintiffs can supply them with the names of non-party arrestees.[6] (Moore and Norins 8/18/06 Letter at 3; Bailey 9/20/06 Letter at 2; Letter of Shawn Kerby on behalf of the New York State Office of Court Administration ("OCA") dated June 23, 2006, attached as Exh. F to Moore and Norins 8/18/06 Letter, at 2 n.1).

The City cites Bryant v. City of New York, No. 99 Civ. 11237, 2000 WL 1877082 (S.D.N.Y. Dec. 27, 2000), and Fountain v. City of New York, No. 03 Civ. 4526, 2004 WL 1474695 (S.D.N.Y. June 30, 2004), in support of its argument that it should not be required to produce the names and arrest numbers of non-party arrestees. These cases are inapposite. In Bryant and Fountain, the plaintiffs sought the names of non-party arrestees in order to contact them about joining the action as plaintiffs or participating as witnesses. Bryant, 2000 WL 1877082, at *2-3; Fountain, 2004 WL 1474695, at *2. The court in Bryant expressed concern that permitting the plaintiffs' attorneys to contact non-party arrestees would burden the privacy rights created by CPL § 160.50. See Bryant, 2000 WL 1877082, at *2 (noting that "many of the arrestees might be upset [if contacted by the plaintiffs' lawyers], particularly if this information were to come to the attention of

---

[6] Although the Court in Haus ordered the City to produce redacted documents, it appears that the City produced the records in unredacted form so that the names could be provided to third parties to permit them to comply with the plaintiffs' subpoenas. (Moore and Norins 8/18/06 Letter at 6).

their family, friends, employers or co-workers").

In this case, however, the plaintiffs do not seek to contact non-party arrestees.[7]   (Moore and Norins 9/27/06 Letter at 4; Letter of Jonathan C. Moore and Clare Norins dated Oct. 31, 2006 ("Moore and Norins 10/31/06 Letter") at 10).   Rather, the plaintiffs need to know the names of non-party arrestees in order to decipher documents relevant to "both the appropriateness of class certification and the merits of [their] assertions that they were targeted for baseless arrests." Haus, 2006 WL 1148680, at *2. Therefore, unlike in Bryant and Fountain, the privilege created by CPL § 160.50 must yield to "the federal interest in presenting relevant information to a trier of fact."[8]

---

[7] DANY vigorously protests unsealing of non-party arrestees' records on the ground that "[w]ere . . . identifying data [such as addresses and other pedigree information] to be unsealed, there can be no question that plaintiffs will seek out such non-party arrestees to be a witness on behalf of plaintiffs or to ascertain whether they wish to participate in a class action suit, should the class be certified." (Bailey 10/24/06 Letter at 11).   However, this Order, which permits production of non-party arrestee documents on an attorneys'-eyes-only basis, should be understood to bar plaintiffs' counsel in the consolidated RNC cases from attempting to contact non-party arrestees for any purpose without permission from this Court.   There is therefore no need to redact addresses or other identifying information from the non-party arrestee documents produced either by DANY or the City.

[8] In balancing the privacy interests of the non-party arrestees against the federal interest in broad discovery of relevant information, it is relevant, though not dispositive, that the names of 1793 arrestees were published in the Village Voice in September 2004. ("The Honor Roll," attached as Exh. 6 to Moore and Norins 9/27/06 Letter).   See Woodard, 2000 WL 516890, at *5 (privacy concerns "hardly prepossessing" where names of non-party arrestees are known to all parties and events at issue are largely

As the plaintiffs point out, the burden on the legitimate privacy interests of the non-party RNC arrestees can be minimized by an "attorneys'-eyes-only" designation.  Accordingly, the plaintiffs' motion is granted, and the City is ordered to produce unredacted versions of the BADS/PASS documents and police logs that it has already produced or agreed to produce.  These documents shall be designated as "attorneys'-eyes-only."[9]  Names, arrest numbers, and other identifying information need not be redacted from any documents produced pursuant to this Order.

The plaintiffs also seek an order requiring the City to generate and produce a list of the names and arrest numbers of all RNC arrestees, which the plaintiffs would then provide to counsel for third parties to assist them in complying with the plaintiffs' subpoenas.  (Moore and Norins 8/18/06 Letter at 6).  The City is under no obligation to create such a list for the plaintiffs' use, see Washington v. Garrett, 10 F.3d 1421, 1437 (9th Cir. 1993); Universal Acupuncture Pain Services, P.C. v. State Farm Mutual Automobile Insurance Co., No. 01 Civ. 7677, 2002 WL 31309232, at *4 (S.D.N.Y. Oct. 15, 2002); however, if such a list already exists, the City is required to produce it.

---

a matter of public record).

[9]  This designation necessarily includes the plaintiffs' experts, as well as attorneys for third parties who require the names of non-party arrestees in order to comply with the plaintiffs' subpoenas.

B. <u>Motion to Compel Production by Defendants</u>

The plaintiffs have moved to compel production by the City of various different categories of arrest-related documents.  To the extent that the City objects to producing a particular type of document based on CPL § 160.50, that objection is overruled for the reasons discussed above.  However, the City asserts a number of other objections, which are addressed below.

1. <u>Online Booking System ("OLBS") Arrest Worksheets</u>

The OLBS Worksheets contain handwritten information regarding the  arresting or assigned officer's recollection of the events that preceded the arrest.  The information on the Worksheet is subsequently entered into the OLBS, often by someone other than the officer who filled out the worksheet.  (Moore and Norins 8/18/06 Letter at 7).  The City has produced OLBS Worksheets for named plaintiffs, but has refused to produce them for non-party arrestees.

The City contends that the plaintiffs' request for OLBS Worksheets for non-party arrestees is duplicative, since the information sought "can be found in the BADS documents which Defendants have already agreed to produce" for non-party arrestees. (Smith 9/15/06 Letter at 6).  The plaintiffs contend that "significant errors, edits and omissions" occur at the data entry stage, and that the information contained in the handwritten worksheets may therefore differ from that in the BADS computer

printouts, which contain only the information actually entered into the OLBS.  (Moore and Norins 9/27/06 Letter at 7).  The example cited by the plaintiffs (OLBS Worksheet, attached as Exh. J to Moore and Norins 8/18/06 Letter) supports this contention: there the officer's narrative of the events providing probable cause to arrest differs significantly from the narrative contained in the BADS printout.  Accordingly, the City is ordered to produce OLBS Worksheets for non-party arrestees as well as named plaintiffs, subject to the "attorneys'-eyes-only" designation described above.[10]

2. <u>Officer Activity Logs ("Memo Books")</u>

The City has already produced memo book entries for defendant officers.  However, the plaintiffs seek production of memo book entries from all of the approximately 360 arresting officers, in addition to the officers responsible for processing arrestees at the PASS and MAPC locations.  The City objects on the grounds that the plaintiffs' request is overbroad and unduly burdensome because the procedure for obtaining memo book entries from officers who are now assigned to numerous different commands is complicated and time-consuming.  (Smith 9/15/06 Letter at 7).

---

[10] The City also contends that the plaintiffs could obtain the same information contained in the OLBS Worksheets by deposing the arresting officers.  However, by the City's estimate, there were 360 arresting officers at the RNC demonstrations.  (Smith 9/15/06 Letter at 7).  Even assuming the officers would remember, more than two years later, precisely what they observed with respect to each arrestee, the production of 360 officers for deposition would likely constitute a far greater burden for the City than production of OLBS Worksheets for non-party arrestees.

The plaintiffs seek memo book entries from non-defendant officers on the grounds that they may contain information about the circumstances of arrests of non-party arrestees as well as the times at which certain events occurred during the course of the arrestees' detention. (Moore and Norins 9/27/06 Letter at 7-8). The plaintiffs have received or will receive memo book entries from defendant officers which will describe the arrests of almost 600 plaintiffs, as well as additional BADS/PASS documents and logs for all 1,800 arrestees, to assist them in proving their claims that the defendants implemented a policy of making arrests without probable cause and of detaining arrestees unnecessarily. Given the burden of production in this instance, the plaintiffs' request for memo book entries from non-defendant officers is unreasonably cumulative.

The plaintiffs also contend that the memo books may contain statements by officers that could constitute admissions of a party opponent. (Moore and Norins 9/27/06 Letter at 8). Such a vague assertion of potential relevance is insufficient to justify the burden of production. Finally, the plaintiffs allege that the memo books contain vehicle numbers that could be used to identify officers, currently named as "John/Jane Doe" defendants, who allegedly behaved abusively toward the plaintiffs when they were being transported by bus from one location to another. (Moore and Norins 9/27/06 Letter at 8). However, even assuming that the memo

15

books would allow the plaintiffs to determine the names of the officers who rode in each vehicle, it is likely that more than one officer rode on each bus, and the plaintiffs have not shown that the memo book entries would allow them to determine which of those officers actually engaged in abusive behavior.

The plaintiffs have not demonstrated that memo book entries from several hundred additional officers are sufficiently likely to provide additional relevant evidence to justify the significant burden of production. See Larsen v. City of New York, No. 04 Civ. 0665, 2005 WL 1020871, at *2 (S.D.N.Y. April 28, 2005) ("The request for the memo books of [over one hundred officers] is overbroad and only in particularized instances may contain information that is relevant or reasonably calculated to lead to the discovery of admissible evidence."); Fed. R. Civ. P. 26(b)(2) (discovery may be limited where burden or expense outweighs likely benefit). Therefore, the City is not required to produce memo book entries for officers not named as defendants.

### 3. Polaroid Photos of Arrestees

The plaintiffs allege that "one or more Polaroid photos were taken of each arrestee with the arresting or assigned officer either at the location of the arrest or at Pier 57, and a Mass Arrest Pedigree Label was affixed to the back." (Moore and Norins 8/18/06 Letter at 10-11). The City states, however, that these photographs, with affixed pedigree labels, were destroyed according

to standard New York Police Department ("NYPD") procedures.  The
City has agreed to produce any photographs of named plaintiffs
still in existence, but it objects to production of photographs of
non-party arrestees on the grounds that the plaintiffs have failed
to demonstrate their relevance.

The plaintiffs claim that the photographs are relevant because
(1) they "visually illustrate the diversity of the age, race and
other physically visible characteristics" of the RNC arrestees, (2)
they demonstrate the "physical cleanliness" of the arrestees when
they were taken into custody, which would show that they were not
responsible for the "oily, black substance that covered the floor
of Pier 57," and (3) they show whether the arrestees were free of
"skin irritations and rashes" prior to being detained at Pier 57.
(Moore and Norins 8/18/06 Letter at 11; Moore and Norins 9/27/06
Letter at 9).  It is difficult to imagine how the age, race, and
other physical characteristics of non-party arrestees are relevant
to the plaintiffs' claims, which do not include any claim of a
pattern or practice of discrimination on the basis of those
characteristics.  With respect to the "physical cleanliness" of the
arrestees, the issue seems to be whether the arrestees carried mud
or dirt into Pier 57 on their shoes.  (Excerpt from Deposition of
Emily Friedman, attached as Exh. N to Moore and Norins 8/18/06
Letter, at 453).  The photographs, which show arrestees from the
waist up, are unlikely to provide evidence that the arrestees'

shoes were clean. (Arrest Photo, attached as Exh. M to Moore and Norins 8/18/06 Letter). Finally, whether or not non-party arrestees suffered from skin irritations prior to being detained at Pier 57 is irrelevant to the plaintiffs' claims that they were exposed to chemical contaminants at that location.

The plaintiffs have failed to make a sufficient showing that their request for the photographs is reasonably calculated to lead to the discovery of admissible evidence. The City is therefore not required to produce either the remaining photographs of non-party arrestees or the pedigree labels affixed to the back of the photographs. The City is also not required to produce any record of the destruction of the photographs.

4. Prisoner Movement Slips

Prisoner Movement Slips (also known as "RNC CJB Movement Documents" or "Prisoner Production Sheets") contain a digital photo of the arrestee and a computerized notation of the date and time the image was taken. (Moore and Norins 8/18/06 Letter at 11). The documents are therefore relevant because they will assist the plaintiffs in reconstructing the time-line of each arrestee's time in detention.

While the City states that it has produced and will continue to produce any Prisoner Movement Slips that can be located for named plaintiffs, it also represents that these documents are not stored electronically and are destroyed as a matter of course. The

City objects to production of any Prisoner Production Sheets still in existence for non-party arrestees on the basis of CPL § 160.50. However, since I have determined that the records of non-party arrestees may be unsealed, the City must produce, in unredacted form, any Prisoner Movement Slips that can be located for non-party arrestees. These forms shall be maintained by the plaintiffs on an attorneys'-eyes-only basis.

The plaintiffs also seek a document known as the NYPD Prisoner Production to Arraignment Part Sheet for all arrestees. This document contains an NYPD employee's "estimate" of when an arrestee would be ready for arraignment. (Moore and Norins 8/18/06 Letter at 12). However, the actual time of each arrestee's arraignment is included in the BADS documents (Smith 9/15/06 Letter at 9), and a mere estimate of the time the arrestee would be ready for arraignment is unlikely to offer any significant additional information regarding delays in the arrest processing system. Therefore, the City shall not be required to produce the NYPD Prisoner Production to Arraignment Part Sheets.

    5. Documents Related to Department of Correction ("DOC")

The plaintiffs seek documents indicating which DOC employees drove which buses from the various arrest sites to Pier 57 and from Pier 57 to MAPC. The City states that the defendants are searching for any such documents and will produce them if they are located. The plaintiffs also ask that the City be compelled to produce

documents indicating the names and shift assignments of DOC personnel assigned to MAPC, 100 Centre Street, and Pier 57. Such documents may assist the plaintiffs in identifying and locating DOC personnel who allegedly made statements regarding the defendants' intent to detain arrestees for longer than necessary, or who participated in or witnessed mistreatment of arrestees at those locations. Therefore, to the extent that such documents exist, the City shall produce them.

The plaintiffs also request that the City be compelled to produce any paperwork completed by DOC personnel in connection with their RNC shift assignments. The plaintiffs do not set forth any basis for their assertion that such paperwork may document either DOC employees' interactions with arrestees or the conditions and length of the arrestees' confinement. The plaintiffs do not state what roles DOC personnel played at Pier 57, MAPC, or 100 Centre Street beyond transporting arrestees from one location to another, a task that is unlikely to generate paperwork containing the kind of statements sought by the plaintiffs. Furthermore, to the extent that DOC employees engaged in or witnessed harassment of arrestees, it seems unlikely that such comments or behavior would have been documented in the sort of routine paperwork sought by the plaintiffs. Therefore, the City shall not be required to produce paperwork completed by DOC personnel in connection with their RNC shift assignments.

### 6. Documents Related to Medical Treatment

The plaintiffs seek RNC Medical Triage Forms and Medical Treatment of Prisoner Forms for all 1,800 arrestees.  These documents contain information about symptoms reported by arrestees and any treatment provided to them.  (Moore and Norins 8/18/06 Letter at 13).  The City contends that the plaintiffs' request for these forms is not reasonably calculated to lead to the discovery of admissible evidence.  However, evidence that numerous arrestees complained of skin irritations or respiratory problems would support the plaintiffs' allegations that Pier 57 was unsafe for use as a detention facility and that the plaintiffs' own symptoms resulted from confinement at the Pier.  The forms would also reveal how many arrestees complained of injury or pain resulting from the defendants' use of flexicuffs, which is relevant to the plaintiffs' claim that the defendants intentionally implemented a policy of "excessive and unnecessary handcuffing."  (First Amended Class Action Complaint, ¶ 82).

According to the City, the RNC Medical Triage Forms are completed and kept by the New York City Health and Hospitals Corporation ("HHC").  However, the Triage Form indicates that one copy is for HHC, one copy is for the detainee, and one copy is for the "file."  (RNC Medical Triage Form for Detainees, attached as Exh. S to Moore and Norins 8/18/06 Letter).  The plaintiffs allege that this "File Copy" may refer to the NYPD file.  Therefore, the

City shall produce an affidavit from a knowledgeable NYPD official indicating whether the Medical Triage Forms are kept solely by HHC and whether any copies remain in the custody of the NYPD.

The City states that it has produced Medical Treatment of Prisoner Forms for plaintiffs whose claims include allegations of inadequate medical attention.  (Smith 9/15/06 Letter at 9 n.11).  Because the forms are relevant to the plaintiffs' claims, as described above, the City is ordered to produce any Medical Treatment of Prisoner Forms that relate to non-party arrestees.  These forms shall be maintained by the plaintiffs on an attorneys'-eyes-only basis.[11]  The City shall also produce any such forms, if they exist, for plaintiffs whose claims do not include allegations of inadequate medical attention.

7. Prisoner Property Invoices

The plaintiffs seek Prisoner Property Invoices for all RNC arrestees, alleging that these documents will reveal how many, if any, of the arrestees were carrying "weapons, smoke bombs, or other paraphernalia indicative of violence or terrorism" at the time of arrest.  (Moore and Norins 9/27/06 Letter at 11).  The plaintiffs

---

[11] The City makes a vague contention that it is barred by regulations enacted pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") from releasing medical forms for non-party arrestees, but fails to explain its concerns or to cite to any particular regulation that would bar production of the forms.  As noted above, the attorneys'-eyes-only designation to which the plaintiffs have agreed provides sufficient protection for the privacy concerns of non-party arrestees.

contend that this is relevant to show that peaceful demonstrators, as well as non-demonstrators, were indiscriminately and needlessly taken into custody.  However, whether or not arrestees were actually carrying weapons or other contraband at the time of arrest is irrelevant to the plaintiffs' claims that the City established, prior to the beginning of the RNC, a policy of mass arrests without probable cause followed by unnecessarily lengthy detention. Accordingly, the City shall not be required to produce the Prisoner Property Invoices.

### 8. Overtime Control Logs

The City alleges that no overtime control logs were created during the RNC.  Instead, individual officers submitted overtime slips to their commands each day.  The City therefore contends that tracking down each officer's overtime slips would constitute an undue burden.  (Smith 9/15/06 Letter at 10).  However, the City states that the defendants will search for any other document that reflects the total number of overtime hours worked during the RNC and, if such a document exists, will produce it.  This is a sufficient response to the plaintiffs' request.

### 9. PASS Law Enforcement Officer Sign-In Logs

The City states that no document known as the "PASS Law Enforcement Officer Sign-In Log" exists, and it objects to the plaintiffs' modified request for "any existing documentation of the date and time each arresting officer arrived at Pier 57." (Smith

9/15/06 Letter at 10; Moore and Norins 8/18/06 Letter at 15).  The plaintiffs contend that this information is relevant to their excessive detention claims because arrestees could not be processed until their arresting or assigned officer arrived at Pier 57. However, the defendant officers' memo books, which have already been produced, will generally indicate the time of the officer's arrival at Pier 57.  (See, e.g., Memo Book Entries, attached as Exhs. J and K to Moore and Norins 8/18/06 Letter).  Therefore, to the extent that this information is useful in proving delay in the arresting officers' arrival at Pier 57, the plaintiffs already have a significant sample from which to work.  The City is not required to produce any further documentation indicating when  arresting officers arrived at Pier 57.

       10. <u>RNC Activity Log Supplements</u>

    This document is a printed form with spaces for officers to note the date, day of the week, tour of duty, post number, post location, assignment instructions, the names of their supervisor and commander, and the telephone number of their temporary headquarters. (RNC Activity Log Supplement, attached as Exh. T to Moore and Norins 8/18/06 Letter).  The plaintiffs do not offer any explanation why the information in these documents is relevant to their claims, although they do make a vague assertion that the documents may contain "additional factual or editorial notations . . . that do not appear in other arrest documents."

(Moore and Norins 8/18/06 Letter at 15).  This is unlikely, since the forms do not request or provide space for such notations. Furthermore, the City contends that production of these documents would constitute an undue burden because it would involve a process similar to that involved in collecting memo book entries.  For these reasons, the City shall not be required to produce the RNC Activity Log Supplements.

####  11. DCLM/CJB Documents

During the RNC, an attorney from the Office of the Deputy Commissioner of Legal Matters ("DCLM") interviewed each arresting or assigned officer and reviewed the charging paperwork for each arrestee.  A Criminal Justice Bureau ("CJB") supervisor then reviewed and signed each officer's charging paperwork.  (Moore and Norins 8/18/06 Letter at 16).  The plaintiffs seek any documents prepared by DCLM attorneys or CJB supervisors in connection with this review of the charges against each arrestee.  The plaintiffs contend that such documents are relevant to the "defendants' purported defense that each RNC arrest was supported by probable cause." (Moore and Norins 8/18/06 Letter at 16).

In its opposition to the plaintiffs' motion to compel, the City states that no written records were maintained, aside from individual attorneys' notes, during review of arresting officers'

charges.[12]   (Smith 9/15/06 Letter at 12).  The plaintiffs have
therefore modified their request to include "all documents
reflecting any training or preparation in connection with the
review of arrest paperwork" by DCLM attorneys and CJB supervisors.
(Moore and Norins 9/27/06 Letter at 13).  To the extent that any
training documents or guidelines for conducting these reviews
exist, the City is ordered to produce them.  The City shall also
produce an affidavit from an NYPD employee with knowledge of these
reviews attesting whether any written documents, aside from
individual attorneys' notes, were created during the course of the
reviews.

    12. Documents Prepared by NYPD for Transmittal to DANY

    The City objects to the plaintiffs' request for all documents
prepared by the NYPD for transmittal to DANY on the grounds that it
is vague and ambiguous and that it fails to describe the
information sought with reasonable particularity.  Without
clarification from the plaintiffs, the City contends that it cannot
identify documents responsive to the request.  The plaintiffs have
provided no further explanation regarding the type of documents
they are seeking and why the documents are relevant to their
claims.  Therefore, the plaintiffs' motion to compel production of

---

    [12] The City states that such notes are attorney work product
and subject to the attorney-client privilege.  The City states that
the defendants will search for any such notes and, if any are
located, the City will document them in its privilege log.  (Smith
9/15/06 Letter at 12).

these documents is denied.

       13. <u>OCA CRIMS Appearance Histories</u>

OCA CRIMS Appearance Histories for certain arrestees were produced during the course of proceedings held before New York State Supreme Court Justice John Cataldo.  (Letter of Gerald S. Smith dated Oct. 6, 2006 ("Smith 10/6/06 Letter") at 1).  The City objects to the plaintiffs' request for this document in the current proceeding on the ground that it is duplicative because "[a]ny information that could be gleaned from [it] is provided through the BADS documents" that the City has agreed to produce.  (Smith 9/15/06 Letter at 12).  The plaintiffs, in response, state that they have not had an opportunity to see this document because the City has not allowed the plaintiffs to review documents produced during the state court proceedings.  (Moore and Norins 9/27/06 Letter at 13).  Because the defendants will have to review arrestee files in order to produce other documents pursuant to this Order, the burden of production of this document is minimal.  The City shall therefore produce CRIMS Appearance Histories for all named plaintiffs and non-party arrestees.

       14. <u>"Decline to Prosecute" Documents</u>

The defendants state that they have no "decline to prosecute" documents in their possession.  Accordingly, the plaintiffs have sought production of these documents from DANY by subpoena.

### 15. DAT Investigation Forms and DATs

A Desk Appearance Ticket ("DAT") is a written notice directing an arrestee to appear in court at a designated future time, and may be issued in lieu of detaining an arresteee on a misdemeanor or violation.  The DAT Investigation Form indicates whether a DAT was issued to the arrestee and, if not, states the reason for the denial.  The City objects to this request solely on the ground that the DAT Investigation Forms are not relevant to the plaintiffs' claims.

The plaintiffs allege that the DAT Investigation Forms "are probative of whether DATs were denied without justification in order to prolong the detention of RNC arrestee[s]."[13]  (Moore and Norins 8/18/06 Letter at 19).  According to the plaintiffs, only 400 of the approximately 1,800 arrestees were given DATs, including all those who were issued DATs after Justice Cataldo ruled that he would hold the City in contempt if it did not release arrestees who had been in custody for more than 24 hours.  (Moore and Norins 8/18/06 Letter at 19).  DAT Investigation Forms for non-party arrestees are clearly relevant to the issue of whether the NYPD implemented a policy of denying DATs without justification during the RNC.  Accordingly, the City is ordered to produce DAT

---

[13] For example, the plaintiffs have submitted a form that states the reason for denial as "Unable to Verify Address," even though the same form indicates that the arrestee's address was verified using her driver's license.  (DAT Investigation Form, attached as Exh. V to Moore and Norins 8/18/06 Letter).

Investigation Forms for all party and non-party arrestees, with the latter being subject to the attorneys'-eyes-only designation described above.

Although the DAT is a document created by the NYPD and given to an arrestee upon his or her release from NYPD custody, the City maintains that it is NYPD policy not to retain copies of the DATs. (Smith 9/15/06 Letter at 13; Def. Resp. at 17).  The City has nevertheless agreed to produce DATs, where available, for named plaintiffs.  (Def. Resp. at 17).  The plaintiffs now seek an order compelling production of DATs issued to non-party arrestees. Arrestees who were issued DATs were not arraigned prior to release, and the DAT is therefore the only record of the date and time of their release.  Without this information, the plaintiffs cannot calculate the length of the arrestee's detention, which is clearly relevant to their claims.  (Moore and Norins 9/27/06 Letter at 14). The City shall therefore produce an affidavit from an NYPD official with knowledge of the Department's record-keeping practices attesting that it is not the NYPD's practice to retain copies of the DATs, and indicating where such copies may be found so that the plaintiffs may seek them by subpoena if necessary.

### 16. Fingerprints and Other Electronic Data

The plaintiffs contend that prior to the RNC, the NYPD adopted a policy that all RNC arrestees would be fingerprinted, including those who were only charged with violations.  Under New York law,

a violation is not a printable offense unless the officer is unable to ascertain the arrestee's identity or reasonably suspects that the identification given by the arrestee is inaccurate or that the arrestee is wanted for another offense. See CPL § 160.10. The plaintiffs therefore seek various kinds of documents and electronic data related to the fingerprinting of RNC arrestees. They argue that this information is relevant to the claim that the RNC arrestees were subjected to fingerprinting, criminal record checks, and other privacy intrusions without justification because they engaged in speech protected by the First Amendment. (Moore and Norins 8/18/06 Letter at 20).

The City maintains that in cases where the top charge against an RNC arrestee was a violation, any fingerprints that were taken and kept by the NYPD were later destroyed. (Smith 9/15/06 Letter at 13). The plaintiffs therefore request an order compelling the City to produce an affidavit from a knowledgeable NYPD official attesting that such fingerprints were destroyed, and describing the manner in which they were disposed of. This request is granted.

Furthermore, the plaintiffs seek additional documentation related to the fingerprints. Specifically, they request an order compelling the City to produce:

> RNC-arrestee fingerprint information sent by any NYPD subdivision to the NYPD ID Section and/or the Bureau of Criminal Identification (BCI) or generated by the ID Section/BCI, including without limitation all records documenting which arrestees' fingerprints were sent to the ID Section/BCI, all reports generated in connection

> with the images sent, and all documentation of the
> destruction and/or sealing of the images[;] . . . [a]ll
> electronic data concerning RNC arrests maintained by
> NYPD, OCA, DCJS, and DANY in the NYPD's possession[;] .
> . . [and a]ll documents generated by the FBI relating to
> any RNC arrestee that were received by the NYPD,
> including without limitation all AFIS (Automatic
> Fingerprint ID System) reports.

(Moore and Norins 8/18/06 Letter at 20).  The City contends that these requests are so vague that it cannot determine what documents the plaintiffs seek.  (Smith 7/27/06 Letter at 2-3).  However, with the exception of the request for "all electronic data concerning RNC arrests maintained by NYPD, OCA, DCJS, and DANY in the NYPD's possession," the plaintiffs' requests appear to be sufficiently narrowly tailored to permit the City to determine which documents are responsive.  Therefore, with the exception of the request for "all electronic data," which is impermissibly vague, the City shall produce all documents responsive to the plaintiffs' requests.  If responsive documents were destroyed along with the fingerprints themselves, the affidavit from a knowledgeable NYPD official shall so indicate.

17. <u>Documents Produced During State Court Proceedings</u>

Finally, the plaintiffs seek unredacted arrest documents produced by the City during proceedings held before Justice Cataldo.  (Letter of Daniel Alterman dated Sept. 29, 2006 ("Alterman 9/29/06 Letter"), at 1).  Justice Cataldo held hearings to determine whether the NYPD and other City agencies had defied his earlier order to release RNC arrestees who had been held for

31

more than 24 hours. (Alterman 9/29/06 Letter at 1).  The following documents were produced, pursuant to a confidentiality stipulation, for those arrestees who had sought a writ of habeas corpus from the State Supreme Court: OLBS Worksheet, Arrest Report Run, PASS Data Intake Sheet, OLPA History, OCA CRIMS Appearance History, and DAT Investigation Worksheet.  (Smith 10/6/06 Letter at 1;  Alterman 9/29/06 Letter at 2).  After the parties to the state court proceedings reached a settlement, petitioners' counsel returned the documents to the City and did not retain any copies.  (Alterman 9/29/06 Letter at 2).

To the extent that these documents are a subset of the non-party arrestee documents requested by the plaintiffs in their motion to compel production, they will be produced pursuant to this Order.  (Smith 10/6/06 Letter at 1).  If the plaintiffs believe that any documents produced during the state court proceedings are not included among those produced pursuant to this Order, and are relevant to these proceedings, the plaintiffs may specifically request them from the defendants.

The plaintiffs also seek an order compelling the City to produce, in addition to the arrest documents described above, "any and all spreadsheets, chronos, or other, similar documents" produced in the course of the state court proceedings.  (Letter of Gideon Oliver dated Oct. 11, 2006 ("Oliver 10/11/06 Letter"), at 2).  The plaintiffs point to statements made by Corporation Counsel

32

Michael A. Cardozo indicating that an Excel spreadsheet given to the court and to petitioners' counsel contained "the arrest number; prisoner's last name; the prisoner's first name; time of arrest; time of arrival at the pier . . .; the time the individual was released and the processing that preceded that arraignment [or] DAT." (Transcript of Proceeding before Hon. John Cataldo dated Sept. 10, 2004, attached to Oliver 10/11/06 Letter). This information is clearly relevant to the plaintiffs' excessive detention claim, and the City is therefore ordered to produce this spreadsheet, as well as any other data summaries, compilations, or chronological timelines created for and produced in connection with the state court proceedings in September 2004.

The City states that "with respect to Mr. Alterman's request for 'summaries,' Defendants interpret that request to mean the data compilation produced . . . on September 10, 2004. Mr. Alterman is already in possession of that data compilation." The City also states that it will produce that data compilation if this Court so orders. (Smith 10/6/06 Letter at 2). If indeed only one data compilation was created and produced to petitioners' counsel in the course of the state court proceedings, the City shall produce that document to Mr. Alterman, and shall confirm in writing that there are no other documents of the kind described above.

Daniel Alterman and Gideon Oliver, who represented some of the petitioners in the state court proceedings, were among the

attorneys who reviewed documents pursuant to a confidentiality agreement during the course of those proceedings. (Stipulation and Protective Order, attached as Exh. C to Alterman 9/29/06 Letter). Mr. Alterman and Mr. Oliver wish to discuss those documents with other plaintiffs' counsel. However, they are concerned that they place themselves in jeopardy by doing so in the absence of either an agreement by the City or a court ruling that such discussion does not violate the confidentiality agreement. The City shall therefore state in writing whether it takes the position that Mr. Alterman and Mr. Oliver are barred from discussing the documents they reviewed with other plaintiffs' counsel, so that they can determine whether they need to request a court's interpretation of the agreement.

    C. <u>Form of Production</u>

Thus far, the City has agreed to produce documents related to named plaintiffs only to the lawyers representing them, and has proposed that plaintiffs' counsel distribute the documents among themselves. Given the large number of attorneys involved, however, the most efficient way for all counsel to obtain the documents produced pursuant to this Order is for the City to distribute them to each attorney in all of the RNC cases.[14]   Accordingly, the City

---

[14] With regard to the form of production, there is no reason to distinguish between documents related to named plaintiffs and documents related to non-party arrestees. For any given plaintiff, a document related to a named plaintiff in another case is relevant for the same reason a document related to a non-party arrestee is

shall produce documents that have already been produced to individual counsel, in addition to any documents produced pursuant to this Order, including unredacted BADS/PASS documents and logs, to all plaintiffs' counsel.[15]  To the extent possible, documents related to the various plaintiffs shall be grouped according to the case with which they are associated or by date and arrest location.

D. Rule 45(c)(2)(B) Motion

The plaintiffs have requested an order pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure compelling DANY, a non-party, to produce the following documents for all RNC arrestees: DATs, Criminal Court Complaint and Supporting Affirmations, Decline to Prosecute Documents, Prisoner Movement Slips, Polaroid Photos of Arresting Officer with Arrestee, and DA Datasheets (along with any other record of any interview with a police officer, supervisor, or witness to the events surrounding the arrest).  (Moore and Norins 10/10/06 Letter at 1-3).  DANY contends that production would constitute an undue burden within the meaning of Rule 45(c)(3)(A)(iv) and has moved to quash the subpoena in its entirety.  (Letter of Patricia Bailey dated Oct.

_____

relevant, as indirect or statistical evidence to support that plaintiff's claims.

[15] The City has already distributed certain materials relevant to the plaintiffs' Monell claims to all plaintiffs' counsel. See Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978) (holding that local government can be held liable under 42 U.S.C. § 1983 if state actor acts unconstitutionally pursuant to government policy or custom).

24, 2006 ("Bailey 10/24 Letter")).

As an initial matter, I do not credit the plaintiffs'
contention that DANY has waived its objections by failing to state
them within 14 days of service of the subpoena. (Moore and Norins
10/10/06 Letter at 3). Generally, "failure to serve written
objections to a subpoena within the time specified by Rule
45(c)(2)(B) . . . constitutes a waiver of such objections."
Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 48 (S.D.N.Y.
1996). However, DANY maintains that it indicated to plaintiffs'
counsel on May 31, 2006, at the time of service, that it would not
respond to the subpoena until this Court issued its decision in a
related case regarding DANY's obligation to produce DA Data Sheets.
(Bailey 10/24/06 Letter at 1-2). It appears that plaintiffs'
counsel did not object. This Court's decision regarding the DA
Data Sheets was not issued until September 14, 2006, Abdell v. City
of New York, No. 05 Civ. 8453, 2006 WL 2664313 (S.D.N.Y. Sept. 14,
2006), over a month after DANY responded in writing to the
MacNamara plaintiffs' subpoena. (Bailey 8/9/06 Letter). In their
initial response to DANY's letter stating its objections, the
plaintiffs made no mention of DANY having waived them. (Letter of
Clare Norins dated Aug. 30, 2006, attached as Exh. D to Bailey
9/20/06 Letter). DANY has shown good cause for its failure to
object within 14 days of service, and therefore its objections have
not been waived. See Concord Boat Corp., 169 F.R.D. at 51-52

(finding good cause for failure to object within 14 days where subpoena was overbroad, movant was non-party acting in good faith, and movant was in contact with counsel for subpoenaing party concerning its efforts to comply prior to time motion to quash was made). I will therefore consider the merits of each of DANY's objections.

### 1. Documents Relating to Named Plaintiffs

DANY objects to the plaintiffs' subpoena insofar as it seeks documents related to plaintiffs named in other RNC cases. DANY does not contest the relevance of these documents, but alleges that the plaintiffs should seek them from the City rather than from DANY. If DANY has already turned over a subpoenaed document to the City, the City is ordered to distribute it to all plaintiffs' counsel. If DANY has not turned over a subpoenaed document to the City, it must do so, and the City shall then distribute it to all plaintiffs' counsel.[16] The plaintiffs shall provide DANY with a list of all named plaintiffs in the consolidated RNC cases so that DANY may comply with this Order.

Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure

---

[16] This order does not apply to subpoenaed documents related to MacNamara plaintiffs, since DANY and plaintiffs' counsel in MacNamara have already reached an agreement regarding production of those documents. (Moore and Norins 10/31/06 Letter at 2). Furthermore, DANY and the City need not turn over Polaroid photos of arrestees because, as outlined above, the plaintiffs have failed to demonstrate that the request is reasonably calculated to lead to the discovery of admissible evidence.

requires the Court to protect a non-party from "significant expense" resulting from inspection and copying.  The plaintiffs have agreed to pay the costs of reproduction and shall do so at DANY's request.  (Moore and Norins 10/10/06 Letter at 9).

### 2. Documents Relating to Non-Party Arrestees

DANY also moves to quash the plaintiffs' subpoena on the ground that production of the requested non-party arrestee documents would constitute an undue burden.[17]  DANY bears the burden of showing that compliance with the plaintiffs' subpoena would be unduly burdensome.  See Jones v. Hirschfeld, 219 F.R.D. 71, 74-75 (S.D.N.Y. 2003); Concord Boat Corp., 169 F.R.D. at 48-49.

> An evaluation of undue burden requires the court to weigh the burden to the subpoenaed party against the value of the information to the serving party.  Whether a subpoena imposes an "undue burden" depends upon "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed."  However, courts also give special weight to the burden on non-parties of producing documents to parties involved in litigation.

Travelers Indemnity Co. v. Metropolitan Life Insurance Co., 228 F.R.D. 111, 113 (D. Conn. 2005) (internal citation omitted) (quoting United States v. International Business Machines Corp., 83 F.R.D. 97, 104 (S.D.N.Y. 1979)); see also Night Hawk Ltd. v.

---

[17]  DANY also objects to production of non-party arrestee documents sealed pursuant to CPL § 160.50.  However, this unsealing Order should obviate those concerns, since it applies to DANY's files as well as any non-party arrestee documents in the defendants' possession.

Briarpatch Ltd., No. 03 Civ. 1382, 2003 WL 23018833, at *8
(S.D.N.Y. Dec. 23, 2003).

The plaintiffs have significantly narrowed the scope of the
subpoena, which originally sought all documents pertaining to
individuals who were criminally charged or prosecuted by DANY in
connection with the RNC. Aside from the Polaroid photos, the
subpoena now encompasses five categories of documents that the
plaintiffs are unable to obtain from the City, either because the
City has stated that the NYPD does not retain them, or because the
documents were generated and kept by DANY. These documents were
clearly identified in the plaintiffs' modified request. (Norins
9/28 Letter at 2-3).

As noted above, DANY does not contest the relevance of any of
the requested documents. The documents, with the exception of the
Polaroids, are relevant to the plaintiffs' claims. DATs for non-
party arrestees are relevant to the plaintiffs' claim that the
defendants implemented a policy of excessive detention because, for
arrestees who were issued DATs, the DAT is the only document
indicating the date and time of release. The Prisoner Movement
Slips, as noted above, are also relevant to the plaintiffs'
excessive detention claim because they will assist the plaintiffs
in reconstructing the time-line of each arrestee's detention. The
City has indicated that the defendants did not retain copies of
either of these documents, and DANY has indicated that, at least

sometimes, it does.   (Smith 9/15 Letter at 8, 12; Bailey 10/24 Letter at 7).

The plaintiffs also contend that NYPD officers falsely stated in criminal complaints and in interviews with Assistant District Attorneys ("ADA"s) that they had personal knowledge of the conduct of arrestees that formed the basis of the charges against them. Non-party arrestees' criminal complaints, along with the DA Data Sheets, which are completed by the ADA who drafts the complaint, are therefore relevant to the plaintiffs' claim that the NYPD implemented a policy of mass arrests without probable cause and instructed officers to make false statements in charging instruments regarding the existence of probable cause.

With regard to the "decline to prosecute" documents, DANY states that it declined to prosecute only four cases. (Bailey 10/24/06 Letter at 14). These documents are relevant because general similarities between cases in which DANY declined to prosecute and cases in which DANY did prosecute may shed light on the extent to which the arrests in question were based upon probable cause.[18]

DANY contends that retrieving files for 1,200 non-party arrestees would be time-consuming and expensive.   There can be no

_____

[18] DANY notes that since non-party arrestee files are sealed, it has not inspected any "decline to prosecute" documents for non-party arrestees.   (Bailey 10/24 Letter at 14).   If, upon inspection, DANY determines that the documents are privileged, DANY may raise such objections at that time.

doubt that compliance with the subpoena would constitute a burden for DANY.  However, DANY itself notes that it receives "hundreds of requests for documents from civil litigants" each year, many of which involve "multiple case files."  (Bailey 10/24/06 Letter at 4).  This subpoena poses a particularly heavy burden only because it involves a larger number of files.  Given the fact that the subpoena requests a narrow set of specific relevant documents, generated over a seven-day period, and for which DANY appears to be the only available source, compliance with the subpoena would not constitute an undue burden.  See Travelers Indemnity Co., 228 F.R.D. at 114 (where subpoena of non-party called for review of all documents associated with over 1,000 insurance policies, stored in various offices and warehouses in several states, "the sheer volume of documents would be no reason, in and of itself, to quash the subpoenas" if there was no other means for the party to obtain the information).

Accordingly, DANY's motion to quash the plaintiffs' subpoena is denied.  DANY shall produce to the City, within a reasonable time, unredacted copies of any non-party arrestee DATs, Criminal Complaints and accompanying Affidavits, Prisoner Movement Sheets, DA Data Sheets, and "decline to prosecute" documents contained in its files.  The plaintiffs shall provide DANY with a list of non-party arrestees so that DANY may comply with the terms of this

Order,[19] and shall pay the reasonable cost of reproduction. Upon receipt of the documents, the City shall produce them to all of the plaintiffs in the consolidated RNC cases pursuant to the procedure described above. These documents shall be maintained on an attorneys'-eyes-only basis.

## Conclusion

For the reasons set forth above, the plaintiffs' motions to compel are granted in part and denied in part. The defendants' objections to producing information about non-party arrestees based on CPL § 160.50 are overruled. Objections to specific requests on grounds of irrelevance or burden are resolved as discussed above. Finally, DANY's objections to the subpoena served by the plaintiff are, for the most part, overruled.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       November 13, 2006

---

[19] Obviously, the plaintiffs will be unable to provide DANY with such a list until the City releases the names of the non-party arrestees pursuant to this Order.

42

Copies mailed this date:

Jonathan C. Moore, Esq.
Clare Norins, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue
New York, New York 10016

Daniel L. Alterman, Esq.
Alterman & Boop LLP
35 Worth Street
New York, New York 10013

Gideon Oliver, Esq.
Oliver & Oliver
200 East 10th Street #917
New York, New York 10003

Gerald S. Smith, Esq.
Assistant Corporation Counsel
100 Church Street
New York, New York 10007

Patricia J. Bailey, Esq.
Assistant District Attorney
One Hogan Place
New York, New York 10013