```
UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
DEIRDRE MACNAMARA, DEEPA MAJMUDAR, : 04 Civ. 9216 (KMK) (JCF)
ELIZABETH FLEISCHMAN, REBECCA      :
STONEBACK, JASON BARRUS, CHRIS     :
KORNICKE, RANDALL STEKETTE, WENDY  :
STEFANELLI, DANIELLE WALSH,        :
WILLIAM HOBBS, JULIA COHEN, SIMON  :
HARAK, SONIA CHANDRA, CELINE       :
MELANUM, ERIKA BIDDLE, DIANA       :
RAIMONDI, RACHEL HEINOLD, NOAH     :
CHARNEY, STACY COTLER, BARBARA and :
LEONARD FRIEDMAN, as parents and   :
natural guardians of EMILY         :
FRIEDMAN, a minor, ALI GHAHREMANI, :
as parent and natural guardian of  :
SHAHRZAD GHAHREMANI, WILLIAM       :
STEYERT, JR., CHRISTOPHER THOMAS,  :
KATE ESPOSITO, individually, and   :
on behalf of a class of all others :
similarly situated,                :
                                   :
                 Plaintiffs,       :          MEMORANDUM
                                   :          AND  ORDER
                                   :
     - against -                   :
                                   :
THE CITY OF NEW YORK, a municipal  :
entity; MICHAEL BLOOMBERG, Mayor   :
of the City of New York; RAYMOND   :
KELLY, New York City Police        :
Commissioner; JOSEPH ESPOSITO,     :
Chief of Department, New York City :
Police Department; THOMAS GRAHAM,  :
Commander, Disorders Control Unit, :
New York City Police Department;   :
BRUCE SMOLKA, Assistant Chief,     :
Patrol Borough Manhattan South;    :
TERRENCE MONAHAN, Deputy Chief,    :
Patrol Borough Bronx; JOHN J.      :
COLGAN, Deputy Chief and           :
Commanding Officer, Pier 57; New   :
York Police Supervisor MICHAEL     :
INGRAM; New York Police Supervisor :
ROMAN; New York City Police        :
Officers MONA PHILLIPS, NELSON     :
RODRIGUEZ, Shield No. 21015,       :
```

```
MICHAEL FILOSETA, KEVIN SAM,       :
STEVEN CHOINSKI, TYRONE RIGGAN,    :
DAN MALLOY, BOYLE, DIEZ, Shield    :
No. 4285, MICHAEL BALICKI, ANTHONY :
MASON, BAITY and MELISSA ROMAN;    :
New York City Police Supervisors   :
and Commanders RICHARD ROEs 1-50;  :
New York City Police Officers JOHN :
DOEs 1-50, individually and in     :
their official capacities, jointly :
and severally,                     :
                                   :
                     Defendants.   :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

This case is one of many cases arising from the arrests of approximately 1,800 people during the Republican National Convention (the "RNC") in New York City in the summer of 2004. Throughout the litigation, the City of New York and the individual defendants (collectively, the "City") have withheld or redacted a number of documents requested by the plaintiffs on the basis of various privileges.  On March 14, 2007, I granted in part and denied in part the plaintiffs' motion to compel production of documents that the City claimed were subject to the self-critical analysis privilege, the attorney-client privilege, and the deliberative process privilege.  MacNamara v. City of New York, No. 04 Civ. 9216, 2007 WL 755401 (S.D.N.Y. March 14, 2007).  The plaintiffs now seek an order compelling the City to produce in unredacted form additional documents that the City has withheld on the basis of the deliberative process privilege and the law enforcement privilege.  In addition, the plaintiffs seek an order

reopening depositions at which the City instructed witnesses not to answer questions regarding the presence of undercover or plainclothes officers at demonstrations.  For the reasons set forth below, the plaintiffs' motion is granted in part and denied in part.[1]

Discussion

    A. Deliberative Process Privilege

        1. Legal Standard

The deliberative process privilege "'covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated' . . . ."  Tique v. United States Department of Justice, 312 F.3d 70, 76 (2d Cir. 2002) (quoting Department of the Interior v. Klamath Water Users Protective Association, 532 U.S. 1, 8 (2001)).  The privilege protects "subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  Grand Central Partnership v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999) (quoting Ethyl Corp. v. United States Environmental Protection Agency, 25 F.3d 1241, 1248 (4th Cir. 1994)).

> The rationale behind the privilege is "the obvious realization that officials will not communicate candidly amongst themselves if each remark is a potential item of discovery and front page news, and its object is to

---

[1] I have reviewed in camera each of the documents at issue here.

> enhance the quality of agency decisions, by protecting
> open and frank discussion among those who make them
> within the Government." <u>Klamath</u>, 532 U.S. at 8-9
> (quoting <u>National Labor Relations Board v. Sears, Roebuck
> & Co.</u>, 421 U.S. 132, 151 (1975)); <u>accord</u> <u>Coastal States
> Gas Corp. v. Department of Energy</u>, 617 F.2d 854, 866
> (D.C. Cir. 1980) ("The [deliberative process] privilege
> has a number of purposes: it serves to assure that
> subordinates within an agency will feel free to provide
> the decisionmaker with their uninhibited opinions and
> recommendations without fear of later being subject to
> public ridicule or criticism; to protect against
> premature disclosure of proposed policies before they
> have been finally formulated or adopted; and to protect
> against confusing the issues and misleading the public by
> dissemination of documents suggesting reasons and
> rationales for a course of action which were not in fact
> the ultimate reason for the agency's action.").

<u>Tique</u>, 312 F.3d at 76.

The privilege applies to inter-agency or intra-agency communications that are both "predecisional" and "deliberative." <u>Tique</u>, 312 F.3d at 76. A document is "predecisional" when it is "prepared in order to assist a decisionmaker in arriving at his decision." <u>National Council of La Raza v. Department of Justice</u>, 411 F.3d 350, 356 (2d Cir. 2005) (quoting <u>Grand Central Partnership</u>, 166 F.3d at 482). In order to assert the privilege,

> the agency "must be able to demonstrate that . . . the
> document for which . . . privilege is claimed related to
> a specific decision facing the agency." <u>Tique</u>, 312 F.3d
> at 80. This is to be distinguished from an agency's
> "routine and ongoing process of self-evaluation," which
> is not covered. <u>See</u> <u>id.</u> at 80 (quoting <u>Maricopa Audobon
> Society v. United States Forest Service</u>, 108 F.3d 1089,
> 1094 (9th Cir. 1997)).

<u>Haus v. City of New York</u>, No. 03 Civ. 4915, 2004 WL 3019762, at *3 (S.D.N.Y. Dec. 29, 2004). A document is "deliberative" when it is

"actually . . . related to the process by which policies are formulated." La Raza, 411 F.3d at 356 (quoting Grand Central Partnership, 166 F.3d at 482).  The privilege "does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." Tigue, 312 F.3d at 80 (quoting Grand Central Partnership, 166 F.3d at 482).

"Purely factual" material is not protected by the privilege. Grand Central Partnership, 166 F.2d at 482; see also National Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 88, 93 (S.D.N.Y. 2000); Resolution Trust Corp. v. Diamond, 137 F.R.D. 634, 640-41 (S.D.N.Y. 1991).   Furthermore, the privilege is a qualified one, requiring courts to balance the agency's interest in non-disclosure against "the public interest in opening for scrutiny the government's decision-making process." Resolution Trust Corp., 137 F.R.D. at 642 (quoting In Re Franklin National Bank Securities Litigation, 478 F. Supp. 577, 582 (E.D.N.Y. 1979)).

## 2. Civil Disturbance Subcommittee Documents

The New York City Police Department (the "NYPD") began planning for the RNC more than a year before the convention. (Declaration of Raymond W. Kelly dated Feb. 23, 2007 ("Kelly Decl."), attached to Letter of Cheryl L. Shammas dated Feb. 23, 2007 ("Shammas 2/23/07 Letter"), ¶ 2).  To facilitate planning, the work was divided among several committees, each of which assigned

tasks to various subcommittees. (Kelly Decl., ¶ 2). The committees were overseen by Assistant Chief Jack McManus, the NYPD's RNC Coordinator. (Kelly Decl., ¶ 2). The NYPD Executive Committee held weekly meetings at which Assistant Chief McManus, Police Commissioner Raymond W. Kelly, and various other high-ranking NYPD officials discussed the merits of the committees' recommendations. (Kelly Decl, ¶¶ 3-4).

One of the committees involved in RNC planning was the Civil Disturbance/Prisoner Processing Subcommittee (the "Civil Disturbance Subcommittee"), which included representatives from the NYPD, the United States Secret Service, and various other city, state, and federal agencies. (Kelly Decl., ¶¶ 5-6). The City has withheld agendas for Civil Disturbance Subcommittee meetings held on January 13, May 5, and July 21, 2004, as well as memoranda describing what was discussed at each meeting. The meeting agendas contain lists of new members, lists of attendees at previous meetings, and brief summaries of issues discussed at previous meetings. The memoranda, written by various NYPD officials for the benefit of Assistant Chief McManus, consist of brief descriptions of issues and plans discussed at the meetings. Having reviewed these documents in camera, I find that they do not fall within the scope of the deliberative process privilege.

As an initial matter, lists of committee members and persons in attendance at meetings are plainly factual information not

subject to the privilege.  Moreover, while it is true in some sense that the documents "reflect deliberations and discussions" about plans for the RNC (Shammas 2/23/07 Letter at 4), that bare assertion is, as I have said before, insufficient to justify application of the privilege.  See Schiller v. City of New York, No. 04 Civ. 7922, 2007 WL 136149, at *9-10 (S.D.N.Y. Jan. 19, 2007) (rejecting claim of privilege based upon assertion that document "reflect[ed] internal discussions among top NYPD executives, recommendations and proposals for policing the RNC").  The summaries contained in the meeting agendas merely state that certain issues were discussed.  They are descriptive rather than deliberative, and do not contain the personal opinions of any member of the committee or even the recommendations of the committee as a whole.  The memoranda, which are essentially minutes of the meetings, similarly do not contain the recommendations or opinions of the writers or of any other members of the committee, but merely describe the issues discussed.

The City attempts to bolster its assertion of the privilege with an affidavit from Commissioner Kelly in which he states that the Executive Committee "at its [] weekly meetings, assessed the merits of [] proposals [put forward by the various RNC committees] while engaging in discussions and deliberations on various planning tasks and operational issues that needed to be addressed."  (Kelly Decl., ¶ 3).  While this statements is undoubtedly true, it does

not establish that the particular documents at issue here were created "in order to assist an agency decisionmaker in arriving at" a particular decision. La Raza, 411 F.3d at 356 (quoting Grand Central Partnership, 166 F.3d at 482). Instead, the documents describe reports from various agencies and committees regarding the current state of plans for the RNC. The deliberative process privilege "does not operate indiscriminately to shield all decision-making by public officials" from discovery in civil cases. Grossman v. Schwartz, 125 F.R.D. 376, 381 (S.D.N.Y. 1989) (citation omitted). These memoranda are not "contemplative, deliberative, analytical documents, weighing the pros and cons of a given course of action." Associated Press v. United States Department of Defense, No. 05 Civ. 5468, 2006 WL 2707395, at *8 (S.D.N.Y. Sept. 20, 2006). They cannot be considered "deliberative" because they are not "indicative of the agency's thought processes," Local 3, International Brotherhood of Electrical Workers v. National Labor Relations Board, 845 F.2d 1177, 1180 (2d Cir. 1988), and do not reflect "the give-and-take of the consultative process." Coastal States Gas Corp., 617 F.2d at 866. Accordingly, they are not subject to the privilege and must be disclosed.

### 3. Criminal Justice Bureau Documents

The NYPD Criminal Justice Bureau (the "CJB") was responsible for developing plans for arrest processing during the convention. (Kelly Decl., ¶ 2). The City has withheld the following CJB-

related documents: (1) a February 19, 2004 memorandum from Deputy Inspector Matthew Pontillo of the CJB to Assistant Chief McManus; (2) a PowerPoint presentation dated April 1, 2004 entitled "Arrest Processing Plan for the Republican National Convention"; (3) a document containing hand-drawn and computer-generated flow charts illustrating the Mass Arrest Processing Plan (the "MAPP") for the RNC; and (4) an undated PowerPoint presentation describing plans for the use of 100 Centre Street as an arrest processing site during the RNC.

The February 19, 2004 memorandum outlines plans discussed at a meeting held that day between Assistant Chief McManus, Assistant Chief Patrick Devlin, and Deputy Inspector Pontillo.  Much like the memoranda described above, it is not deliberative; it simply sets forth the current state of plans for the RNC and indicates that several topics had been identified as "issues."  The remaining documents are also not deliberative.  They describe the MAPP that the NYPD was planning to use at the time the documents were created.  There is no reason to believe that disclosure of these documents would stifle "open and frank discussion," Tigue, 312 F.3d at 76 (quoting Klamath, 532 U.S. at 8-9), because the documents neither evaluate various alternatives nor discuss any particular individual's opinions or ideas regarding the NYPD's plans for the RNC.  Nor do they "suggest[] reasons and rationales for a course of action which were not in fact the ultimate reason for the agency's

action." <u>Coastal States Gas Corp.</u>, 617 F.2d at 866.  They contain factual information regarding the MAPP that the NYPD planned to use at the time the documents were created.[2]  The fact that the MAPP described therein is not the same MAPP that was ultimately used, (Shammas 2/23/07 Letter at 5), does not bring non-deliberative documents within the scope of the privilege.  Therefore, these documents must also be disclosed to the plaintiffs.

    4. <u>E-mails</u>

The City has also withheld two e-mails and redacted a third on the basis of the deliberative process privilege.  The withheld e-mails are both dated August 5, 2004, and were sent by Paul J. Browne of the NYPD to Edward Skyler of the Office of the Mayor. The redacted e-mail is dated August 10, 2004, and was sent by Detective Michael Gorsky to Assistant Chief John Colgan.

The withheld e-mails relate to a planned meeting to be attended by the Mayor and the Police Commissioner on August 9, 2004.  Both include a list of "Possible Mayor Talking Points" suggested by Mr. Browne, and one includes a description of the NYPD's plans to stage drills prior to the RNC.  The City contends that these e-mails are protected by the privilege because they

---

[2] The April 1, 2004 PowerPoint presentation also contains factual information regarding the MAPP used for a February 15, 2003 demonstration against the then-impending war in Iraq.  The flow chart document has a cover page briefly listing "issues" to be considered, but does not contain any statements that could reasonably be considered "deliberative."

reflect the opinions and suggestions of the writer and "were communicated prior to any final decision on the topic discussed." (Shammas 2/23/07 Letter at 6). However, as noted above, the deliberative process privilege does not "shield all decision-making by public officials." Grossman, 125 F.R.D. at 381. As I stated in a prior decision in a related RNC action,

> [i]n arguing that the deliberative process privilege applies to these documents, among others, the City asks the Court to accept that virtually all decisions made by the NYPD [and other agencies] regarding the RNC were matters of important public policy. See Soto v. City of Concord, 162 F.R.D. 603, 612 (N.D. Cal. 1995) ("The deliberative process privilege should be invoked only in the context of communications designed to directly contribute to the formulation of important public policy."). This is plainly not the case. Instead, the Court must determine in each case whether the decision at issue was a "routine operating decision" rather than a "policy oriented judgment" to which the privilege would apply. See E.B. v. New York City Board of Education, 233 F.R.D. 289, 293 (E.D.N.Y. 2005).

Schiller, 2007 WL 136149, at *10. Whether or not the Mayor should use Mr. Browne's suggested "talking points" is not the sort of public policy decision that falls within the scope of the privilege. The discussion of planned security drills is also not covered by the privilege, because even assuming that security drills qualify as a matter of policy, the e-mail does not contain anything that could be characterized as a recommendation, proposal, or opinion regarding the drills.

The redacted e-mail relates to the NYPD's use of Pier 57 as a "Post-Arrest Staging Site." The City asserts that the e-mail

contains Detective Gorsky's "opinions" regarding "the preparation of Pier 57" for use during the RNC. (Shammas 2/23/07 Letter at 6). However, in an earlier decision, I found that "[d]ecisions regarding work to be done at Pier 57 [in preparation for the RNC] are routine operating decisions" not subject to the privilege. Schiller, 2007 WL 136149, at *10. Furthermore, having reviewed the e-mail, I find it does not contain anything that could plausibly be characterized as an "opinion." The redacted portions of the e-mail are not deliberative. The City must therefore produce an unredacted copy of this e-mail, as well as the two e-mails it has withheld.

    B. Law Enforcement Privilege

        1. Legal Standard

> The purpose of [the law enforcement] privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

In re Department of Investigation of the City of New York, 856 F.2d 481, 484 (2d Cir. 1988) (citation omitted). In order to sustain the privilege, a party "must make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not rely simply on generalized reiterations of the policies underlying the privilege." Kunstler v. City of New York, Nos. 04 Civ. 1145, 04

Civ. 665, 04 Civ. 2611, 2005 WL 2656117, at *1 (S.D.N.Y. Oct. 18, 2005); see also MacWade v. Kelly, 230 F.R.D. 379, 381 (S.D.N.Y. 2005) (stating that party asserting law enforcement privilege "must make a clear showing of harm").

This privilege, like the deliberative process privilege, is a qualified one. See Kunstler, 2005 WL 2656117, at *1; MacWade, 230 F.R.D. at 381. When determining whether to order disclosure, courts should therefore "'balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information.'" Kunstler v. City of New York, 439 F. Supp. 2d 327, 328 (S.D.N.Y. 2006) (quoting Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1341 (D.C. Cir. 1984)); accord Kitevski v. City of New York, No. 04 Civ. 7402, 2006 WL 680527, at *3 (S.D.N.Y. March 16, 2006). "However, the party asserting the privilege must 'make a threshold showing that the privilege attaches' before the court is required to balance the parties' interests." City of New York v. Beretta U.S.A. Corp., 222 F.R.D. 51, 66 (E.D.N.Y. 2004) (quoting United States v. United States Currency in the Sum of Twenty One Thousand Nine Hundred Dollars, No. 98 CV 6168, 1999 WL 993721, at *3 (E.D.N.Y. Sept. 21, 1999)).

2. Disorder Control Incident Documents

Prior to the RNC, a number of high-ranking NYPD officials met at the Police Commissioner's office to plan for "anticipated types

of possible civil disorder." (Declaration of Thomas Graham ("Graham Decl."), attached to Shammas 2/23/07 Letter, ¶ 6). At these meetings, the officials reviewed documents known as "Disorder Control Incident Tabletop Exercises" ("Tabletop Exercises"), which contain "hypothetical scenarios" involving what the City refers to as "terrorist activity." (Graham Decl., ¶ 6). The Tabletop Exercises also contain "talking points" intended to stimulate discussion regarding potential problems the NYPD might encounter in dealing with similar incidents. (Graham Decl., ¶ 7). After these meetings, unspecified persons prepared "Control Incident Action Items" ("Action Items"), which contain "proposed courses of action to be undertaken by [NYPD officials]" to address issues identified during the Tabletop Exercises. (Graham Decl., ¶ 8). The City has withheld both the Tabletop Exercises and the Action Items on the basis of the law enforcement privilege.

The City relies on an affidavit from Chief Thomas Graham, Commanding Officer of the Disorder Control Unit, in which he claims that disclosure of the Tabletop Exercises and Action Items

> would educate groups with a history of unlawful or
> violent behavior and would-be terrorists about how the
> Department would respond to the scenarios therein and the
> types of scenarios that the Department is prepared to
> handle (and hence may not be prepared to handle). It
> also educates individuals on disruptive tactics typically
> used at demonstrations and the Department's methods and
> weaknesses in addressing those tactics. It would
> similarly educate them on how to commit egregious acts
> against the City; on how to shut down various City
> facilities and/or systems of mass transportation; on how
> to divert police resources; and on how to evade

apprehension.

(Graham Decl., ¶ 9).

The Tabletop Exercises contain several brief hypothetical scenarios in which demonstrators threaten to wreak havoc in New York City during the RNC. The City does not contend that these scenarios contain, or are based upon, actual intelligence information. As noted above, these scenarios are followed by very broad questions intended to stimulate discussion. The Action Items are vague instructions to various units within the NYPD. For example, the Action Items include instructions such as "develop a plan or strategy" for a particular type of incident, "ensure adequate staffing resources" for certain units, and "determine the technical feasibility" of a given strategy. Neither type of document contains sufficiently specific information to raise legitimate concerns about educating demonstrators regarding the NYPD's tactical weaknesses or its strategies for dealing with mass disorder. Similarly, the City's claim that these documents would educate protesters about how to "commit egregious acts" against the City is overblown. Another court has addressed a similar claim in an unrelated mass-demonstration case, finding that

> review of the materials in question demonstrates that the [materials] are pitched at such a high level of generality that the harm anticipated by [Chief Graham] from public dissemination is simply unconvincing. Indeed, the information . . . is both predictable and lacking in specific detail, and hence there is no reason to believe that, even if it fell into the hands of someone intent on violence, it would offer meaningful

assistance in evasive tactics.

Kunstler, 2005 WL 2656117, at *3 (holding that law enforcement privilege did not apply to NYPD "Disorder Control Guidelines").

Moreover, there is a protective order in place in the consolidated RNC actions that permits the City to designate documents produced in discovery as "confidential." Accordingly, the information contained in these documents will not be circulated publicly, but will be viewed only by plaintiffs' counsel. The City has offered "no information suggesting that such limited production and circulation, with appropriate safeguards for return of these materials at the conclusion of the litigation, poses any threat to public order or safety."[3] Id.; see also Haus, 2004 WL 3019762, at *5 (S.D.N.Y. Dec. 29, 2004) ("[G]iven the fact that these documents may be produced under the terms of a strict confidentiality order, it is entirely unclear how defendants expect that these supposedly sensitive items of information will be dispersed over the internet

---

[3] I find unpersuasive the City's contention that as a result of my recent decision in Schiller, 2007 WL 136149, the defendants "can no longer rely on the protections of the protective order." (Shammas 2/23/07 Letter at 10). In that decision, I found that the City had not shown good cause for the confidentiality designations it had assigned to various documents pursuant to the protective order. Under the protective order, which remains in place, any confidentiality designation remains in place until challenged by the other party, at which point the designating party bears the burden of establishing that there is good cause under Rule 26(c) of the Federal Rules of Civil Procedure. Good cause exists when "disclosure will result in a clearly defined, specific, and serious injury." In Re Terrorist Attacks on September 11, 2001, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (quoting Shingara v. Skiles, 420 F.3d 301, 306 (3d Cir. 2005)).

to enable future demonstrators to outwit the Police Department.").

                3. <u>Legal Subcommittee Meeting Documents</u>

        The City has produced to the plaintiffs two memoranda, dated
January 7, 2004 and March 2, 2004, from Deputy Chief John P.
Gerrish to Assistant Chief McManus, among others, describing Legal
Subcommittee meetings. The City has redacted portions of these
memoranda on the basis of the law enforcement privilege.[4]

        With respect to the January 7 memorandum, the City claims that
part of the redacted material "pertain[s] to the use of modern
technology," and that it would "inform individuals who are intent
on committing criminal activity about the existence and use of the
technology." (Graham Decl., ¶ 16). The remainder, according to
the City, "contains information about the ongoing techniques and
methods of investigation of the NYPD's Intelligence Division."
(Shammas 2/23/07 Letter at 14). The City contends that
"[d]isclosure of this information would undermine the viability of
those techniques and methods . . . and [] compromise the NYPD[]
Intelligence Division's abilities to investigate anticipated
unlawful activity and prevent civil disorder at future
demonstrations." (Graham Decl., ¶ 17). Having reviewed the
redacted material, I find that there is no basis for these

_____

        [4] The City has agreed to restore one redacted portion of the
March 2, 2004 memorandum that contains "information obtained from
public sources." (Shammas 2/23/07 Letter at 14). I will therefore
address only the remaining redactions.

                                17

conclusory assertions.  The City's "generalizations plainly fail[]
to justify invocation of the privilege in light of the type of
information actually withheld."  Haus, 2004 WL 3019762, at *4.

The City contends that in reviewing the redacted sections of
the March 2, 2004 memorandum, it has determined that they "reflect
[] communications between the NYPD Legal Bureau [] and its
clients." (Shammas 2/23/07 Letter at 14).  Accordingly, the City
now asserts the attorney-client privilege, rather than the law
enforcement privilege, with respect to these sections.  The first
redacted paragraph, which is paragraph 8(a) of the memorandum, does
not appear on its face to be a communication made for the purpose
of obtaining legal advice, and the City has given me no reason to
believe that it is.  The second redacted paragraph, which is
paragraph 10, does appear to be an attorney-client communication
regarding legal advice.

Accordingly, the City must produce these memoranda in
unredacted form with the exception of paragraph 10 of the March 2,
2004 memorandum, which it may redact.

### 4. Mobile Reserve Sector After-Action Report and Emergency Operations Center RNC Incident Reports

The "Mobile Reserve Sector After-Action Report" ("After-Action
Report"), authored by Chief Graham, is a "self-critique report" of
the kind described in my March 14, 2007 decision.[5]  See MacNamara

---

[5] The City also asserts that this document is subject to the
self-critical analysis privilege.  (Shammas 2/23/07 Letter at 15;

v. City of New York, No. 04 Civ. 9612, 2007 WL 755401, at *2
(S.D.N.Y. March 14, 2007).   The document entitled "Emergency
Operations Center RNC Incident Reports" ("Incident Reports") is a
computer log of RNC-related incidents.

The City has redacted from both documents information
regarding "how many officers (and of what rank) were deployed
during the RNC at certain locations throughout New York City"
(Graham Decl., ¶¶ 18, 20), and has redacted from the Incident
Reports "specific methods of investigation[] . . . used by the
NYPD."   (Graham Decl., ¶ 20).   The City has also redacted the
section entitled "Key recommendations" from the After-Action
Report, along with information regarding daily NYPD operations
during the RNC.   The City claims that disclosure of this
information would "severely compromise the effectiveness" of future
deployments by permitting individuals intent on criminal activity
to anticipate how the NYPD will respond to particular types of
events. (Graham Decl., ¶¶ 19-20).   This explanation is once again
so vague that it provides little assistance to the Court in
determining whether the privilege applies.

Another court has already rejected the City's claim that

---

RNC Defendants' Privilege Log 2/3/06, attached as Exh. A to Letter
of Jonathan C. Moore dated Jan. 10, 2007 ("Moore 1/10/07 Letter"),
at 7).   I have already rejected this contention with respect to
such "after-action reports."   See MacNamara, 2007 WL 755401, at *2-
6.   In its opposition to the instant motion, the City has given me
no reason to reconsider that decision.

information regarding the number and rank of officers deployed at
demonstrations is protected by the law enforcement privilege.
Haus, 2004 WL 3019762, at *4-5.  That court found that

> [t]he number of police at specific locations was an
> observable fact at the time of the [] demonstration.
> Moreover, why that information would be useful to people
> supposedly bent on mayhem in future demonstrations is
> entirely a matter of mystery.  Presumably, such
> demonstrations will occur in different locales, will
> feature larger (or smaller) numbers of demonstrators,
> will pose different potential threats of law-breaking and
> will thus present different contexts for the police to
> invest manpower in specific locations.

Id. at *5.  Furthermore, the remaining redacted information in the
After-Action report is highly specific to the RNC, and it is
difficult to imagine how it could be useful to persons determined
to foil the NYPD's efforts to keep order at future demonstrations.
The "specific methods of investigation" redacted from the Incident
Reports are not described in any detail, and I see no reason to
believe that the disclosure of a mere mention of a type of
technology would jeopardize the NYPD's ability to conduct future
investigations using that technology.

The City shall produce both documents to the plaintiffs
without the redactions described above, but may redact information
contained in the After-Action Report regarding locations considered
to be potential terrorist targets.  (Bates Nos. 15011-15014).

### 5. Critical Mass Bike Block Demonstration Presentation

This document is a PowerPoint presentation that outlines the
NYPD's planned response to a Critical Mass bicycle ride that took

place on August 27, 2004, several days before the RNC.[6]  (Graham Decl., ¶ 21).  The City contends, somewhat vaguely, that this plan "will likely be used to combat unlawful conduct at future Critical Mass Bike Riders," and that disclosure would "render it ineffective."  (Graham Decl., ¶ 21).

The plan outlined in the PowerPoint presentation focuses on a specific route that the riders were expected to take on August 27, 2004, and contains photographs of locations along the route.  It is difficult to see how disclosure of this plan would jeopardize the NYPD's ability to police future Critical Mass rides, as the City has given the Court no indication that this particular route has been used by Critical Mass riders since the RNC, or that they are likely to use it again.  Moreover, the document refers to a number of police tactics that are by now public knowledge.  See Randal C. Archibold et al., 100 Cyclists Are Arrested as Thousands Ride in Protest, N.Y. Times, August 28, 2004, at B1.  The document will

---

[6] According to the City's privilege log, this document was also withheld on the basis of the deliberative process privilege. (RNC Defendants' Privilege Log 11/8/06 ("11/8/06 Log"), attached as Exh. B to Moore 1/10/07 Letter, at 6).  The City has not addressed that claim in its opposition to the plaintiffs' motion.  In any case, the document is not deliberative, and therefore not subject to the privilege.

Along with the document entitled "Critical Mass Bike Block Demo," the City has submitted a document referred to in its privilege log as "3 Squad Platoon Formations."  (11/8/06 Log at 6). The plaintiffs do not appear to have challenged the City's assertions of privilege with respect to this document, and I assume that it was submitted in error.

presumably be released pursuant to the terms of the protective order, and there is no reason to believe that such limited disclosure would jeopardize law enforcement interests.

      6. <u>Undercover Officers</u>

     Finally, the plaintiffs challenge the City's assertion of the law enforcement privilege to bar questioning at depositions regarding the presence of undercover officers at RNC-related demonstrations. The City asserts that "confirmation of [the presence of undercover and plainclothes officers at demonstrations] will defeat the element of uncertainty, which itself deters criminal activity." (Shammas 2/23/07 Letter at 12). However, the fact that the NYPD has used undercover officers at protests is already widely known. <u>See</u> Jim Dwyer, <u>Police Memos Say Arrest Tactics Calmed Protests</u>, N.Y. Times, March 17, 2006, at A1; Jim Dwyer, <u>New York Police Covertly Join In at Protest Rallies</u>, N.Y. Times, Dec. 22, 2005, at A1. It is difficult to imagine how disclosure of whether undercover officers were present at specific demonstrations more than two years ago will do anything further to eliminate "the element of uncertainty." Thus, the City has not made a sufficient showing of harm to demonstrate that the law enforcement privilege is applicable here. <u>See</u> <u>Kunstler</u>, 439 F. Supp. 2d at 328 (affirming magistrate judge's ruling that law enforcement privilege did not apply to presence of undercover police officers at February 15, 2003 anti-war demonstration).

Accordingly, the plaintiffs may question witnesses at depositions regarding the presence and activities of undercover officers at RNC-related demonstrations, and may re-call those witnesses who have previously been instructed not to answer such questions.

The plaintiffs seek to discover the identities of undercover officers, "at a minimum," insofar as those officers "witnessed, participated in, or provided information for their arrest and detention." (Letter of Jonathan C. Moore dated March 16, 2007 at 10). The plaintiffs are entitled to discover the identity of such officers, given the relevance of that information to their claims. Of course, that information may be designated "confidential" pursuant to the protective order and thereby limited to plaintiffs' counsel. If the City determines that disclosure of an officer's identity to plaintiffs' counsel would pose a significant safety risk to the officer or would jeopardize an ongoing investigation, the City may seek appropriate relief, such as an order permitting the City to identify the officer by shield number or pseudonym.

The City has also withheld two documents that relate to the use of undercover officers: (1) a June 4, 2004 memorandum from Deputy Chief Louis M. Croce to Chief McManus, and (2) an August 9, 2004 memorandum from Chief Graham to the Commanding Officer of the Building Maintenance Section. The June 4, 2004 memorandum lists officers "deemed qualified to be plainclothes officers" during the RNC. (Shammas 2/23/07 Letter at 13). This information is

23

irrelevant to the plaintiffs' claims, and the document need not be produced. The August 9, 2004 memorandum appears to relate to the use of undercover or plainclothes officers, but does not identify, or provide a means to identify, any such officers. Accordingly, it must be produced.[7]

Conclusion

With the exceptions noted above, the documents that are the subject of the plaintiffs' motion must be produced in unredacted form. The plaintiffs may also re-call certain witnesses in order to make inquiries regarding the presence of undercover officers at RNC-related demonstrations.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
        April 20, 2007

Copies mailed this date:

Jonathan C. Moore, Esq.
Rachel Kleinman, Esq.
Clare Norins, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue
New York, New York 10016

---

[7] The memorandum contains an officer's cell phone number, which may of course be redacted.

24

Cheryl L. Shammas, Esq.
Fred M. Weiler, Esq.
Assistant Corporation Counsel
100 Church Street
New York, New York 10007