Docket No.  04 CV 9216 (KMK) (JCF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MACNAMARA, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

Defendants.

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### *MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
Attorney for Defendants
100 Church Street
New York, N.Y.  10007
(212) 788-1570

*Of Counsel:*
*Peter G. Farrell*
*Tonya Jenerette*
*James Mirro*
*Jeffrey C. Brooks*
*Cheryl L. Shammas*
*Gerald Smith*
*Jeffrey Dougherty*
*Fred Weiler*
*Liora Jacobi*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

I.      INTRODUCTION ................................................................................................ 1

II.     PRELIMINARY STATEMENT ......................................................................... 2

III.    STATEMENT OF FACTS REGARDING THE PROPOSED SUB CLASSES AND CLASSES............................................................................... 4

    A.  The Eight False Arrest Sub-Classes................................................................4

    B.  The Conditions of Confinement Class.........................................................25

    C.  The Excessive Detention Class....................................................................25

IV.     ARGUMENT ..................................................................................................... 27

    A.  Legal Requirements For Class Certification................................................27

        (1)  Burden and Standard of Proof.................................................................28

        (2)  Plaintiffs Lack Standing To Maintain A Class Action For Injunctive Or Declaratory Relief Under Fed. R. Civ. P. 23(b)(2). ...............................................................................................29

    B.  Plaintiffs' Proposed Classes Fail To Meet the Requirements of Rule 23(a) ................................................................................................31

        (1)  Plaintiffs Fail to Satisfy Rule 23(a) Numerosity Requirements Because Joinder is Not Impractical ...............................31

        (2)  Each of Plaintiffs' Proposed Classes Fail to Meet Rule 23(a) Commonality and Typicality Requirements...............................34

        (3)  The proposed class representatives do not have standing to assert First Amendment retaliation claims....................................34

    C.  Plaintiffs' Proposed Classes Also Fail Rule 23(b)(3) Predominance Requirements ......................................................................36

        (1)  Individualized Inquiries Are Necessary to Determine Municipal Liability .............................................................................37

**Page**

    (2)  Individualized Probable Cause Inquiries Are Necessary to Determine Liability For The Eight Proposed False Arrest Sub-Classes ........................................................................40

        (i)  The Legal Standard ................................................................40

        (ii)  Individualized Probable Cause Determinations Are Required ..............................................................................42

        (iii) Individual Class Members' Suits for False Arrest Are Barred by the Doctrine of Heck v. Humphrey .....................48

    (3)  Individualized Inquiries Are Necessary to Determine Whether Conditions Confinement Violated the Fourteenth Amendment .............................................................49

        (i)  The Legal Standard ................................................................50

        (ii)  Determining Liability for the Conditions Class Will Require Mini-Trials ................................................................52

    (4)  Individualized Inquiries Necessary to Determine Whether Detention Times Were Excessive In Violation of the Fourth Amendment ............................................................65

        (i)  The Legal Standard ................................................................65

        (ii)  Material Variances in Arrest-to Arraignment Times Preclude Certification of Plaintiffs' Proposed Excessive Detention Class ................................................69

        (iii) Plaintiffs "As Applied" Attack on the MAPP Requires Analysis of How The MAPP Was Applied to Each Putative Class Member. .............................................71

    (5)  Superiority ..................................................................................73

V.   CONCLUSION .......................................................................................... 75

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                          <u>Pages</u>

<u>Allen v. City of New York</u>,
   2007 U.S. Dist. LEXIS 15 (S.D.N.Y. Jan. 3, 2007)...............................................................67

<u>Amaker v. Coombe</u>,
   2002 U.S. Dist. LEXIS 5934 (S.D.N.Y. 2002) ...................................................................49

<u>Amchem Products, Inc. v. Windsor</u>,
   521 U.S. 591 (1997)..............................................................................................................37

<u>Ansari v. New York Univ.</u>,
   179 F.R.D. 112 (S.D.N.Y. 1998) .........................................................................................33

<u>Arce v. Banks</u>,
   913 F. Supp. 307 (S.D.N.Y. 1996) ......................................................................................66

<u>Atwater v. Lago Vista</u>,
   532 U.S. 318 (2000)..............................................................................................................44

<u>Augustin v. Jablonsky</u>,
   2001 U.S. Dist. LEXIS 10276 (E.D.N.Y. Mar. 8, 2001) ......................................................70

<u>Baird v. California Faculty Ass'n</u>,
   2000 U.S. Dist. LEXIS 13594 (E.D. Cal. July 13, 2000) .....................................................73

<u>Baker v. McCollan</u>,
   443 U.S. 137 (1979)..............................................................................................................42

<u>Barham v. Ramsey</u>,
   434 F.3d 565 (D.C. Cir. 2006) ........................................................................................44, 47

<u>Bauer v. Veneman</u>,
   352 F.3d 625 (2d Cir. 2003)..................................................................................................30

<u>Bell v. Wolfish</u>,
   441 U.S. 520 (1979)..........................................................................................................51, 53

<u>Benjamin v. Fraser</u>,
   343 F.3d 35 (2d Cir. 2003)...................................................................................39, 51, 52, 54

<u>Bernard v. United States</u>,
   25 F.3d at 102 (2d Cir. 1994)............................................................................................41, 42

**Cases**                                                                 **Pages**

Bewry v. Hopkins,
    1997 U.S. App. LEXIS 26241 (2d Cir. 1997) ..........................................................64

Broderick v. Okla.,
    413 U.S. 601 (1973).......................................................................................................36

Bryant v. City of New York,
    404 F.3d 128 (2d Cir. 2005)...............................................................................68, 69, 71

Burley v. City of New York,
    2005 U.S. Dist. LEXIS 4439 (S.D.N.Y. Mar. 23, 2005) .......................................28, 55, 60, 74

Butler v. Westchester County,
    2000 U.S. Dist. LEXIS 3981 (S.D.N.Y. March 30, 2000) ...........................................39, 51, 61

Califano v. Yamasaki,
    442 U.S. 682 (1979).......................................................................................................35

Caridad v. Metro-North Commuter Railroad,
    191 F.3d 283 (2d Cir. 1999).............................................................................................29

City of Lakewood v. Plain Dealer Pub. Co.,
    486 U.S. 750, 770 n.11 (1988)) .......................................................................................72

City of St. Louis v. Praprotnik,
    485 U.S. 112 (1988).......................................................................................................38

Concepcion v. City of New York,
    05 Civ. 8501 (KMK).............................................................................................20, 21, 33

County of Riverside v. McLaughlin,
    500 U.S. 44 (1991).................................................................................................67, 69, 70

Curley v. Village of Suffern,
    268 F.3d 65 (2d Cir. 2001)...............................................................................................36

DeMarco v. Edens,
    390 F.2d 836 (2d Cir. 1968).............................................................................................33

Dellums v. Powell,
    566 F.2d 167 (D.C. Cir. 1977).........................................................................................44

Deposit Guar. Nat' Bank v. Roper,
    445 U.S. 326 (1980).......................................................................................................33

| Cases | Pages |
|-------|-------|

Devenpeck v. Alford,
543 U.S. 146 (2004)] ................................................................43

Dodge v. County of Orange,
2004 U.S. App. LEXIS 11907 (2d Cir. June 7, 2004) ....................30

Doyle v. Okla. Bar Ass'n,
998 F.2d 1559 (10th Cir. 1993) ..............................................69

Dunnigan v. Metropolitan Life Ins.,
214 F.R.D. 125 (S.D.N.Y. 2003) ............................................70

Fernandez v. City of New York,
2003 U.S. Dist. LEXIS 13122 (S.D.N.Y. July 29, 2003) ..............49

Field Day, LLC v. County of Suffolk,
463 F.3d 167 (2d Cir. 2006)...................................................72

Gen. Telephone Co. of Southwest v. Falcon,
457 U.S. 147 (1982)...........................................................29, 35

Gonzalez v. City of New York,
2000 U.S. Dist. LEXIS 5230 (E.D.N.Y. 2000)...........................55

Grubbs v. Safir,
1999 U.S. Dist. LEXIS 374 (S.D.N.Y. January 15, 1999) .........53, 57

Harrison v. Ienuso,
1995 U.S. Dist. LEXIS 8616 (S.D.N.Y. June 23, 1995)............39, 54

Heck v. Humphrey,
517 U.S. 477 (1994).............................................................49

Hernandez v. City of New York,
2004 U.S. Dist. LEXIS 23365 (S.D.N.Y. 2004)..........................49

Hock v. Kline,
758 N.Y.S.2d 640 (1st Dept. 2003) ........................................50

Hollender v. Trump Village Cooperative Inc.,
58 N.Y.2d 420 (1983) .........................................................50

Hopson v. Schilling,
418 F. Supp. 1223 (N.D. Ind. 1976) ........................................73

**Cases**                                                                                                      **Pages**

Hudson v. City of Chicago,
    2007 U.S. Dist. LEXIS 37515 (N.D. Ill. May 22, 2007) ............................................37, 46, 73

In re Initial Pub. Offerings Sec. Litig.,
    471 F.3d at 33 ...............................................................................................................29

Illinois v. Gates,
    462 U.S. 213 (1983)......................................................................................................42

Jermosen v. Coughlin,
    878 F. Supp. 444 (N.D.N.Y. 1985).............................................................................66

Johnson v. Bax,
    63 F.3d 154 (2d Cir. 1995).........................................................................................50

La Trieste Restaurant and Cabaret v. Village of Port Chester,
    40 F.3d 587, 589-591 (2d Cir. 1994))........................................................................73

Lareau v. Manson,
    651 F.2d 96 (2d Cir. 1981).....................................................................................51, 53

Lewis v. Casey,
    518 U.S. 343, 135 L. Ed. 2d 606, 116 S. Ct. 2174....................................................52, 54

Lewis v. Washington,
    1996 U.S. Dist. LEXIS 18173 (S.D.N.Y. Dec. 6, 1996) ...........................................39

Loper v. New York City Police Dept.,
    802 F. Supp. 1029 (S.D.N.Y. 1992)...........................................................................36

Mahase v. City of New York,
    2000 U.S. Dist. LEXIS 2046 (E.D.N.Y. January 5, 2000) .......................................51

Mandal v. City of New York,
    2006 U.S. Dist. LEXIS 74925 (S.D.N.Y. Oct. 17, 2006) .........................................69

Marisol A. v. Giuliani,
    126 F.3d 372 (2d Cir. 1997).......................................................................................35

Maryland v. Pringle,
    540 U.S. 366 (2003) ...................................................................................................41

McCarthy v. Kleindienst,
    741 F.2d 1406 (D.C. Cir. 1984).............................................................................28, 47

<u>**Cases**</u>                                                                                                         <u>**Pages**</u>

<u>McDermott v. City of New York</u>,
   2002 U.S. Dist. LEXIS 2893 (S.D.N.Y. February 25, 2002) .................................................51

<u>McFadden v. Solfaro</u>,
   1998 U.S. Dist. LEXIS 5765 (S.D.N.Y. April 23, 1998) .........................................................53

<u>Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.)</u>,
   471 F.3d 24 (2d Cir. 2006)...................................................................................................29

<u>Molina v. City of New York</u>,
   814 N.Y.S.2d 120 (1st Dept. 2006) ....................................................................................50

<u>Monell v. Dep't of Soc. Servs.</u>,
   436 U.S. 658 (1978)..............................................................................................................38

<u>Moore v. Paine-Webber Inc.</u>,
   306 F.3d 1247 (2d Cir. 2002)...............................................................................................70

<u>Odom v. Keane</u>,
   1997 U.S. Dist. LEXIS 14077 (S.D.N.Y. September 17, 1997)............................................61

<u>Pembaur v. City of Cincinnati</u>,
   475 U.S. 469 (1986)..............................................................................................................38

<u>Primavera Familienstiftung v. Askin</u>,
   178 F.R.D. at 410 ................................................................................................................33

<u>Pugilese v. Nelson</u>,
   617 F.2d 916 (2d Cir. 1980)................................................................................................69

<u>Ramirez v. Holmes</u>,
   921 F. Supp. 204 (S.D.N.Y. 1996) ....................................................................................66

<u>Rhodes v. Chapman</u>,
   452 U.S. 337, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981)...................................................52, 54

<u>Ricciuti v. Transit Auth.</u>,
   124 F.3d 123 (2d Cir. 1997)................................................................................................42

<u>Rivera v. S.B. Johnson</u>,
   1996 U.S. Dist. LEXIS 14192 (W.D.N.Y. Sept. 20, 1996) ...................................................63

<u>Robidoux v. Celani</u>,
   987 F.2d 931 (2d Cir. 1993)...........................................................................................32, 35

**Cases**                                                               **Pages**

Roesch v. Otarola,
    980 F.2d 850 (2d Cir. 1992)........................................................................50

Romano v. Howarth,
    998 F.2d 101 (2d Cir. 1993)........................................................................55

Roundtree v. City of New York,
    778 F. Supp. 614 (E.D.N.Y. 1991) ............................................................69

Rush v. Astacio,
    1998 U.S. App. LEXIS 18588 (2d Cir. 1998) ....................................39, 53

Saddler v. United States,
    531 F.2d 83 (2d Cir. 1976)..........................................................................49

Savino v. City of New York,
    332 F.3d 63 (2d Cir. 2003).........................................................................42

Shain v. Ellison,
    356 F.3d 211 (2d Cir. 2004)..................................................................30, 31

Simer v. Rios,
    661 F.2d 655 (7th Cir. 1981) .....................................................................28

Singer v. Fulton Cty. Sheriff,
    63 F.3d 110 (2d Cir. 1995).........................................................................50

Sorlucco v. New York City Police Dep't.,
    971 F.2d 864 (2d Cir. 1992).......................................................................38

Stefanopolous v. City of New York,
    2005 U.S. Dist. LEXIS 22445 (S.D.N.Y. February 28, 2005) ................55

Sulkowska v. City of New York,
    129 F. Supp. 2d 274 (S.D.N.Y. 2001)......................................................55

Thomas v. Chicago Park Dist.,
    534 U.S. 316, 325 (2002)) ........................................................................72

Thomas v. Nassau County Correctional Center,
    288 F. Supp. 2d 333 (E.D.N.Y. 2003) ................................................53, 64

United States v. Ceballos,
    812 F.2d 42 (2d Cir. 1987)..........................................................................41

**<u>Cases</u>**                                                                                                  **<u>Pages</u>**

<u>United States v. Colon</u>,
    250 F.3d 130 (2d Cir. 2001).................................................................................42

<u>United States v. Fisher</u>,
    702 F.2d 372 (2d Cir. 1983)...........................................................................41, 42

<u>Universal Calvary Church v. City of New York</u>,
    177 F.R.D. 181 (S.D.N.Y. 1998) ......................................................................40

<u>Vippolis v. Village of Haverstraw</u>,
    768 F.2d 40 (2d Cir. 1985), <u>cert. denied</u>, 480 U.S. 916 (1987) ..............................39

<u>In re Visa Check/MasterMoney Antitrust Litig.</u>,
    280 F.3d 124 (2d Cir. 2001).........................................................................28, 50

<u>Vodak v. City of Chicago</u>,
    2006 U.S. Dist. LEXIS 30052 (N.D. Ill. 2006) .........................................43, 44, 47

<u>Watson v. City of New York</u>,
    92 F.3d 31 (2d Cir. 1996)...............................................................................69

<u>Weyant v. Okst</u>,
    101 F.3d 845 (2d Cir. 1996)......................................................................41, 49, 63

<u>Whitted v. Lazerson</u>,
    1998 U.S. Dist. LEXIS 7437 (S.D.N.Y. May 21, 1998)......................................53

<u>Williams v. Ward</u>,
    845 F.2d 374 (2d Cir. 1987).........................................................................68, 71

<u>Zeno v. Cropper</u>,
    650 F. Supp. 138 (S.D.N.Y. 1986) ...................................................................66

**<u>Statutes</u>**

Fed. R. Civ. P. 23(a) ...............................................................................................28

Fed. R. Civ. P. 23(b) ...............................................................................................28

Fed. R. Civ. P. 23(b)(2)........................................................................................1, 29

Fed. R. Civ. P. 23(b)(3)............................................................................................37

## I.        INTRODUCTION

Defendants submit this memorandum in opposition to plaintiffs' motion for class certification. In this action, twenty-four plaintiffs seek certification of ten (10) different classes. The first eight classes are false arrest subclasses that correspond to eight separate locations involving arrests for varying unlawful conduct on different days and at different times shortly before or during the 2004 Republican National Convention (the "RNC"). The ninth (9th) class consists of arrestees who were arrested on different days and times over the course of the week of the RNC and spent varying amounts of time in custody prior to their release. Almost all were released within the 48 period deemed presumptively valid under the Fourth Amendment. The tenth (10th) class consists of individuals who, as part of their arrest processing, were sent to Pier 57 where their arresting officers and numerous other NYPD officers and staff worked to process their arrests. These arrestees allege that conditions of confinement at Pier 57 were unconstitutional.

Defendants respectfully submit that all of the proposed classes are fatally flawed under the certification requirements set forth in Rule 23(a) and Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Individual, material evidentiary differences predominate in all of the claims asserted by the proposed classes, precluding certification under the Second Circuit's rigorous requirements. Moreover, certification of the classes would create more case management problems and judicial inefficiencies than it would solve as approximately 98 RNC-related actions consisting of approximately 600 of the purported class members have already been filed. The commencement by 600 plaintiffs in almost 100 RNC-related actions indicates that plaintiffs themselves believe that the pursuit of individual claims is superior to the class action device for advancing their rights and interests. Accordingly, and for all of the reasons set

forth below, defendants respectfully request that the court deny plaintiffs' motion for class certification in its entirety.

## II.   **PRELIMINARY STATEMENT**

In February 2003, the Republican National Committee announced that New York City would host the 2004 Republican National Convention (the "RNC"). The RNC was scheduled to take place from August 29 – September 2, 2004. The New York City Police Department (the "NYPD") began planning for the RNC more than one year before the convention. Planning for the RNC was a massive undertaking. To facilitate overall planning, the NYPD divided the work required to done among a series of committees, all of which were overseen by an RNC coordinator. In turn, each committee assigned various tasks in the planning process to subcommittees, each of which was responsible for a particular aspect of policing the RNC. For example, the Site Security Committee included subcommittees responsible for delegate safety, vehicle checkpoints, and security around the area of Madison Square Garden ("MSG") where the Convention was to take place; the Tactical Support Committee included subcommittees responsible for intelligence/counterterrorism and security inside MSG; and the Operational Support Committee included subcommittees responsible for legal issues, arrest processing and training. The NYPD's Criminal Justice Bureau also developed plans for arrest processing and worked closely with some of these subcommittees.

From the Fall of 2003 leading up to the RNC, at numerous meetings, these committees and subcommittees developed plans for their respective areas of responsibility to determine the most effective ways to accomplish their respective missions. The committees' recommendations were then presented to the Police Commissioner and other high-level NYPD members who formed the NYPD Executive Committee. All of the planning was done in an effort to achieve four principle mandates.

As set out in the "2004 Republican National Convention New York City Police Department Executive Summary," in June, 2004, those mandates were to:

1. Ensure the safety of the citizens of New York and its visitors;
2. Provide for the security of the RNC;
3. Minimize the inconvenience to commuters, residents and merchants; and
4. Facilitate the rights of others to peacefully protest against the Convention.[1]

*See* Exhibit 6 to the Declaration of Jonathan Moore ("Moore Decl."), attached to Plaintiffs' Memorandum of Law in Support of Class Certification ("Plaintiffs' Motion for Class Cert."), filed January 31, 2007.   As part of its efforts to achieve the 4th mandate the NYPD held discussions with a variety of entities seeking to demonstrate during the RNC and also issued numerous parade permits. *See* Exh. 4 to Moore Decl. For example, United For Peace and Justice was issued a permit for a march on August 29, 2004 that proceeded directly in front of MSG, the venue for the RNC, on the eve of the convention while the final security plans were being implemented. It was anticipated that over 250,000 participants would attend that march. *See* Exh. 6 to Moore Decl.   In addition, a demonstration zone was set up throughout the RNC on Eighth Avenue near MSG.   Moreover, the NYPD facilitated numerous marches throughout the RNC that did not have a permit.

### Unlawful Activity

Because the RNC was scheduled to take place shortly before the third anniversary of the terror attacks on the World Trade Center and the fifth anniversary of violent protests that overwhelmed law enforcement and caused the cancellation of the World Trade Organization meetings in Seattle, the NYPD also prepared to respond to violent or unlawful activity. The

---

[1] This message was further communicated in the Legal Guidelines For the Republican National Convention specifically states that "fundamental to a free society is the right to communicate one's ideas. . . A heavy burden is placed upon the police to justify any limitation of First Amendment rights." Exh. 51 to Moore Decl.. The Legal Guidelines "stressed that the *content* of the speaker's message may not influence a decision by the police to limit freedom of speech," emphasizing that "one of the primary obligations of the police is to protect the right of the speaker to exercise First Amendment rights, no matter how offensive the message." *Id.*

NYPD became aware of plans by to engage in unlawful activity and acts of civil disobedience as such information was widely communicated on the internet. That information revealed a wide range of threats, including specific targets of violent activity, plans to use illegal civil disobedience to shut down the City, tactics for attacking, undermining or evading the NYPD, instruction in the use of weapons and plans to falsify identities in order to disrupt arrest processing. *See* Exhibit 1 attached to the Declaration of Tonya Jenerette ("Jenerette Decl."), annexed hereto. Moreover, August 31, 2004 had been designated as "The Day of Chaos" by those intent on engaging in unlawful conduct and specifically chosen as the date for creating large-scale civil disorder. *See id.*

In response to this information, the NYPD developed the Mass Arrest Processing Plan (the "MAPP") which required all arrestees to be processed for Desk Appearance Tickets or arraigned. Arrestees were also to be fingerprinted. *See* Exhs. 53, 61 and 62 to the Moore Decl. All RNC-related arrestees were to be processed according to the MAPP, which "was designed in order to efficiently and quickly manage RNC mass arrests." Ex. 61 to Moore Decl. at ¶¶ 10-11. The MAPP was also designed to alleviate issues identified in large-scale arrest processing at prior events. *See* Exhs. 53 and 62 to Moore Decl.

## III.   STATEMENT OF FACTS REGARDING THE PROPOSED CLASSES

### A.   *The Eight False Arrest Sub-Classes*

Plaintiffs seek certification of eight sub-classes of individuals arrested on different days and times under different circumstances at various locations throughout the City during the week of the RNC (the "Proposed False Arrest Sub-Class Locations"). The eight locations from which plaintiffs derive their false arrest sub-classes share two common facts: (1) plaintiffs at those locations had obtained none of the required permits to march from the NYPD and (2) officers observed and videotaped large groups of individuals blocking city streets and sidewalks,

4

preventing ordinary New Yorkers from going about the business of their daily lives. Officers at all of the Proposed False Arrest Sub-Class Locations observed individuals within the groups engaging in various kinds of unlawful conduct before they were arrested. Thus, in addition to criminal charges based upon group conduct such as parading without a permit and blocking vehicular and pedestrian traffic, a large number of individuals at plaintiffs' 8 Proposed False Arrest Sub-Class Locations were also charged with a myriad of charges based upon observations of individual conduct. Some putative class members were later convicted of those charges. None of the arrests were unlawful unless they were effected without probable cause. Indeed, despite plaintiffs' use of the phrase "indiscriminate mass arrest" to sidestep the issue of probable cause, they concede that the issue of "whether there was probable cause to arrest individual plaintiffs" must be "adjudicated on an individual basis." *See* Plaintiffs' Motion for Class Cert. at 39. As a result, trial of these classes would require scores, if not hundreds, of mini-trials due to the overwhelming predominance of individualized proof on key legal issues.

### Proposed False Arrest Sub- Class Location 1

False Arrest Sub-Class 1 "consists of persons arrested by the New York City Police Department in connection with the RNC [on] August 27, 2004 on 7th Avenue between 34th and 35th Street between 6:30 p.m. and 9:30 p.m." (Plaintiffs' Motion for Class Cert. at 3-4).

Arrests at this location arose from the Friday, August 27, 2004 "Critical Mass" bicycle ride.[2] On that date, approximately 5,000 bicyclists participated in an unpermitted ride through the streets and avenues of Manhattan.[3] They rode to protest the RNC, the use of automobiles, and to advocate the rights of bicyclists.[4] Before the ride began, police distributed flyers bearing the NYPD logo that advised the riders of various traffic laws and warned them that violations of those laws could result in arrest.[5]

---

[2] Defendants' recitation of facts is culled from testimony of numerous witnesses and from numerous videotapes that depict the events described.

[3] *See* Compilation of Video Footage, compiled from footage taken by the NYPD's Technical Assistance Response Unit and footage produced by plaintiffs in the consolidated RNC actions, annexed to the Jenerette Decl. as Exh. 76. ("Video Compilation").

[4] *See* Video Compilation; *see also* Deposition of James Shea ("Shea Dep."), annexed as Exh. 65 to the Jenerette Decl.

[5] *See* Deposition of Lorenzo Johnson ("Johnson Dep."), at 301, annexed as Exh. 58 to the Jenerette Decl.

As they rode, the bikers committed a long list of violations.  Those violations included running red lights, blocking vehicular and pedestrian traffic, parading without a permit and numerous violations of the vehicle and traffic law (including violations specific to bicyclists).  At approximately 8:00 p.m. on August 27, 2004, hundreds of bike riders converged at the intersection of 34th Street and 7th Avenue, bringing vehicular traffic to a standstill.[6]  At approximately 8:30 pm, police formed a line across Seventh Avenue south from the northwest to northeast corners of the 34th Street intersection in an effort to clear the intersection and to re-open east-west traffic on 34th Street.

North of the police line, from 34 to 35th Streets on 7th Avenue, a heavy concentration of bicyclists took over 7th Avenue, blocking vehicle and pedestrian traffic.[7]  Police gave a series of orders to those bicyclists to disperse or face arrest.  These orders were given both to the crowd as a whole and to particular bikers on an individual basis.  Many of the bikers complied with police orders to disperse and exited the street.  Some moved to the sidewalks on either side of the avenues; some walked south on the sidewalks and south of the police line; some walked north on the sidewalks; others dispersed by walking directly north on Seventh Avenue.[8]  Despite ample opportunity to do so, however, a number of the riders refused to comply with police orders to disperse.  As the police moved in a line in a northerly direction from the intersection, individuals who elected not to comply with dispersal orders were arrested.

Among the presumptive class members from this location are plaintiff Julia Cohen, who is proceeding in her own action, and Michael Binder.[9]  Officer Steven Choinski testified that he personally issued repeated warnings to disperse to plaintiff Julia Cohen.  At the time Officer Choinski issued his initial order to disperse, Ms. Cohen was standing in the street blocking vehicular traffic.  She then moved to the sidewalk where she proceeded to block pedestrian traffic.  Officer Choinski again ordered her to disperse or face arrest.  After she failed to comply with "at least three" dispersal orders, Officer Choinski placed her under arrest.[10]

Putative class representative Michael Binder rode to Union Square to meet up with other bicyclists to participate in a Critical Mass ride.  It took him 30 minutes to exit Union Square Park because of the large number of bicyclists.[11]  Binder testified that he rode with the group to the intersection of 35th Street and 7th Avenue, where he encountered a "large and chaotic" scene with

---

[6] See Deposition of James Torchi ("Torchi Dep.") , at 71, annexed as Exh. 67 to Jenerette Decl.

[7] See Video Compilation.

[8] See Shea Dep. at 51-55; 73-79; Torchi Dep. at 88-89; 97-100; 136 – 140; Deposition of Steven Choinski ("Choinski Dep.") , at 38-42; 92-103, annexed as Exh. 48 to the Jenerette Decl.

[9] Julia Cohen originally was a named plaintiff in the MacNamara action.  Shortly after defendants noticed her deposition in this action, she dismissed her claims in this action and subsequently commenced an individual action in which she is represented by other counsel.

[10] Choinski Dep. at 54-66; 95, 103-110 ("I asked her to move and she did not move.  We came back and asked people to move and she still didn't move.  We asked her to move and eventually she moved up onto the sidewalk where she was blocking pedestrian traffic.  A female black lady – so long as I live I will not forget this – was coming down the sidewalk.  These people were trying to get into Penn Station.  She collided.  She was very mad at her for blocking the sidewalk.  At that time I told her, you have to move.  I didn't know here name was Julia Cohen. I told her that she needed to move.  I told her, you have to exit the area not go up on the sidewalk, because now you are causing harm and blocking pedestrian traffic on the sidewalk. . . I told her, now you need to go and I showed her how to proceed.  The police officers were opening up the streets on the sides and the people were exiting.").

[11] 50-H at 29.

6

a large police presence.[12] He testified that, although a friend riding with him elected to avoid the intersection by turning onto 35th Street (and was not arrested), Binder stopped at the intersection light and took a photo of the "chaotic scene" and of arrests being made.[13] Binder testified that he saw police officers, either on scooters or vehicles, within minutes of turning onto 7th Avenue.[14] He observed a group of cyclists ahead of him continue to ride southbound on 7th despite the police presence.[15] Binder also admitted seeing bikers ahead of him being taken off their bikes and arrested, but claims he was just sitting at a traffic light and not breaking the law when he was arrested.[16]

Charges against individuals arrested at Proposed False Arrest Sub-Class Location 1 include:[17]

- 14 charges of disorderly conduct;
- 18 charges of obstructing vehicular or pedestrian traffic;
- 8 charges of congregating in a public place and refusal to comply with a lawful order to disperse;
- 30 charges of parading without a permit;
- 22 charges of biking violations;
- 4 charges of obstructing governmental administration.

### Proposed False Arrest Sub-Class 2

Proposed False Arrest Sub-Class 2 "consists of persons arrested by the New York Police Department in connection with the 2004 Republican National Convention" on August 27, 2004 "on 35th Street between Tenth Avenue and Dyer between 8:00 pm and 11:00 p.m." (Plaintiffs' Motion for Class Cert. at 3-4).

Like Proposed False Arrest Sub-Class #1, this proposed class arises from arrests of Critical Mass bicyclists who participated in the unpermitted bicycle ride by thousands of protesters through the streets and avenues of Manhattan on August 27, 2004. Before that ride began, police distributed flyers bearing the NYPD logo that advised the riders of various traffic laws and warned them that violation of those laws could result in arrest.[18]

Nevertheless, riders committed a long list of traffic violations in the several hours that they rode through Manhattan and as they ended their ride, including but not limited to running red lights, blocking vehicular and pedestrian traffic (particularly at intersections) parading without a permit, and engaging in violent or tumultuous behavior.[19] Many of the individuals who rode in that event concluded their ride on 35th Street near 10th Avenue, where they finally were arrested.

---

[12] Transcript of 50-H Examination of Michael Binder ("Binder 50-H"), Exh. 11 to the Moore Decl., at 43-45.
[13] Binder 50-H at 44-45.
[14] Deposition of Michael Binder, annexed as Exh. 6 to Jenerette Dec. ("Binder Dep.") at 237-8, 241.
[15] Binder Dep. at 242.
[16] Binder Dep. at 251-252, 268.
[17] All charges referenced herein are based upon the Booking Arraignment Disposition System Forms produced in consolidated discovery.
[18] See Johnson Dep. at 301.
[19] See Video Compilation.

On August 27, 2004, Captain Christopher Monahan was in charge of one of the NYPD bicycle details that was on patrol throughout various parts of Manhattan. Captain Monahan learned that Critical Mass would stage one of its largest protests, starting at Union Square Park. At approximately 7:00 p.m., the Critical Mass protest began, starting at Union Square Park and heading towards various parts of the City. Shortly thereafter, the group began to split up.[20] Captain Monahan received radio transmissions warning that the riders were heading towards 35th Street and 9th Avenue.[21] At approximately 8:40 p.m. Captain Monahan responded to the area.[22] When he arrived, he observed hundreds of bicyclists like a "swarm of bees," riding within arms' length of each other, taking over the whole street and blocking vehicular traffic.[23]

Part of the group broke off and formed a chain across 9th Avenue at the intersection of 35th Street, thereby also preventing the flow of vehicular traffic southbound on 9th Avenue.[24] The traffic was stopped long enough that the traffic lights changed for 2-3 cycles.[25] At least some cyclists, when they saw the police, turned around and headed back north on 10th Avenue and east on 35th Street (against the flow of traffic).[26] In order to restore order, officers had to block the bicyclists on 35th Street between Dyer and 10th Avenue. Captain Monahan directed one of his mobile field forces, headed by Lieutenant Christopher Schmidt, to 10th Avenue to block the protesters from proceeding further westbound on 35th Street.[27] He also informed the group – especially those who were blocking the intersection – that they were going to be placed under arrest.[28]

Police Officer Keith Ames, an arresting officer who responded to 35th Street and 10th Avenue under the direction of Lieutenant Schmidt, testified at his deposition that he saw hundreds of cyclists on 35th Street and that he heard orders given to the crowd over the bullhorn warning them not to block traffic and not to block pedestrians.[29] Captain Monahan was able to stop one of the bicyclists, which caused a whole group of protesters to surround him and start yelling "Let her go!"[30] When additional police assistance arrived, Captain Monahan and the scooter police officers followed the Critical Mass riders from behind towards Dyer Avenue and blocked them off.[31] Once the group was blocked in, officers began making arrests.

Inspector Deickmann was in charge of four captains that day, including Captain Monahan.[32] He testified that the bicycle detail policed the Critical Mass rides for traffic congestion or any other type of illegal activity.[33] In the course of that evening, Insp. Dieckmann received urgent

---

[20] *See* Criminal Court Proceedings Transcript, People v. Tilia Duhaime ("Duhaime Tr."), annexed as Exh. 13 to the Jenerette Decl., at 19.
[21] Duhaime Tr., p. 19.
[22] Duhaime Tr., p. 19.
[23] Duhaime Tr., p. 20.
[24] Duhaime Tr., p. 22.
[25] Duhaime Tr., p. 23.
[26] Duhaime Tr., p. 23.
[27] Duhaime Tr., p. 24.
[28] Duhaime Tr., p. 24.
[29] Deposition of Keith Ames ("Ames Dep"), annexed as Exh. 11 to Jenerette Decl.., at 40.
[30] Duhaime Tr., p. 25.
[31] Duhaime Tr., p. 26.
[32] *See* Deposition of Gerald Deickmann ("Deickmann Dep."), annexed as Exh. 49 to Jenerette Decl, at 243.
[33] Deickmann Dep. at 251.

radio calls for assistance from Captain Monahan.[34]   Captain Monahan said he was "surrounded" by bicyclists heading west on 35th Street who were blocking traffic and kicking cars.[35]   Many of the riders split off into different groups.[36]

When he arrived on the scene, Inspector Deickmann saw several hundred cyclists heading towards him and other officers on 35th Street.[37][38]   He ordered officers to line up with their bicycles to stop the riders from proceeding westbound.  He then radioed for more assistance, as the riders spanned the width of 35th Street.[39]   In response to the police barricade, some bicyclists turned around to head back in the opposite direction; others tried to throw their bikes over a wall from a nearby parking structure, but the majority of them stood there with their bikes.[40]   Minutes later, the Dyer end of the block was closed off by police officers.[41]

Among the presumptive class members are Tilia Duhaime, Warren Karp, Sarah Glidden, and putative class representative Elizabeth Fleischman, each of whom were arrested on 35th Street, between 10th and Dyer Avenues.  Ms. Duhaime and Mr. Karp proceeded to trial on their criminal charges and were both found guilty of blocking vehicular and pedestrian traffic and parading without a permit.

At Ms. Duhaime's trial, the People presented the testimonies of  Captain Christopher Monahan and Lieutenant Christopher Schmidt – who testified about the Critical Mass group's unlawful conduct.  Also introduced was the testimony of Police Officer Ebony Huntley – Tilia Duhaime's arresting officer – who testified that he personally observed Ms. Duhaime at the arrest location.  The criminal court judge found her guilty on charges of parading without a permit and disorderly conduct.

At Warren Karp's trial, the People presented evidence by Captain Monahan, who testified about the group's unlawful conduct.  Officer McConell, Mr. Karp's arresting officer, testified specifically about Mr. Karp's unlawful conduct, stating that he personally observed Mr. Karp at the arrest location engaging in various traffic violations.  Mr. Karp testified, among other things, that he was not part of Critical Mass, that he had no intention of participating in any kind of bicycle protest, that he ended up at the arrest location because he was on his way to visit his girlfriend, that he was not violating any traffic laws, and that he should not be punished for promoting environmental awareness (which is for the greater good).   Based upon the "extraordinary" evidence presented by the People, the criminal court judge rejected Mr. Karp's arguments and found him guilty on both counts.[42]

---

[34] Deickmann Dep. at 255-256.
[35] Deickmann Dep. at 256.
[36] Deickmann Dep. at 258.
[37] Deickmann Dep. at 262-263.
[38] Deickmann Dep. at 262-263.
[39] Deickmann Dep. at 266.
[40] Deickmann Dep. at 268-269.
[41] Deickmann Dep. at 270.
[42] Criminal Court Proceedings Transcript, People v. Warren Karp ("Karp Tr."), annexed as Exh. 72 to Jenerette Decl., at 72.

Elizabeth Fleischman is a named class representative. Ms. Fleischman was deposed on July 12, 2006. Her testimony substantially corroborates the observations and testimony of Captain Monahan, Lieutenant Schmidt, and many other police personnel who were present at the arrest location. Ms. Fleischman testified that a huge mass of riders, consisting of hundreds of bicyclists, rode on the streets from the Union Square Park area to West 35th Street.[43] She observed thousands of riders extending from Union Square for many blocks and, consistent with the testimony of other plaintiffs, she testified that there was no way for all of the bicyclists to stay in the bike lanes throughout the ride.[44]

Ms. Fleischman testified that, at some points during the ride, bikers covered the widths of the streets and spanned many blocks.[45] She observed bicyclists stop traffic, block traffic, or "park" their bicycles in intersections in front of cars throughout the ride.[46] Similarly, she admitted that she, as well as two of her friends, blocked cars and/or intersections during the Critical Mass ride and that vehicles were inconvenienced.[47] Ms. Fleischman's claim, among others, is that Critical Mass should be allowed to reclaim the public streets.[48] As discussed above, that claim was rejected by the judge who presided over Mr. Karp's criminal trial.

Sarah Glidden, another presumptive class member, was deposed on May 21, 2007. Ms. Glidden admitted to having participated in the Critical Mass ride, which was in part to protest the RNC.[49] Ms. Glidden admitted that she saw fliers being handed out by police that warned against unlawful bicycle riding.[50] She testified that she read the flyer and fully understood its contents.[51] She admitted that she did not have a permit to parade and that her bike did not have lights, which is a violation of New York law.[52]

Ms. Glidden testified that cyclists left Union Square park *en masse* and headed west on 14th Street and north on Broadway, where they took up most of the roadway.[53] She could not say, for sure, whether she or the group obeyed traffic laws or traffic signals.[54] She testified that, by the time the group reached Times Square, all traffic had been stopped.[55] She admitted that the traffic around her "could not go anywhere."[56] She testified that she then rode west, then south on 9th Avenue until she reached 35th Street.[57] At that time, Ms. Glidden was riding with approximately 40-50 other cyclists. Ms. Glidden turned west on 35th Street.[58]

---

[43] Deposition of Elizabeth Fleischman ("Fleisch. Dep."), annexed as Exh. 17 to the Jenerette Decl., at 86-96; 134-135.
[44] Fleisch. Dep. at 141-42; see also Deposition of Jeanette Lee discussed *infra*.
[45] Fleisch. Dep. at 142-43.
[46] Fleisch. Dep. at 147-49.
[47] Fleisch. Dep. at 178-84.
[48] Fleisch. Dep. at 194.
[49] Deposition of Sarah Glidden ("Glidden Dep."), annexed as Exh. 22 to Jenerette Decl, at 95-96.
[50] Glidden Dep. at 104.
[51] Glidden Dep. at 121-122.
[52] Glidden Dep. at 100, 104, 122, 174.
[53] Glidden Dep. at 124.
[54] Glidden Dep. at 126.
[55] Glidden Dep. at 126.
[56] Glidden Dep. at 142.
[57] Glidden Dep. at 148.
[58] Glidden Dep. at 149.

Charges against individuals arrested at Proposed False Arrest Sub-Class Location 2 include:
- 7 charges of fighting or participating in violent, tumultuous or threatening behavior;
- 78 charges of obstructing pedestrian or vehicular traffic;
- 26 charges of refusing to comply with a lawful order to disperse;
- 62 charges of parading without a permit;
- 114 charges of biking violations.

### Proposed False Arrest Sub-Class Location 3

Proposed False Arrest Sub-Class 3 "consists of persons arrested by the New York City Police Department in connection with the 2004 Republican National Convention [on] August 27, 2004 on Second Avenue between 9th and 10th Street between 8:00 p.m. and 11:00 p.m." Plaintiffs' Motion for Class Cert. at 3-4. Like Proposed False Arrest Sub-Classes 1 and 2, this proposed class arises from arrests of Critical Mass bicyclists who participated in the unpermitted bicycle ride by thousands of protesters through the streets and avenues of Manhattan on August 27, 2004. As noted *supra*, these riders also received flyers from the NYPD advising the riders of various traffic laws and warned them that violation of those laws could result in arrest.

Nevertheless, riders committed a long list of violations in the several hours that they rode through Manhattan and as they ended their ride.[59] Many of the individuals who rode in that event concluded their ride in the East Village of Manhattan late in the evening. Hundreds (if not thousands) of riders came to a halt directly on Second Avenue, in front of St. Mark's Church, between 10th and 11th Streets.[60] Other riders congregated on the surrounding streets and sidewalks.[61]

As the riders stopped on Second Avenue and on the adjacent sidewalks, vehicle and pedestrian traffic on Second Avenue and on the adjacent streets became completely blocked and remained blocked for a period of hours. Among others, officers who responded to the area in cars, vans and on scooters were prevented from traveling south on Second Avenue due to the traffic blockages.[62] When they arrived, officers discovered a scene of chaos in which Second Avenue and the surrounding streets and sidewalks were covered with bicyclists and pedestrians.[63] During the criminal trial of one of those arrested, Inspector James McCarthy estimated that there were approximately 2000 protesters in the immediate vicinity of Second Avenue and 10th Street when he arrived at that location.[64]

Police gave dispersal orders "many times" to the mass of protesters in an effort to clear the streets and sidewalks.[65] In an effort to reopen Second Avenue, police ordered individuals to

---

[59] Johnson Dep. at 343.
[60] Johnson Dep. at 316.
[61] Johnson Dep. at 321.
[62] Deposition of Officer Danwantt Sanasie ("Sanasie Dep."), annexed as Exh. 64 to the Jenerette Decl., at 49-50, 65-66, 92; Johnson Dep. at 313, 387-89.
[63] Johnson Dep. at 316, 343; *see also* Video Compilation
[64] Criminal Court Proceedings Transcript, People v. Christopher Lee ("Lee Tr."), annexed as Exh. 70 to the Jenerette Decl., at 24.
[65] Sanasie Dep. at 59-61, 95.

disperse east and west.[66]   Multiple senior police officers gave those orders by bullhorn and allowed the protesters ample opportunity to disperse.[67]   While many individuals complied with police orders, others chose not to comply.[68]   Of those, some were arrested.  At 9th Street and Second Avenue, police formed a line and subsequently arrested various individuals in that vicinity.[69]

The individuals arrested in that vicinity were charged with a range of violations and have testified to participating in a wide range of conduct.   Those individuals demonstrate the uniqueness of the circumstances that will go to establish probable cause for each arrest – and the inappropriateness of certification of a class consisting of these individuals.   Among those arrested (and now a member of the putative class) was a male individual who strenuously resisted arrest, cursed at and assaulted (or attempted to assault) Captain Johnson by spitting in the Captain's face.[70]   The assistance of numerous police officers was required to bring that individual under control; he was ultimately arrested and convicted.

Also arrested in that vicinity were presumptive class members Jeanette Lahn-Sheen Lee (who is proceeding in her own action), Christopher Lee (who was convicted at the criminal trial) and Scott Kerns (who was convicted), and putative class representative Randall Steketee.  The evidence to be considered by the jury in the cases of Steketee and Jeanette Lee is remarkably different, just as the evidence considered by the criminal court judges in the cases of Christopher Lee and Scott Kerns was very different (although it resulted in convictions in each case).  These apparent differences in the proofs militate strongly against certification of a class at this location.

At her deposition, Jeanette Lee testified that she had participated in up to ten Critical Mass bike rides including the August 27, 2004 ride.[71]  During the August 27 ride, she testified that she "followed the stream of bikes."[72]  In doing so, she and the others committed a series of traffic violations.  For instance, she explained that "when the bikes would be going through an intersection, oftentimes people would block the traffic so that the bikes could pass safely."[73]  She was "part of the crowd that passed through" as traffic was stopped at intersections.[74]

She agreed that, with that many riders, "there was no way to stay in bike lanes."[75]   In fact, the riders took up "several lanes [of traffic] as they were riding" and, in some instances, "there were riders across all lanes of an avenue."[76]  At the time of her ride, she was aware that Critical Mass had no permit for a parade.[77]   At the same time, she was not aware of any procedures to allow pedestrians to cross the streets safely while the ride proceeded.[78]  Nor was

---

[66] Johnson Dep. at 318-19, 342-43, 350.
[67] Johnson Dep. at 339, 343, 347, 367-68; Lee Tr.at 29.
[68] Johnson Dep. at 339, 343.
[69] Deposition of Randall Steketee ("Steketee Dep."), annexed as Exh. 39 to the Jenerette Decl., at 191-92.
[70] See Johnson Dep. at 328-30, 358-60; see also Video Compilation.
[71] Deposition of Jeanette Lee ("Lee Dep."), annexed as Exh. 25 to the Jenerette Decl., at 87, 92.
[72] Lee Dep. at 128.
[73] Lee Dep. at 129, 144.
[74] Lee Dep. at 302.
[75] Lee Dep. at 132.
[76] Lee Dep. at 135.
[77] Lee Dep. at 204-05.
[78] Lee Dep. at 142.

she aware of "any instances during the August 27 ride where bikers stopped . . . to allow pedestrians to cross."[79]  "I think if, if, if a pedestrian were trying to cross the street, they would face the same delay or inconvenience as a car."[80]

Ms. Lee agreed that police vehicles could not have gone through the intersection of Second Avenue and Tenth Street without clearing the crowd out of that intersection.[81]  She testified that she was ultimately arrested after an officer gave her repeated orders to disperse to the west by crossing to the other side of the avenue – orders with which she refused to comply and instead argued with the officer.[82]

In contrast, in his deposition, Randall Steketee testified that he was not part of the Critical Mass ride but was enjoying an evening with friends in midtown before he rode to the East Village on his bicycle.  He testified that he rode east on eighth street to Second Avenue, where he made an illegal left-hand turn onto Second Avenue and rode north on the avenue (Second Avenue is one-way southbound avenue).[83]  According to Mr. Steketee, at that point, he did not know that the mass of individuals with bikes whom he observed were Critical Mass riders.[84]  He testified that "there was a lot of yelling" by "the people that had congregated in the street" and that some of those people "were holding their bicycles above their heads."[85]  He testified that there were so many people in the approximate 1/2 –half block between himself and St. Mark's Church that he "could hardly see the church."[86]

Mr. Steketee stood "on the street" to observe the scene for approximately five minutes.[87]  During that time, "there were no cars coming down Second Avenue."[88]  In addition, "the sidewalks were pretty well packed with people at that time."[89]  He testified that, only when he saw police enter the crowd at Tenth Street, did he start walking his bike southbound in the street on Second Avenue.[90]  At that point, police formed a line ahead of him at Ninth Street, with scooters, and he was arrested while trying to cross that police line.[91]  Mr. Steketee, who was a law student at the time of his deposition, testified that he had "an understanding that [he was] welcomed to pass through the police line."[92]

At least four individuals were convicted after their arrests at this location.  The charges and the evidence to support them varied widely, as did the testimony they offered in their defense.  At the trial of Christopher Lee, officers testified that they gave repeated dispersal orders at the intersection of Second Avenue and 10th Street and that Lee was close enough to

---

[79] Lee Dep.at 143-45.
[80] Lee Dep.at 147-48.
[81] Lee Dep.at 161-63.
[82] Lee Dep.at 166-93.
[83] Steketee Dep. at 157-58.
[84] Steketee Dep. at 166.
[85] Steketee Dep. at 169.
[86] Steketee Dep. at 172.
[87] Steketee Dep. at 175.
[88] Steketee Dep. at 176, 178.
[89] Steketee Dep. at 179.
[90] Steketee Dep. at 189.
[91] Steketee Dep. at 191-93.
[92] *Id.*

hear those orders.[93]   Officer Richard Wall testified that, rather than comply with Inspector McCarthy's orders to disperse, Lee argued with the Inspector.[94]   The Court found Lee guilty beyond a reasonable doubt of obstructing vehicle or pedestrian traffic and of failure to comply with a lawful order to disperse.[95]

At the trial of Scott Kerns, Inspector McCarthy testified that the bikers were stopped on Second Avenue all the way from "10th Street and Second Avenue to approximately 13th Street" when he arrived at the scene.[96]   The Inspector testified that he "tried to get the intersection back" by giving numerous dispersal orders and warnings that individuals would be placed under arrest including orders over a bullhorn.[97]   He gave those orders for approximately 10 minutes during which many individuals did disperse.[98]

Others who did not disperse, including defendant Kerns, were placed under arrest. Inspector McCarthy testified that, when he first saw Mr. Kerns, Mr. Kerns was in the "middle of the intersection" where he "was raising his bicycle up in the air and chanting with everybody else."[99]   Officer Florencio testified that numerous other ranking NYPD officers at that intersection also were giving orders to disperse, either by yelling or using bullhorns, before Kerns' arrest.[100]   Defendant Kerns admitted that "the officer who gave the order [to disperse] was standing right in front of my face" and that he had no problem hearing that order.[101] Nevertheless, during the time in which the Inspector repeated his orders to disperse, he did not observe the defendant "make any motion at all to disperse."[102]   Kerns was tried and convicted for disorderly conduct.   The uniqueness of the circumstances of each of these arrests demonstrates that certification of a "false arrest" class is inappropriate.

Charges against individuals arrested at Proposed False Arrest Sub-Class Location 3 include:
- 6 charges of fighting or participating in violent, tumultuous or threatening behavior;
- 45 charges of obstructing pedestrian or vehicular traffic;
- 32 charges of refusal to comply with a lawful order to disperse;
- 39 charges of parading without a permit;
- 8 charges of obstructing governmental administration in the second degree;
- 11 charges of resisting arrest;
- 58 charges of biking violations.

---

[93] Lee Tr. at 52-55.
[94] Lee Tr. at 56.
[95] Lee Tr. at 93-95.
[96] Criminal Court Proceedings Transcript, People v. Scott Kerns ("Kerns Tr."), annexed as Exh. 71 to the Jenerette Decl., at 20-24.
[97] Id.
[98] Id.
[99] Id at 24.
[100] Id at 56.
[101] Id.
[102] Id at 25.

***Proposed False Arrest Sub-Class 4***

False Arrest Sub-Class 4 "consists of persons arrested by the New York City Police Department in connection with the 2004 Republican National Convention…on August 29th, 2004 on 37th [Avenue] between 7th Avenue and Broadway between 12:00 p.m. and 3:00 p.m." Plaintiffs' Motion for Class Cert. at 3. Arrests at this location arose from the Sunday August 29, 2004 "bike bloc" bicycle ride. On that date, a group of individuals, estimated at points during the ride to be between 80 and 200, participated in an unpermitted ride through the streets of Manhattan. The event was organized by an organization called Time's Up, and the stated purpose of the Bike Bloc was to be a bike action in solidarity with United For Peace And Justice.[103] Unlike the UFPJ March, the Bike Bloc was not a permitted event. Prior to the start of the ride, at least one individual from Time's Up warned the crowds that they could be arrested.[104] Throughout the Bike Bloc ride, individuals violated numerous traffic laws, including traveling through stop lights and weaving in and out of traffic.[105] In addition, participants ignored orders from Police Officers to cease riding and rode directly through police barricades.[106]

The Bike Bloc began at approximately 11:45 a.m. when participants in the bike bloc began to proceed north on Park Avenue. At or around 23rd Street, the group turned west towards 6th Avenue and then proceeded north on 6th Avenue. Bicyclists took up the entire width of 6th Avenue while riding, with some participants remaining on the side of the street while others weaved in and out of moving traffic. As bicyclists approached the Herald Square area, they encountered heavy vehicular traffic and weaved in between cars as they rode. At points during the ride, participants chanted in unison, and many rode through red lights.[107]

One participant in this ride was Carolyne Alikhan, who claims that on August 29th she had rollerbladed to Union Square Park on the morning of August 29th for "recreational" purposes and, when she left the Park and proceeded north towards Central Park, she was joined by a group of bicyclists.[108] Although Ms. Alikhan admits to speaking with these bicyclists and traveling with them and their group, she maintains that she was never actually part of this Bike Bloc. Unlike other potential sub-class members such as Kalea Economos, Kelly Morrison, and Jerem Baras, who arrived at Union Square park intending to participate in the bike bloc ride in order to show support for the UFPJ March (CCRB at p. 2), Ms. Alikhan has testified that she did not know of this event beforehand, did not know if this bicycle ride had been organized by anyone in particular or whether a permit had been obtained for the ride (Alikhan at p.38:21-23). Despite not knowing any of these facts, Ms. Alikhan proceeded north with the group, never attempting to travel by herself or to distinguish herself from this group. (Alikhan at pp. 30-31:24-2). While Ms. Alikhan maintains she herself did not violate any traffic laws, she did admit in her deposition that she was not aware at the time of how all other participants in the ride were behaving, and does not know whether all other members of the proposed sub-class obeyed all

---

[103] *See* Civilian Complaint Review Board File #200408525 ("CCRB"), annexed as Exh. 74 to the Jenerette Decl., at 2. United For Peace And Justice ("UFPJ") was the organizing body of a march which was taking place at the same time in Manhattan and which involved approximately 250,000 participants.

[104] *See* CCRB at 6.

[105] *See id.*

[106] *See id.*

[107] Deposition of Carolyne Alikhan ("Alikhan Dep."), annexed as Exh. 4 to the Jenerette Decl., at 40.

[108] Alikhan Dep. at 11-12, 19.

traffic laws. (Alikhan at pp.26-27:8-10). Indeed, other participants in this ride have already testified that they either witnessed others violating traffic laws or violated those laws themselves. (See CCRB at p. 6).

Putative sub-class member Adrienne Garibini was deposed on May 18, 2007. Like Ali-Khan, Garibini testified that when she rode her bicycle from her home to Union Square on August 29, 2004, she did not plan to participate in a protest.[109] Ms. Garibini testified that she rode her bike into Union Square "because it was Sunday and it was warm and there were things going on in the city."[110]Yet, she freely joined a group of 30 - 40 bicyclists as they rode their bikes from Union Square north on Park Avenue South. She never attempted to split off, travel alone or distinguish herself from the group.[111] She also testified that the cyclists rode "in line," of "maybe thirty individuals" that "was spread out" and riding "to the side or in traffic with cars" and that she doesn't recall obeying traffic laws during the ride.[112] Moreover, she testified that, although it "became clear to [her] that the men on scooters were law enforcement type individuals," she didn't believe that "they were in pursuit. It seemed like if I had turned and gone it was possible that I could have biked away. . . It didn't seem like we were being corralled or told where to go."[113]. But she didn't bike away. Instead, she and "30 to 40 " bicyclists turned left off of Park Avenue and rode "two to three abreast" down a small cross town street. While it is undisputed that the NYPD did form a police line at the intersection to 37th Street and Broadway to stop the bike bloc from proceeding, Garibini testified that she "didn't see any police officers" at the intersection and that she voluntarily dismounted from her bike and began walking.[114]

While it is undisputed that the NYPD did attempt to stop the bike bloc form proceeding, the manner in which this occurred varies depending upon the recollection of each sub-class member. For example, while some potential sub-class members have testified that Officers were proceeding in the street on scooters but did not come into contact with any bicyclists, others have also claimed that these officers intentionally rammed their scooters into bicyclists, causing them to fall to the ground[115] At the same time, other participants have stated they did not see anybody fall off their bicycles as a result of contact with scooters.[116]

The disparity in testimony regarding the events of the bike bloc highlights the fact that the arrests at this location cannot be examined on a class-wide basis, as it is clear that the participants all had very different experiences which are directly bearing upon the basis for their individual arrest. This fact becomes even clearer when the wide range of charges brought against the individual participants are considered. Indeed, as Ms. Alikhan, *the lone class representative for this sub-class* has testified, she does not know the reasons why other individuals were arrested at this location but conceded that she would need to know more about

---

[109] Deposition of Adrienne Garbini ("Garbini Dep."), annexed as Exh. 19 to the Jenerette Decl., at 33.
[110] Garbini Dep. at 34
[111] Garbini Dep. at 37-44
[112] Garbini Dep. at 43 -44.
[113] Garbini Dep. at 49-50.
[114] Garbini Dep. at 55-56; 73-74.
[115] *See* CCRB at 6.
[116] Transcript of 50-H Examination of Charles Mahoney ("Mahoney 50-H"), annexed as Exh. 73 to the Jenerette Decl., at 31.

those arrests before she opined upon them, as individual who had engaged in civil disobedience at this location would have been arrested under different circumstances than her own.[117] (Alikhan at pp. 110-111:21-22)

Charges for False Arrest Sub-class 4 include:
- 8 charges of fighting or participating in violent, tumultuous or threatening behavior;
- 52 charges of obstructing vehicular or pedestrian traffic;
- 4 charges of refusal to comply with a lawful dispersal order;
- 55 charges of parading without a permit;
- 55 charges of reckless endangerment in the third degree;
- 58 charges of obstructing governmental administration in the second degree;
- 1 charge of unlawful possession of marijuana;
- 26 charges of criminal nuisance in the 2nd degree;
- 4 charges of assault in the 3rd degree;
- 1 charge of resisting arrest

### *Proposed False Arrest Sub-Class Location 5*

False Arrest Sub-Class 5 "consists of persons arrested by the New York City Police Department [on] August 31, 2004 on Fulton Street between Church and Broadway between 12:00 p.m. and 3:00 p.m."[118] Putative class representatives William Steyert, Simon Harak, and Diana Raimondi were arrested at this location. A group called the War Resisters League planned to lead an unpermitted march from the World Trade Center site near Church and Fulton north on Broadway, against traffic, to Madison Square Garden.[119] Upon arrival at Madison Square Garden, march organizers planned to stage a "die-in" on the floor of the convention. *See* WRL Press Releases attached as Exh. _ to Jenerette Decl.

Before the march began, Inspector Thomas Galati warned the group over a bullhorn that they did not have a permit for the march and that they must comply with all applicable laws.[120] Before the march, Inspector Galati and a representative of the NYPD Legal Bureau had attempted to negotiate an alternative route with Ed Hedemann, one of the march organizers, that would have had the march going with the flow of traffic. That proposal was rejected and plaintiffs insisted on taking their route against traffic on Broadway. Inspector Galati told Mr. Hedemann that, in order to proceed with their march, participants would have to remain on the sidewalk and walk two abreast to avoid blocking pedestrian traffic.[121] Inspector Galati received assurances from Mr. Hedemann that the marchers would march on the sidewalk and obey traffic signals and crossing signals. However, Mr. Hedemann and the other march organizers rebuffed Inspector Galati's request that marchers walk two abreast to allow pedestrians use of the sidewalks.[122]

---

[117] Alikhan Dep. at 110-111.
[118] Plaintiffs' Motion for Class Cert., p. 3
[119] Deposition of Thomas Galati ("Galati Dep."), annexed as Exh. 55 to the Jenerette Decl., at 102, 111; Deposition of Neal Curley ("Curley Dep."), annexed as Exh. 12 to the Jenerette Decl., at 84.
[120] Galati Dep. at 103.
[121] Galati Dep. at 106-107, 112; Deposition of Diane Raimondi ("Raimondi Dep."), annexed as Exh. 32 to the Jenerette Decl., at 356-257.
[122] Galati Dep. at 115-116.

Standing at the front of the assembled group, Inspector Galati used a bullhorn to inform the group that there was no permit for the march and that any violation of the law would result in arrest.[123]   Deputy Inspector James Shea used a bullhorn to give the same warnings to individuals gathered in the middle and at the rear of the group.[124]   At approximately 4:00 pm, the group of over 200 persons traveled out from the west side of Church Street into the intersection of Church and Fulton.

The group then crossed Church Street, many walking against the crossing signal.[125]   The marchers at the front of the group proceeded onto the sidewalk on the north side of Fulton Street.[126]   They carried a large banner that stretched across the entirety of the Fulton Street sidewalk.   Marchers spread out across the sidewalk, forcing pedestrians into the street.[127]   Deputy Chief Terence Monahan observed the group "cover[ing] the sidewalk from the [fence of St. Paul's Church] to the curb."[128]   Chief Monahan then shouted "two to three dispersal orders," warning the crowd to disperse or face arrest.   Marchers refused to comply with orders to disperse.[129]   Chief Monahan and Inspector Galati then halted the march, ordered officers present at the scene to cordon off the area and began making arrests.[130]

Putative class representative William Steyert was one of the organizers of the War Resisters League March.[131]   Mr. Steyert, by his count, has been arrested eight times, all of which arose out of protest activity.[132]   Mr. Steyert was near the front of the march when it began, and heard Inspector Galati, on a bullhorn, tell the crowd that "even though the march wasn't permitted we will allow [it] to proceed if you walk two abreast and don't block traffic."[133]   Mr. Steyert in fact admitted that he was aware that the march did not have a permit.[134]    Mr. Steyert testified that it took "a little more" than five minutes for the marchers to cross Church Street and continue the procession up Fulton.[135]   Further, Mr. Steyert noted, after viewing TARU footage of the event, that "the sidewalk was filled as you went down closer to Church Street".[136]   Mr. Steyert also heard Chief Monahan give a warning to the banner-holders at the front of the procession, and admitted upon review of video footage that Chief Monahan gave dispersal orders but claims he only heard Chief Monahan yelling.[137]

---

[123] Galati Dep. at 116-117; Deposition of Michael Schiller ("Schiller Dep."), annexed as Exh. 35 to the Jenerette Decl., at 38; Curley Dep. at 85.
[124] Galati Dep. at 115; Deposition of James Shea ("Shea Dep."), annexed as Exh. 65 to the Jenerette Decl., at 103-104; Raimondi Dep. at 439.
[125] See Video Compilation
[126] Galati Dep. at 117.
[127] Deposition of Deputy Chief Terence Monahan ("Monahan Dep."), annexed as Exh. 61 to the Jenerette Decl., at 177-178.
[128] Monahan Dep. at 185.
[129] Monahan Dep. at 179.
[130] Galati Dep. at 119-120; Monahan Dep. at 183-184.
[131] Deposition of William Steyert ("Steyert Dep.), annexed as Exh. 40 to the Jenerette Decl, at 375, 395.
[132] Steyert Dep. at 110, 149.
[133] Steyert Dep. at 404.
[134] Steyert Dep. at 433.
[135] Steyert Dep. at 407.
[136] Steyert Dep. at 419.
[137] Steyert Dep. at 434, 439.

Putative class representative Diane Raimondi, who "fairly regularly" attends protests and marches but had never been arrested, heard of the War Resisters League march by "word of mouth" and was aware of the planned die-in and possibility of arrest.[138]  Ms. Raimondi was also aware that the march was unpermitted, and that parading without a permit was against the law.[139]  Moreover, Raimondi specifically testified that she "listened to the negotiations between Mr. Hedemann and [Inspector Galati]".[140]  Although she did not hear Inspector Galati give his warnings on the bullhorn, she testified that she heard other individuals from the WRL walking around the march giving similar instructions.[141]  Raimondi also heard warnings being given about the use of amplified devices.[142]  Raimondi admitted that, in violation of Inspector Galati's instructions, she observed people walking more than two abreast on the Fulton Street sidewalk.[143]  She later heard Chief Monahan "yelling" as the march moved up Fulton Street, but did not discern specific orders.[144]

Charges against individuals arrested at Proposed False Arrest Sub-Class Location 5 include:
- 215 charges of obstructing vehicular or pedestrian traffic;
- 214 charges of congregating in a public place and refusal to comply with a lawful order to disperse;
- 153 charges of parading without a permit;
- 2 charges of obstructing governmental administration in the second degree;
- 2 charges of resisting arrest; and
- 1 charge of disturbing a lawful assembly or meeting of persons.

### *Proposed False Arrest Sub-Class Location 6*

False Arrest Sub-Class Location 6 consists of persons arrested on August 31, 2004 on 16th Street between Union Square East and Irving Place between 7:00 p.m. and 10:00 p.m." (Pl. Memo at 3).  Putative class representatives Emily Friedman and Celine Malanum were arrested at this location.  August 31, 2004 was known, among demonstrators, as "A31", a day of civil disobedience and a day to specifically challenge the City's permit requirements for protests.[145]  Over 300 individuals were arrested on August 31, 2004 at the vicinity of East 16th Street between Union Square East and Irving Place.  They engaged in wide range of unlawful activity prior to their arrests.[146]  The NYPD had not issued a permit for this event.[147]

---

[138] Raimondi Dep. at 265-267, 269, 306-307.
[139] Raimondi Dep. at 318, 411.
[140] Raimondi Dep. at 347.
[141] Raimondi Dep. at 361-363, 369-370.
[142] Raimondi Dep. at 380-381.
[143] Raimondi Dep. at 402.
[144] Raimondi Dep. at 421-423.
[145] *See* Deposition of Steven Black ("Black Dep"), Exh. 8 to the Jenerette Decl., at 150-154, 409-410; Deposition of Yasmine Farhang ("Farhang Dep."), Exh. 15 to Jenerette Decl., at 144; Deposition of Rebecca Sutton ("Sutton Dep."), Exh. 43 to Jenerette Decl., at 35-36; and Deposition of Dana Pryor ("Pryor Dep."), Exh. 31 to Jenerette Decl., at 9-14.
[146] *See* Video Compilation; *see also* Deposition of Inspector James Essig ("Essig Dep."), Exh. 52 to Jenerette Decl., at 161-163.
[147] *See* Essig Dep. at 159-161; Deickmann Dep. at 90-93; Deposition of Jason Carpentieri ("Carpentieri Dep."), Exh. 48 to Jenerette Decl., at 194-202; Deposition of Salvatore DiMaggio ("DiMaggio Dep."), Exh. 50 at Jenerette Decl.,

The march, including a band playing music, began at approximately 7:00 p.m.. Without warning to officers at the scene, they entered Union Square East and marched down the middle of the street, blocking vehicular and pedestrian traffic. A parade of hundreds of people comprised of individuals holding posters of *Wizard of Oz* characters, demonstrators, members of the media, people wearing masks and bandannas over their faces, and individuals photographing the event all marched down the middle of the streets and sidewalks. Traffic came to a standstill.

Police in the area responded by forming a line at the intersection of Union Square East and East 16th Street, preventing the procession from entering Park Avenue South. When the procession reached the police line, the marchers turned right onto East 16th Street, stopping traffic on that street and blocking pedestrian traffic in the crosswalks. As the marchers passed the police line, officers of various ranks gave repeated orders to disperse or face arrest. Some people chose not to enter 16th Street, separated from the procession and were not arrested. Others decided to continue marching.[148]

Some people marched on the sidewalks; others occupied the streets. Cars could not get through. Plaintiffs Steitz and Pryor admit that vehicles were mixed in with the demonstration and that vehicular traffic was blocked.[149] However, putative class representative Celine Malanum testified that there were "no cars in the Street."[150] During this time police officers continued to give orders to disperse and specifically ordered people to get off the street. Many people in the procession ignored these orders. Some individuals also made obscene gestures at policemen.[151]

The procession attempted to march through the intersection of East 16th Street and Irving Place, but police officers had already formed a police line across that intersection. The police line did not initially extend from building to building, so people were still permitted to exit the area on either the north or south sidewalks of East 16th Street. Indeed, the marcher carrying the poster of the *Wizard of Oz* lion passed through the police line at that intersection and was not arrested. The majority of the group chose not to comply with police orders to exit the area.[152] Members of the crowd threw smoke bombs at the officers in the police line and continued to dance around in the middle of the street.[153]

---

at 153–154; Deposition of Ann Maurer ("Maurer Dep."), Exh. 30 to Jenerette Decl., at 68-70; Deposition of Aaron Maert ("Maert Dep."), Exh. 28 to Jenerette Dep., at 73-75; Pryor Dep. at 55-57.

[148] *See* Video Compilation; Deposition of Jim Steitz ("Steitz Dep."), Exh. 38 to Jenerette Decl., at 7-8, 109-121; Deposition of Noelle Grosso ("Grosso Dep."), Exh. 23 to Jenerette Decl., at 7-9, 87-94; Deposition of Jennifer Giles ("Giles Dep."), Exh. 21 to Jenerette Decl., at 7-11, 57-80; Deposition of Jody Concepcion ("Concepcion Dep."), Exh. 10 to Jenerette Decl., at 10-13, 18-19; Maurer Dep. at 127-136; Essig Dep. at 100-103, 729-736; Deposition of James Rufle ("Rufle Dep."), Exh. 63 to Jenerette Decl., at 33-46.

[149] Steitz. Dep. at 114-115; 148-149; Pryor Dep. at 115-117.

[150] Deposition of Celine Malanum ("Malanum Dep."), Exh. 29 to Jenerette Decl., at 257-259

[151] *See* Video Compilation; Deposition of James Franzo ("Franzo Dep."), Exh. 54 to Jenerette Decl., at 31-42; DiMaggio Dep. at 38-63; Maurer Dep. at 176-77, 266-272; Steitz Dep. at 148-150, 130-132.

[152] *See* Video Compilation; Johnson Dep. at 51-52, 132-133; Carpentieri Dep. at 103-106, 130-140; Deposition of Alexis Fernandez ("Fernandez Dep."), Exh. 53 to Jenerette Decl., at 45-51; Maurer Dep. at 176-77; Steitz Dep. at 122-124.

[153] *See* Video Compilation; Monahan Dep. at 348-349; Essig Dep. at 104-111, 268-269, 308-312; Rufle Dep. at 86-93; Fernandez Dep. at 47-53; Grosso Dep. at 108-109.

Officers eventually began to effect arrests of those who had engaged in unlawful conduct. Some people in the crowd interlocked their arms, resisting by refusing to separate. Police officers had to forcibly pull some people from the interlocked group and forcibly cuff them. Some arrestees did not resist arrest, others did.[154]

Charges against individuals arrested at Proposed False Arrest Sub-Class Location 6 include:
- 373 charges of obstructing vehicular or pedestrian traffic;
- 341 charges of refusing to comply with a lawful dispersal order;
- 3 charges of unlawful assembly;
- 3 charges of assault in the second degree;
- 2 charges of harassment in the second degree;
- 292 charges of parading without a permit;
- 1 charge of obstructing governmental administration; and
- 3 charges of resisting arrest.

### Proposed Sub-Class Location 7

Proposed False Arrest Sub-Class Location 7 include individuals arrested on "August 31, 2004 on 17th Street between Fifth Avenue and Broadway between 8:00 p.m. and 10:00 p.m." (Pl. Memo at 3). At approximately 8:30 PM, a large group of protesters began moving from Union Square northward on Union Square West/Broadway. Putative class representative Rebecca Stoneback testified that she and a large group left the Union Square Park area at approximately 7:30 p.m. and headed northbound on Broadway with the intention to arrive in the Madison Square Garden vicinity.[155] The group consisted of about 75-100 people formed into a line procession, which moved simultaneously, with people in line walking close to one other. Stoneback was located at the front of the line.[156]

Deirdre MacNamara, the lead class plaintiff, testified that she observed police in the vicinity of Union Square Park, people with signs and instruments inside the park and overheard discussions about heading to Madison Square Garden.[157] MacNamara headed down 17th Street for personal reasons; Stoneback intended to walk with this group from Union Sq. to MSG.[158] As MacNamara walked northbound, she observed groups of twos and three, some holding signs, also walking northbound on Broadway.[159]

Stoneback had no knowledge whether a permit was obtained and it never crossed her mind.[160] Stoneback continued walking with this group northbound, even after she saw barricades and police stretched across Broadway at 17th Street. There were no physical impediments preventing her or the group from turning around and heading back down Broadway.[161]

---

[154] Farhang Dep. at 216-227, Maert Dep. at 85-89; Steitz Dep. at 7-9, 151-152; Maurer Dep. at 183-189, 208-209; Concepcion Dep. at 104-105; Giles Dep. at 7-15; Rufle Dep. at 101-109, 156-161.
[155] Deposition of Rebecca Stoneback ("Stoneback Dep."), Exh. 41 to Jenerette Decl., at 221-29.
[156] Stoneback Dep. at .229-239.
[157] Deposition of Deirdre MacNamara ("Macnamara Dep."), Exh. 27 to Jenerette Decl., at 178-79, 185-189.
[158] MacNamara Dep. at 133-34; Stoneback Dep. at 221-29.
[159] MacNamara Dep. at193-95; *see also* Video Compilation.
[160] Stoneback Dep. at 241, 249-252.
[161] Stoneback Dep. at 245-252, 260.

On reaching a barricade erected across Broadway on the northern sidewalk of 17th Street, the group turned left and headed westward on 17th Street towards 5th Avenue.[162] Stoneback continued with the whole group, turning down 17th Street along the right sidewalk and heading towards 5th Avenue.[163] She did not think about or attempt to turn back towards Broadway, even when she saw other police barricades going up at other end of 17th Street at 5th Avenue. Since Stoneback was at the front of this procession and was looking forward, she cannot recall whether anyone was in the street behind her as they moved down 17th Street.[164] MacNamara testified that after she turned down 17th Street, she observed a large concentration of about 40-45 people on both sidewalks and in the street.[165] When first looking down 17th Street there were too many people blocking her view; then she saw barricades and police officers at 5th Avenue; then she moved into the street.[166] MacNamara did not leave 17th Street but stood around.[167]

The group began its march down 17th Street on the sidewalk, but as they proceeded westward, they moved into the street, eventually occupying the entire width of 17th Street as they marched.[168] At that time, 17th Street was open to pedestrian and vehicular traffic.[169] Officers who had been posted near the corner of 17th Street and 5th Avenue noticed a group of 50-100 people heading in their direction, chanting and walking in the middle of the street.[170] This group did not have a permit to march at that location.[171] Officers near the corner of 17th and 5th erected metal barricades and orange mesh to prevent the crowd from reaching 5th Avenue.[172] While people in this crowd were walking and later standing in the middle of 17th Street, they blocked vehicular traffic. At least two to three vehicles on West 17th Street were prevented by the group from proceeding westward.[173]

Multiple dispersal orders were given to the crowd at the barricades.[174] Once dispersal orders were given, 6-12 people from the crowd turned and headed eastbound on 17th Street toward Broadway, but except for those persons, the group did not react to dispersal orders.[175] Once dispersal orders were given, someone wishing to disperse was free to turn around and leave

---

[162] *See* Video Compilation.

[163] Stoneback Dep. at 263-64.

[164] Stoneback Dep. at 265-266.

[165] MacNamara Dep. at 198-199.

[166] MacNamara Dep. at 201.

[167] MacNamara Dep. at 206-7.

[168] Gonzalez Dep. at 46:19-47:18.

[169] Deposition of Thomas DiRusso ("DiRusso Dep."), Exh. 51 to Jenerette Decl., at 39:3-5; Deposition of Stephen Nelson ("Nelson Dep."), Exh. 62 to Jenerette Decl., 46:2-8; Gonzalez Dep., 42:20-43:6.

[170] DiRusso Dep. at 40:8-19, 108:3-10; Nelson Dep. at 58:13-59:3, 213:2-4; Gonzalez Dep. at 42:10-18, 44:18-24; Deposition of Russell John ("John Dep."), Exh. 57 to Jenerette Decl., at 62:22-63:8; Deposition of Bienvenido Mena ("Mena Dep."), Exh. 59 to Jenerette Decl., at 26:6-10, 29:23-30:5.

[171] John Dep. at 165:5-8.

[172] DiRusso Dep. at 47:3-10, 52:4-17; Nelson Dep. at 56:2-14; Gonzalez Dep. at 48:14-16, 51:15-21; John Dep. at57:15-59:7.

[173] DiRusso Dep. at 45:3-13, 150:10-18; Nelson Dep. at 60:13-15, 72:8-73:18; Gonzalez Dep. at 42:10-18, 79:22-80:2, 80:20-81:19.

[174] DiRusso Dep. at 115:24-116:6, 120:5-8; Gonzalez Dep. at 19:16-25.

[175] Nelson Dep. at 76:8-12, 84:5-11; Gonzalez Dep. at 19:10-15.

17th Street further east at Broadway; there were no obstructions on the eastern end of 17th Street that would have prevented people from leaving.[176]

When the group failed to disperse, Inspector Thomas DiRusso made a decision to arrest persons, and ordered officers under his command to begin making arrests.[177] Sufficient time was given for persons to disperse before arrests began.[178] Once an arrest decision was made, people were ordered to line up along the southern sidewalk of 17th Street. The barricades were opened up, officers came in, and began making arrests.[179]  Of the 56 arrests, putative class member Derek Bloom was found guilty of both disorderly conduct, subsection 5, and parading without a permit.

Charges against individuals arrested at Proposed False Arrest Sub-Class Location 7 include:
- 52 charges of obstructing vehicular or pedestrian traffic;
- 45 charges of refusing to comply with a lawful dispersal order; and
- 17 charges of parading without a permit.

### Proposed False Arrest Sub-Class Location 8

Proposed False Arrest Sub-Class Location 8 consists of individuals who were arrested on "August 31, 2004 on 35th Street between 5th and 6th Avenue between 7:00 p.m. and 10:00 p.m." (Pl. Memo at 3). On August 31, 2004, at approximately 8:15 pm, a group of approximately 12 individuals sat down in the intersection of Sixth Avenue and West 35th Street.  They blocked all traffic, including buses containing RNC delegates, from passing through on 35th Street.  After sitting in the intersection for approximately 15 minutes, they finally were arrested and removed by police.[180]

Shortly thereafter, at approximately 8:40 PM, members of the Manhattan South Task Force, posted at the corner of 35th and 6th, saw a large group of more than 100 people moving down 35th Street from the east, extending building line to building line and into the street, blocking the street and sidewalks.[181]  The group was chanting and carrying signs while walking.[182] As the group approached the intersection of 35th and 6th from the east, some people climbed on telephone booths, street signs, and other objects on the sidewalks.[183] After the group of sitters (discussed above) was arrested, car traffic had again been flowing freely on 35th Street before this second group came down the street.[184]  With this group, however, traffic again was completely blocked on 35th Street.[185]  The group did not have a permit to parade.[186]

---

[176] DiRusso Dep. at 115:24-116:6, 120:5-8.
[177] DiRusso Dep. at 63:20-64:4.
[178] DiRusso Dep. at 68:9-10, 117:23-118:18; Nelson Dep. at 77:5-10.
[179] DiRusso Dep. at 64:11-13; Gonzalez Dep. at 64:21-65:3; Mena Dep. at40:23-41:5.
[180] See Video Compilation.
[181] Deposition of Anthony Bologna ("Bologna Dep."), Exh. 46 to Jenerette Decl., at 60:23-61:2, 108: 6-9, 232:23-25; Deposition of Bruce Smolka ("Smolka Dep."), Exh. 66 to Jenerette Decl., at 240:15-241:2, 257:16-25; see also Video Compilation.
[182] Bologna Dep. at 62:14-19; Video Compilation
[183] Bologna Dep. at 61:2-6, 91:4-9.
[184] Bologna Dep. at 66:13-17, 68:8-10, 136:11-137:3.
[185] Bologna Dep. at 68:8-10.

Officers pulled barriers across 35th Street near the intersection of 35th/6[th] to prevent the group from reaching 6th Avenue.[187] The group reached the barrier and stood in the street and on the sidewalks, stretching from building line to building line and 15-20 feet deep.[188] The group chanted, "Whose streets? Our streets" and other chants while standing at the barrier.[189] Standing near the barrier, Capt. Anthony Bologna gave repeated orders by bullhorn to the group to disperse because, by standing in the street and on the sidewalk, they were blocking vehicular and pedestrian traffic.[190] Other officers told people to disperse while the group was at the barrier.[191] At the time dispersal orders were given, people were free to leave to the east of 35th/6[th] Avenue.[192]

After 10-15 minutes of dispersal warnings, the group began to move eastward. Capt Bologna and other officers went through the barrier and followed the group eastward, continuing to give orders to disperse.[193] As the group moved eastward on 35th Street, people stopped and started moving several times.[194] When the group was midway between 5th and 6th Avenues on 35th Street, Chief Smolka made the decision to arrest people who continued to block the street and sidewalks.[195] Officers began arresting the persons remaining on 35th Street. Sufficient time elapsed between when dispersal orders were given and arrests begun.[196]

Charges against individuals arrested at Proposed False Arrest Sub-Class Location 8 include:
- 149 charges of obstructing vehicular or pedestrian traffic;
- 148 charges of refusing to comply with a lawful dispersal order;
- 51 charges of parading without a permit;
- 1 charge of loitering;
- 1 charge of reckless endangerment;
- 1 charge of killing or injuring a police animal;
- 1 charge of criminal trespass in the third degree; and
- 1 charge of burglary in the second degree.

---

[186] Deposition of Shahrzad Gharemani-Ghadjar ("Gharemani Dep."), Exh. 20 to Jenerette Decl., at 344:8-24; Deposition of Wei-Wei Wang ("Wang Dep."), Exh. 45 to Jenerette Decl., at 81:17-21; Deposition of Edward Sugden ("Sugden Dep."), at 112:12-14.

[187] Bologna Dep. at 61:14-17, 98:22-99:7; Deposition of Jeffrey Black ("J. Black Dep."), Exh. 7 to Jenerette Decl., 44:19-21.

[188] Bologna Dep., at 101:14-21; Smolka Dep., at 256:21-23, 199:14-22; Morse Dep. at 62:21-63:7; Deposition of Jean Vergin ("Vergin Dep."), Exh. 68 to Jenerette Decl., at 34:23-35:8; Ghahremani Dep. at 235:2-7; J. Black Dep. at 52:4-8; Video Compilation.

[189] Deposition of Jason Barrus ("Barrus Dep."), Exh. 5 to Jenerette Decl., at 31:12-22; Deposition of Brendan Sexton ("Sexton Dep."), Exh. 36 to Jenerette Decl., at 49:25-50:2; J. Black Dep. at 52:17-53:3; Video Compilation.

[190] Bologna Dep. at 71:3-17, 102:5-23, 233:14-23; Smolka Dep. at 4:15-5:9.

[191] Bologna Dep. at 103:14-15; Vergin Dep. at 35:25-36:8, 37:20-38:3, 41:1-3.

[192] Smolka Dep. at 20:16-22.

[193] Bologna Dep. at 72:12-22, 73:25-74:12, 101:9-13, 104:20-25; 68:16-19, 81:10-23; Ghahremani Dep. at 249:10-250:20.

[194] Bologna Dep. at 105:8-19.

[195] Bologna Dep. at 75:17-76:2, 108:14-19.

[196] Bologna Dep. at 234:2-234:19; Smolka Dep. at 21:17-25.

### B.    The Conditions of Confinement Class

Plaintiffs propose a class consisting of "all persons arrested by the New York City Police Department between August 27, 2004 and September 2, 2004 who were handcuffed with plastic flexicuffs and detained at the RNC Post-Arrest Staging Site ("PASS") at Pier 57. (Plaintiffs' Motion for Class Cert. at 4).  Plaintiffs allege that the members of this class were subjected to a litany of unconstitutional conditions.  However, non of these alleged conditions can be classified as common to the class, as none of the class representatives or potential class members were exposed to all of the alleged conditions. As a result, each class member's claim within this proposed class will be unique to that class member, thus requiring numerous mini-trials in order to evaluate each claim.

### C.    The Excessive Detention Class

Plaintiffs claim that the arrest processing steps required by the MAPP were deliberately designed to prolong detention.  The MAPP consisted of four steps between arrest and release: (1) arrest at the scene; (2) transportation to a post-arrest staging site set up at Pier 57 on 11th Avenue and West 15th Street; (3) transportation to a mass arrest processing center at 125 White Street; and (4) arraignment or release with a desk appearance ticket at 100 Centre Street.

Police officials responsible for creating the MAPP have testified that its purpose was to process large numbers of arrestees as efficiently as possible if that became necessary.[197] Plaintiffs concede that the time necessary to complete each step of the MAPP varied according to the date, time and location of the arrest.  (Plaintiffs' Motion for Class Cert. at 20 – 24). Depending upon the arrest location, the NYPD "spent 30 minutes to over three hours"

---

[197] Colgan Affidavit, attached as Exh. 62 to Moore Decl., at paragraphs 10-12. "In anticipation of RNC related protests, and recognizing the possibility that there would be a larger number of arrests than normal, a special RNC arrest process was designed in order to efficiently and quickly manage RNC mass arrests, including adding two sites which would accommodate mass arrest processing."

completing the steps precedent to transporting arrestees from the arrest site to the post arrest staging site at Pier 57. (Plaintiffs' Motion for Class Cert. at 20). Indeed, there are wide disparities in arrest-to-arraignment processing times for the proposed class.

Plaintiffs' proposed excessive detention class includes individuals who were processed under the MAPP in just 4 to 6 hours; arrestees who were released with Desk Appearance Tickets ("DATs") in less than 24 hours; arrestees who were arraigned and released in 23 hours; and individuals who were held for more than 50 hours. Indeed, even the variation in the arrest to arraignment times among the 24 proposed class representatives range from just 4 hours to 52 hours. [198] Plaintiffs Deirdre MacNamara and Deepa Majmudar, who were arrested after 8:00 on August 31, 2004 at two different arrest locations, were detained for "approximately 45-50 hours." (Plaintiffs' First Amended Class Action Complaint ("Pl. Am. Com."), attached as Exh. 1 to the Moore Decl., at ¶¶ 89 and 94). But plaintiffs William Steyert, Jr., and Christopher A. Thomas, who were arrested before 8:00 p.m. on August 31, 2004 were arraigned and released in "approximately 16-17 hours" and "15 to 16 hours" respectively. Pl. Am. Com. ¶ 179. One named plaintiff, Shahrzad Ghahremani-Gadjar, also arrested after 8:00 on August 31, 2004, was released in "approximately four hours," whereas plaintiff Diana Raimondi, arrested between 4:00 and 4:30 on that same day "was held for approximately 52 hours." Pl. Am. Com. ¶ 155. Named plaintiffs Elizabeth Fleischman and Michael Binder, who were arrested after 8:00 p.m. on August 27, 2004, when fewer arrestees were in the system, were released within "approximately 20 hours" and "approximately 16-20 hours" respectively. Pl. Am. Com. ¶¶ 99 and 199. In short, the extremely wide variations in the length of detention of the various plaintiffs, and the wide variety of reasons for that variation, militates against certification of a class on this basis. This is

---

[198] See Pl. Am. Com. at ¶¶ 89, 94, 99, 104, 110, 115, 120, 125, 130, 135, 140, 145, 149, 155, 159, 163, 167,171, 175, 179, 183, 188, 192,197).

because trial of this class would require hundreds of mini-trials due to the overwhelming predominance of individualized proof.

## IV.   **ARGUMENT**

### A.   *Legal Requirements For Class Certification*

In order to certify a class, the party seeking class certification must first demonstrate that the proposed class meets the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure: (1) the class is so numerous that joinder of all members is impracticable;  (2)  there are questions of law or fact common to the class;   (3)   the claims or defenses of the representatives are typical of the claims or defenses of the class;  and (4)   the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132-133 (2d Cir. 2001).

Second, the party seeking class certification must demonstrate that the proposed class action meets at least one of the requirements of Rule 23(b):  (1) prosecution of separate actions by individual parties would create a risk of inconsistent adjudications or would be dispositive of the interests of those members not parties to the adjudication;  (2)  defendants have acted or refused to act on grounds generally applicable to the class;  or (3) questions of law or fact common to members of the class predominate, and that a class action is superior to other available methods for adjudication. *See* Fed. R. Civ. P. 23(b); *see also In re Visa*, 280 F.3d at 133.  Basically, "Rule 23(a)'s interrelated prerequisites serve as 'guideposts' for determining whether the respective claims are sufficiently similar that a class action will serve as an efficient litigation control device." *McCarthy v. Kleindienst*, 741 F.2d 1406, 1410 (D.C. Cir. 1984).

In addition to the express requirements for class certification set forth above, Rule 23 contains an implicit requirement that the proposed class be "precise, objective and presently ascertainable." *Burley v. City of New York*, 2005 U.S. Dist. LEXIS 4439, *28 (S.D.N.Y. Mar.

23, 2005) (citing *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981). In this regard, "a proposed class must be clearly defined so that it is 'administratively feasible for a court to determine whether a particular individual is a member.'" *Burley* at *28 (quoting *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 1983)).

### (1) Burden and Standard of Proof

The Second Circuit recently reaffirmed the rigorous standards of proof required of a party seeking to certify a class. The court held that "(1) that a district judge may not certify a class without making a ruling that each Rule 23 requirement is met and that a lesser standard such as 'some showing' for satisfying each requirement will not suffice, (2) that all of the evidence must be assessed as with any other threshold issue, [and] (3) that the fact that a Rule 23 requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met." *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.)*, 471 F.3d 24, 27 (2d Cir. 2006) ("*In re IPO*"). The District Court may resolve factual disputes relevant to each Rule 23 requirement to be persuaded that the requirements have been met. *See id* at 41. The class determination "generally involves considerations that are enmeshed in the factual and legal issues comprising plaintiff's cause of action." *Gen. Telephone Co. of the Southwest v. Falcon*, 475 U.S. 147, 160 (1982). "[T]he important point is that the requirements of Rule 23 must be met, not just supported by some evidence." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 33. Moreover, plaintiffs bear the burden of proof on every requirement of Rules 23(a) and (b). *Caridad v. Metro-North Commuter Railroad*, 191 F.3d 283, 291 (2d Cir. 1999). Plaintiffs cannot carry that burden on the record in this case.

**(2) Plaintiffs Lack Standing To Maintain A Class Action For Injunctive Or Declaratory Relief Under Fed. R. Civ. P. 23(b)(2).**

To certify a class under Fed. R. Civ. P. 23(b)(2), the Court must find that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." In this case, plaintiffs have moved to certify a 23(b)(2) class for permanent injunctive and declaratory relief from defendants' alleged "policies, practices and/or customs of indiscriminate mass arrest; preventative and punitive detention to keep lawful, peaceful demonstrators off the streets; and subjecting those arrested to cruel and inhumane conditions." Pl. Am. Com. at 47. "Plaintiffs further seek an order enjoining these same policies, practices and customs." *Id.* In addition, plaintiffs seek to certify a 23(b)(3) class for monetary damages. Plaintiffs do not have standing to seek declaratory or injunctive relief.

In order to certify a 23(b)(2) class, plaintiffs must prove that they have standing to seek prospective equitable relief. To prove standing, plaintiffs must show "both a likelihood of future harm and the existence of an official policy or its equivalent." *Dodge v. County of Orange,* 2004 U.S. App. LEXIS 11907, *3 (2d Cir. June 7, 2004) (quoting and adopting the reasoning of *Shain v. Ellison,* 356 F.3d 211 (2d Cir. 2004) ("*Shain II*")). In addition, plaintiffs must "demonstrate standing for each claim and form of relief sought." *Bauer v. Veneman,* 352 F.3d 625, 641 n.15 (2d Cir. 2003).

Plaintiffs claim that "[s]uch broad declaratory and injunctive relief is necessary in light of the fact that New York is a frequent host city for both small and large-scale demonstrations and that the NYPD has exhibited a repeated disregard for the civil rights of protestors." (Pl. Compl. at pg. 47). However, even after two years of exhaustive consolidated discovery, plaintiffs have failed to present a shred of evidence supporting their claim of an official *de facto* or *de jure*

NYPD policy of indiscriminate mass arrests or preventative and punitive detention. As noted above, however, the first prong of the *Shain II/Dodge* test for standing to request equitable relief is the likelihood of future harm based upon the existence of an official policy. *Shain II*, 356 F.3d at 216; *Dodge,* 2004 U.S. App. LEXIS 11907, at *3. Moreover, plaintiffs' complaint is devoid of any specific allegation that they face the likelihood of future harm. Instead of actual evidence plaintiffs offer the hypothetical possibility of future harm based upon the fact that "New York is a frequent host city for both small and large-scale demonstrations." But that bare bones assertion, unsupported by record evidence, is plainly insufficient to ground standing under *Shain II*.

In *Shain II,* the Second Circuit held that the plaintiff, who had been strip searched while in custody for a misdemeanor, lacked standing to seek injunctive relief because he "had not established – or even alleged before this appeal – the likelihood of a future encounter with the Nassau County police likely to result in a subsequent unconstitutional strip search." *Shain II,* 356 F.3d at 215. Where, as here, plaintiffs have not even alleged a factual basis for the likelihood of future harm, they "cannot rely on past injury to satisfy the injury requirement but must show a likelihood" that they "will be injured in the future." *Shain II,* 356 F.3d at 215. Past injury provides a predicate for compensatory damages but not for prospective equitable relief "since the fact that such practices had been used in the past did not translate into a real and immediate threat of future harm. Invoking the Supreme Court's standing analysis in *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983), the Second Circuit in *Shain II* made clear that plaintiff Shain could establish a sufficient likelihood of a future unconstitutional practice only by showing that "*if* he is arrested in Nassau County and *if* the arrest is for a misdemeanor and *if* he is not released on bail and *if* he is remanded to NCCC and *if* there is no particularized reasonable suspicion that he

is concealing contraband, he will again be strip searched.  Such an accumulation of inferences is simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Shain II* at 215-16 (citing *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)).

Similarly, here, plaintiffs would have to show that *if* they participate in large-scale demonstrations in New York City, and *if* they are arrested with a large group of people and if they are handcuffed in plastic flexicuffs that are tight and painful and *if* they are cuffed for an unreasonably excessive period of time, and *if* they are not considered for a summons and *if* they are detained at Pier 57 (which has reverted to ownership by HRPT, the temporary arrangement for use of the Pier having expired), and *if* they are processed under the MAPP, and *if* they are held pending arraignment for an excessive period of time, they would be able to meet the first prong of *Shain II/Dodge*.  However, under both *Shain II* and *Lyons*, this is a chain of inferences too speculative and conjectural on which to base prospective injunctive relief.  As the *Shain II* court noted, since the Supreme Court's ruling in *Lyons* this has simply not been enough to confer standing for injunctive relief:

> Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement are unconstitutional.

*Shain II* at 215 (quoting *Lyons*, 461 U.S. at 111).

## B.   *Plaintiffs' Proposed Classes Fail To Meet the Requirements of Rule 23(a)*

### (1) Plaintiffs Fail to Satisfy Rule 23(a) Numerosity Requirements Because Joinder is Not Impractical

Pursuant to Rule 23(a)(1), plaintiffs may sue as representatives of a class *only if* "the class is so numerous that joinder of all members is impracticable."  The Second Circuit has

emphasized that the applicable standard is not whether joinder would be impossible, but merely whether it would be impracticable. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

In determining whether a proposed class "is so numerous that joinder of all members is impracticable, courts look at a number of factors, including "(1) judicial economy arising from the avoidance of a multiplicity of actions; (2) the geographic dispersion of class members; (3) the financial resources of class members; (4) the ability of claimants to institute individual lawsuits; (5) the amount of each member's individual claim; (6) knowledge of the names and existence of the potential class members; and (7) whether potential class members have already joined other actions." *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405 (S.D.N.Y. 1998) (citing *Robidoux*, 987 F.2d at 936).[199] The class action device is typically reserved for those situations "where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of...individual suits for damages." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980).

Plaintiffs have submitted "no evidence that permitting this suit to go forward as a class action is necessary to avoid a multiplicity of redundant lawsuits." *Ansari v. New York Univ.*, 179 F.R.D. 112, 115 (S.D.N.Y. 1998). As the *Ansari* court noted, the prospective class members have brought, and have demonstrated their ability to bring, suits on their own behalf. Cases arising out of arrests at the RNC have been pending before this court for over three years, and have proliferated to almost one hundred separate actions involving almost 600 plaintiffs, including the 24 representatives for the proposed classes. Indeed, 148 RNC plaintiffs have already joined together in *Abdell v. City of New York*, 05 Civ. 8453 (KMK)(JCF), and another 96 in *Adams v. City of New York*, 05 Civ. 9484 (KMK)(JCF). There are numerous smaller suits

---

[199] Moreover, "[c]ourts should not be so rigid as to depend on mere numbers as a guideline on the on the practicability of joinder; a determination of practicability should depend on all circumstances surrounding the case." *DeMarco v. Edens*, 390 F.2d 836, 845 (2d Cir. 1968).

ranging from individual plaintiffs in actions such as *Concepcion v. City of New York*, 05 Civ. 8501 (KMK)(JCF) and *Jarick v. City of New York*, 05 Civ. 7626 (KMK)(JCF) to slightly larger groups such as the 14 plaintiffs who have joined in *Biddle v. City of New York*, 05 Civ. 1570 (KMK)(JCF). Thus, putative class members have already exhibited their readiness and ability to institute actions on their own behalf. Certification of these classes will not enhance judicial economy.

Further, "plaintiffs will be [as] equally able to pursue their suits if their claims are joined as they would be were a class to be certified."" *Universal Calvary Church v. City of New York*, 177 F.R.D. 181, 183 (S.D.N.Y. 1998). While plaintiffs may be dispersed geographically, even plaintiffs residing in countries other than the United States and in states far removed from this Court have demonstrated willingness to participate in and vigorously prosecute their respective cases. *See, e.g.*; Verification of Yasmine Farhang attached to Plaintiff's Response to Defendant's First Set of Interrogatories in *Adams v. City of New York,* 05 Civ. 9484 (KMK)(JCF) (plaintiff residing in Tehran, Iran); Verification of Rebecca Sutton attached to Plaintiff's Response to Defendant's First Set of Interrogatories in *Adams* (plaintiff residing in San Francisco, California); Verification of William Conwell attached to Plaintiff's Response to Defendant's First Set of Interrogatories in *Abdell v. City of New York*, 05 Civ. 8453 (KMK)(JCF) (plaintiff residing in Washington County, Oregon) (attached as Exhibit 2 to Jenerette Decl.). Moreover, the RNC cases have been the subject of widespread publicity in local and national publications. Arrestees interested in pursing legal action can and have joined existing RNC cases. Defendants submit that, if joinder of 148 plaintiffs and 96 plaintiffs was not impracticable in the related *Abdell* and *Adams* actions, then joinder of the remaining  plaintiffs arrested at the Proposed False Arrest Sub-Class Locations in existing RNC actions is not impracticable.

33

### (2) Each of Plaintiffs' Proposed Classes Fail to Meet Rule 23(a) Commonality and Typicality Requirements.

The Supreme Court has held that "the class action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named plaintiffs only.'" *Gen. Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-701 (1979)). Again citing *Califano,* the Court in *Gen. Telephone Co.* went on to note that "[c]lass relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class." 457 U.S. at 155. "For in such cases, the class action device saves the resources of the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Id.*

"The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir. 1997). "These requirements ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Id* (quoting *Gen. Telephone Co.,* 457 U.S. at 157 n. 13)). "The typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani,* 987 F.2d 931, 936-37 (2d Cir. 1993).

### (3) The proposed class representatives do not have standing to assert First Amendment retaliation claims.

Plaintiffs allege that the NYPD implemented a policy of "indiscriminate mass arrest" in order to "punish the plaintiffs for their exercise of First Amendment rights, [thereby] criminaliz[ing] dissent and public protest." (Pl. Am. Com. at ¶¶ 84-85, 87). However, standing

to assert a First Amendment claim requires that the plaintiff be engaged in protected speech at the time of arrest. *See Loper v. New York City Police Dept.*, 802 F.Supp. 1029, 1035 (S.D.N.Y. 1992); *see also Broderick v. Okla.*, 413 U.S. 601, 611 (1973) (narrow standing exception that plaintiff not engaged in protected activity may prosecute First Amendment claim on behalf of others only when a statue is challenged for overbreadth).   Moreover, even if plaintiffs claim retaliation for exercising First Amendment rights, the putative class members would still have to prove that (1) they had an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by the exercise of that right; and (3) defendants' actions effectively chilled the exercise of the First Amendment right. *See Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

Several of the putative class representatives have in fact testified that they were not engaged in First Amendment activity at the time of arrest.  For instance, Carolyn Ali-Khan at Proposed False Arrest Sub-Class Location 4 testified that she was just out roller-blading. Adriene Garibini at Proposed Sub-Class Location 4 testified that she simply wanted to ride her bike on a warm Sunday afternoon. Randall Steketee at Proposed False Arrest Sub-Class Location 3 testified that he was simply enjoying an evening with friends.  Celene Malanum, putative class representative for Proposed False Arrest Sub-Class Location 6 testified that she was on her way to an Asian restaurant to meet friends for drinks. If these plaintiffs were not engaged in First Amendment activity, they do not have standing to claim that defendants acted in response to their exercise of First Amendment activity.

Moreover, while individual plaintiffs for the proposed conditions of confinement class complain generally of being subjected to unreasonably cold conditions, lack of toilets, handcuffing, and excessive lengths of detention, not every plaintiff complained of those

conditions. In addition, as discussed more fully below, depending upon their individual length of confinement, the legal standard applicable to each of their claims will differ. See Section IV(C)(2) *infra*. In many cases, even the circumstances of the putative class representatives differs greatly as to each of the allegations and complained-of conditions. The claims of the class representatives therefore cannot be said to even be typical of each other, much less typical of non-named potential class members. They do not have common claims on the issue of whether there was probable cause for their arrests, whether their conditions of confinement constitute constitutional violations or whether they were excessively detained.   Simply, plaintiffs cannot meet the commonality and typicality prongs of Rule 23(a) and certification should be denied for this reason alone.

### C.   *Plaintiffs' Proposed Classes Also Fail Rule 23(b)(3) Predominance Requirements*

In addition to the four requirements of Rule 23(a), a plaintiff seeking to certify a class pursuant to Rule 23(b)(3) must also show that: (1) common questions of fact or law predominate over questions affecting individual class members; and (2) that a class action is superior to other methods of adjudication. *See* Fed. R. Civ. P. 23(b)(3).

"The predominance criterion is far more demanding" than Rule 23(a) commonality. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-624 (1997). In considering Rule 23(b)(3)'s requirements, the court must review the substantive elements of plaintiffs' cause of action, the proof necessary for the various elements and the manageability of the trial of the issues. *In re IPO*, 471 F.3d at 30. "The court is obligated to determine whether the existence of individual issues preclude certification, and must take into account the substantive law, facts, procedural due process and fundamental fairness." *Hudson v. City of Chicago*, 2007 U.S. Dist. LEXIS 37515, *21 (N.D. Ill. May 22, 2007). Moreover, plaintiffs must make more than "some

showing" of compliance that the predominance requirement has been met. *In re IPO*, 471 F.3d at 32. "A district judge may certify a class…*only* if the judge…is persuaded to rule, based on the relevant facts and applicable legal standard, that the requirement is met." *Id* (emphasis added). Based upon the record in this case, plaintiffs cannot meet that exacting standard for certification of any of their proposed classes as individual issues predominate over common questions of law and fact for each proposed class.

### (1) Individualized Inquiries Are Necessary to Determine Municipal Liability

Plaintiffs are apparently attempting to certify a municipal liability class claim with respect to all 10 proposed classes. Plaintiffs may prove municipal liability by demonstrating one of the following: (1) a formal policy, officially promulgated or adopted by the City of New York, (2) that an official or officials responsible for establishing final policy with respect to the subject matter in question took action or made a specific decision that caused the alleged violation of plaintiffs' constitutional rights, or (3) the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute custom or usage, and proof that this practice was so manifest or widespread as to imply the constructive acquiescence of policymaking officials. *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-130 (1988) (plurality opinion); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion); *see also Sorlucco v. New York City Police Dep't.*, 971 F.2d 864, 871 (2d Cir. 1992).

It is clear that individualized issues will overwhelm the generalized issues with respect to plaintiffs' claims. The Second Circuit has held that "[t]he plaintiff must first prove the existence of a municipal liability or custom in order to show that the municipality took some action that caused his injuries…Second, the plaintiff must establish a causal connection – an 'affirmative link' – between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of*

*Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985), *cert. denied*, 480 U.S. 916 (1987). After two years of consolidated discovery in the RNC cases, plaintiffs have uncovered no evidence of a: (1) policy of indiscriminate mass arrest, (2) a policy of holding arrestees in inhumane conditions of confinement or (3) deliberately prolonging their detention in order to punish them for exercising their First Amendment right to political protest.

With respect to the alleged policy of indiscriminate mass arrests, plaintiffs' argument that there was an official policy of indiscriminate mass arrests of people exercising their First Amendment rights is belied by the fact that hundreds of thousands of people exercised their First Amendment rights during the RNC and were not arrested. Moreover, the NYPD facilitated both scheduled marches for which permits had been issued and unscheduled, spontaneous marches.[200]

Similarly, with respect to the conditions claim, in order to show that their constitutional rights were violated, each plaintiff must prove that the conditions to which they were subject fell below constitutional standards. *Benjamin v. Fraser*, 343 F.3d 35, 51 (2d Cir. 2003) (to establish the deprivation of a basic human need, plaintiff must show "actual or imminent harm"); *Rush v. Astacio*, 1998 U.S. App. LEXIS 18588, *4-5 (2d Cir. 1998) (failure to offer detainee food and fact that detainee was held in a "very cold" room for 6½ hours were not substantial and resulted in no injuries whatsoever); *Butler v. Westchester County*, 2000 U.S. Dist. LEXIS 3981, *15 (S.D.N.Y. March 30, 2000)("the alleged deprivation must be 'sufficiently serious' that it denies 'the minimal civilized measure of life's necessities."); *Lewis v. Washington*, 1996 U.S. Dist. LEXIS 18173, *9 (S.D.N.Y. Dec. 6, 1996) ("It is clear that plaintiff must show he sustained a significant injury as a result of defendant's conduct in order to prevail under the Fourteenth Amendment's Due Process Clause"); *Harrison v. Ienuso*, 1995 U.S. Dist. LEXIS 8616, *6

---

[200] *See page 3 supra.*

(S.D.N.Y. June 23, 1995) ("the Constitution only requires that prisoners not be subjected to conditions so uninhabitable as to be shocking").

In addition, each plaintiff must additionally prove a causal connection between the alleged municipal policy and the alleged deprivation of their constitutional rights. *Vippolis v. Village of Haverstraw*, 768 F.2d at 44. The resolution of this issue would require individual determinations of whether the officers assigned to each arrestee acted in accordance with a policy of the of the NYPD to punish demonstrators arrested during the RNC by subjecting them to punishing conditions of confinement or unnecessarily prolonging their detention. Simply put, the circumstances of the conditions of confinement of each individual arrestee were different. They were not all arrested at the same location at the same time and confined in the same manner. They were not all processed by the same officers. Thus, in addition to the individual circumstances that must be assessed to determine whether their conditions of confinement fell below constitutional standards, individual determinations are necessary to determine whether each claimant was subjected to the alleged punitive policy.

The attempt by plaintiffs to certify eight false arrest sub-classes, a conditions of confinement class and an excessive detention class raises issues similar to those addressed by the court in *Universal Calvary Church v. City of New York*, 177 F.R.D. 181, 184 (S.D.N.Y. 1998). In that § 1983 action alleging police misconduct arising out of a single event, police response to an alleged robbery at a church, the Court denied certification on grounds that plaintiffs failed to satisfy Rule 23(b)(3) predominance requirements:

> the series of interactions between individual plaintiffs and individual police officers will raise issues of fact and law specific to each interaction, and the defendants' liability will vary accordingly. Trial will raise such issues as whether each particular action was justified....Moreover, the damages suffered by the plaintiffs will vary depending on such factors as the level of force in each instance, the extent of false imprisonment to which each plaintiff was subjected, the extent of each plaintiff's exposure to mace, and so on. It

is not established on this record that common questions of fact or law predominate over
questions affecting only individual plaintiffs.

177 F.R.D. at 184. It is clear that each plaintiff will have to prove that their constitutional rights
were violated by being subjected to arrest without probable cause, excessive detention and
unconstitutional conditions of confinement.   For this reason, plaintiffs cannot meet the
predominance requirement of Rule 23(b) (3) for their Monell claims.

### (2) Individualized Probable Cause Inquiries Are Necessary to Determine Liability For The Eight Proposed False Arrest Sub-Classes

#### (i)       *The Legal Standard*

Individual issues overwhelm each of plaintiffs' eight Proposed False Arrest Sub-Classes.
Plaintiffs cite a wide variety of actions taken by the NYPD to detain and process large numbers
of individuals at each sub-class location as "evidence that a policy or practice of indiscriminate
mass arrest existed and was implemented during the RNC at each of the sub-class locations." [201]
Plaintiffs' Motion for Class Cert. at 3.  However, none of the arrests – whether based upon group
or individual conduct – were unlawful if the NYPD had probable cause to make them.

The Second Circuit has held that a "§1983 claim for false arrest, resting on the Fourth
Amendment right of an individual to be free from unreasonable seizures, including arrest without
probable cause, is substantially the same as a claim for false arrest under New York law."
*Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  The "existence of probable cause to arrest
constitutes justification and 'is a complete defense to an action for false arrest,' whether that
action is brought under state law or under §1983."  *Id* (citing *Bernard v. United States*, 25 F.3d
98, 102 (2d Cir. 1994)).

---

[201] Plaintiffs cite the following actions as "evidence that a policy or practice of indiscriminate mass arrest existed
and was implemented during the RNC at each of the foregoing sub-class locations": use of orange netting, lines of
police officers or lines of police bicycles or scooters to corral people; failure to distinguish bystanders, media
personnel and legal observers prior to making arrests; assigning one arresting officer to five arrestees.

Probable cause to arrest exists when the police officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has or is being committed (2) by the person to be arrested." *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987) (citing *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983)). Such information includes all of the facts and circumstances leading to the arrest. *See Maryland v. Pringle,* 540 U.S. 366, 371 (2003) ("probable cause...depends on the totality of the circumstances."); *see also Illinois v. Gates,* 462 U.S. 213, 230-32 (1983). "Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily or even usefully reduced to a neat set of legal rules." *Pringle,* 540 U.S. at 232; *see also Ricciuti v. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (the Court should consider the facts available to the officer at the time of the arrest).

The "Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 146 (1979). "Probable cause can also exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard*, 25 F.3d at 102. The Second Circuit has consistently held that probable cause to arrest exists when the police officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has or is being committed (2) by the person to be arrested." *Ceballos*, 812 F.2d at 50 (citing *U.S. v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983)). That information includes all of the facts and circumstances leading to the arrest, including the knowledge and information of all cooperating law enforcement officials; "the knowledge of one is presumed shared by all". *Savino v. City of New York,* 332 F.3d 63, 74 (2d Cir. 2003); *see also United States v. Colon,* 250 F.3d 130, 135 (2d Cir. 2001) ("[t]he whole

complex of swift modern communication in a large police department would be a futility if the authority of an individual officer [were] to be circumscribed by the scope of his first hand knowledge of facts concerning a crime or alleged crime.")

Plaintiffs rely upon the fact that officers arrested certain individuals based upon group conduct as evidence of a policy of "indiscriminate mass arrest." However, whether class members were arrested for blocking streets and sidewalks as part of an unpermitted parade or for wholly individual conduct, the dispositive question is whether officers had probable cause to make the arrests. Even plaintiffs concede that this probable cause inquiry must be adjudicated on an individualized basis.[202]   Individual issues would overwhelm the class because probable cause determinations – and thus defendants' liability – would have to be made based upon the circumstances surrounding the arrests at each Proposed False Arrest Sub-Class Location. There are material variations in those circumstances.

### (ii)   *Individualized Probable Cause Determinations Are Required*

Plaintiffs erroneously assume that merely being charged with group conduct violations under §240.20 or §10-110 is sufficient to establish liability under the Fourth Amendment. However, a Fourth Amendment violation is not determined by the actual charge filed against the class member.  Rather, as the Second Circuit explained in *Jaegly v. Couch*, it is determined by the existence of probable cause for any crime at the time of arrest:

> Following [*Devenpeck v. Alford*, 543 U.S. 146 (2004)], we conclude here that a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or,

---

[202] Plaintiffs erroneously argue that "assuming plaintiffs can establish that unlawful, indiscriminate mass arrests occurred at one or more of the sub-class locations, the issue of actual injury – i.e., whether there was probable casue to arrest individual plaintiffs – may be adjudicated on an individual basis." (Pl. Memo at 39).  This is patently false. Rather, the question of probable cause goes to the lawfulness of the arrest, not injury.  Indeed, even in the sole mass arrest case that plaintiffs rely upon for this proposition the court held that "the relevant question [in a mass arrest scenario] is not whether individual circumstances existed, the relevant question is whether such circumstances were taken into account in determining whether probable cause existed to arrest." *Vodak v. City of Chicago*, 2006 U.S.Dist. LEXIS 30052, *33  (N.D. Ill. 2006).

> indeed, any charge actually invoked by the arresting officer at the time of arrest. Stated differently, when faced with a claim for false arrest, we focus on the validity of the *arrest*, and not on the validity of each charge.

439 F.3d 149, 154 (2d Cir. 2006).  Thus, the Court will have to consider the circumstances surrounding the arrests at each Proposed Sub-Class location to determine whether there was probable cause for the arrests. There was no need to conduct probable cause hearings in the mass arrest cases relied upon by plaintiffs because all of the people arrested at a particular location were charged with the exact same offense. *See Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006); *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977); *Vodak v. City of Chicago*, 2006 U.S. Dist. LEXIS 30052 (N.D. Ill. April 17, 2006).  Common issues therefore predominated over individual issues because every member of the class would rely upon the same evidence to prove defendant's liability for unlawful arrest.  In this case, however, a variety of charges were leveled against arrestees at each location.  Some of those charges stemmed from participation in unlawful conduct with a large group of people.  However, there were also individualized circumstances leading to many arrests at the Proposed Sub-Class locations and criminal charges leveled against those arrested reflect those differences. Proof of liability will vary for those arrests.  For example, when defendants present videotape (including that which is attached to this filing as Exh. 76 to the Jenerette Decl.) as proof of probable cause to arrest based upon the conduct of hundreds of bike riders collectively taking over the streets, running traffic lights, bringing traffic to a standstill and preventing ordinary New Yorkers from simply crossing the street, plaintiffs will attempt to defeat that showing with proof of individual innocence. The Court will then have to determine whether the arrests were lawful as to certain individuals and unlawful as to others.

   In the event that the Court finds that there was probable cause for the arrest of a particular plaintiff, that would be a complete defense to liability in that instance. *See Atwater v.*

*Lago Vista*, 532 U.S. 318, 354 (2000) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")  Significant material differences in the evidence to be presented on behalf of each arrestee means that the Court will be forced to conduct hundreds of mini-trials to determine which plaintiffs, if any, were arrested unlawfully.

For example, Officer Choinski testified that, at Proposed Sub-Class Location 1, he personally issued repeated warnings to disperse or face arrest to presumptive class member Julia Cohen.  He arrested her after she failed to comply with at least three dispersal orders.[203] At trial, a hearing officer found that Officer Choinski's testimony was credible and that there was probable cause to arrest Cohen.[204]  Elizabeth Fleischman, a putative class representative for Proposed Sub-Class Location 2, corroborated the testimony of Captain Monahan and Lieutenant Schmidt when she testified she observed thousands of bike riders covering the width of the streets, block traffic and run red lights as they rode from Union Square Park to West 35th Street.  Moreover, she specifically admitted that she blocked cars and intersections during the ride.[205] Similarly, proposed Sub-Class Location 2 class representative Sarah Glidden admitted that she read a flyer distributed by the NYPD warning against unlawful bicycle riding and that she fully understood its contents.  In contrast, Adrienne Garibini, putative class member of Proposed Sub-Class Location 4, testified that she never saw such a flyer and did not know that bicyclists were

---

[203] *See* pages 2-3, *supra.*

[204] Plaintiffs rely upon an order dated November 28, 2006 by Magistrate Judge Francis holding that "defendants are deemed to have no knowledge of plaintiffs' actions.  This includes any member of the NYPD" as proof that officers followed a policy of mass arrests without probable cause.  However, that order was issued early on in discovery. During a subsequent hearing on December 1, 2006, Judge Francis ruled that the order does not preclude the City from coming back and saying "we've now identified Officer So-and-So, who, in fact, saw this person receive a direct order or refused to move off the sidewalk, or whatever the officer saw, and then that would come in . . . I do understand that discovery is a rolling process, and that they haven't gotten to all of these officers yet."  Since the date of that ruling, defendants have deposed numerous officers who witnessed unlawful conduct by individual arrestees.

[205] *See* pages 4-5, *supra.*  Moreover, Magistrate Judge Francis made clear that his ruling regarding "personal knowledge" was not a finding on probable cause. *See* Plaintiffs' Exh. 52.

not permitted to block traffic.[206]   Glidden also admitted that she did not have a permit to parade,

and that her bike did not have lights – both of which are violations of New York law of which

she had been apprised.   Moreover, the fact that plaintiffs arrested at various Proposed False

Arrest Sub-Class Locations were ultimately convicted – while others were acquitted – further

demonstrates the necessity of individualized assessments of proof with respect to each proposed

class member.[207]   Thus, "[i]t is clear that the factual circumstances surrounding each arrest

varies, and individualized inquiry would have to be conducted in order to determine if Plaintiffs

were unlawfully targeted or were violating" a law or ordinance. *Hudson v. City of Chicago*, 2007

U.S. Dist. LEXIS 37515, *28 (N.D. Ill. May 22, 2007).   This case-by-case analysis defeats the

predominance and commonality requirements for class certification.

In *Hudson*, the court refused to certify a class of plaintiffs alleging that the City of

Chicago and officers in the Chicago Police Department unlawfully arrested them for violation of

a City ordinance that forbade panhandling on or near a bridge.   *See id* at *6.   Plaintiffs gave

conflicting testimony about the circumstances surrounding their arrests.   "For example, one

plaintiff claims that he panhandles on the bridge regularly; two other plaintiffs claim that they

---

[206] *See* pages 16-18, *supra.*

[207] By way of example, from events on 8/31 at Union Square, Yuri Cantor was convicted of parading without a permit (two other defendants acquitted). The Court also stated that, "regarding civil lawsuits, I do make a finding . . . that there was reasonable cause to believe they were, in fact, violating the law and the police had every right to arrest them at that point. Proof beyond a reasonable doubt is another ball game." Transcript at 86. Similarly, from 8/27 at 35th/Dyer, Tila Duhaime was convicted of parading without a permit and disorderly conduct section 5. From 8/27 at 35th St/10th-Dyer, Warren Karp, was convicted of parading without a permit and disorderly conduct section 5. From 8/27 at 10th St/2d Ave, Christopher Lee, was convicted of disorderly conduct sections 5 and section 6. From 8/27 at 10th St/2d Ave,  Scott Kerns was convicted of disorderly conduct section 5 and section 6. From 8/27 at 11th St/2d Ave, Nanya Bronsema was convicted of disorderly conduct sections 5 and 6. From 8/31 at Union Square, Michael Duncan was convicted of parading without a permit. From 8/31 at Union Square, Kyle Rettstadt was convicted of disorderly conduct subsection 5 and parading without a permit. From 8/31at 17th St/5th Ave, Derek Bloom was convicted of disorderly conduct subsection 5 and parading without a permit. From 8/31 at 1181 Broadway, Beverly Rice was convicted of disorderly conduct section 5. From 8/31 at 1181 Broadway, James Morgan was convicted of disorderly conduct section 5. From 8/31 at 28th/Broadway, John Breitbart, Neena Das, James Morgan and Beverly Rice were all convicted of disorderly conduct subsection 5. From 8/30 at 29th/8th Ave, Liah Honso was convicted of resisting arrest. From 8/27 at 13th St/7th Ave, Ben Stewart was convicted of disorderly conduct and parading without a permit.

panhandle on the street and never on the bridge; and one plaintiff even pled guilty to violating the Bridge Ordinance." *Id* at 28. As noted above, the court refused to certify the class on predominance grounds, holding that "it is clear that the factual circumstances surrounding each arrest varies, and an individualized inquiry would have to be conducted in order to determine if plaintiffs were unlawfully targeted or were violating the Bridge Ordinance." *Id* at *28-*29. Similarly, in this case, some plaintiffs were convicted of violating the law, plaintiffs such as Elizabeth Fleishman and Jeanette Lee admitted that they were obstructing pedestrian or vehicular traffic while Steketee and Ali-Khan claimed that they were simply out for an afternoon of roller-blading or dinner with friends. Despite plaintiffs' use of the term "mass arrest" in an attempt to gloss over the variation in the factual circumstances surrounding arrests at the Proposed False Arrest Sub-Class Locations, the record in this case proves that the Court would have to conduct individualized inquiries to determine whether arrests at each location were lawful. *See, e.g., McCarthy v. Kleindeinst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984) (certification of class of arrestees from May Day Vietnam protests denied when "there are serious drawbacks to the maintenance of a class action are presented where initial determinations, such as liability *vel non,* turn upon highly individualized facts.").

The cases that plaintiffs rely upon, *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) *Vodak v. City of Chicago,* 2006 U.S. Dist. LEXIS 30052 (N.D. Ill. 2006) are irrelevant for two reasons. First, this Court is not bound by those cases. Rather, the Court must conduct its own rigorous analysis of the facts and claims of this case to determine whether plaintiffs' proposed class should be certified. *In Re IPO,* 471 F. 3d at 27. Second, the facts of those cases are so distinct from this case as to render them inapplicable.

*Barham v. Ramsey* dealt with a protest in a D.C.-area park as part of a larger, weekend-long series of protests against globalization. The commanding officer at the protest in Pershing Park observed a "steady stream" of individuals entering the park, but never asserted that protestors were "operat[ing] as a cohesive unit that entered or left the park intact" nor that all non-protestors left the park prior to the individuals alleged to be protestors entered the park. *Id.* at 569. The commanding officer "did not order any persons to clear the park before directing his officers to conduct the mass arrest, and he did not warn the persons in the park that arrest was imminent." *Id.* at 570. The D.C. Circuit rejected defendants' argument that probable cause to arrest everyone in the park was created by "scattered acts of lawlessness that [the commanding officer] and others had witnessed that morning" *outside* of the park. *Id* at 574. The court reasoned that acts by unidentified protestors could not reasonably be imputed to the random collection of individuals cordoned off inside Pershing Park. *Id.* "Thus, after letting significant time elapse while a diverse crowd entered and exited the park freely, police arrested everyone who happened to occupy the park at a particular, randomly chosen moment." *Id.*

This case is distinguishable from *Barham* for two reasons. First, the commanding officer in that case issued his order to arrest based upon conduct that he did not witness and deliberately refused to give a dispersal order. In contrast, the deposition testimony and videotape evidence in this case establishes that officers: (1) witnessed unlawful conduct before issuing orders to arrest and (2) gave numerous dispersal orders that some people chose to obey and others to disregard. The commanding officer in *Barham* deliberately failed to give dispersal orders because he feared more disturbance would ensue if he allowed the protestors to disperse from the scene. *Id..* Second, all 386 people arrested in the Park were charged with one count of failure to obey a police officer *Id.* The court considered this material evidence that the arrests were not based

upon particularized findings of probable cause. In this case, the charges at Proposed Sub-Class Locations vary according to the behavior of the arrestees, indicating that defendants considered individual circumstances in determining whether probable cause existed to arrest.

Similarly, in *Vodak* all arrestees were charged with the same offense – reckless conduct, whereas here there were various charges based upon observations of individual unlawful conduct.[208] *Vodak*, 2006 U.S. Dist. LEXIS at *32-33. Moreover, unlike *Vodak*, here many arrestees either admitted to or were convicted of the unlawful conduct with which they were charged, which further demonstrates the necessity of individualized assessments of proof with respect to each proposed class member. Stated simply, the complexity of events that transpired at the Proposed Sub-Class Locations are so different as to render *Barham* and *Vodak* inapposite.

### (iii)   *Individual Class Members' Suits for False Arrest Are Barred by the Doctrine of Heck v. Humphrey*

In *Heck v. Humphrey*, 517 U.S. 477, 486-487 (1994), the Supreme Court held that, in order for a plaintiff to maintain a §1983 action to recover damages for a harm caused by unlawful actions which would render a conviction or sentence invalid, the plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus. Where a plaintiff maintains a §1983 for false arrest, as discussed *supra*, that plaintiff must show that a defendant intentionally confined her without her consent and without justification. *See Fernandez v. City of New York*, 2003 U.S. Dist. LEXIS 13122, *9 (S.D.N.Y. July 29, 2003). Probable cause constitutes such a justification. *See id.* For the purposes of *Heck*, courts in this Circuit have routinely held that "a conviction would normally be conclusive evidence of probable cause." *Weyant v. Okst*, 101 F.3d

---

[208] *See* pages 4 – 25 *supra*.

845, 854 (2d Cir. 1996); *see also Amaker v. Coombe*, 2002 U.S. Dist. LEXIS 5934, at *34 (S.D.N.Y. 2002). In addition, "a guilty plea is the equivalent of a conviction." *Hernandez v. City of New York*, 2004 U.S. Dist. LEXIS 23365, at *16-*17 (S.D.N.Y. 2004) (quoting *Saddler v. United States*, 531 F.2d 83, 85-86 (2d Cir. 1976)). Here, putative class members at each Proposed False Arrest Sub-Class Location were convicted of the crimes with which they charged during the RNC. In addition, in several cases, even where courts declined to convict, the judge still found that there was probable cause for the arrest and that the officer's testimony was credible.[209] False arrest claims asserted by those arrestees are barred under the Heck doctrine. Plaintiffs Proposed False Arrest Classes thus fail for this reason.[210]

### (3) Individualized Inquiries Are Necessary to Determine Whether Conditions of Confinement Violated the Fourteenth Amendment

Plaintiffs have proposed an "Unreasonable Conditions Class," consisting of "all persons arrested by the New York City Police Department between August 27, 2004 and September 2, 2004 who were handcuffed with plastic flexicuffs and detained at the RNC Post-Arrest Staging Site ("PASS") at Pier 57. Plaintiffs' Motion for Class Cert. at 4. This class should not be certified as questions of fact are not common to the class, and thus will have to be examined on an

---

[209] *See* pages 5-7, *infra*.

[210] Further, class members who accepted adjournments in contemplation of dismissal (ACDs) are estopped from challenging probable cause and must be excluded from the putative class. In *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992), the Second Circuit held that acceptance of an ACD precluded a plaintiff from maintaining an action for false arrest, noting that a criminal charge disposed of by an ACD cannot be considered to be disposed in a manner favorable to a false arrest plaintiff.[210] *See also Johnson v. Bax*, 63 F.3d 154 (2d Cir. 1995). While the Second Circuit moved away from this analysis recently, relying in large part on New York's interpretation of ACDs in *Hollender v. Trump Village Cooperative Inc.*, 58 N.Y.2d 420 (1983), this same reliance on state law interpretation should be persuasive in this case. *See, e.g., Singer v. Fulton Cty. Sheriff*, 63 F.3d 110 (2d Cir. 1995). New York state courts have recently moved away from *Hollender* and recognized that an ACD should bar a plaintiff from asserting a false arrest or false imprisonment cause of action. *See Molina v. City of New York*, 814 N.Y.S.2d 120, 121 (1st Dept. 2006) (citing with approval *Roesch v. Otarola*, 980 F.2d 850 (2d Cir. 1992)); *see also Hock v. Kline*, 758 N.Y.S.2d 640 (1st Dept. 2003). Given the Second Circuit's prior reliance on state case law in determining the elements of a §1983 false arrest claim, this Court should follow the *Molina* interpretation and find that those plaintiffs who accepted ACDs are barred from membership in any certified false arrest class. Should this court find that the number of putative class members who accepted ACDs or otherwise received unfavorable terminations of their criminal litigation predominate the class membership, defendants respectfully submit that the court should refuse to certify the 8 proposed false arrest sub-classes on those additional grounds.

individual basis at trial. Moreover, the claims of the class representatives are not typical of the class. *See In re Visa*, 280 F.3d at 132-133 (2d Cir. 2001).

### (i)      *The Legal Standard*

Plaintiffs' conditions of detention claims are properly viewed under the Due Process Clause of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003); *Mahase v. City of New York*, 2000 U.S. Dist. LEXIS 2046 *14 (E.D.N.Y. January 5, 2000) (Due Process Clause of 14th Amendment applied to claims of unsanitary conditions by pre-trial detainee held at Queens Central Booking). Plaintiffs may be properly subjected to the restrictions and conditions at Pier 57 so long as the Court determines that those restrictions (1) are "but an incident of some other legitimate governmental purpose" and (2) do not amount to punishment. *See Bell v. Wolfish*, 441 U.S. at 536-537; *Lareau v. Manson*, 651 F.2d 96, 102-103 (2d Cir. 1981). "Absent a showing of an expresses intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable to it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Bell v. Wolfish*, 441 U.S. at 538; 99 S. Ct. at 1873-1874 (citations omitted).

Moreover, where plaintiffs challenge prison conditions that are not affirmatively imposed, they must prove deliberate indifference. *See Benjamin v. Fraser*, 343 F.3d at 51 ("pretrial inmate mounting a constitutional challenge to environmental conditions must show deliberate indifference."); *McDermott v. City of New York*, 2002 U.S. Dist. LEXIS 2893, *25-27 (S.D.N.Y. February 25, 2002) (applying deliberate indifference standard to pre-arraignment detainee's claims of denial of opportunity to use bathroom and inadequate medical treatment and finding that "deliberate indifference – if not involving the unnecessary infliction of pain – means

conduct that 'shocks the conscience.'"); *Butler v. Westchester County*, 2000 U.S. Dist. LEXIS 3981, *15 (S.D.N.Y. March 30, 2000).

Finally, each plaintiff must show "actual substantial harm". *See Benjamin*, 343 F.3d at 51; *Lewis v. Casey*, 518 U.S. 343, 350-351, 135 L.Ed.2d 606, 616-617, 116 S. Ct. 2174, 2179 ("[I]t is the role of courts to provide relief to claimants, in individual or class actions, who have suffered…actual harm;"); *Rhodes v. Chapman*, 452 U.S. 337, 367, 69 L.Ed.2d 59, 101 S. Ct. 2392 (1981) (Brennan, J., concurring) ("A court is under the obligation to examine the actual effect of challenged conditions upon the well-being of the prisoners.").

Accordingly, in addition to showing that an allegedly punishing condition existed while a particular plaintiff was detained and that the plaintiff was exposed to that condition, each plaintiff must also show that the challenged condition was specifically imposed to punish the plaintiff (rather than imposed for a legitimate government purpose) and that each putative class member suffered *actual substantial* harm.

Even in cases where plaintiffs allege one or more of the same unconstitutional conditions, courts have declined to certify proposed classes when vast differences in the particular circumstances of each class member – the date and time of that class member's arrest and detention, the length of time each class member may have been detained and thus exposed to a particular condition, whether a class member actually requested and was denied something such as food or access to toilet facilities, and/or whether the actions of the class member or other class members may have contributed to or exacerbated the alleged condition – essentially require a "mini-trial" for each class member in order to asses whether that class member actually suffered a constitutional injury.

### (ii) *Determining Liability for the Conditions Class Will Require Mini-Trials*

First, the trier of fact must determine how long a particular class member was detained. The length of exposure to a challenged condition has a direct relationship to whether a showing of actual harm and thus whether the condition violated the constitution for that plaintiff. *See Bell v. Wolfish*, 441 U.S. at 543 (holding no constitutional violation as "[o]ur conclusion…is further buttressed by the detainees' length of stay at the [facility]" where nearly all detainees were released within 60 days); *Lareau v. Manson*, 651 F.2d at 103, 105 ("the duration of confinement should be taken into account in judging the constitutionality of certain conditions" and holding that pretrial detainees held in double bunked cells and overloaded dayrooms would be constitutionally permissible up to 15 days); *Grubbs v. Safir*, 1999 U.S. Dist. LEXIS 374, *16 (S.D.N.Y. January 15, 1999) (on motion for summary judgment on plaintiffs' claim for declaratory and injunctive relief relating to conditions, the court found that "there are issues of fact in this record concerning the amount of time plaintiffs are actually detained – a critical fact necessary to determine whether this condition [denial of sleeping mats] is indeed unconstitutional under the circumstances."); *see also Whitted v. Lazerson*, 1998 U.S. Dist. LEXIS 7437, *4-5 (S.D.N.Y. May 21, 1998) ("[c]rucial considerations in the determination of whether a particular condition is so serious as to invoke the Eighth Amendment include the duration of the condition and the potential for serious physical harm.") (citations omitted).[211]

Accordingly, a finding as to each plaintiff's length of detention is required to assess both liability and damages on the conditions claims. *See Rush v. Astacio*, 1998 U.S. App. LEXIS

---

[211] Cases addressing Eighth Amendment claims are equally applicable, at a minimum, to identify relevant factors one must look at to determine whether a constitutional violation exists. *See Thomas v. Nassau County Correctional Center*, 288 F. Supp.2d 333, 337 (E.D.N.Y. 2003) ("Here, the plaintiff does not indicate whether he has already been convicted of a crime or whether he is a pre-trial detainee. Nevertheless, regardless of the academic distinction between the Eighth and Fourteenth Amendments, the standard for analyzing a pre-trial detainee's Fourteenth Amendment claim is the same as the Eighth Amendment standard.")

18588 (2d Cir. July 31, 1998) (no constitutional violation where pretrial detainee denied food for 12 hours and held in a "very cold" room for six and one-half hours); *McFadden v. Solfaro*, 1998 U.S. Dist. LEXIS 5765 *43 (S.D.N.Y. April 23, 1998) (pretrial detainee's claim that his constitutional rights were violated because the water in his cell was shut-off for two periods of three days each was without merit "given the temporary nature and limited consequence" of the problem); *Harrison v. Ienuso*, 1995 U.S. Dist. LEXIS 8616 *6 (S.D.N.Y. June 23, 1995) (pretrial detainee's claim dismissed where court held "[e]ven if it is true that Cell 1 had no light or running water during the one day in which plaintiff was housed there, the duration and circumstances of plaintiff's confinement were not so egregious a deprivation as to amount to 'punishment' proscribed by the Fourteenth Amendment.").

In addition to the length of an individual arrestee's detention, other individualized inquiries will also be necessary to determine whether the specific conditions alleged by plaintiffs violate the Fourteenth Amendment with respect to each class member. For instance:

*Razor Wire* - Other than the fact that they were all held for varying lengths of time in holding cells constructed with chain link fencing, not a single class representative has produced any evidence of injuries suffered due to those cells. In fact, not a single class representative or potential class member has testified that they suffered any type of injury as a result of the fencing used for the cells at the PASS. It is well settled that actual substantial harm is a prerequisite to any claim alleging an unconstitutional condition. *See Benjamin*, 343 F.3d at 51; *Lewis*, 518 U.S. at 350-351; *Rhodes*, 452 U.S. at 367. That burden of proof would also require an individualized inquiry – precisely the type of "mini-trial" Rule 23 seeks to avoid. Moreover, even if a class member were to make an allegation of actual injury, they would still be required to show that the

chain link fencing was utilized specifically to punish and was not part of a legitimate purpose, such as the securing of arrestees.

*Flexcuffs* - As the assertions regarding the use of flexcuffs, while many of the class representatives and other potential class members may complain generally about some discomfort and tightness, each class member will, under current law, have to go beyond that and show an actual injury, thus requiring individualized factual findings. In *Sulkowska v. City of New York*, 129 F.Supp.2d 274, 292 (S.D.N.Y. 2001), the court found no constitutional violation of excessive force where the only allegation of harm against plaintiff while in custody was the fact that she was handcuffed to the bars of the holding cell. The plaintiff testified that "the handcuffs were tight," that her hands were sore and swollen, and that she was chained "higher than I can keep my hands." *Id.* The court held that "[p]laintiff's restraint by handcuffs was merely an incident of her detention, and does not amount to the type of punishment that violates the Fourteenth Amendment." *Id* (quoting *Bell*, 441 U.S. at 539) ("Even assuming *arguendo* that plaintiff could prove that he sustained minor injuries from the handcuffs, this fact alone is insufficient to constitute a Fourth Amendment claim of unreasonable force."); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) ("a *de minimis* use of force will rarely suffice to state a constitutional claim"); *Gonzalez v. City of New York*, 2000 U.S. Dist. LEXIS 5230, *4 (E.D.N.Y. 2000) ("if the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force").[212]

The question of whether a "handcuff class" is appropriate under 23(b)(3) was recently addressed by this court in *Burley. v. City of New York*, 2005 U.S. Dist LEXIS 4439 (S.D.N.Y. March 23, 2005). The *Burley* plaintiffs, represented in part by the same attorneys as represent

---

[212] As pre-arrest detainees, class claims regarding the use of handcuffs should be analyzed as excessive force claims under the 14th Amendment. *Stefanopolous v. City of New York*, 2005 U.S. Dist. LEXIS 22445, *6 (S.D.N.Y. February 28, 2005).

the plaintiffs in this case, attempted to certify a handcuffing class as to the approximately 200 persons arrested during the World Economic Forum demonstrations, making essentially the same allegations as to "unreasonable" handcuffing. Plaintiffs' counsel argued that the test to determine whether an individual was a member of the unreasonable handcuffing class was "function of time and tightness." The Court held that the proposed definition of the handcuff class – all arrestees who were subject to excessive handcuffing with "plastic cuffs, not the metal cuffs normally assigned to police officers of the NYPD" – provided "no clear definition for what is meant by "unreasonable or excessive handcuffing." *Burley*, 2005 U.S. Dist LEXIS at *27. As a result, the proposed class could not be certified under 23(b)(3), as it would have required potential class members to assess whether they were cuffed so tightly as to make the police's actions unreasonable. *See id.* For this reason the proposed class failed the Rule 23(b) definiteness requirement *Id* at *28. The same analysis applies here, where the proposed class includes "all persons arrested by the New York City Police Department between August 27, 2004 and September 2, 2004 who were handcuffed with plastic flexcuffs and detained at the RNC Post-Arrest Staging Site ("PASS") at Pier 57". Plaintiffs' Motion for Class Cert. at 4. Given that plaintiffs have no claim, as a matter of law, for handcuffing alone the only viable claim they can assert is based on tightness or injury, making this "class" equally amorphous to the class in *Burley* and thus incompatible with the requirements of Rule 23.

There is a wide disparity in testimony regarding the use of flexicuffs. While some individuals have alleged to have suffered injuries as a result of being handcuffed, others have denied having suffered any such injuries *See* Malanum Dep. at 136-37 (Exh. 29 to Jenerette Decl.); Fleischman Dep. (Exh. 17 to Jenerette Decl.) at 301-303; Binder Dep. (Exh. 6 to Jenerette Decl.) at 294, 306-307. For example, putative class representative Adrienne Garibini

testified that her arresting officer responded to her complaints about excessive tightness by cutting off her flexicuffs and re-cuffing her less tightly. *See generally* Garibini Dep. (Exh. 19 to Jenerette Decl.).  At the same time, other potential class members have offered testimony that directly contradicts the idea that the NYPD, as a group, was punishing the proposed class of all persons arrested by the New York City Police Department between August 27, 2004 and September 2, 2004 who were handcuffed with plastic flexicuffs and detained at the RNC Post-Arrest Staging Site ("PASS") at Pier 57."[213]  Plaintiffs' Motion for Class Cert. at 4.

*Insufficient Space to Sit or Sleep*.  For each claim alleging a lack of places to sit or sleep, the Court will have to examine when that individual was at the PASS, (including whether they were detained during the daytime or overnight), as well as how long the individual was detained at the PASS. *See Grubbs v. Safir*, 1999 U.S. Dist. LEXIS 374, *16 (S.D.N.Y. January 15, 1999) (issue of fact existed on claim that denial of sleeping mats for pretrial detainees held overnight because "there are issues of fact in this record concerning the amount of time plaintiffs are actually detained – a critical fact necessary to determine whether this condition [denial of sleeping mats] is indeed unconstitutional under the circumstances.").  The testimony provided by the class representatives as well as other potential class members makes it clear that not only did the number of people, and therefore availability of benches, depend on the date of arrest, but also on the time of day as well the particular cell.  For example, many of the class representatives have testified to staying in more than one cell while at the PASS with the number of people varying from cell to cell and from time to time. *See* Malanum Dep. (Exh. 29 to Jenerette Decl.) at 392; Fleischman Dep. (Exh. 17 to Jenerette Decl.) at 240-243; Raimondi Dep. (Exh. 32 to

---

[213]   Interestingly, Plaintiffs allege that the NYPD engaged in widespread excessive cuffing during the RNC but limit their subclass to those who were arrested *and* also detained at the PASS, thereby excluding individuals who were arrested but never detained at the PASS.  This seemingly random distinction is another indication of the arbitrary and undefined nature of Plaintiffs' proposed class.

Jenerette Decl.) at 470-471; Alikhan Dep. (Exh. 4 to Jenerette Decl.) at 60.  In addition, not all class representatives claim to have been subjected to overcrowded cells at the PASS, pointing out once again that the class representatives' allegations are not representative of the class-wide allegations.  *See* Fleischman Dep. (Exh. 17 to Jenerette Decl.) at 240-243; Thomas Dep. (Exh. 44 to Jenerette Decl.) at 239-240.  Therefore, the threshold question of whether an individual was actually exposed to an unconstitutional lack of a place to sit or sleep will require an individual assessment of that person's experience at the PASS.  *See* Barrus Dep. (Exh. 5 to Jenerette Decl.) at 85 (saw other arrestees at PASS sitting and sleeping); Alikhan Dep. (Exh. 4 to Jenerette Decl.) at 60 (observed individuals in cell next to having enough room to play games, and leap and dance around); *see also* Gharemani Dep. (Exh. 20 to Jenerette Decl.) at 291-293; Fleischman Dep. at 242-243; Raimondi Dep. (Exh. 32to Jenerette Decl.) at 472-473; Steyert Dep. (Exh. 40 to Jenerette Decl.) at 510; Thomas Dep. (Exh. 44 to Jenerette Decl.) at 245-246.

*Exposure To Dirty Floors And Hazardous Conditions* – An examination of class representative and other potential class member's testimony establishes that an examination of plaintiffs' claims that they were exposed to dirty floors and "hazardous conditions" will have to be conducted on an individual basis, as there is material variation in the testimony provided thus far depending upon the time and day that an arrestee was processed at Pier 57.[214]  For example, carpeting was laid down on the floors of the PASS on or about Wednesday September 1st, meaning that any individual at the PASS after September 1st would not have sat or laid down on

---

[214] While Defendants do not directly address the merits of all of plaintiffs' allegations regarding conditions at the PASS, Defendants in no way concede that plaintiffs' allegations are true.  Indeed, there has been extensive testimony regarding the measures taken by Defendants before and during the RNC to ensure that conditions at the PASS were sufficient under any Constitutional standard.  See, e.g. Colgan 4/25/06 Tr. at pp. 185-86 (floors of PASS were mechanically cleaned on daily basis during RNC), 235 (floors and whole of PASS facility was cleaned prior to beginning of RNC), 260-263 (numerous measures taken prior to RNC as well as during RNC, including daily cleaning of toilet facilities by contractor); 4/26/06 at p. 472 (physicians and nurses present at PASS).

the same surface as those class members at the PASS prior to September 1st. *See* Winkleman Dep. (Exh. 69 to Jenerette Decl.) at 177; Karlin Dep. (Exh. 26 to Jenerette Decl.) at 205 (carpeting installed at PASS)).

Moreover, class representative and class member testimony highlights that the conditions of the floor varied from cell to cell based, in part, upon the number of people in the cell and their own behavior.  For example, in at least one cell arrestees began playing with empty cereal boxes and discarding garbage on the floor of the cells. *See* Winkleman Dep. at 175-176; *see also* Friedman Dep. (Exh. 18 to Jenerette Decl.) at 427, 455 (women urinating on floor of cell).  Class representatives and other potential class members have offered widely different accounts of the exact conditions of the floor and whether they may have suffered any alleged injuries as a result of those conditions.

***Cold & Uncomfortable Temperatures at Pier 57*** – Conflicting testimony from class representatives proves that a class cannot be certified on grounds that the cells at Pier 57 were "cold and uncomfortable." This group of allegations, in addition to being vague and imprecise, is belied by testimony from class representatives and other potential class members that demonstrates the subjective nature of the claim.  *See* Maret Dep. (Exh. 28 to Jenerette Decl.) at 70 (does not recall temperature or presence of fans at PASS); Binder Dep. (Exh. 6 to Jenerette Decl.) at 312-313 (does not recall temperature at PASS); Malanum Dep. (Exh. 29 to Jenerette Decl.) at 392 (cannot recall temperature); Steketee Dep. (Exh. 39 to Jenerette Decl.) at 328 (temperature was "cool"); Raimondi Dep. (Exh. 32 to Jenerette Decl.) at 472 (temperature was "okay for me"); Bushong Dep. (Exh. 9 to Jenerette Decl.) at 196 (temperature was okay); Walsh 50H (Exh. 75 to Jenerette Decl.) at 29-30 (temperature was "normal"); Winkleman Dep. (Exh.

69 to Jenerette Decl.) at 206 (temperature was "very warm"); Alikhan Dep. (Exh. 4 to Jenerette Decl.) at 94 ("it was too everything").

For example, according to plaintiffs, the temperature at the PASS appears to have varied depending upon the date of arrest and time of day. *See* Wang Dep. (Exh. 45 to Jenerette Decl.) at 112; Ghahremani Dep. (Exh. 20 to Jenerette Decl.) at 310; Binder Dep. (Exh. 6 to Jenerette Decl.) at 313. In addition, many of the complaints regarding temperature, as well as any allegations of general discomfort, are not linked to any specific condition but rather to a general frustration and discomfort of having been being arrested. *See, e.g.,* Alikhan Dep. (Exh. 4 to Jenerette Decl.) at 94. As a result, any examination of these allegations would require an individualized inquiry in order to determine the nature of that particular class member's discomfort. This kind of imprecise and highly subjective claim does not provide a proper basis for class certification. *See Burley*, 2003 U.S. Dist. LEXIS 4439 at *28.

**Insufficient Toilet Facilities** - Plaintiffs' claim that toilet facilities at Pier 57 were inadequate fails both Rule 23(a) typicality requirements and Rule 23(b)(3) predominance requirements. At the outset, it is clear from the testimony provided by class representatives and other potential class members that this is not a claim that is typical of the class as a whole. For example, 48 of the 49 plaintiffs deposed thus far in the RNC litigations[215] have admitted that they had access to bathroom facilities while in custody, including 12 of the class representatives deposed in this action. *See* Barrus Dep. (Exh. 5 to Jenerette Decl.) at 59-60; Binder Dep. (Exh. 6 to Jenerette Decl.) at 309; Fleischman Dep. (Exh. 17 to Jenerette Decl.) at 239-240; Ghahremani Dep. (Exh. 20 to Jenerette Decl.) at 298-300; Alikhan Dep. (Exh. 4 to Jenerette Decl.) at 64; MacNamara Dep. (Exh. 27 to Jenerette Decl.) at 252; Malanum Dep. (Exh. 29 to Jenerette Decl.) at 389-391; Raimondi Dep. (Exh. 32 to Jenerette Decl.) at 469-470; Steketee Dep. (Exh. 39 to

---

[215] This includes plaintiffs who were never detained at the PASS.

Jenerette Decl.) at 320; Steyert Dep. (Exh. 40 to Jenerette Decl.) at 500; Stoneback Dep. (Exh. 41 to Jenerette Decl.) at 316; Thomas Dep. (Exh. 44 to Jenerette Decl.) at 373.[216]

Further, even if a number of class members do allege a lack of *adequate* toilet facilities, such as Jason Barrus who doesn't remember if he used the facilities but claims the facilities were inadequate, those claims require individualized inquiry. Barrus Dep. (Exh. 5 to Jenerette Decl.) at 60, 73. For example, with regard to claims of "inoperable toilets," individualized questions such as whether the class member needed to use the toilet, whether the class member was otherwise able to relieve themselves, and whether the toilet was fixed while plaintiff was detained, will all have to be made before that class member's claim can be assessed to determine whether that class member actually suffered a constitutional injury . *See McDermott*, supra at *26 (court dismissed pretrial detainee's claim for denial of use of bathroom at police precinct where "[plaintiff] was not prevented from urinating in his cell and thus suffered no medical consequences from the lack of bathroom facilities."); *Odom v. Keane*, 1997 U.S. Dist. LEXIS 14077, *13 (S.D.N.Y. September 17, 1997) (court, in dismissing prisoner's §1983 claim, stated that "[p]laintiff's toilet functioned approximately twelve hours every day, time enough to dispose of plaintiff's bodily wastes."); *see also Butler v. Westchester County*, 2000 U.S. Dist. LEXIS 3981, *17 (S.D.N.Y. March 30, 2000) (dismissing pretrial detainee's claim for 'deplorable conditions' where "given the relatively brief duration of plaintiff's incarceration …generalized allegations of smells, noises, and filth…even when taken together, do not arise to constitutional dimensions.") For claims alleging a more general lack of "adequate" toilet facilities, a similar level of individual inquiry will also be necessary. Specifically, each class member will have to first establish exactly what he or she felt to be inadequate in order to demonstrate the requisite

---

[216] Of these 12, 10 used the bathroom facilities at the PASS while one (Jason Barrus) does not recall if he did or not and one class representative, Emily Friedman alleges that there were no bathroom facilities at the PASS. *See* Friedman Dep. (Exh. 18 to Jenerette Decl.) at 403.

constitutional injury.[217]  *See* Barrus Dep. (Exh. 5 to Jenerette Decl.) at 73 (toilet facilities at PASS were inadequate because they were not connected to City sewer system).

       **Denial of Telephone Use/Access To Counsel** – Similar to their allegations regarding the use of chain link fencing and razor wire, not a single class representative has produced any evidence, nor have they specifically alleged, any constitutional injuries resulting from the lack of telephones at the PASS.[218]  Indeed, most of the class representatives, as well as other putative class members, have admitted that they were given access to phones once they were transported to 125 White Street.[219]  *See* Barrus Dep. (Exh. 5 to Jenerette Decl.) at 93; MacNamara Dep. (Exh. 27 to Jenerette Decl.) at 282; Raimondi Dep. (Exh. 32 to Jenerette Decl.) at 516; Steketee Dep. (Exh. 39 to Jenerette Decl.) at 370; Alikhan Dep. (Exh. 4 to Jenerette Decl.) at 67; Thomas Dep. (Exh. 44 to Jenerette Decl.) at 399; Binder Dep. (Exh. 6 to Jenerette Decl.) at 321; Malanum Dep. (Exh. 29 to Jenerette Decl.) at 417; Fleischman Dep. (Exh. 17 to Jenerette Decl.) at. 268.  In addition, other class representatives and potential class members have admitted that they were allowed to retain and use their personal cell phones for a period of time after their arrest or that they witnessed others doing so.  *See* Ghahremani Dep. (Exh. 20 to Jenerette Decl.) at 298-300; Thomas Dep. (Exh. 44 to Jenerette Decl.) at 370-371; Curley Dep. (Exh. 12 to Jenerette Decl.) at 49-50; Bushong Dep. (Exh. 9 to Jenerette Decl.) at 170-171.  Thus, a class that consists of individuals claiming they were not allowed access to a phone while at the PASS will require an individualized examination to determine whether that individual was actually

---

[217]  For example, Plaintiffs suggest in their motion papers that a subset of female arrestees may have suffered disproportionately from a lack of adequate toilet and sanitary facilities due to the fact that they were denied sanitary materials while they were menstruating.  Plaintiffs' Motion for Class Cert. at 18.  Obviously, this claim could provide a threshold showing of an injury.  However, such a showing would not be one typical of the class as a whole and will involve a different evidentiary showing from a more general class-wide allegation of a general lack of toilet facilities.

[218]  A separate question is whether lack of phones at the PASS could ever amount to a constitutional injury.

[219]  The amount of time a class member may have spent at the Pier before arriving at 125 White Street is, of course, a highly individualized inquiry and will vary according to the date of arrest.

denied access to a phone. Similar variations exist in the testimony of plaintiffs concerning their desire to confer with, and their access to, legal counsel.

*Failure to Provide Medical Care* – This claim fails to meet Rule 23 requirements for two reasons. First, the claims are not common to the class as a whole. Indeed, even amongst the proposed class representatives the majority have admitted that they never requested medical assistance. *See* Malanum Dep. (Exh. 29 to Jenerette Decl.) at 113; Fleischman Dep. (Exh. 17 to Jenerette Decl.) at 262-263; Alikhan Dep. (Exh. 4 to Jenerette Decl.) at 72; Binder Dep. (Exh. 6 to Jenerette Decl.) at 296; Ghahremani Dep. (Exh. 20 to Jenerette Decl.) at 361-362).

Second, any claim for a lack of medical care will require a showing that the individual medical need was serious enough to meet the threshold requirement for a constitutional violation. *See Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) ("official custodian of pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a *serious* medical condition and did so because of his deliberate indifference to that need.") (emphasis added); *Rivera v. S.B. Johnson*, 1996 U.S. Dist. LEXIS 14192, *6 (W.D.N.Y. Sept. 20, 1996) ("[p]rison inmates suffering from ailments such as, inter alia, a toothache, a kidney stone and…a broken finger have all been held to fail to satisfy the constitutional serious-medical-need standard."). In the instant case, this inquiry will not even be possible in the case of many class representatives, as they have admitted that they did not specify while at the PASS exactly why they required medical assistance or what was wrong. *See* Heinold 50-H (Exh. 24 to Moore Decl.) at 35; Stoneback 50-H (Exh. 41 to Jenerette Decl.) at 31. Others have admitted that when they did request medical assistance they did so on behalf of someone else, and therefore cannot speak to the nature of that individual's specific medical condition. *See* Raimondi Dep. (Exh. 32 to Jenerette Decl.) at 212-215; Transcript of 50-H

Examination of William Hobbs (Exh. 25 to Moore Decl.) at 28; Deposition of Stacy Cotler (Exh. 14 to Moore Decl.) at 325.

In addition, there are material differences in medical need even among the handful of plaintiffs who requested medical care on their own behalf. First, many of the allegations involve the types of conditions Courts have routinely found insufficient to state such a claim. *See* Raimondi Errata (Exh. 29 to Moore Decl.) at 184; MacNamara Dep. (Exh. 27 to Jenerette Decl.) at 254-55 (requested Tylenol).[220] Second, several of the class representatives and potential class members did not request any medical attention until *after* they had left the PASS. *See* Transcript of 50-H Examination of Wendy Stefanelli (Exh. 31 to Moore Decl.) at 38-39; Transcript of 50-H Examination of Randall Steketee (Exh. 32 to Moore Decl.) at 31-32.

Moreover, defendants' response varied according to the medical need expressed. Many of the class representatives and potential class members *did* receive medical care while in custody, while others admitted that they could have received medication and/or assistance but did not require it prior to their release. *See* Barrus Dep. (Exh. 5 to Jenerette Decl.) at 92-93; *but see* Steyert Dep. (Exh. 40 to Jenerette Decl.) at 99.

The few class members alleging a lack of medical care will have to demonstrate that care was denied with the subjective intent (knowledge of the need) required to establish "deliberate indifference." *See Bewry v. Hopkins*, 1997 U.S. App. LEXIS 26241, *2 (2d Cir. 1997) (affirming district court's granting of defendants' motion for summary judgment on plaintiff's claim for lack of medical care where "at no time did [plaintiff] indicate to the officers that he was in need

---

[220] Further evidence of the individualized nature of these claims can be found in the Medical Treatment Of Prisoner Forms produced in this litigation. For example, over one-third describe the arrestee as complaining of a "superficial," or "minor" injury. The Medical Treatment Of Prisoner Forms also indicate that at least 15 individuals were provided with medication, and at least 4 individuals were offered but refused any further treatment. The Medical Treatment Forms as well as the testimony of the few class members actually alleging a refusal of medical treatment demonstrate the impossibility of examining such a claim on a class-wide basis.

of treatment or that he wanted to see a doctor."); *Thomas v. Nassau County Correctional Center*, 288 F. Supp.2d 333, 337 (E.D.N.Y. 2003) ("to establish a constitutional claim of inadequate medical care, the plaintiff must prove "deliberate indifference to [his] serious medical needs."). This burden of proof will require an individual examination of each allegation, which is precisely the type of inquiry the class action mechanism seeks to avoid. Furthermore, the number of individuals alleging lack of medical care is small, as evidenced by the relatively small number of class representatives who have claimed to have requested and been denied medical care.

*Taunting by NYPD and DOC Personnel* – Plaintiffs also allege that, as a class, they were subjected to "taunting, insults, threats, sexual harassment and otherwise offensive and inappropriate remarks from NYPD and Department of Corrections personnel." Plaintiffs' Motion for Class Cert. at 15-19. First, as discussed below, even if true this does not rise to a constitutional violation. Moreover, it can hardly be said that this claim is common to the class, as it is clear from the deposition testimony and other evidence collected thus far that the number of individuals who actually allege to have been subjected to such behavior is very small. Moreover, the exact nature of these allegations are highly individualized, and differ in both questions of fact and law. For example, three of the allegations cited in plaintiffs' memorandum do not even involve verbal taunts or remarks. *See* Malanum Dep. (Exh. 29 to Jenerette Decl.) at 146-148 (officers winking at her); Steyert Dep. (Exh. 40 to Jenerette Decl.) at 105 (felt insulted for having to look at posters of President Bush and Vice-President Cheney while being photographed; Transcript of 50-H Examination of Jeremy Biddle (Exh. 6 to Moore Decl.) at 32 (felt humiliated for having to ask for medical assistance).

In addition, the claims of taunting and verbal abuse also vary in where they allegedly took place. For example, while plaintiff Binder alleged in his 50-H hearing that a condescending

remark was made towards him at 100 Centre Street, plaintiff Chandra has alleged that a police officer was mocking and laughing at her at the arrest scene. *See* Exh. 8 to Moore Decl. at 56; Exh. 9 to Moore Decl. at 22. Plaintiff Cotler, meanwhile, testified at her deposition that an officer allegedly made a sexually inappropriate comment to both her and her arresting officer on the bus going to Pier 57. *See* Exh. 13 to Moore Decl. at 327. The differences in these allegations of location and circumstance further demonstrate that these alleged statements cannot be described as anything but isolated incidents, each different in almost any circumstance one can imagine. As a result, the very few allegations of "verbal abuse" cannot be described as common to the class and do not provide an appropriate basis for certification of the proposed class.

In addition, even for those individuals who allege that they were subject to such behavior, verbal taunting in general is insufficient to state a constitutional violation. *See Ramirez v. Holmes,* 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983"); *Arce v. Banks*, 913 F. Supp. 307 (S.D.N.Y. 1996); *Zeno v. Cropper*, 650 F. Supp. 138, 141 (S.D.N.Y. 1986); *Jermosen v. Coughlin*, 878 F. Supp. 444, 449 (N.D.N.Y. 1985) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under section 1983.").

### (4) Individualized Inquiries Necessary to Determine Whether Detention Times Were Excessive In Violation of the Fourth Amendment

#### (i)      *The Legal Standard*

According to plaintiffs, the common questions of law and fact created by the MAPP are "whether the defendants engaged in a policy, practice or custom whereby those arrested for engaging in protest against the RNC or who were in the vicinity of such protests . . . were

detained for unreasonably prolonged, excessive and unnecessary periods of time" in violation of the Fourth Amendment. (Pl. Am. Com. paragraphs 49(c) and (d)).  That question must be analyzed under the Supreme Court's rulings in *Gerstein v. Pugh*, 420 U.S. 103 (1974) and *County of Riverside v. McLaughlin,* 500 U.S. 44 (1991). *See Allen v. City of New York,* 2007 U.S. Dist. LEXIS 15, * 42-43 (S.D.N.Y. Jan. 3, 2007) ("Because "plaintiffs contend that their detention [and] delay was motivated by ill will…we will follow the law as set forth in *County of Riverside*, as have other courts in this Circuit, to examine the subjective intent of the officers allegedly responsible for the timing of plaintiffs' arraignments.").

In *Gerstein*, the Supreme Court held that a probable cause hearing must take place "promptly after arrest," but stopped short of mandating a specific timetable. 420 U.S. at 125.  In *County of Riverside,* the Supreme Court "articulate[d] more clearly the boundaries of what is permissible under the Fourth Amendment," so that "states and counties may establish procedures with confidence that they fall within constitutional bounds." 500 U.S. at 55.  The court held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter comply with the promptness requirement of *Gerstein. For this reason, such jurisdictions will be immune from systemic challenge." Id* (emphasis added).

Under *County of Riverside,* a probable cause hearing provided within 48 hours of arrest violates *Gerstein* only "if *the arrested individual* can prove that his or her probable cause determination was delayed unreasonably.  Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id* at 56 (emphasis added).  Moreover, the Court expressly held that "in evaluating whether delay in a particular case is unreasonable…courts must allow a substantial degree of flexibility" and "cannot ignore the often

unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate judge is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities." *Id* at 56-57; *see also Williams v. Ward,* 845 F.2d 374, 381-382 (2d Cir. 1987) ("We...note that the sheer volume of arrests...guarantees enormous problems in coordinating the numerous actors and actions necessary to each arraignment.")

"Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes.  In such a case, the arrested individual does not bear the burden of proving an unreasonable delay.  Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id* at 57.  In this case, a small number of 1,818 arrested were held for more than 48 hours. The remaining arrestees were processed and released within the 48 hours deemed presumptively constitutional under *Gerstein* and *County of Riverside.*

Among class representatives, the arrest-to-arraignment times under the MAPP ranged from a low of 4 hours to a high of 52 hours.  This vast range in processing times is constitutionally significant for two reasons.  First, it undermines plaintiffs' contention that the purpose of the MAPP was to detain RNC demonstrators for "unreasonably prolonged, excessive and unnecessary periods of time." (Pl. Am. Com. at 20). Rather, the MAPP procedures resulted in probable cause hearings and release of arrestees well within the 48-hour period held presumptively constitutional by *Gerstein* and *County of Riverside.* Although "plaintiffs contend that an arrestee is constitutionally entitled to a probable cause hearing as soon as would be reasonably possible under conditions that are assumed to be relatively ideal, [t]he case law simply does not support this rule." *Williams,* 845 F.2d at 385-386.  Nor were plaintiffs

constitutionally entitled to immediate release upon receipt of a desk appearance ticket. *Bryant v. City of New York*, 404 F.3d 128, 138 (2d Cir. 2005) ("in light of the principles established by *Gerstein* and *McLaughlin*, the issuance of a DAT for the release of an arrestee immediately upon completion of the post arrest administrative procedures is not constitutionally required. New York's discretionary scheme with respect to the issuance of desk appearance tickets is well within the range of flexibility allowed to states with respect to their post arrest procedures.")

Moreover, defendants were not constitutionally required to arraign and release arrestees within 24 hours of arrest pursuant to § 140.20(1) of the New York Criminal Procedure Law. "Ample precedent establishes that a state rule of criminal procedure, such as section 140.20(1), does not create a liberty interest that is entitled to protection under the federal Constitution." *Watson v. City of New York*, 92 F.3d 31, 38 (2d Cir. 1996) (citing *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1570 (10th Cir. 1993) ("The mere expectation of receiving a state afforded process does not of itself create an independent liberty interest protected by the Due Process Clause."); *see also Pugilese v. Nelson*, 617 F.2d 916, 924 (2d Cir. 1980) ("Although a Due Process Clause liberty interest may be grounded in state law that places substantive limits on the authority of state officials, no comparable entitlement can derive from a statute that merely establishes procedural protections.").

Second, under *Gerstein* and *County of Riverside*, plaintiffs who were detained for less than 48 hours do not have a constitutional claim for excessive detention unless each individual plaintiff can prove release was delayed unreasonably – that is that they were delayed for delay's sake or because of ill will by the arresting officer.[221]

---

[221] *County of Riverside*, 500 U.S. at 56. *See also, Bryant*, 404 F.3d at 138 ("What is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours...the three plaintiffs who were arraigned made those court appearances and were released less than 24 hours after they were arrested. The other four plaintiffs were released after they had been in custody for some 6-9 hours.

> **(ii)**   ***Material Variances in Arrest-to Arraignment Times Preclude Certification of Plaintiffs' Proposed Excessive Detention Class***

Plaintiffs' excessive detention class includes hundreds of people who were detained for less than 48 hours.  Indeed,  16 of the 24 named plaintiffs were detained for less than 48 hours.  Individual issues will predominate because those arrestees do not have a constitutional claim unless each "arrested individual can prove that his or her probable cause determination was delayed unreasonably." *County of Riverside*, 500 U.S. at 56.  In order to determine liability, the Court would have to conduct mini-hearings for each arrestee to establish that the delay was caused by ill will against the arrestee or delay for delay's sake.  Each class member's claim would have to be examined and defended differently according to the particular facts and circumstances of each individual arrest and detention.  But courts have consistently held that the class action mechanism is unsuitable where, as here, the primary issues to be litigated are subject to such individualized proof.[222]

As discussed above, plaintiffs' proposed excessive detention class includes individuals who were released after just 4 to 6 hours; people released with DATs  in less than 24 hours; people who were arraigned and released in 23 hours; and individuals who were held for more than 50 hours.  Indeed, there are constitutionally significant differences in arrest-to-arraignment

---

In sum, the duration of plaintiffs detentions did not come close to the presumptively unreasonable 48 hour mark."); *Roundtree v. City of New York*, 778 F.Supp. 614, 621 (E.D.N.Y. 1991)("The Supreme Court held that detention of an individual for 48 hours prior to a hearing to determine probable cause for his arrest does not violate the Fourth Amendment. Here, *a fortiori*, detention of the plaintiff for 24 hours prior to arraignment...cannot constitute a constitutional violation."); *Mandal v. City of New York*, 2006 U.S. Dist. LEXIS 74925, *17 (S.D.N.Y. Oct. 17, 2006) ("Plaintiffs admit that they were detained for approximately twenty-four hours. Under, *Bryant*, that period of detention is not 'presumptively unreasonable' and plaintiffs' claims based on the Fourth Amendment are therefore dismissed.").

[222] *See Augustin v. Jablonsky*, 2001 U.S. Dist. LEXIS 10276, *13 (E.D.N.Y. Mar. 8, 2001)(motion for class certification denied in a case challenging the strip-search policy at Nassau County Correctional Center because individual issues of proof and damages threatened to swallow the common questions of law and fact); *see also Moore v. Paine-Webber Inc.*, 306 F.3d 1247, 1255-56 (2d Cir. 2002) (individual issues predominated because defendant's liability for fraud would require individualized proof of statements made to class members); *Dunnigan v. Metropolitan Life Ins.*, 214 F.R.D. 125 (S.D.N.Y. 2003) (certification denied where each class member's claim would require the court to determine whether MetLife's delay in making  benefit determination was reasonable.)

times even among the proposed class representatives.  Plaintiffs Deirdre MacNamara and Deepa Majmudar, who were arrested after 8:00 on August 31, 2004 at two different arrest locations, were detained for "approximately 45-50 hours." (Pl. Am. Com. ¶¶ 89 and 94). But plaintiffs William Steyert, Jr., and Christopher A. Thomas, who were arrested before 8:00 p.m. on August 31, 2004 were arraigned and released in "approximately 16-17 hours" and "15 to 16 hours" respectively. (Pl. Am. Com. ¶ 179).  One named plaintiff, Shahrzad Ghahremani-Gadjar, also arrested after 8:00 on August 31, 2004, was released in "approximately four hours," whereas plaintiff Diana Raimondi, arrested between 4:00 and 4:30 on that same day "was held for approximately 52 hours." (Pl. Am. Com. ¶ 155).  Named plaintiffs Elizabeth Fleischman and Michael Binder, who were arrested after 8:00 p.m. on August 27, 2004, when fewer arrestees were in the system, were released within "approximately 20 hours" and "approximately 16-20 hours" respectively. (Pl. Am. Com. ¶¶ 99 and 199).

Thus, in some cases, the MAPP resulted in arrest-to-arraignment times within New York State's 24-hour ideal.  In other cases, "the duration of plaintiffs detentions did not come close to the presumptively unreasonable 48 hour mark." *Bryant*, 404 F.3d at 138.  And in other cases, detention time exceeded 50 hours. The Second Circuit has recognized that "the Supreme Court's endorsement of...a vast array of [post-arrest] procedures, along with its recognition that additional procedures require additional time, indicate that the constitutional promptness of a probable cause hearing must be determined in light of the totality of the processes afforded the defendant." *Williams v. Ward,* 845 F.2d at 386.  The wide disparity in detention times over a wide expanse of dates, times and arrest locations proves that individual issues will predominate over common issues. The Court will have to conduct mini-trials to determine whether the material disparity in arrest-to-arraignment times is attributable to the practical realties of

processing a large volume of arrests or the product constitutionally impermissible motives by the various state agencies responsible for carrying out the MAPP.  Such individualized trials will engulf common issues of law and fact, thus precluding certification under Rule 23(b)(3).

### (iii)   Plaintiffs "As Applied" Attack on the MAPP Requires Analysis of How The MAPP Was Applied to Each Putative Class Member.

Plaintiffs' excessive detention class should also be denied on the grounds that their claims state an attack on the constitutionality of the MAPP *as applied* during the RNC instead of a facial challenge.  Plaintiffs allege that the MAPP was designed to prolong detention in order to (1) punish demonstrators for exercising their First Amendment right of protest and (2) keep demonstrators off the streets for as long as possible in order to prevent them from engaging in further protest activity.

There are two ways to challenge a statute on free speech grounds.  *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006).  The first is a facial challenge, which challenges the text of the statute itself.  *See id* at 174 (citing *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 n.11 (1988)).  The second is an "as applied" challenge, which "requires an analysis of the facts of a particular case to determine whether the application of the statute, even constitutional on its face, deprived the individual to whom it was applied of a protected right." *Field Day, LLC*, 463 F.3d at 174-175 (citing *Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410 (2006)).

The Second Circuit in *Field Day* gave several examples of instances where a statute, though constitutional on its face, is unconstitutional "as applied."  For example, the use of a "facially constitutional licensing regulation to favor certain speakers over other speakers would of course be unconstitutional." 463 F.3d at 192-193 (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002)).  Another example provided by the Second Circuit in *Field Day* was the

selective enforcement of zoning regulations against a topless cabaret establishment in an attempt to keep it from operating. 463 F.3d at 193 (citing *La Trieste Restaurant and Cabaret v. Village of Port Chester*, 40 F.3d 587, 589-591 (2d Cir. 1994)).

Here, plaintiffs do not challenge the text of the MAPP itself. The reason, arguably, is because the text of the MAPP is silent on the time required to process arrestees. Moreover, the post-arrest processing procedures required under the MAPP are clearly permissible under *Gerstein*, where the Supreme Court held that "flexibility and experimentation" by the states are "desirable" and reasoned that "there is no single preferred pretrial procedure." 420 U.S. at 123.

Rather, plaintiffs allege that their First Amendment rights were violated because the MAPP's post-arrest processing procedures resulted in unconstitutionally excessive lengths of detention. Thus, plaintiffs essentially challenge the constitutionality of the MAPP as applied to people arrested during the RNC. But that inquiry necessarily entails an analysis of how the MAPP was applied to each individual class member. For that reason, courts have consistently denied class certification where plaintiffs attack a statute or procedure as applied. *See Hudson v. City of Chicago*, 2007 U.S. Dist. LEXIS 37515 (N.D. Ill. May 22, 2007) (refusing to certify false arrest class attacking panhandling ordinance because the court would have to look at application of statute to individuals); *Baird v. California Faculty Ass'n*, 2000 U.S. Dist. LEXIS 13594 (E.D. Cal. July 13, 2000)(denying class attacking constitutionality as applied); *Hopson v. Schilling*, 418 F. Supp. 1223, 1239 (N.D. Ind. 1976) (refusing to certify a class attacking the constitutionality of a statute as applied because court would have to look at the actual practices of the defendant);.

As discussed in detail *supra*, almost 400 of 1,818 RNC-related arrestees were processed and released in 18 hours or less, leaving them plenty of time to join additional demonstrations

(which many did).  An additional 425 RNC-related arrestees were processed and released within New York's 24-hour ideal arrest to arraignment time.  Thus, the Court would have to conduct mini-hearings for over 800- putative class members to determine if and how the MAPP was unconstitutional as applied to them.  Plaintiffs' excessive detention class fails for this additional reason.

### (5) Superiority

For certification under Rule 23(b)(3), the court must also be convinced that maintaining the action as a class action is superior to other methods of adjudication.  Courts consider four non-exclusive factors to determine superiority:  (1)  the interest of the class members in individually controlling the prosecution or defense of separate actions;  (2)  the extent of litigation concerning similar issues already commenced by members of the class;  (3)  the desirability of litigating the action in this forum; (4)  difficulties in managing the case as a class action. *Burley v. City of New York*, 2005 U.S. Dist. LEXIS 4439, *23 (S.D.N.Y. Mar. 25, 2005).

The commencement by other plaintiffs' counsel of approximately 100 related RNC actions, involving some 600 plaintiffs suing in their own names, is strong evidence that *plaintiffs themselves* believe that the pursuit of claims in their own names – rather than as part of a class – is the superior procedure for advancing plaintiffs' rights and interests.  All but two of these related RNC actions, moreover, were filed *after* plaintiffs filed this action, indicating that plaintiffs who filed or joined related actions had at least inquiry notice, if not actual notice, of the pendency of this action and *still* chose to litigate in their own names.[223]  Indeed, several of the original plaintiffs named in *this* action have elected to dismiss their claims voluntarily and to

---

[223] Plaintiffs' counsel in this action held a press conference announcing the commencement of this lawsuit, which was followed by considerable publicity concerning the filing of this action. *See* Exh. _ attached to the Jenerette Decl.

pursue their own claims in separate actions and with other plaintiffs' counsel.[224]  Thus, the first two non-exclusive factors to be considered by the Court as to the superiority prong of Rule 23(b)(3) dictates a finding that a class action is not a superior form for this litigation.

Plaintiffs claims in this care are similar to those asserted in *United Cavalry Church*, where the court denied certification of the § 1983 claims made in that case on superiority grounds, reasoning that "if a class action were utilized, the subclasses proposed by plaintiffs would, in all probability not be sufficient for a fair and efficient adjudication of the controversy and would have to be revised.  Because plaintiffs seek to raise assaults, illegal confinement, the use of mace, insufficient medical attention, etc., these fact-specific claims involving specific actions by specific defendants will probably have to be subdivided into groups smaller than the broad groups proposed by plaintiffs.  Under these circumstances, it is not clear…that a class action certification will make the action more manageable." 177 F.R.D. at 184.  As in *United Cavalry Church*, the class action mechanism in this case is not superior to holding individual trials on the issues of false arrest, excessive detention and conditions of confinement.

---

[224] *See* Julia Cohen v. City of New York, 05 Civ. 6780 (KMK)(JCF), Chris Kornicke v. City of New York, 05 civ. 7025 (KMK)(JCF).

## V.     **CONCLUSION**

For all of the foregoing reasons, defendants' respectfully request that plaintiff's motion for class certification be denied in its entirety.

\s\
———————————————

Peter G. Farrell (PF 6751)
Tonya Jenerette (TJ 7276)

*Of Counsel:*
*James Mirro*
*Jeffrey Brooks*
*Fred Weiler*
*Cheryl Shammas*
*Gerald Smith*
*Jeffrey Dougherty*
*Liora Jacobi*