# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

№ 04 Civ. 9216 (RJS)

_____

DEIRDRE MACNAMARA, ET AL.,

Plaintiffs,

VERSUS

CITY OF NEW YORK, ET AL.,

Defendants.

_____

MEMORANDUM AND ORDER
March ___, 2008

_____

RICHARD J. SULLIVAN, District Judge:

Defendants in the above-entitled action seek, pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, to set aside an order issued by the Honorable James C. Francis, Magistrate Judge, granting in part and denying in part plaintiffs' motion to compel the production of certain documents notwithstanding defendants' assertion of the law enforcement and deliberative process privileges. For the following reasons, the Court modifies in part, and adopts in part, Judge Francis's order.

## I. BACKGROUND

This action is one of many relating to protests surrounding the 2004 Republican National Convention (the "RNC") held in New York City. The actions have been consolidated before this Court and referred to Judge Francis for general pretrial purposes.[1]

_____

[1] The RNC cases, including the instant action, were previously assigned to the Honorable Kenneth M. Karas, District Judge. The RNC cases were reassigned to the undersigned on October 2, 2007.

Plaintiffs in this action were arrested during RNC-related demonstrations. The Court presumes the parties' familiarity with the facts and procedural history of this action, including those facts specifically related to the instant application, as set forth in Judge Francis's April 20, 2007 Order (the "April 20 Order"). Below, the Court briefly recites only those facts necessary to resolve defendants' objections.

In the April 20 Order, Judge Francis addressed plaintiffs' request for an order compelling defendants (1) to produce certain documents in unredacted form that defendants had withheld on the basis of the deliberative process and law enforcement privileges, and (2) to answer questions relating to the presence and activities of undercover or plainclothes officers at demonstrations during the RNC.[2] (*See* April 20 Order at 2-3.) With regard to the overwhelming majority of the documents, Judge Francis found that defendants had failed to discharge their threshold burden of establishing the applicability of the respective privileges at issue. (*See* April 20 Order at 24.)

First, Judge Francis found that the following categories of documents withheld by defendants were *not* subject to the deliberative process privilege: (1) the "Civil Disturbance Subcommittee Documents" (the

"Subcommittee Documents"), which consist of agendas and memoranda relating to meetings of that subcommittee prior to the RNC (*id.* at 5-8; *see* Bates Nos. 5734-5745, 5679-5683, 5688-5690, 5721-5725); (2) the "Criminal Justice Bureau Documents" (the "CJB Documents"), which consist of certain documents relating to the NYPD's plans for arrest processing during the RNC (April 20 Order at 8-10; *see* Bates Nos. 5686-5687, 5691-5705, 6019-6023, 6025-6040); and (3) three e-mails relating, respectively, to "Possible Mayor Talking Points" for a planned meeting of the Mayor and the Police Commissioner regarding the RNC, the NYPD's plans to stage drills prior to the RNC, and the NYPD's plans to use Pier 57 as a "Post-Arrest Staging Site" during the RNC (April 20 Order at 10-11; *see* Bates Nos. 100003750, 100003747, 100005945).

In support of their assertion of the deliberative process privilege, defendants relied principally on a declaration from Raymond W. Kelly, the Police Commissioner of the City of New York (the "Kelly Declaration"), wherein Commissioner Kelly set forth the potential risks that would allegedly arise from disclosure of certain documents. (*See* Kelly Decl. ¶¶ 9-10.) However, Judge Francis found that the assertions contained in the Kelly Declaration, while "undoubtedly true," did not satisfy defendants' initial burden of showing that the deliberative process privilege applied to the documents at issue. (*See* April 20 Order at 7-8.)

Second, Judge Francis found that the following categories of documents, save for certain exceptions noted *infra*, were not subject to the law enforcement privilege:

(1) the "Disorder Control Incident Documents" (the "Disorder

---

[2] In this case, both the undersigned and Judge Francis have reviewed the documents at issue *in camera*. It is well-settled that "*in camera* review is particularly encouraged in cases invoking governmental claims of privilege." *Borchers v. Comm. Union Assur. Co.*, 874 F. Supp. 78, 79 (S.D.N.Y. 1995) (collecting cases); *see Kerr v. United States Dist. Court for the Northern Dist. of Calif.*, 426 U.S. 394, 405-6 (1976) ("[T]his Court has long held the view that *in camera* review is a highly appropriate and useful means of dealing with claims of governmental privilege."); *accord United States v. Lilla*, 699 F.2d 99, 105-6 (2d Cir. 1983).

Documents"), which were prepared by NYPD employees for review by higher ranking NYPD officials prior to the RNC and contain, among other things, "hypothetical scenarios" regarding possible unlawful activity in New York City and "talking points" regarding steps that the NYPD should take in order to deal with such incidents (*id.* at 13-14; *see* Bates Nos. 5849-5855, 6056-6062, 10587-10601);

(2) the "Legal Subcommittee Meeting Documents" (the "Legal Documents"), which consist of two memoranda dated January 7, 2004 and March 2, 2004 (the "January 7 Memo" and "March 2 Memo") describing meetings of the subcommittee that were prepared for review by higher-ranking NYPD officials (April 20 Order at 17-18; *see* Bates Nos. 10491-10493, 10503-10505);

(3) the "Critical Mass Bike Block Demonstration Presentation" (the "Bike PowerPoint"), a PowerPoint presentation that outlined the NYPD's planned response to a protest group's bicycle ride that was scheduled to occur several days before the RNC (April 20 Order at 20-21; *see* Bates Nos. 26267-26282, 26303-26320);

(4) the "Mobile Reserve Sector After-Action Report" (the "After-Action Report"), which is a "self-critique report" prepared by the NYPD that addresses the performance of the Mobile Reserve Sector unit during the

RNC[3] (April 20 Order at 18-20; *see* Bates Nos. 15001-15033); and

(5) the "Emergency Operations Center RNC Incident Reports" (the "Operations Report"), a computer log listing, among other things, RNC-related incidents and the NYPD's deployment of officers in response thereto (April 20 Order at 18-20; *see* Bates Nos. 7218-7299).

In support of their assertion of the law enforcement privilege, defendants relied principally on a declaration from NYPD Chief Thomas Graham, Commanding Officer of the NYPD's Disorder Control Unit (the "Graham Declaration"), wherein Chief Graham outlined the security risks that would allegedly arise from the disclosure of certain documents. (*See* Graham Decl. ¶ 1.) However, Judge Francis found that the assertions contained in the Graham Declaration regarding these harms were, *inter alia*, "overblown" (April 20 Order at 15) and "so vague that [they] provide[d] little assistance to the Court in determining whether the [law enforcement] privilege applies" (*id.* at 19).

Furthermore, with regard to all of the documents assertedly subject to the law-enforcement privilege, Judge Francis noted that the two protective orders (collectively, the "Protective Orders") previously issued in the RNC cases mitigated the risk of harm, if

---

[3] Specifically, the After-Action Report addresses the performance of "Mobile Field Force units," composed of NYPD officers, that were "used to police the RNC . . . ." (*See* Graham Decl. ¶ 18.)

any, that may arise from disclosure.[4] (*See id.* at 16.) Specifically, Judge Francis observed that "there is a protective order in place in the [] RNC actions that permits the City to designate documents produced in discovery as 'confidential.' Accordingly, the information contained in these documents will not be circulated publicly, but will be viewed only by plaintiffs' counsel." (*Id.* at 16.) Furthermore, Judge Francis noted that defendants had failed to produce *any* information suggesting that "'such limited production and circulation [pursuant to the Protective Orders] poses any threat to public order or safety.'" (*Id.* (quoting *Haus v. City of New York*, No. 03 Civ. 4915 (RWS) (MHD), 2004 WL 3019762, at *5 (S.D.N.Y. Dec. 29, 2004)).)

Finally, Judge Francis found that defendants had failed to establish that the law enforcement privilege applied to deposition testimony regarding the "presence and activities of undercover officers at RNC-related demonstrations." (*Id.* at 23.) Similarly, he rejected defendants' invocation of the privilege as it applied to plaintiffs' request to "seek to discover the identities of undercover officers" who had "witnessed, participated in, or provided information for [plaintiffs'] arrest[s] and detention[s]." (*Id.*) With regard to these rulings, Judge Francis

noted that the items at issue may be designated as "confidential" pursuant to the Protective Orders, and that, if necessary, defendants could apply for further protective measures — such as disclosing only the shield number of an undercover officer, or using a pseudonym — in order to ensure that an officer would not be exposed to a "significant safety risk . . . ."[5] (*Id.*)

On May 11, 2007, defendants filed objections to the April 20 Order. Defendants assert that Judge Francis erred in finding that the law enforcement and deliberative process privileges did not apply to certain items, and in directing defendants to produce the items to plaintiffs.

## II. LEGAL STANDARDS

### A. Standard of Review

Rule 72(a) and the Federal Magistrates Act, 28 U.S.C. § 636(b)(1)(A), provide that a district court shall reverse a magistrate judge's order regarding a non-dispositive matter only where the order is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *see Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007). Pretrial discovery matters are

---

[4] Judge Francis issued two protective orders relevant to the documents at issue here. First, on October 4, 2005, Judge Francis issued "Protective Order #1," which provided that either party may deem a document "Confidential" and, therefore, limit its disclosure to the parties and their counsel. (Oct. 4, 2005 Order ¶¶ 1, 5.) Second, on January 12, 2007, Judge Francis directed that any "intelligence documents" produced by defendants "shall be" subject to an "attorneys' eyes-only" designation. (Jan. 12, 2007 Order.)

[5] In addition, in the April 20 Order, Judge Francis also denied plaintiffs' request to compel production of (1) one paragraph of a March 2, 2004, memorandum prepared by the Legal Subcommittee on the basis of the attorney-client privilege, and (2) a June 4, 2004, memorandum from the NYPD, on relevancy grounds. In addition, he directed defendants to produce an August 9, 2004, memorandum from Chief Graham listing officers "deemed qualified to be plainclothes officers" during the RNC. (*Id.* at 23-24.) The parties do not challenge these rulings.

"non-dispositive," and, thus, must be reviewed under this highly deferential standard. *See Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990); *Popular Imports, Inc. v. Wong's Int'l, Inc.*, 166 F.R.D. 276, 277 (E.D.N.Y. 1996).

An order is "clearly erroneous" if the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). An order is "contrary to law" "when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Thompson v. Keane*, No. 95 Civ. 2442 (SHS), 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996) (internal quotation marks omitted). Therefore, pursuant to these standards, a magistrate judge's orders on discovery matters are entitled to substantial deference. *U2 Home Entm't, Inc. v. Hong Wei Int'l Trading Inc.*, No. 04 Civ. 6189 (JFK), 2007 WL 2327068, at *1 (S.D.N.Y. Aug. 13, 2007) (citing *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 189 (S.D.N.Y. 1988) ("Consistently, it has been held that a magistrate's report resolving a discovery discourse between litigants should be afforded substantial deference and be overturned only if found to be an abuse of discretion."); *see, e.g.*, *Catskill Dev., LLC v. Park Place Entm't Corp.*, 206 F.R.D. 78, 86 (S.D.N.Y. 2002).

### B. The Deliberative Process Privilege

"The deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials. It is based on 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news.'"[6] *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001)). An "inter- or intra-agency document" may be subject to the privilege if it is both (1) "predecisional" and (2) "deliberative." *La Raza*, 411 F.3d at 356 (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)) (additional internal citations omitted).

A document is predecisional "when it is prepared in order to assist an agency decisionmaker in arriving at his decision." *Tigue v. United States Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002). The Second Circuit has noted some factors to consider in determining whether a document is "predecisional," including whether the organization asserting the privilege can (1) "pinpoint the specific . . . decision to which the document correlates" and (2) "verify that the document precedes, in temporal sequence, the 'decision' to which it relates." *Grand Cent. P'Ship*, 166 F.3d at 482 (quoting

---

[6] The deliberative process privilege is commonly asserted in actions where a party seeks documents from the federal government under the Freedom of Information Act ("FOIA"). Although the privilege is codified in FOIA, *see* 5 U.S.C. § 552(b)(5), it is derived from, and still applied as, a common-law privilege in federal court. *See, e.g.*, *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Thus, in addressing the privilege, district courts in this Circuit and elsewhere frequently rely on authority applying the privilege in both FOIA and non-FOIA actions. *See, e.g.*, *E.B. v. New York City Bd. of Educ.*, 233 F.R.D. 289, 292 (E.D.N.Y. 2005); *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88 (S.D.N.Y. 2000).

*Providence Journal Co. v. United States Dep't of the Army*, 981 F.2d 552, 557 (1st Cir. 1992)).

A document is deliberative when it is "actually . . . related to the process by which policies are formulated." *Grand Cent. P'Ship*, 166 F.3d at 482 (citing *Hopkins*, 929 F.2d at 84) (additional citation and internal quotation marks omitted). In other words, "the privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Tigue*, 312 F.3d at 80 (internal quotation marks and citation omitted). Thus, the privilege "'focus[es] on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Grand Cent. P'ship*, 166 F.3d at 482 (quoting Hopkins, 929 F.2d at 84-85) (additional internal quotation marks and citation omitted). In particular, it is well-settled that "[d]raft documents, by their very nature, are typically predecisional and deliberative. They reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors." *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D.D.C. 1983) (internal quotation marks and citation omitted); *see also Nat'l Council of La Raza v. Dep't of Justice*, 339 F. Supp. 2d 572, 573 (S.D.N.Y. 2004) ("Drafts and comments on documents are quintessentially predecisional and deliberative.").

Nevertheless, a document is not "deliberative" where it concerns "purely factual" information regarding, for example, investigative matters or factual observations. *See Grand Cent. P'Ship*, 166 F.3d at 482; *Hopkins v. U.S. Dep't of Hous. and Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991). "Thus, factual findings and conclusions, as opposed to opinions and recommendations, are not protected." *E.B. v. New York City Bd. of Educ.*, 233 F.R.D. 289, 292 (E.D.N.Y. 2005) (internal quotation marks and citation omitted).

C. The Law Enforcement Privilege

The purpose of the law enforcement privilege "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988) (citing *Aspin v. Dep't of Defense*, 491 F.2d 24, 29-30 (D.C. Cir. 1973), and *Frankel v. Sec. and Exch. Comm'n*, 460 F.2d 813, 817 (2d Cir. 1972)); *see also Tuite v. Henry*, 181 F.R.D. 175, 176 (D.D.C. 1998) ("The federal law enforcement privilege is a qualified privilege designed to prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement. The privilege serves to preserve the integrity of law enforcement techniques and confidential sources . . . ."), *aff'd* 203 F.3d 53 (D.C. Cir. 1999). "'In order to assert a claim of privilege against disclosure of police materials to a plaintiff raising federal civil rights claims . . . , the officers or the police department must do more than alert the court to the [relevant

privilege] or the generalized policies which support it. The police must make a substantial threshold showing[] that there are specific harms likely to accrue from disclosure of specific materials . . . .'" *Fountain v. City of New York*, No. 03 Civ. 4526 (RWS), 2004 WL 941242, at *3 (S.D.N.Y. May 3, 2004) (quoting *King v. Conde*, 121 F.R.D. 180, 189 (E.D.N.Y. 1988) (Weinstein, J.)) (additional internal quotation marks and citation omitted); *accord MacWade v. Kelly*, 230 F.R.D. 379, 381 (S.D.N.Y. 2005) ("To sustain the invocation of such a privilege . . . , [the party invoking the privilege] must make a clear showing of harm if the information is disclosed.") (quoting *Galvin v. Hoblock*, No. 00 Civ. 6058 (MHD), 2003 WL 22208370, at *3 (S.D.N.Y. Sept. 24, 2003)). This initial burden must be discharged by presenting "those facts that are the essential elements of the privileged relationship" and not "'by mere conclusory or *ipse dixit* assertions.'" *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224-25 (2d Cir. 1984) (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir.1965)) (additional internal citations omitted).

However, "[a]n investigation need not be ongoing for the law enforcement privilege to apply as 'the ability of a law enforcement agency to conduct *future investigations* may be seriously impaired if certain information is revealed.'" *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88, 95 (S.D.N.Y. 2000) (citing *Morrissey v. City of New York*, 171 F.R.D. 85, 90 (S.D.N.Y. 1997)) (additional internal citation omitted) (emphasis added); *see also Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 546 (D.C. Cir. 1977) (noting that the privilege may apply after the conclusion of an investigation where "the investigative techniques of the investigating body would be disclosed to the general public"). Thus, the law enforcement privilege applies where the defendant demonstrates that the disclosure of information, such as law enforcement "techniques and protocols," would "jeopardize future criminal investigations." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007); *see Morrissey*, 171 F.R.D. at 91 (applying the privilege where disclosure of the items at issue "would seriously compromise future law enforcement investigations"); *see also United States v. Winner*, 641 F.2d 825, 831 (10th Cir. 1981) ("[The] law enforcement investigative privilege is based primarily on the harm to law enforcement efforts which might arise from public disclosure of investigatory files.") (internal quotation marks and ellipse omitted); *cf. In re United States Dep't of Homeland Sec.*, 459 F.3d 565, 569 (5th Cir. 2006) (recognizing the law enforcement privilege in the Fifth Circuit and observing that "in today's times the compelled production of government documents could impact highly sensitive matters relating to national security").

D. Balancing the Parties' Interests

Both the deliberative process and law enforcement privileges are *qualified* privileges and, therefore, "when the existence of [the] privilege is established, there is a need to balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information." *United States v. United States Currency in Sum of Twenty One Thousand Nine Hundred Dollars*, No. 98 Civ. 6168 (SJ), 1999 WL 993721, at *2 (E.D.N.Y. Sept. 21, 1999) (citing

*Friedman v. Bache Halsey Stuart Shields*, 738 F.2d 1336, 1341 (D.C. Cir. 1984), and *Raphael v. Aetna Cas. & Sur. Co.*, 744 F. Supp. 71, 74-75 (S.D.N.Y. 1990)) (additional internal citation omitted).

Thus, in assessing the government's assertion of privilege, "[t]he court must balance the interests favoring and disfavoring disclosure, keeping in mind that the burden of persuasion rests on the party seeking to prevent disclosure. The court must also consider the value of appropriate protective orders and redactions." *King*, 121 F.R.D. at 190-91; *see also Kitevski v. City of New York*, No. 04 Civ. 7402 (RCC) (RLE), 2006 WL 680527, at *3 (S.D.N.Y. March 16, 2006) ("Whether the showing of relevance and need rises to the requisite level is a discretionary determination that must necessarily be made on a case-by-case basis."); *United States v. Sawinski*, No. 00 Crim. 0499 (RPP), 2000 WL 1702032, at *3 (S.D.N.Y. Nov. 14, 2000) (citing *In re Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988)).

In his oft-cited opinion in *King v. Conde*, the Honorable Jack Weinstein, District Judge, set forth various factors that courts should consider when deciding whether to compel disclosure of privileged information from the government. Among the interests that may favor non-disclosure, Judge Weinstein cited (1) the threat to police officers' safety, (2) the invasion of police officers' privacy, such as through disclosure of officers' personnel records, (3) the weakening of law enforcement programs, and (4) the chilling of police internal investigative candor. 121 F.R.D. at 191-93.

As to the interests that may favor disclosure, Judge Weinstein cited, *inter alia*, (1) the relevance of the requested materials to the plaintiff's case, (2) the importance of the materials to the plaintiff's case, including the availability of the information from alternative sources, (3) the strength of the plaintiff's case (although, "at the discovery stage," doubts relating to this consideration "must be resolved" in the plaintiff's favor), and (4) the importance to the public interest, which is "the interest that . . . looms largest," as it "giv[es] force to the federal civil rights laws." *Id.* at 193-95. Furthermore, Judge Weinstein noted that, in light of "[t]he great weight of the policy in favor of discovery in civil rights" actions and "the normal presumption in favor of broad discovery," defendants' case for non-disclosure or restricted disclosure "must be extremely persuasive." *Id.* at 195; *accord Nat'l Congress*, 194 F.R.D. at 96; *Morrissey v. City of New York*, 171 F.R.D. 85, 92 (S.D.N.Y. 1997); *Kinoy v. Mitchell*, 67 F.R.D. 1, 12 (S.D.N.Y. 1975).

E. Protective Orders

When considering whether to compel disclosure of items subject to either of the above-cited privileges, the Court "must consider the effect of a protective order restricting disclosure to the plaintiff and the plaintiff's attorney, or to the plaintiff's attorney alone. Such an order can mitigate many if not all of the oft-alleged injuries to the police and to law enforcement." *King*, 121 F.R.D. at 190 (internal citation omitted); *see Nat'l Congress*, 194 F.R.D. at 96; *see generally Martindell v. Int'l Tel. and Tel. Corp.*, 594 F.2d 291, 295 (2d Cir. 1979) (noting that "the vital function of a protective

order issued under [Rule 26] . . . is to secure the just, speedy, and inexpensive determination of civil disputes . . . by encouraging full disclosure of all evidence that might conceivably be relevant").

In this case, the Protective Orders provide, *inter alia*, that documents designated as "confidential" are subject to limited disclosure to the parties and their counsel, (Oct. 4, 2005 Order ¶¶ 1, 5); in addition, any "intelligence documents" produced by defendants "shall be" subject to an "attorneys' eyes-only" designation, (Jan. 12, 2007 Order). Furthermore, "any confidentiality designation remains in place until challenged by the other party, at which point the designating party bears the burden of establishing that there is good cause under Rule 26(c) of the Federal Rules of Civil Procedure. Good cause exists when 'disclosure will result in a clearly defined, specific, and serious injury.'" (April 20 Order at 16 & n.3 (quoting *In Re Terrorist Attacks on September 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006)) (internal citation omitted).)

## III. DISCUSSION

Upon a review of the full record in this case, including the parties' respective submissions in connection with plaintiffs' motion to compel, the April 20 Order, and defendants' objections, as well as an *in camera* review of the unredacted versions of documents withheld from defendants, the Court modifies in part and adopts in part Judge Francis's rulings regarding the items sought by plaintiffs.

## A. Deliberative Process Privilege

Defendants argue that Judge Francis clearly erred in rejecting the applicability of the deliberative process privilege. For the following reasons, the Court modifies, in part, the April 20 Order but adopts Judge Francis's conclusion that the documents at issue should be produced to plaintiffs. Below, the Court addresses each category of documents at issue.

However, as an initial matter, the Court clarifies the contours of the deliberative process privilege. Judge Francis found, *inter alia*, that certain documents were "non-deliberative" where they "neither evaluate[d] various alternatives nor discuss[ed] any particular individual's opinions or ideas regarding the NYPD's plans for the RNC." (April 20 Order at 9-10.) Yet, the deliberative process privilege applies more broadly to "'documents *reflecting* advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Hopkins*, 929 F.2d at 84-85) (emphasis added). Indeed, the "privilege serves to protect the deliberative process itself, not merely documents containing deliberative material." *See Mapother v. Dep't of Justice*, 3 F.3d 1533, 1538 (D.C. Cir. 1993) ("When a summary of factual material on the public record is prepared by the staff of an agency administrator, for his use in making a complex decision, such a summary is part of the deliberative process, and is exempt from disclosure . . . .") (citing *Montrose Chem. Corp. v. Train*, 491 F.2d 63, 68-71 (D.C. Cir. 1974)); *see also Petroleum Info. Corp. v. United States Dep't of Interior*, 976 F.2d

1429, 1435 (D.C. Cir. 1992) ("To the extent that predecisional materials, even if 'factual' in form, reflect an agency's *preliminary positions* or ruminations about how to exercise discretion on some policy matter, they are protected under [the privilege as codified in FOIA.]") (emphasis added). Thus, a document may be deemed "deliberative" not only where it explicitly weighs competing policy alternatives, but also where it contains a preliminary outline of a policy prepared by lower-ranking government officials for presentation to a superior with final policymaking authority. *See, e.g., Edmonds Inst. v. Dep't of Interior*, 460 F. Supp. 2d 63, 70 (D.D.C. 2006) ("[P]reliminary drafts of historical documents are exempt from disclosure when a comparison of the drafts with the final products would reveal editorial changes made by the agency.") (citing *Dudman Commc'ns v. Dep't of Air Force*, 815 F.2d 1565, 1567-68 (D.C.Cir. 1987)). With these principles in mind, the Court turns to defendants' objections.

1. The Civil Disturbance Subcommittee Documents

Judge Francis found that the entirety of the Subcommittee Documents was "not subject to the privilege and must be disclosed." (April 20 Order at 8.) For the following reasons, the Court modifies, in part, the April 20 Order but adopts Judge Francis's ultimate conclusion that the Subcommittee Documents should be disclosed to plaintiffs.

First, the Court finds no clear error in Judge Francis's determination that the "meeting agendas" dated January 13, 2004 (Bates Nos. 5688-5690), and May 5, 2004 (Bates Nos. 5721-5723), as well as the May 5,

2004 memorandum by Deputy Chief Harry Wedin (Bates Nos. 5724-5725) were not subject to the privilege. These documents merely list the individuals in attendance at meetings on those dates as well as the broadly-defined issues discussed at the meetings. Thus, because the documents do not reflect "recommendations" or "deliberations comprising part of a process by which governmental decisions and policies are formulated," *Grand Cent. P'ship*, 166 F.3d at 482, the Court affirms Judge Francis's determination that the privilege does not apply to these items.

Second, the Court finds no clear error in Judge Francis's determination that the July 21, 2004 memorandum (Bates Nos. 5734-5745) — which was authored by Captain Gary Healy and concerned a summary of subjects discussed at a meeting of the subcommittee on that date — was not subject to the privilege. The memorandum contains, among other things, a list of the subjects discussed, and a summary of a presentation regarding a publically filed judicial decision. (Bates Nos. 5734-45.) The document is clearly not "deliberative," as its author expressly indicates that the substantive portions of the document are unrelated to matters of policy, and, therefore, cannot be said to "bear on the . . . exercise of policy-oriented judgment." *Tigue*, 312 F.3d at 80.

Third, the Court finds that Judge Francis acted contrary to law in concluding that the privilege did not apply to the January 13, 2004 memorandum from Officer Matthew Pontillo (Bates Nos. 5679-5683). Judge Francis found that the document — which contains a summary of preliminary decisions regarding the mass arrest processing plan (the

"MAPP") for the RNC — was not subject to the deliberative process privilege because it did "not contain the recommendations or opinions of [its] writer[] or of any other members of the committee . . . ." (April 20 Order at 7.)

However, as noted *supra*, the deliberative process privilege applies not only to documents that themselves contain policy recommendations but also, more broadly, to documents that "*reflect*[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Hopkins*, 929 F.2d at 84-85) (emphasis added). Thus, the Court finds that Judge Francis failed to apply the proper legal standard to the January 13 memorandum.

Applying the appropriate standard, the Court finds that the memorandum is clearly "predecisional" because its contents relate to decisions regarding MAPP policies during the RNC, and the document was prepared prior to a final decision regarding the MAPP. (*See* Kelly Decl. ¶ 6 (indicating that the memorandum "describes an arrest processing plan that was never ultimately adopted by the NYPD").) Moreover, the memorandum is "deliberative" because it contains a draft outline of the MAPP for the RNC and, thus, contrary to Judge Francis's finding, necessarily "reflect[s] . . . recommendations" regarding the formulation of a final policy — namely, the MAPP to be used during the RNC. *See Grand Cent. P'ship*, 166 F.3d at 482; *see also Mapother v. Dep't of Justice*, 3 F.3d 1533, 1538 (D.C. Cir. 1993) (finding that, "[w]hen a summary of factual material . . . is prepared by the staff of an . . .

administrator, for his use in making a complex decision, such a summary is part of the deliberative process, and is exempt from disclosure . . . "). Thus, it was contrary to law for Judge Francis to conclude that defendants had failed to make a threshold showing that the January 13 memorandum was subject to the deliberative process privilege.

Nevertheless, upon conducting a balancing analysis *de novo*, the Court finds that the parties' respective interests favor disclosure of the January 13 memorandum.[7] First, the January 13 memorandum is plainly relevant to plaintiffs' claims. As Judge Francis previously observed in this case:

> The deliberations that led to the development of the MAPP for the RNC are at issue in this litigation because the plaintiffs seek to prove that the MAPP was designed to discourage political protest and free expression. The plaintiffs contend, *inter alia*, that the defendants implemented an unnecessarily convoluted arrest processing system and subjected the plaintiffs to lengthy detention under hazardous conditions at Pier 57 in order to suppress and discourage First Amendment activity. The plaintiffs further contend that in recent years, the NYPD has developed ever more elaborate and prolonged MAPPs specifically directed at persons arrested for minor violations

---

[7] Because Judge Francis did not conduct a balancing analysis with regard to any of the items, save one, at issue in the April 20 Order, the Court addresses this issue *de novo* in resolving all but one of the instant objections.

at political protests in order to punish expressive activity. . . . The intent and knowledge of the NYPD officials who made decisions regarding the MAPP are central to the plaintiffs' claims. . . .

*MacNamara v. City of New York*, No. 04 Civ. 9612 (JCF), 2007 WL 755401, at *10-11 (S.D.N.Y. March 14, 2007) (internal quotation marks and citation omitted). Thus, because the January 13 memorandum relates to the NYPD's preparation of the MAPP for the RNC, it directly bears on plaintiffs' claims regarding defendants' intent and knowledge in formulating and implementing the MAPP for the RNC. (*See* Pls.' Opp. at 35.) Second, the information contained in the memorandum is "important," in that it may be obtained solely from defendants. *See King*, 121 F.R.D. at 193.

Third, it appears that disclosure of the memorandum would not pose a substantial risk of chilling internal candor among NYPD employees, at least where the memorandum is disclosed subject to the Protective Orders. *See King*, 121 F.R.D. at 191; *see also In re Franklin Nat'l Bank Sec. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979) (characterizing this interest as "the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable") (Weinstein, J.). Specifically, the Protective Orders in this case strictly limit the scope of disclosure of items falling within its provisions, thus mitigating the risk that items subject to the deliberative process privilege will be publically disclosed and result in the "chilling" of NYPD employees. It is also self-evident that, notwithstanding the production of the January 13 memorandum to plaintiffs, NYPD employees retain a strong

incentive — namely, a desire to enhance public safety and to fulfill their professional obligations — to relay to their superiors recommendations regarding operational policies.

Furthermore, the Court rejects defendants' argument that the Protective Orders are an ineffective means of restricting the disclosure of documents in the RNC cases. Specifically, defendants argue that, notwithstanding the entry of the Protective Orders, members of the press have previously obtained — from an unidentified source — documents deemed "confidential" by the parties and produced pursuant to the Protective Orders. *See Schiller*, 2007 WL 1623108, at *4; (Defs.' Obj. at 21). However, there is absolutely no evidence in the record indicating that plaintiffs or their counsel were responsible for such disclosures, or that they are likely to violate the Protective Orders in the future. Indeed, in a previous order, Judge Francis specifically found that defendants had failed to offer any evidence indicating that "[a] breach of the protective orders . . . originated with plaintiffs' counsel," and noted "a number of factors that suggest otherwise." *Schiller*, 2007 WL 1623108, at *4. In their objections to the April 20 Order, defendants have similarly failed to present any basis to suggest that the Protective Orders are an ineffective means of restricting the parties' use of items disclosed thereunder, or to revisit Judge Francis's prior finding on this issue.

Therefore, in light of the public interest in "giving force to the federal civil rights laws," *King*, 121 F.R.D. at 195, the Court finds that the interests at issue weigh in favor of disclosing the January 13 memorandum, at least where defendants may designate the

memorandum as "confidential" and, thus, subject to the restrictions of the Protective Orders.

## 2. The Criminal Justice Bureau Documents

Judge Francis determined that, save for a single portion of a certain document, the CJB Documents were not subject to the law enforcement privilege. (*See* April 20 Order at 8-10.) For the following reasons, the Court modifies the April 20 Order to the extent that it rejected the applicability of the privilege to portions of the CJB Documents, but adopts Judge Francis's ultimate conclusion that the documents should be disclosed to plaintiffs.

Specifically, the Court finds that Judge Francis clearly erred in determining that the following CJB Documents were not subject to the privilege: the February 19, 2004 memorandum by Officer Pontillo (Bates Nos. 5686-5687); the PowerPoint presentation entitled "Arrest Processing Plan for the Republican National Convention" (the "Arrest PowerPoint") (Bates Nos. 5691-5709); the document entitled "Issues re Arrest Processing During RNC" (the "Arrest Issues Document") (Bates Nos. 6019-6024); and the PowerPoint presentation entitled "Manhattan Court Section Functions at 100 Center Street" (the "Court PowerPoint") (Bates Nos. 6025-6040). Judge Francis found that these documents were "not deliberative" because they either "simply set[] forth the current [*i.e.,* then-existing] state of plans for the RNC and indicate[] that several topics had been identified as 'issues,'" or "describe[d] the MAPP that the NYPD was planning to use at the time the documents were created." (April 20 Order at 9.)

However, it is clear from Judge Francis's description of these documents as well as the documents themselves that they constitute the type of documents that typically fall within the scope of the deliberative process privilege — that is, "[d]raft documents" which "by their very nature, are typically predecisional and deliberative," and "reflect only the tentative view of their authors . . . that might be altered or rejected upon further deliberation either by their authors or by superiors." *Exxon Corp.*, 585 F. Supp. at 698 (internal quotation marks and citation omitted); *see also Nat'l Council of La Raza*, 339 F. Supp. 2d at 573 ("Drafts and comments on documents are quintessentially predecisional and deliberative."). Indeed, the Court is left with the definite and firm conviction that Judge Francis was mistaken in concluding that the privilege did not apply to the CJB Documents.

First, the February 19 memorandum is predecisional because it was "prepared to assist the [City] in the formulation of [a] specific decision" regarding the operational details of the MAPP. *Tigue*, 312 F.3d at 80; (*see* Kelly Decl. ¶ 19). The memorandum is also deliberative because it contains summaries of internal discussions regarding a preliminary version of the MAPP for the RNC, which necessarily provide insight into the deliberative processes of NYPD decisionmakers. *See Grand Cent. P'ship*, 166 F.3d at 482; *Petroleum Info. Corp.*, 976 F.2d at 1435 ("To the extent that predecisional materials . . . reflect an agency's preliminary positions . . . on some policy matter, they are protected . . . ."); Kelly Decl. ¶ (noting that the February 19 memorandum "contains proposals that were not adopted in the final arrest processing plan").

Second, the Arrest PowerPoint is clearly both predecisional — although undated, it was presented to NYPD officials on April 1, 2004, prior to the RNC (*see* Kelly Decl. ¶ 7) — and deliberative — it contains a preliminary outline of the MAPP for the RNC, at least some portions of which were not "ultimately adopted by the NYPD," (*id.*). *See Grand Cent. P'ship*, 166 F.3d at 473.

Similarly, the Arrest Issues Document is clearly both pre-decisional and deliberative, in that it reflects non-final recommendations regarding arrest processing procedures during the RNC that were prepared in order to assist in the formulation of a final MAPP for the RNC. (*See* Kelly Decl. ¶ 7.)

Finally, having reviewed the Court PowerPoint, it is clear that the document summarizes factual material regarding the capabilities and responsibilities of facilities and personnel involved in the proposed MAPP, and was presented to NYPD supervisors prior to a final decision regarding the MAPP. (*See id.*) "[S]uch a summary is part of the deliberative process," at least where, as here, the summary is the product of an effort to "extract pertinent facts, organize them to suit a specific purpose, and to identify . . . significant issues . . . ." *Mapother*, 3 F.3d at 1538-39; *see also Reliant Energy Power Generation, Inc. v. F.E.R.C.*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007) (finding that "draft reports" were subject to the deliberative process privilege where disclosure would permit the plaintiff "to probe too deeply into the thought processes of the drafters and would have a chilling effect on communication between agency employees regarding similar projects [in] the future") (citing *Mapother*, 3 F.3d at 1539).

Nevertheless, while Judge Francis clearly erred in rejecting the applicability of the deliberative process privilege to the CJB Documents, the Court declines to set aside Judge Francis's determination that defendants must disclose the CJB Documents to plaintiffs. Instead, upon conducting a balancing analysis *de novo*, the Court finds that the interests at issue here favor disclosure of the items.

First, the CJB Documents are plainly relevant to plaintiffs' claims because they bear upon the intent and knowledge of NYPD officials in formulating the MAPP to be used during the RNC. Second, it appears that the CJB Documents, and the specific information contained therein regarding court personnel and their potential role in arrest processing during the RNC, may not be obtained through alternative sources. Finally, given the restrictions of the Protective Orders, disclosure of the CJB Documents presents only a slight risk of chilling internal candor among NYPD employees. *See, e.g.*, *King*, 121 F.R.D. at 190; *Nat'l Congress*, 194 F.R.D. at 96*; Price v. County of San Diego*, 165 F.R.D. 614, 620 (S.D. Cal. 1996) (finding that the documents at issue should be produced and noting that "the infringement upon the frank and independent discussions regarding contemplated policies and decisions of the County . . . can be alleviated through the use of a strict protective order").

### 3. E-Mails

The Court finds no clear error in Judge Francis's determination that the e-mails regarding the following subjects were not subject to the deliberative process privilege: (1) "Possible Mayor Talking Points" prepared

for an anticipated meeting of the Mayor and the Police Commissioner regarding the RNC (Bates Nos. 100003750-100003751); (2) an NYPD drill being staged prior to the RNC (Bates Nos. 100003747-100003749); and (3) operational details regarding the use of Pier 57 as a "Post-Arrest Staging Site" during the RNC (Bates No. 100005945). (*See* April 20 Order at 10-11.). Specifically, having reviewed the items *in camera*, the Court concurs with Judge Francis's finding that the e-mails concerned "'routine operating decision[s]' rather than 'policy oriented judgment[s]' to which the privilege would apply." (*Id.* at 11 (internal quotation omitted)); *see Tigue*, 312 F.3d at 80 ("[T]he privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment.") (internal quotation marks and citation omitted). Accordingly, the Court declines to modify or to set aside Judge Francis's rulings regarding these items.

## B. Law Enforcement Privilege

Defendants argue that Judge Francis committed clear error in concluding that the law enforcement privilege did not apply to certain documents. For the following reasons, the Court rejects defendants' assertion that Judge Francis improperly "substitut[ed] his judgment" for that of NYPD Chief Graham, (Defs.' Obj. at 2), but modifies in part the rulings set forth in the April 20 Order regarding the law enforcement privilege.

### 1. Deference to the Determinations of a Law Enforcement Official

Defendants assert that the Graham Declaration set forth "clear and specific harm[s]" to "particular law enforcement operation[s]" that would arise from disclosure of the items at issue. (*Id.*) Therefore, according to defendants, Judge Francis was *required as a matter of law* to defer to the assertions contained in the Graham Declaration regarding the purportedly "specific harms" likely to arise from disclosure of the items. (*See id.* at 2-4.) In support of that proposition, defendants cite several cases wherein district courts "relied upon declarations or affidavits from experienced law enforcement personnel" in applying the law enforcement privilege. (*Id.* at 3 (collecting cases).)

Defendants accurately characterize the holdings of the cited cases — each found that the law enforcement privilege applied, at least in part, to documentary evidence on the basis of declarations and/or affidavits submitted by law enforcement officials. *See, e.g.*, *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88, 89-90 (S.D.N.Y. 2000); *Morrissey*, 171 F.R.D. at 90-91; *Raphael v. Aetna Cas. & Sur. Co.*, 744 F. Supp. 71, 74-75 (S.D.N.Y. 1990). However, none of the cases cited by defendants stand for the proposition that district courts are required to defer blindly to assertions made by a law enforcement official regarding the existence of the law enforcement privilege.

Rather, it is well-settled that, in order to establish the existence of the law enforcement privilege, the party asserting the privilege must make "a substantial threshold showing[]

that there are specific harms likely to accrue from disclosure of specific materials,'" *Fountain*, 2004 WL 941242, at *3, and that this burden must be discharged by presenting "those facts that are the essential elements of the privileged relationship" and not "'by mere conclusory or *ipse dixit* assertions,'" *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d at 224-25 (citing *In re Bonanno*, 344 F.2d at 833) (additional internal citations omitted)).

Accordingly, in this case, because Judge Francis was under no obligation to accord unquestioning deference to the Graham Declaration, he did not err by requiring defendants to "make a clear and specific evidentiary showing" of the harm likely to result from disclosure of these items, rather than relying on "generalized reiterations of the policies underlying the privilege."[8] (April 20 Order at 12 (internal quotation marks and citation omitted).) With this standard in mind, the Court turns to a review of the merits of Judge Francis's holdings.

---

[8] Similarly, the Court rejects defendants' completely unfounded assertion that, in declining to adopt the conclusory assertions of Chief Graham, Judge Francis relied "on nothing more than his personal beliefs . . . ." (Defs.' Obj. at 6.) Defendants appear to assert that, because Judge Francis refused to defer to Chief Graham's conclusions regarding the Disorder Documents, he must have inserted his "personal beliefs" into the case. (*Id.*) However, it is clear to this Court that, based on the entirety of the record in this case, as well as the other RNC cases, Judge Francis has diligently performed his duty of exercising reasoned and independent judgment in applying the law to the facts. Indeed, there is nothing in the record to suggest that Judge Francis inserted his own personal beliefs into this case. Going forward, defendants should avoid making such assertions without compelling support in the record.

2. The Documents Sought by Plaintiffs

Judge Francis rejected the applicability of the law enforcement privilege to all of the documents sought by plaintiffs. For the following reasons, the Court modifies, in part, Judge Francis's rulings regarding disclosure of the documents purportedly subject to the law enforcement privilege.

a. Disorder Control Incident Documents

Judge Francis held that the entirety of the Disorder Documents were not subject to the law enforcement privilege and, therefore, should be disclosed to plaintiffs. (April 20 Order at 13-14.) Specifically, Judge Francis found that these documents were not subject to the privilege because they neither appeared to be "based upon[] actual intelligence information," nor "contain[ed] sufficiently specific information to raise legitimate concerns about educating demonstrators regarding the NYPD's tactical weaknesses or its strategies for dealing with mass disorder." (April 20 Order at 15.) Thus, Judge Francis found that defendants' assertions regarding the harms likely to arise from disclosure were "overblown" and "simply unconvincing." (April 20 Order at 15 (internal quotation marks and citation omitted).)

However, for the following reasons, the Court finds that it was clearly erroneous for Judge Francis to reject the applicability of the privilege to the entirety of the Disorder Documents. In addition, the Court finds that defendants have satisfied their burden of showing that certain items among the Disorder Documents should not be produced to plaintiffs. *See In re Dep't of Investigation*,

856 F.2d at 484; *see also Dep't of Homeland Sec.*, 459 F.3d at 569.

As a threshold matter, the Court finds that Judge Francis acted contrary to law in rejecting the applicability of the privilege on the ground that "[t]he City does not contend that [the items in question] contain, or are based upon, actual intelligence." (April 20 Order at 15.) The law imposes no such requirement upon a party that seeks to invoke the law enforcement privilege. Indeed, the Second Circuit has repeatedly stated that "the purpose of this privilege" is not only to safeguard information derived from actual intelligence, such as "the confidentiality of sources" or the identity of witnesses, but also "to prevent disclosure of law enforcement techniques and procedures . . . ." *In re Dep't of Investigation*, 856 F.2d at 484; *accord Amodeo*, 44 F.3d at 147. Thus, the law enforcement privilege has frequently been applied to items that contain information unrelated to "actual intelligence" gleaned from law enforcement operations, such as "internal FBI protocols relating to the use of force," *Commonwealth of Puerto Rico*, 490 F.3d at 67, "memoranda [that] discuss specific deployment tactics used in a program to reduce subway crime," *Nat'l Congress*, 194 F.R.D. at 94, or a document that "describe[s] the NYPD's plans for its pre-RNC intelligence-gathering operation, " *Schiller v. City of New York*, 244 F.R.D. 273, 280 (S.D.N.Y. 2007) (Francis, M.J.).

Here, Chief Graham specifically asserted that the documents at issue contain descriptions of anticipated problems relating to various NYPD techniques and procedures that are employed in responding to mass disorder scenarios, including "potential communication problems," "deployment constraints," limits on the allocation of the NYPD's resources during such events, and the NYPD's ability to "use and evaluat[e] . . . intelligence information . . . ." (*See* Graham Decl. ¶ 3.) Thus, it is clear that, although the documents at issue may contain information relating to *hypothetical* events, the problems identified therein appear to be based on *actual*, then-existing evaluations of the strengths and weaknesses of various techniques and procedures that the NYPD uses or expects to use to respond to certain mass disorder situations. Accordingly, the Court finds that Judge Francis clearly erred in imposing an "actual intelligence" requirement upon defendants.

Furthermore, the Court finds that Judge Francis clearly erred in rejecting defendants' assertion that, if disclosed, the "Scenario" portions of the three Tabletop Exercise documents (collectively, the "Scenarios") would likely expose vulnerabilities in the NYPD's ability to address mass disorder and/or terrorist activity.[9] (*See* Graham Decl. ¶¶ 7, 9.) The Scenarios present hypothetical narratives concerning violent activity and/or potential violent activity that could potentially highlight and exploit weaknesses in the NYPD's ability to respond to those or similar situations. Defendants assert that disclosure of the Scenarios would reveal "the types of scenarios that the [NYPD] is prepared to handle (and hence may not be prepared to handle)." (Graham Decl. ¶ 9.) Judge Francis rejected defendants' assertions, and found that the Scenarios do not "contain[] sufficiently

---

[9] The three Tabletop Exercises contain a total of eight Scenarios. (*See* Bates Nos. 5851, 5853, 5855, 10598, 10600, 6058, 6060, 6061)

specific information to raise legitimate concerns about educating demonstrators regarding the NYPD's tactical weakness or its strategies for dealing with mass disorder." (April 20 Order at 15.)

The Court is left with the "definite and firm conviction" that Judge Francis was mistaken in concluding that the information identified by defendants was insufficiently specific so as satisfy their threshold burden. *Easley*, 532 U.S. at 242. Indeed, having reviewed the documents at issue *in camera*, as well as the parties' submissions, the Court finds that defendants have clearly made a substantial threshold showing that public disclosure of the Scenarios would likely result in specific harm to "identified important interests." *King*, 121 F.R.D. at 190. Specifically, defendants have established that the hypothetical narratives contained in the Scenarios present sufficiently detailed descriptions of circumstances that are likely to exploit and/or reveal weaknesses in the NYPD's ability to respond to mass disorder or other violent activities so as to justify the applicability of the law enforcement privilege. *See In re Dep't of Investigation*, 856 F.2d at 484; *see also Commonwealth of Puerto Rico*, 490 F.3d at 67 (finding that the law enforcement privilege applied to information regarding, *inter alia*, "internal FBI protocols relating to the use of force" because the "[d]isclosure of such information has the potential to thwart future FBI operations by publicizing the internal operations of that agency"); *Abdou v. Gurrieri*, No. 05 Civ. 3946 (JG) (KAM), 2006 WL 2729247, at *3 (E.D.N.Y. Sept. 25, 2006) (finding documents subject to the law enforcement privilege where disclosure "would reveal how the FBI follows up on confidential lead[s] and the

tools, techniques and procedures utilized in such an investigation").

Furthermore, upon conducting a balancing analysis *de novo*, the Court finds that the parties' interests favor non-disclosure of the Scenarios. First, as noted above, disclosure of the Scenarios poses a substantial threat to police officers' safety as well as to the "weakening of law enforcement programs." *See King*, 121 F.R.D. at 191. Specifically, if disclosed, the hypothetical scenarios would reveal vulnerabilities in the NYPD's ability to respond to the types of unlawful activities discussed therein.

Second, the Scenarios are of minimal, if any, relevance to plaintiffs' claims. Although "[t]he intent and knowledge of the NYPD officials who made decisions regarding the MAPP are central to the plaintiffs' claims," *MacNamara*, 2007 WL 755401, at *11, the Scenarios appear to have no bearing on this issue. Indeed, based upon this Court's *in camera* review of these portions of the Tabletop Exercises, there is no reasonable basis to conclude that they have "any tendency to make the existence of any fact that is of consequence to the determination of [this] action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401, or that they "appear reasonably calculated" to lead to the discovery of admissible evidence, Fed. R. Civ. P. 26(b)(1). Thus, notwithstanding the fact that the Scenarios are not available from an alternative source, as well as the fact that the Protective Orders may mitigate many of the risks likely to arise from their disclosure, the Court finds that the severely limited relevance of the Scenarios and the substantial risk to law enforcement programs likely to arise from

their production strongly favors non-disclosure of the Scenarios.

As to the remaining Disorder Documents — comprised of the non-Scenario portions of the Tabletop Exercises and the entirety of the Action Items — the Court likewise finds that Judge Francis clearly erred in rejecting the applicability of the law enforcement privilege, but joins in his ultimate conclusion that the documents should be disclosed to plaintiffs, subject to the restrictions of the Protective Orders.

Judge Francis rejected the applicability of the privilege to the non-Scenario portions of the Disorder Documents for the same reason discussed *supra* — namely, that they did not contain "sufficiently specific information" regarding law enforcement techniques and procedures so as to present a risk of harming law enforcement interests. (*See* April 20 Order at 15.) However, as discussed *supra* with regard to the Scenarios, Judge Francis clearly erred in applying an overly exacting "specificity" standard to defendants' threshold burden.

Indeed, having reviewed the documents *in camera*, as well as the parties' submissions, the Court finds that defendants have identified "sufficiently specific information" in the remaining Disorder Documents so as to satisfy defendants' threshold burden of establishing the applicability of the privilege. April 20 Order 15; *see King*, 121 F.R.D. at 190*; see also In re Dep't of Investigation*, 856 F.2d at 484; *see also Commonwealth of Puerto Rico*, 490 F.3d at 67. It is clear that these documents contain information regarding specific vulnerabilities in the NYPD's ability to respond to instances of

mass disorder, as well as specific techniques and procedures employed by, or expected to be employed by, the NYPD in responding to such activity. (*See id.* ¶¶ 6-9.) Specifically, the remaining portions of the Tabletop Exercises present "talking points" relating to certain vulnerabilities in the NYPD's ability to respond to mass disorder, including potential communication problems, "deployment constraints," and intelligence gathering and dissemination issues. (*See id.* ¶ 7.) Similarly, the Action Items contain information regarding particular techniques and procedures employed by, or expected to be employed by, the NYPD in addressing these vulnerabilities. (*See id.* ¶ 8-9.)

Accordingly, because it is clear that defendants have identified sufficiently specific information in the remaining Disorder Documents so as to satisfy defendants' threshold burden, the Court is left with the definite and firm conviction that Judge Francis was mistaken in rejecting the applicability of the privilege to these items. (*See* Graham Decl. ¶¶ 9-10.)

Nevertheless, upon conducting a balancing analysis *de novo*, the Court finds that the parties' respective interests in this case favor disclosure of the Disorder Documents — other than the Scenarios — pursuant to the restrictions of the Protective Orders. First, the remaining portions of the Tabletop Exercises and the entirety of the Action Items bear upon the intent and knowledge of NYPD officials in planning the NYPD's response to instances of civil disorder, and are thus relevant to plaintiffs' claims. *See MacNamara*, 2007 WL 755401, at *11. Second, the information contained in the documents does not appear to be

obtainable from alternative sources. Third, disclosure of the documents subject to the restrictions of the Protective Orders will sufficiently mitigate the risks, if any, that may arise from disclosure. *see, e.g.*, *Nat'l Congress*, 194 F.R.D. at 96.

Accordingly, the Court finds that the Disorder Documents — other than the Scenarios — should be disclosed to plaintiffs subject to the restrictions of the Protective Orders.

b. Legal Subcommittee Meeting Documents

Judge Francis rejected the applicability of the law enforcement privilege to each of the redacted portions of the Legal Documents. Although the Court affirms Judge Francis's rulings with respect to the vast majority of redactions at issue, the Court modifies the April 20 Order as it relates to the disclosure of certain portions of the Legal Documents.

Specifically, the Court finds that Judge Francis clearly erred in finding that paragraphs 5(a)(2) and 5(a)(3) of the January 7 Memo (Bates No. 10492) and paragraphs 6(b) and 8(a) of the March 2 Memo (Bates No. 10505) were not subject to the law enforcement privilege. Judge Francis found that, with regard to the entirety of the documents, there was "no basis" for defendants' assertions that disclosure of the documents would reveal information about the NYPD's intelligence-gathering techniques and/or compromise the NYPD's ability to employ such techniques effectively in the future. (*See* April 20 Order at 17-18; *see also* Graham Decl. ¶¶ 16-17.) However, in so ruling, Judge Francis erroneously applied the legal standards relating to defendants'

threshold burden of establishing the applicability of the privilege to the paragraphs at issue.

Indeed, having reviewed the documents *in camera*, as well as the parties' submissions, the Court finds that defendants have identified a substantial basis for applying the privilege to paragraphs 5(a)(2) and 5(a)(3) of the January 7 Memo and paragraphs 6(b) and 8(a) of the March 2 Memo. Thus, the Court is left with the definite and firm conviction that Judge Francis erred in rejecting defendants' assertion that public disclosure of these paragraphs would likely reveal specific "law enforcement techniques" relating, respectively, to NYPD communications and intelligence gathering strategies, and, therefore, "jeopardize future criminal investigations" relying on those or similar techniques. *See Commonwealth*, 490 F.3d at 64; *Morrissey*, 171 F.R.D. at 90; (*see also* Graham Decl. ¶ 16). Accordingly, the Court finds that Judge Francis committed clear error in rejecting the applicability of the privilege to these portions of the Legal Documents.

Furthermore, upon conducting a balancing analysis *de novo*, the Court finds that the interests at issue in this case strongly favor non-disclosure of paragraphs 5(a)(2) of the January 7 Memo and 8(a) of the March 2 Memo. There is absolutely no indication that the information contained in these paragraphs regarding communications issues is relevant to a claim or defense in this case. Indeed, these paragraphs neither contain information regarding surveillance techniques applied to demonstrators at RNC-related demonstrations nor bear on the intent and/or knowledge of NYPD officials in preparing arrest or arrest processing policies for the RNC.

By contrast, the Court finds that the interests at issue favor disclosure of paragraphs 5(a)(3) of the January 7 Memo and 6(b) of the March 2 Memo. First, the information in these paragraphs regarding intelligence gathering techniques is relevant to plaintiffs' claims that defendants sought to "punish and retaliate against plaintiffs . . . for their expression of opposition to the foreign, military, and domestic policies of the U.S. government and the policies of the Republican Party," and, in doing so, relied, at least in part, on intelligence allegedly obtained by defendants regarding "plans . . . being made by various groups and individuals to demonstrate during the relevant period." (Second Am. Compl. ¶¶ 56, 65.) Second, the information contained in the documents cannot be obtained from alternative sources. Third, defendants have failed to make any showing that the Protective Orders will insufficiently mitigate the risks, if any, likely to arise from disclosure of these portions of the Legal Documents.

Accordingly, the Court finds that paragraphs 5(a)(3) of the January 7 Memo and 6(b) of the March 2 Memo should be disclosed to plaintiffs subject to the restrictions of the Protective Orders.

As to the remaining redacted portions of the January 7 and March 2 Memos, the Court finds no clear error in Judge Francis's determination that these portions of the documents were not subject to the law enforcement privilege and should be produced to plaintiffs in unredacted form. (*See* April 20 Order at 17-18.) Defendants have failed to articulate a sufficiently specific harm arising from disclosure of the remaining redacted portions of the documents that would

justify application of the privilege. Accordingly, the Court finds no clear error in this ruling.

c. Mobile Reserve Sector After-Action Report

Judge Francis found that nearly all of the After-Action Report was not subject to the law enforcement privilege and, therefore, directed defendants to produce an unredacted version of the report to plaintiffs.[10] (*See* April 20 Order at 18-20.) For the following reasons, the Court modifies Judge Francis's finding to the extent that he declined to apply the law enforcement privilege to certain portions of the report. The Court affirms the remainder of Judge Francis's rulings regarding the report.

i. Specific Techniques and Procedures in the Report

First, the Court finds that Judge Francis clearly erred in concluding that the law enforcement privilege did not apply to those portions of the report regarding specific weaknesses of the Mobile Reserve Sector unit and techniques and procedures employed by the unit during the RNC.[11] Judge Francis found that such information was not subject to

---

[10] Judge Francis determined that defendants "may redact information . . . regarding locations considered to be potential terrorist targets. (Bates Nos. 15011-15014)." (April 20 Order at 20.) The parties have not objected to this ruling.

[11] Specifically, the Court finds that the law enforcement privilege applies to the redacted portions of the following sections of the After-Action Report: 3.1.3-3.1.7, 3.2, 3.3, 3.4.3-3.4.5, 3.5, 5.6-5.9, 6.2.1-6.2.5, 6.7.3.4.1, 6.8.1, 6.8.2, 6.8.3, 6.9.2, 6.11.8, 6.11.9, 6.11.13, 6.12.3, 6.12.4, 7.1.1-7.1.5, 10.1.2-10.1.8, 10.2, 10.3, 10.4.2-10.4.5, 10.5.1.

the privilege on the ground that it was "highly specific to the RNC" and, therefore, it was "difficult to imagine how [such portions of the report] could be useful to persons determined to foil the NYPD's efforts to keep order at future demonstrations." (April 20 Order at 20.)

Judge Francis clearly erred in concluding that the "highly specific" nature of these portions of the report excluded them from the scope of the law enforcement privilege. Indeed, it is clear that the "highly specific" information contained in these portions of the report — regarding, *inter alia*, specific techniques employed by the unit and problems relating to the use of such techniques in responding to various law enforcement scenarios — makes it more, rather than less, likely that disclosure of these portions would jeopardize "future law enforcement investigations" utilizing the unit and/or the techniques and procedures in question. *See Morrissey*, 171 F.R.D. at 90.

With this consideration in mind, the Court finds, having reviewed the report *in camera*, that defendants have satisfied their threshold burden on this issue by demonstrating that these portions of the report, taken together, contain a reasonably detailed compilation of NYPD techniques, procedures, and operational vulnerabilities relating to the Mobile Reserve Sector unit, and that public disclosure of such information would likely present a risk of "seriously impair[ing]" the NYPD's ability to rely on that unit and to guard against the exploitation of such weaknesses in the future. *See Nat'l Congress*, 194 F.R.D. at 90; Graham Decl. ¶ 19.

Accordingly, the Court is left with the definite and firm conviction that Judge Francis mistakenly rejected the applicability of the privilege to these portions of the report.

However, upon conducting a balancing analysis *de novo*, the Court finds that — save for certain exceptions noted *infra* — the parties' respective interests favor disclosure of the above-cited portions of the After-Action Report. The information contained in these portions of the report is plainly relevant to plaintiffs' claims. Specifically, because plaintiffs allege that they were falsely arrested as a result of the NYPD's arrest and arrest processing policies for RNC-related demonstrations, the discovery of information regarding the techniques and procedures used by the NYPD in responding to demonstrators, appears, at a minimum, to be "reasonably calculated" to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1); *see Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991). Moreover, the risk that disclosure will "[w]eaken[]" law enforcement programs and/or create a "threat to police officers' safety" may be sufficiently addressed through production of these portions of the report pursuant to the Protective Orders. *King*, 121 F.R.D. at 192.

Finally, the Court finds that the parties' respective interests weigh in favor of *non-disclosure* of particular sections of the report relating to certain equipment and communications issues. Specifically, the Court finds that the information contained in redacted sections 10.3 and 10.4 appears to be of minimal relevance to plaintiffs' claims, but, if disclosed, would likely present a significant risk of "weakening [] law enforcement programs" by disclosing

particular vulnerabilities of the NYPD's ability to respond to mass demonstrations or other unlawful activities. *See generally King*, 121 F.R.D. at 192 ("Disclosure of police procedure guides to the general public could compromise the effectiveness of law enforcement by revealing police tactics to sinister elements."). Accordingly, defendants need not disclose redacted sections 10.3 and 10.4 of the After-Action Report to plaintiffs.

ii. The Remaining Portions of the Report

The Court finds no clear error in Judge Francis's determination that the remaining redacted portions of the After-Action Report — including those portions concerning, *inter alia*, recommended changes to the Mobile Reserve Sector unit, critiques of the unit's performance during the RNC, the number and ranks of officers deployed at certain locations, and the times and modes of deployment — were not subject to the law enforcement privilege. Defendants have failed to demonstrate that the disclosure of such information would present a specific risk of revealing law enforcement "techniques and procedures" or pose a threat to the safety of law enforcement personnel. *See In re Dep't of Investigation*, 856 F.2d at 484.

Specifically, with regard to the redacted sections concerning the number and ranks of officers deployed at certain locations, and the times and modes of deployment,[12] Judge Francis found that defendants had failed to

identify a specific harm likely to arise from the disclosure of such information — which, according to Judge Francis, "was an observable fact at the time of the [] demonstration" — and, thus, found that the privilege did not apply. (April 20 Order at 19-20 (quoting *Haus*, 2004 WL 3019762, at *4-5).) While it appears that these portions of the Report also included information regarding the number and ranks of officers *expected* to be deployed to the locations at issue — which, of course, would not be publically observable — the Court finds no clear error in Judge Francis's conclusion that defendants had failed to satisfy their threshold burden of identifying a specific harm likely to arise from public disclosure of such information. Judge Francis accurately characterized and rejected defendants' "vague" assertion that disclosure of this information would harm the effectiveness of future law enforcement operations. (*Id.* at 19; *see* Graham Decl. ¶¶ 19-20.)

Moreover, even assuming *arguendo* that defendants had established the applicability of the privilege to such information, the Court finds that a balancing of the parties' respective interests favors disclosure of the remaining portions of the report. The information contained in these portions of the report are plainly relevant to plaintiffs' claims. Specifically, as discussed *supra*, information regarding the unit's performance during the RNC, and the NYPD's allocation of resources in responding to incidents during RNC-related demonstrations, appears, at a minimum, to be "reasonably calculated" to lead to the discovery of admissible evidence regarding, for example, defendants' plans to respond to civil unrest during the RNC. Fed. R. Civ. P. 26(b)(1); *see Daval Steel Prods.*,

---

[12] Specifically, the following portions of the Report relate to the number and rank of officers deployed: 1.6, 1.8, 1.9, 1.10, 1.10.1-1.10.2, 2.3.1, 2.3.1.1-2.3.5, 4 (and the attached chart), 5.3.3, 5.4.1, 6.3.1, 6.4.1, 6.5, 6.6.1, 6.7, 6.8.3, 6.9.1, 6.10, 6.11.1, 6.12.1, 6.13.1, 6.14.1.

951 F.2d at 1367. In addition, the risks, if any, arising from disclosure may be sufficiently addressed through production of these portions of the report pursuant to the Protective Orders. *King*, 121 F.R.D. at 191.

### d. Emergency Operations Center RNC Incident Reports

Similarly, the Court finds no clear error in Judge Francis's rulings regarding the Operations Report.[13] Specifically, for the same reasons discussed *supra*, Judge Francis correctly determined that defendants had failed to discharge their threshold burden of demonstrating that the privilege applied to those portions of the report regarding the number and ranks of officers deployed during the RNC.[14] *See supra*, Part III(B)(2)(c)(ii).

Moreover, even assuming *arguendo* that defendants had established the applicability of the privilege to such information, the Court finds that a balancing of the parties' respective interests favors disclosure of an unredacted version of the report. The information contained in the redacted portions of the report is plainly relevant to plaintiffs' claims. Specifically, as discussed

*supra*, information regarding the NYPD's allocation of resources in responding to incidents during RNC-related demonstrations appears, at a minimum, to be "reasonably calculated" to lead to the discovery of admissible evidence regarding, for example, defendants' plans to respond to civil unrest during the RNC. Fed. R. Civ. P. 26(b)(1); *see Daval Steel Prods.*, 951 F.2d at 1367. In addition, the risks, if any, arising from disclosure may be sufficiently addressed through production of these portions of the report pursuant to the Protective Orders. *King*, 121 F.R.D. at 191.

Accordingly, the Court finds that an unredacted version of the Operations Report should be disclosed to plaintiffs subject to the Protective Orders.

### e. Critical Mass Bike Block Demonstration PowerPoint

Having reviewed the entirety of the Bike PowerPoint, and the parties' submissions regarding that item, the Court finds no clear error in Judge Francis's determination that the Bike PowerPoint was not subject to the law enforcement privilege and, therefore, should be produced to plaintiffs pursuant to the Protective Orders.[15] (*See* April 20 Order at 21-22.) As Judge Francis found, defendants

---

[13] Judge Francis rejected the applicability of the privilege to the redacted portions of the Operations Report for the same reason he offered in addressing the After-Action Report — namely, that they contained "observable facts" relating to the amount and ranks of officers deployed during the RNC. (*See* April 20 Order at 19-20.)

[14] Specifically, the Court finds that Judge Francis correctly determined that the law enforcement privilege did not apply to the following redacted sections of the Operations Report: the first and fourth entries on Bates No. 7222; the fourth entry on Bates No. 7223; and the second entry on Bates No. 7284.

[15] The Court also joins in Judge Francis's assumption that the document labeled "3-Squad Platoon Formations" was, in fact, erroneously submitted to the Court for *in camera* review. (*See* Bates Nos. 26285-26302.) Plaintiffs do not appear to challenge defendants' assertion of privilege as to this document and, therefore, the Court declines to modify or to set aside Judge Francis's determination that the item should not be produced to plaintiffs. (*See* April 20 Order 21 n.6.)

have failed to make any showing that the "particular [demonstration] route [at issue in the Report] has been used by [demonstrators] since the RNC, or that they are likely to use it again" in the future. (April 20 Order at 21.)

### 3. Information Relating to Undercover Officers

Finally, defendants assert that Judge Francis committed clear error in finding that the following information was not shielded from disclosure by the law enforcement privilege: (1) deposition testimony regarding the presence and activities of undercover officers at RNC-related demonstrations, and (2) information relating to the identities of undercover officers who may have knowledge of the events underlying plaintiffs' claims. (Defs.' Obj. at 7-11.) For the following reasons, the Court rejects defendants' objections and adopts Judge Francis's rulings on these issues in their entirety.

### a. Deposition Testimony Regarding the Presence and Activities of Undercover Officers

The Court finds no clear error in Judge Francis's determination that the law enforcement privilege did not apply to deposition testimony regarding the "presence and activities of undercover officers at RNC-related demonstrations." (*See* April 20 Order at 23.) Indeed, the Court concurs with Judge Francis's ruling that defendants have failed to discharge their initial burden on this issue.

The following assertion by Chief Graham comprises the entirety of defendants' showing as to the purported "harm" likely to arise from disclosure of this information: "Plaintiffs

should not have knowledge of whether undercover or plainclothes officers are used during certain types of events because confirmation of this information will defeat the element of uncertainty, which itself deters criminal activity." (Graham Decl. ¶ 11.) This conclusory assertion fails to establish that any *specific* harm to ongoing and/or future undercover investigations is likely to arise from disclosure of the information at issue, and, thus, is plainly insufficient to discharge defendants' initial burden of "explain[ing] the reasons for nondisclosure with particularity." *King*, 121 F.R.D. at 189. Indeed, defendants' assertion appears to be inadequate to "meet even the most liberal definition of [its] burden of proof" in asserting the law enforcement privilege. *See S.E.C. v. Thrasher*, No. 92 Civ. 6987 (JFK), 1995 WL 46681, at *11 (S.D.N.Y. Feb. 7, 1995) (internal citations omitted). Thus, on the current record before the Court, Judge Francis accurately observed that "[i]t is difficult to imagine how disclosure of whether undercover officers were present at specific demonstrations more than two years ago will do anything . . . to eliminate the element of uncertainty" relating to the use or non-use of undercover officers at events going forward.[16] (April 20 Order at 22.)

---

[16] In rejecting the existence of the law enforcement privilege as it applied to this line of questioning, Judge Francis noted that the presence of undercover NYPD officers at political demonstrations had previously been referenced in two publically available newspaper articles. (*See* April 20 Order at 22 (citing Jim Dwyer, *Police Memos Say Arrest Tactics Calmed Protests*, N.Y. Times, March 17, 2006, at A1 (noting that portions of "five internal reports made public . . . as part of a lawsuit" contain statements by NYPD officials regarding the previous use of undercover officers at political demonstrations related to the World Economic Forum in New York City in 2002); and Jim Dwyer, *New York Police Covertly join in at Protest Rallies*,

Accordingly, it was not clear error for Judge Francis to reject the existence of the law enforcement privilege and to compel deposition testimony, subject to the provisions of the Protective Orders, regarding the presence and activities of undercover officers at RNC-related demonstrations.

Defendants cite *MacWade v. Kelly*, 230 F.R.D. 379, 382 (S.D.N.Y. 2005), in support of their assertion that a law enforcement official's declaration, by itself, is sufficient to establish that the disclosure of previously non-public information would "harm" defendants' ability to maintain the "element of uncertainty" in law enforcement operations going forward. (*See* Defs.' Obj. at 10.) However, the holding in *MacWade* does not control the privilege inquiry in this case. There, the court set aside the magistrate judge's order compelling the production of statistics "relating to the frequency and location of searches" conducted as part of a "Subway Search Program." 230 F.R.D. at 380. The court relied on several errors made by the magistrate judge, including his failure to conduct an *in camera* review of the items at issue, the seemingly arbitrary selection of the items to be produced, the apparent lack of relevance of the items to the plaintiff's claims, and the absence of a "substantial need" by the plaintiff for the items at issue, at least compared to the "significant potential danger" demonstrated by the defendants that was likely to arise from disclosure of the items. *See id.* at 380-83 (internal quotation marks and citations omitted).

In this case, by contrast, Judge Francis has conducted a careful and thorough review of the record as well as the parties' submissions, and determined, as discussed *supra*, that defendants have failed to make a substantial threshold showing that there are specific harms likely to arise from disclosure of the information at issue.

Moreover, even assuming *arguendo* that defendants had discharged their initial burden regarding the existence of the law enforcement privilege, it is clear that, on the basis of the current record before the Court, plaintiffs' interests in disclosure of the information outweigh defendants' interests in non-disclosure, and, therefore, Judge

N.Y. Times, Dec. 22, 2005, at A1 ("[T]he Police Department's chief spokesman, Paul J. Browne, did not dispute that [videotapes of political demonstrations, including certain RNC-related demonstrations,] showed officers at work but said that disguised officers had always attended such gatherings — not to investigate political activities but to keep order and protect free speech."). ) Notwithstanding the reported statements of the NYPD's spokesman regarding the use of undercover officers, defendants maintain that the "wholly speculative" assertions contained in these articles "were never confirmed by . . . the police department . . . and cannot be considered to be definitive admissions by the NYPD regarding the use of undercover officers . . . ." (Defs.' Obj. at 8.) The Second Circuit has held that, "when facts or opinions found in . . . secondary sources are disputed, it is error to accept the data (however authentic) as evidence, at least without affording an opposing party the opportunity to present information which might challenge the fact or the propriety of noticing it." *Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070, 1086 (2d Cir. 1982), *overruled on other grounds by City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 217-221 (2005). Thus, at this stage of the instant case, because defendants dispute the accuracy of the articles relied on by Judge Francis, it is contrary to law to take judicial notice of the articles for the truth of the matters asserted therein. Nevertheless, because Judge Francis's ruling on this issue is correct even absent his reliance on the articles, this Court declines to set aside his ruling for the reasons discussed herein.

Francis's ultimate determination on this issue was not clearly erroneous. First, the information sought by plaintiffs is plainly relevant to plaintiffs' claims. Specifically, because plaintiffs' claims directly relate to the events surrounding their arrests, and to the NYPD's arrest and arrest processing policies during the RNC, the discovery of information regarding the identity of undercover officers who may have been present at the time of such arrests appears, at a minimum, to be "reasonably calculated" to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1).

Second, defendants have failed to articulate a colorable interest weighing against the limited disclosure — that is, limited by the provisions of the Protective Orders — of information relating to the historical presence and activities of undercover officers at RNC-related demonstrations. In other words, defendants have failed to articulate some non-conclusory basis in support of their assertion that the limited disclosure of such information would likely pose a risk to, for example, the safety of law enforcement personnel and/or the integrity of ongoing criminal investigations, particularly where this information may be designated, pursuant to the Protective Orders, as "confidential" intelligence information subject to an "attorneys' eyes only" restriction. *See id.* at 191. Thus, although information regarding at least some of plaintiffs' arrests is available from alternative sources — such as through depositions of other, non-undercover officers — the Court finds that the interests at issue here favor disclosure of the information.

Accordingly, even assuming *arguendo* that defendants had discharged their initial burden, defendants have failed to discharge their burden at the balancing test stage of the privilege analysis, and, therefore, Judge Francis did not commit clear error in compelling deposition testimony regarding the presence and activities of undercover officers at RNC-related demonstrations.

b. The Identities of Undercover Officers

Judge Francis determined that plaintiffs should be permitted to discover information regarding the identities of undercover officers, subject to strict limitations on the substance and scope of such disclosures, in the hope of deposing such officers at a later date. For the following reasons, the Court affirms that portion of the April 20 Order permitting plaintiffs "to discover the identities of undercover officers" who had "witnessed, participated in, or provided information for [plaintiffs'] arrest[s] and detention[s]." (April 20 Order at 23.)

Judge Francis made no specific finding as to whether defendants had established the applicability of the law enforcement privilege to information regarding the identities of undercover officers. Rather, Judge Francis *initiated* his discussion of this issue by conducting a balancing analysis of the parties' interests in disclosure — weighing both the relevance of such information and the curative effects of the Protective Orders in this case (*see* April 20 Order at 22-23) — thus implicitly indicating that defendants had satisfied their threshold burden of showing that the privilege applied to the information at issue. *Cf. Sec. & Exch. Comm'n v. Credit Bancorp, Ltd.*, 386 F.3d 438, 452 (2d Cir. 2004) (affirming a district court's order on the basis of the district court's "implicit finding").

Indeed, based on the record before the Court, it is clear that defendants made a sufficient threshold showing that disclosure of the identities of undercover officers would create a risk of harm to the personal safety of such officers and to ongoing investigations involving such officers. *See In re Dep't of Investigation of City of New York*, 856 F.2d at 484. Specifically, Chief Graham asserted that "[t]he identities of undercover officers cannot be revealed because, once known, undercover officers will no longer be able to effectively conduct their duties in an anonymous capacity of detecting criminal activity and apprehending criminals. Disclosure . . . undermines the [NYPD's] ability to utilize that officer . . . in an undercover capacity [] and poses a significant safety risk to that officer, should it become known that he/she is a member of the NYPD." (Graham Decl. ¶ 10.)

Defendants now argue that, in ordering disclosure of the information at issue notwithstanding the applicability of the privilege, Judge Francis failed to "give appropriate weight" to the harms identified by defendants. (Defs.' Mem. at 10.) For the following reasons, the Court adopts, in its entirety, Judge Francis's determination that plaintiffs are entitled to seek discovery of the information at issue — subject to certain restrictions identified by Judge Francis — because their interest in the limited disclosure of such information outweighs defendants' interest in non-disclosure. (*See* April 20 Order at 23.)

Among the factors favoring disclosure, it is clear that (1) the information sought is highly relevant to plaintiffs' case, in that identifying and deposing such officers may

enable plaintiffs to obtain additional evidence regarding the events underlying plaintiffs' claims, *see, e.g.*, *Daval Steel Prods.*, 951 F.2d at 1367; (2) the materials are "important" to plaintiffs' case, in that the undercover officers are likely to be the *sole* source of information regarding their own activities during RNC-related demonstrations and how their activities related, if at all, to plaintiffs' respective arrests and detentions; and (3) "the strong public interest in uncovering . . . civil rights violations," if any, favors permitting plaintiffs to obtain discovery relating to the identities of the undercover officers, *Nat'l Congress*, 194 F.R.D. at 96 (internal citation omitted).

Thus, plaintiffs have a compelling interest in the discovery of information regarding the identity of undercover officers who may have information relevant to plaintiffs' claims. At the same time, however, defendants correctly point out that they have a strong interest in preventing the public disclosure, and limiting the non-public disclosure, of the names and personal information of such officers, both to ensure the officers' personal safety and to maintain the integrity of ongoing investigations utilizing the officers. *See Vodak v. City of Chicago*, No. 03 Civ. 2463 (NRN), 2004 WL 2032147, at *5 (N.D. Ill. Sept. 9, 2004) (ordering the Chicago Police Department to disclose certain internal files, but to redact the "names of all undercover intelligence officers as well as any identifying information contained in the files" in deference to the Department's "valid interest in preserving the anonymity of undercover intelligence officers"); *United States v. Orena*, 883 F. Supp. 849, 868 (E.D.N.Y. 1996) (finding that the law enforcement privilege applies to documents that "would reveal the

names . . . of law enforcement officers").; *Jimenez v. F.B.I.*, 938 F.Supp. 21, 31 (D.D.C. 1996) (finding that a federal law enforcement agency properly redacted the names of undercover officers from its records on the ground that "[i]t is in the public interest not to disclose the identity of special agents so that they may continue to effectively pursue their undercover and investigative assignments").

In light of these competing interests, the Court can identify no clear error in Judge Francis's adoption of certain protective measures relating to the disclosure of the information at issue. Specifically, the Court affirms Judge Francis's directions that, notwithstanding the existence of the law enforcement privilege, (1) plaintiffs may seek to discover the identities of undercover officers that witnessed, participated in, or provided information relating to the arrests and/or detentions of plaintiffs; (2) defendants may designate any information responsive to such discovery requests as confidential intelligence items, which are subject to an attorneys' eyes-only restriction; and (3) if defendants determine that the disclosure of any such information would pose a risk to the personal safety of an undercover officer or to an ongoing investigation by the NYPD, defendants may seek an order permitting them to identify any such officer solely by his or her "shield number" or with a pseudonym, as well as any additional protective measures that, in defendants' view, should be adopted by the Court. (*See* April 20 Order at 23.)

Finally, the Court notes the limited nature of the instant ruling — it merely permits plaintiffs to obtain information identifying, in some manner, undercover officers who witnessed, participated in, or provided information relating to the arrests and/or detentions of plaintiffs. This Order has no bearing on other, related issues, such as the protective measures that should be employed at the depositions, if any, of such officers.

## IV. CONCLUSION

For the foregoing reasons, the Court modifies in part and adopts in part Judge Francis's findings in the April 20 Order.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March *31*, 2008
New York, New York

\*\*\*

Plaintiffs are represented by Jonathan C. Moore, Esq., Claire Norins, Esq., and Rachel M. Kleinman, Esq., of Beldock Levine & Hoffman LLP, 99 Park Avenue, New York, New York 11501. Defendants are represented by Peter G. Farrell, Esq., James Mirro, Esq., and Tonya Jenerette, Esq., Assistant Corporation Counsel, and Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, 100 Church Street, New York, New York 10007.

29