UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————

№ 04 Civ. 9216 (RJS) (JCF)

—————————

DEIRDRE MACNAMARA, *et al.*,

Plaintiffs,

VERSUS

CITY OF NEW YORK, *et al.*,

Defendants.

—————————

OPINION AND ORDER
May 19, 2011

—————————

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 5/19/2011

RICHARD J. SULLIVAN, District Judge:

Plaintiffs are a group of 24 individuals who were arrested by the New York City Police Department (the "NYPD") in connection with a series of protests held during the 2004 Republican National Convention (the "RNC"). Plaintiffs bring this putative class action against Defendants the City of New York (the "City") and numerous New York City officials and police officers, alleging violations of their rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as various state law claims. Specifically, Plaintiffs contend that Defendants subjected them to indiscriminate mass arrests without individualized probable cause, unreasonably prolonged detention, and cruel and inhumane confinement conditions.

Before the Court is Plaintiffs' motion to certify three classes, one of which comprises eight subclasses, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. For the reasons that follow, Plaintiffs' motion for class certification is granted in part and denied in part.

I.   BACKGROUND[1]

This action is part of a larger group of cases relating to mass protests that occurred immediately prior to and during the RNC, which was held at Madison Square Garden from August 30, 2004 to September 2, 2004. These cases have been assigned to this Court as related and consolidated for discovery

---

[1] The following facts are derived from the allegations in the Second Amended Complaint ("SAC"), which the Court accepts as true in considering a motion for class certification. *See Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978).

purposes.  Because the Court presumes the parties' familiarity with the facts and procedural history of this action, the Court will briefly recite only those facts necessary to the resolution of the instant motion.

### A.  Parties

Plaintiffs bring this action individually and on behalf of approximately 1,800 individuals who were arrested immediately prior to or during the RNC.  (SAC ¶ 1.)  The proposed Mass Arrest Subclasses include all persons arrested during the Class Period at eight specified locations, dates, and times.  (*Id.* ¶ 52(a).)  The proposed Excessive Detention Class includes all persons arrested during the Class Period who were processed pursuant to the RNC Mass Arrest Processing Plan ("MAPP") and detained at Pier 57.  (*Id.* ¶ 52(b).)  The proposed Conditions of Confinement Class includes all persons arrested during the Class Period who were handcuffed with plastic flex cuffs and detained at Pier 57.  (*Id.* ¶ 52(c).)

Defendants include the City; Mayor Michael Bloomberg; NYPD Commissioner Raymond Kelly; Assistant Chief Terence Monahan; Inspector Thomas Galati ("Galati"); and various named and unnamed New York City officials and police officers (collectively, "Defendants").

### B.  Facts

Months before the scheduled start of the RNC, Defendants were aware that numerous political demonstrations were planned to coincide with the Convention.  (*Id.* ¶ 63.)  In anticipation of the expected volume of protest activity, the City began to prepare for any arrests and prosecutions that might follow the RNC demonstrations.  (*Id.* ¶ 65.)  Plaintiffs allege that the contingency plans and arrest procedures developed by the

NYPD were designed to discourage political protest and slow down the processing of individuals arrested during the RNC in order to maximize the amount of time the arrestees would be held in detention.  (*Id.* ¶ 67.)

#### 1.  Mass Arrests

During the RNC, Defendants allegedly employed an indiscriminate mass arrest policy to arrest large groups of people who were engaging in protected First Amendment activity, observing such activity, or simply passing by at the time of the arrests.  (*Id.* ¶ 72.)  The alleged policy involved, *inter alia*, the use of mesh netting or lines of police officers to corral large groups of protestors or perceived protestors; failure to distinguish bystanders, media personnel, and legal observers from the corralled groups prior to effecting arrests; failure to give dispersal orders that were audible to prospective arrestees; and failure to provide a reasonable opportunity to disperse.  (*Id.* ¶ 73.)  Plaintiffs allege that they were subjected to the mass arrest policy at the following locations:

##### a.  Mass Arrest Subclass One

On August 27, 2004, on Seventh Avenue between 34th and 35th Streets, between 6:30 p.m. and 9:30 p.m., the NYPD arrested individuals who were or were perceived to be participating in a monthly bike event known as "Critical Mass."  (*Id.* ¶¶ 52(a), 74(A).)  To effectuate these arrests, Defendants used mesh nets and lines of police officers on foot or on scooters to trap and arrest groups of cyclists.  (*Id.* ¶ 74(A).)  Plaintiffs allege that the arrestees were given no dispersal order or meaningful opportunity to disperse.  (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Michael Binder, a cyclist who was arrested at the intersection of Seventh Avenue and 35th Street. (*Id.* ¶¶ 116-17.) While stopped at a red light, Binder observed NYPD officers arresting a number of cyclists and pulled out his camera to take a photograph of the intersection. (*Id.* ¶¶ 117-18.) As soon as Binder had taken the photograph, Defendants removed him from his bicycle, forced him to the ground, and handcuffed him. (*Id.* ¶ 119.) Binder was thereafter detained for approximately 16-20 hours. (*Id.* ¶ 116.)

### b. Mass Arrest Subclass Two

On August 27, 2004, on 35th Street between Tenth Avenue and Dyer Avenue, between 8:00 p.m. and 11:00 p.m., the NYPD arrested individuals who were or were perceived to be participating in the Critical Mass bike event. (*Id.* ¶¶ 52(a), 74(A).) Defendants allegedly effectuated the arrests at this site by trapping cyclists between two lines of police officers. (*Id.* ¶ 74(B).) Plaintiffs allege that the arrestees were given no dispersal order or meaningful opportunity to disperse. (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Elizabeth Fleischman, a Critical Mass cyclist who was arrested on 35th Street between Tenth Avenue and Dyer Avenue. (*Id.* ¶¶ 141-42.) After directing Fleischman and other cyclists onto 35th Street, NYPD officers barricaded the entrances and exits at both 10th Avenue and Dyer Avenue, thereby preventing the Critical Mass cyclists from leaving the scene. (*Id.* ¶ 143.) Fleischman was arrested, handcuffed, and transported to the detention facility at Pier 57, where she was detained for approximately 20 hours. (*Id.* ¶¶ 141, 143.)

### c. Mass Arrest Subclass Three

On August 27, 2004, on Second Avenue between 9th and 10th Streets, between 8:00 p.m. and 11:00 p.m., the NYPD arrested individuals who were or were perceived to be participating in the Critical Mass bike event. (*Id.* ¶¶ 52(a), 74(A).) Plaintiffs allege that the arrestees at the Second Avenue site were given no dispersal order or meaningful opportunity to disperse. (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Randall Steketee, who was arrested near the intersection of Second Avenue and 10th Street while riding his bike home from a play. (*Id.* ¶¶ 74(C), 195.) Steketee rode to the intersection of Second Avenue and 9th Street to observe the crowd, but found his path blocked by a row of police officers when he attempted to leave. (*Id.* ¶ 196.) Although Steketee explained that he was not participating in any protest or demonstration, he was arrested, handcuffed, and transported to Pier 57, where he was detained for approximately 33 hours. (*Id.* ¶¶ 195-97, 199.)

### d. Mass Arrest Subclass Four

On August 29, 2004, on 37th Street between Seventh Avenue and Broadway, between 12:00 p.m. and 3:00 p.m., the NYPD arrested individuals who were riding bikes, rollerblading, or walking in the vicinity. (*Id.* ¶¶ 52(a), 74(E).) Once again, Plaintiffs allege that NYPD officers used mesh nets and police lines to surround the arrestees and failed to provide a meaningful opportunity to disperse prior to making the arrests. (*Id.* ¶ 74(E).)

Among those arrested was Plaintiff Carolyne Ali-Khan, who was arrested near the intersection of 37th Street and Broadway

while she was rollerblading in the area. (*Id.*
¶¶ 100-01.)   Ali-Khan and a group of
cyclists were penned in by NYPD officers,
ordered onto the sidewalk, and placed under
arrest. (*Id.* ¶¶ 101-02.) Ali-Khan was then
handcuffed and transported to Pier 57,
where she was detained for approximately
28-29 hours. (*Id.* ¶¶ 100, 102-03.)

### e. Mass Arrest Subclass Five

On August 31, 2004, on Fulton Street
between Church Street and Broadway,
between 4:00 p.m. and 7:00 p.m., the NYPD
arrested more than 200 individuals who
were or were perceived to be participating in
a march organized by the War Resisters
League (the "WRL"). (*Id.* ¶¶ 52(a), 74(F).)
Following negotiations between the
demonstrators and various NYPD officers,
Inspector Galati announced that the march
would be permitted so long as participants
did not block traffic and obeyed traffic
signals at all intersections. (*Id.* ¶ 74(F).)
The march had proceeded for less than a
block when NYPD officers halted the
demonstration, surrounded more than 200
people with mesh nets, and placed them
under arrest. (*Id.*) Plaintiffs allege that the
arrestees were not given reasonably audible
dispersal orders or a meaningful opportunity
to disperse. (*Id.*)

Among those arrested were Plaintiffs
Simon Harak, Diana Raimondi, and William
Steyert, Jr., who had attended a vigil at the
World Trade Center site before joining the
WRL march. (*Id.* ¶¶ 74(F), 156-58, 186-87,
201-02.) Harak was thereafter detained for
approximately 20-25 hours (*id.* ¶ 156),
Raimondi for approximately 50-52 hours
(*id.* ¶ 186), and Steyert for approximately
16-17 hours (*id.* ¶ 201).

### f. Mass Arrest Subclass Six

On August 31, 2004, on 16th Street
between Union Square East and Irving
Place, between 7:00 p.m. and 10:00 p.m.,
the NYPD arrested individuals who were
participating in, observing, or standing in the
vicinity of a march that began in Union
Square Park. (*Id.* ¶¶ 52(a), 74(G).) At the
direction of NYPD officers, the
demonstrators turned east onto 16th Street,
where they were barricaded by a line of
police officers who refused to allow them to
exit. (*Id.* ¶ 74(G).) Everyone trapped on
that block of 16th Street – including
protestors, observers, and bystanders – was
placed under arrest. (*Id.*) Plaintiffs allege
that the arrestees were given no dispersal
order or meaningful opportunity to disperse.
(*Id.*)

Among those arrested were Plaintiffs
Erika Biddle, Sonia Chandra, Emily
Friedman, Deepa Majmudar, Celine
Malanum, and Danielle Walsh. (*Id.*) Biddle
was thereafter detained for approximately
50-52 hours (*id.* ¶ 110); Chandra for
approximately 35-40 hours (*id.* ¶ 123);
Friedman for approximately 45-50 hours (*id.*
¶ 146); Majmudar for approximately 45-50
hours (*id.* ¶ 177); Malanum for
approximately 35-40 hours (*id.* ¶ 182); and
Walsh for approximately 48 hours (*id.*
¶ 218).

### g. Mass Arrest Subclass Seven

On August 31, 2004, on 17th Street
between Fifth Avenue and Broadway,
between 8:00 p.m. and 10:00 p.m., the
NYPD arrested a group of individuals that
included both protestors en route to the
"Free Speech Zone" at Madison Square
Garden and bystanders who happened to be

4

in the vicinity.[2]  (*Id.* ¶¶ 52(a), 74(H).)  At the direction of NYPD officers, these individuals turned west onto 17th Street, where they were stopped by a police line in full riot gear and told they could go no further.  (*Id.* ¶¶ 74(H), 171.)  After complying with orders to form a line and then move to the sidewalk, they were surrounded by police officers and arrested. (*Id.* ¶ 74(H).)  Plaintiffs allege that the arrestees were neither ordered to disperse nor advised that they were in violation of any New York law or ordinance.  (*Id.*)

Among those arrested were Plaintiff Dierdre MacNamara, who was in the area after browsing at the Barnes & Noble bookstore in Union Square (*id.* ¶¶ 170-71), and Plaintiff Rebecca Stoneback, who had traveled to New York City from her home in Asbury, New Jersey to participate in the RNC demonstrations (*id.* ¶¶ 205-06).  Both MacNamara and Stoneback were handcuffed, transported to Pier 57, and detained for approximately 45-50 hours. (*Id.* ¶¶ 170-75, 205-08.)

### h.  Mass Arrest Subclass Eight

On August 31, 2004, on 35th Street between Fifth and Sixth Avenues, between 7:00 p.m. and 10:00 p.m., the NYPD arrested individuals who were participating in, observing, or standing in the vicinity of a march proceeding west on 35th Street.  (*Id.* ¶¶ 52(a), 74(J).)  As these individuals traveled along 35th Street, they were stopped by a police line and told they could go no further.  (*Id.* ¶ 74(J).)  When they turned around to leave, they were blocked by another line of police officers on scooters

and then arrested.  (*Id.*)  Plaintiffs allege that the arrestees were given no dispersal order and no meaningful opportunity to disperse. (*Id.*)

Among those arrested were Plaintiff Jason Barrus, an RNC protestor (*id.* ¶¶ 105-06);  Plaintiff Shahrzad Ghahremani-Ghadjar, a 15-year-old on her way to a movie theater (*id.* ¶¶ 151-52); and Plaintiff William Hobbs, a real estate agent on his way home from work (*id.* ¶¶ 165-66). Barrus was thereafter detained for 46 hours (*id.* ¶ 105), Ghahremani-Ghadjar for approximately four hours (*id.* ¶ 151), and Hobbs for approximately 36 hours (*id.* ¶ 165).

### 2.  Excessive Detention

Plaintiffs further allege that Defendants implemented policies and practices designed to detain the RNC arrestees for unnecessary and prolonged periods of time in order to prevent them from participating in further demonstration or protest activity during the RNC.  (*Id.* ¶ 91.)  The alleged policies included, *inter alia*, (1) a "no summons" policy requiring custodial arrest for all RNC arrestees, no matter how minor the infraction (*id.*); (2) a blanket fingerprinting policy for RNC arrestees, despite the fact that the "overwhelming majority" were detained only on minor violations for which fingerprinting is not typically required (*id.* ¶¶ 91, 93);[3] (3) the use of a post-arrest staging facility without fingerprinting equipment (*id.* ¶¶ 91-92); and (4) the practice of requiring completed criminal background checks from both the New York

---

[2] Defendants had "set up a 24-hour demonstration zone on Eighth Avenue, just a few blocks south of the convention site at Madison Square Garden, open to anyone wishing to protest any issue."  (Defs.' Sur-Reply 4.)

[3] "New York Criminal Procedure Law § 160.10 does not require an arrestee accused of committing a violation to be fingerprinted prior to release from custody with a summons or a Desk Appearance Ticket, unless the arrestee lacks valid identification." (SAC ¶ 93.)

State Division of Criminal Justice Services and the Federal Bureau of Investigation prior to arraignment (*id.* ¶ 91). Plaintiffs allege that these and similar procedures unnecessarily and unreasonably extended the period of time the RNC arrestees spent in custody. (*Id.*)

### 3. Conditions of Confinement

Finally, Plaintiffs allege that Defendants implemented policies and practices designed to detain RNC arrestees in cruel and inhumane conditions both at the arrest sites and at Pier 57. (*Id.* ¶¶ 76-77.) During the mass arrests described above, Plaintiffs were handcuffed with plastic flex cuffs and remained in handcuffs for hours thereafter as they awaited transport to Pier 57. (*Id.* ¶ 89.) In some cases, the arrestees remained in handcuffs even after they arrived at the detention facility. (*Id.*) Numerous Plaintiffs allege that the excessively tight and prolonged handcuffing caused extreme pain, discomfort, numbness, bruising, and discoloration. (*See, e.g., id.* ¶¶ 103, 108, 113, 125, 130.)

Plaintiffs were then transported to the "Post Arrest Staging Site" at Pier 57, an empty storage facility on the west side of Manhattan that had previously been used to house City buses. (*Id.* ¶ 77.) Defendants had entered an agreement to use Pier 57 as a detention center during the RNC on July 28, 2004 – a month before the start of the Convention. (*Id.* ¶ 78.) Although recent environmental reports on the facility had identified the presence of asbestos, the prevalence of oily waste on the concrete floors, and code deficiencies with the electrical, plumbing, and fire protection systems, Defendants failed to undertake an environmental review of the premises or obtain a certificate of occupancy. (*Id.* ¶¶ 77-78.) Instead, Defendants prepared Pier 57

for use as a detention facility by constructing holding cells using chain-link fence topped with razor wire. (*Id.* ¶ 79.)

Upon arrival at Pier 57, Plaintiffs were searched, their property was confiscated, and they were placed in the makeshift holding cells. (*Id.* ¶ 80.) Because there were not enough benches in each cell, many arrestees were forced to sit in the "oily filth" on the floor, and in some cases developed rashes and blisters as a result. (*Id.* ¶ 82.) Due to the poor air quality, many arrestees developed stinging eyes and coughs or breathing difficulties. (*Id.*) Because the restroom facilities at Pier 57 were "grossly inadequate," arrestees were also required to wait in line for many hours to use the portable lavatories put in place for the RNC. (*Id.* ¶ 85.)

In addition to their complaints about the physical conditions at Pier 57, Plaintiffs claim that Defendants denied or ignored their requests for medical attention and access to medication (*id.* ¶ 82); access to telephones (*id.* ¶ 84); and access to attorneys (*id.* ¶ 86). Plaintiffs further allege that Defendants harassed, humiliated, embarrassed, and, in one instance, sexually harassed the RNC arrestees. (*Id.* ¶¶ 87-88, 184.)

### C. Procedural History

Plaintiffs commenced this action by filing a Complaint in the Southern District of New York on November 22, 2004. By Order filed September 21, 2005, this action was consolidated with 43 other cases – involving approximately 226 named plaintiffs – related to RNC protest and arrest activity. The consolidated cases were referred to the Honorable James C. Francis, Magistrate Judge, for discovery purposes. Plaintiffs filed an Amended Complaint on

July 15, 2005, an initial motion for class certification on January 31, 2007,[4] and a further motion to amend on August 27, 2007. The case was reassigned to my docket on October 2, 2007.

Judge Francis granted partial leave to amend by Order dated January 23, 2008, and Plaintiffs filed a Second Amended Complaint (the "SAC") on January 29, 2008. The SAC primarily alleges violations of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, but also includes facial and as-applied challenges to New York City Administrative Code § 10-110 and New York Penal Law § 240.20(5)-(6), as well as supervisory liability, *respondeat superior*, and pendent state law claims. The parties filed supplemental briefs tailoring the outstanding class certification motion to the SAC. The supplemental briefs were fully submitted on March 7, 2008.[5]

By Order dated March 16, 2010, the Court denied the motion for class certification without prejudice to renewal in light of the petition for a writ of mandamus

then pending before the Second Circuit regarding the disclosure of confidential NYPD intelligence documents prepared for the RNC.[6] Plaintiffs thereafter renewed their motion, and the Court held oral argument on May 21, 2010. By letter dated May 3, 2011, counsel in two related RNC cases indicated that fact discovery in all consolidated RNC cases would conclude within the next several weeks. By endorsement dated May 9, 2011, Judge Francis ordered the parties in all consolidated RNC cases to appear for a discovery conference on May 26, 2011.

## II. LEGAL STANDARDS

Rule 23 of the Federal Rules of Civil Procedure governs class certification. In order to proceed as a class action, the proposed class must meet the following Rule 23(a) prerequisites:

> (1) [T]he class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 98-99 (2d Cir. 2007). If the Rule 23(a) criteria are satisfied, the proposed class must also qualify under at least one of the categories provided in Rule 23(b) before it may be certified as a class action. *See Cordes*, 502 F.3d at 104. In this

---

[4] By Order dated February 1, 2007, Judge Karas denied the motion for class certification without prejudice because "[t]he parties were directed to file the motion papers electronically only when the motion has been fully briefed." (Doc. No. 128.) Thus, although Plaintiffs' Notice of Motion is dated January 31, 2007, the motion papers were electronically filed on July 20, 2007.

[5] In ruling on the instant motion, the Court has considered Plaintiffs' Memorandum of Law in Support of Class Certification ("Pls.' Mem."); Defendants' Memorandum of Law in Opposition to Class Certification ("Defs.' Opp'n"); Plaintiffs' Reply Memorandum of Law in Support of Class Certification ("Pls.' Reply"); Defendants' Memorandum of Law in Further Opposition to Class Certification ("Defs.' Sur-Reply"); and Plaintiffs' Memorandum of Law in Further Support for Class Certification ("Pls.' Sur-Reply").

[6] The Second Circuit granted the writ of mandamus in an opinion dated June 9, 2010. *In re City of N.Y.*, 607 F.3d 923 (2d Cir. 2010).

case, Plaintiffs seek certification under Rules 23(b)(2) and 23(b)(3).  (Pls.' Mem. 1.)

Each of the Rule 23 requirements must be satisfied by a preponderance of the evidence, *see Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008), and the burden to prove each element is on the party seeking certification, *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). In order to certify a class, the Court must "resolve[] factual disputes relevant to each Rule 23 requirement" and find that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). Although Rule 23 requirements may overlap with merits issues, "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Id.* Moreover, the district court is afforded broad discretion in class certification questions due to the fact that "the district court is often in the best position to assess the propriety of the class  [action] and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).

## A.  Rule 23(a) Requirements

As previously noted, a proposed class must satisfy the following four prerequisites in order to qualify for class certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  *See* Fed. R. Civ. P. 23(a); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007).

### 1.  Numerosity

Under the first prong of Rule 23(a), a plaintiff must establish that the proposed class is "so numerous that joinder of each member is impracticable."  Fed. R. Civ. P. 23(a).  "Impracticable does not mean impossible." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).  Rather, "[i]mpracticability exists where individual adjudication would take an extended period of time," *Savino v. Computer Credit, Inc.*, 173 F.R.D. 346, 351 (E.D.N.Y. 1997), and "[j]oinder of all claims into one proceeding would be expensive, time-consuming, and logistically unfeasible," *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir. 1992).

Courts will generally find that the numerosity requirement is satisfied when a class comprises 40 or more members, *see Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), and not satisfied when the class comprises 21 or fewer, *see Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998).  In deciding numerosity, particularly in the "gray area" between these parameters, courts must consider factors other than class size.  *See id.*  Those additional factors include (1) the judicial economy of avoiding multiple suits; (2) the geographic dispersion of the proposed class members; (3) the financial resources of the proposed class members; (4) the ability of the proposed class members to file individual suits; and (5) requests for prospective injunctive relief which would involve future class members. *See Robidoux*, 987 F.2d at 936.

### 2.  Commonality

"The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Cent. States*,

8

504 F.3d at 245 (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). "Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008) (Lynch, J.) (quotation marks and alterations omitted). "A single common issue of law may be sufficient to satisfy the commonality requirement" where the common question is "at the core of the cause of action alleged." *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 155 (S.D.N.Y. 2010) (internal citations and quotation marks omitted).

### 3. Typicality

The typicality prong of Rule 23(a) requires that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux*, 987 F.2d at 936)). A plaintiff's claims are typical of the class claims "where the plaintiff's and the class members' 'injuries derive from a unitary course of conduct by a single system.'" *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 337 (S.D.N.Y. 2010) (quoting *Marisol A.*, 126 F.3d at 377). However, "[t]he typicality criterion does *not* require that the factual predicate of each claim be identical to that of all class members." *Shakhnes ex rel. Shakhnes v. Eggleston*, 740 F. Supp. 2d 602, 625 (S.D.N.Y. 2010) (internal citations and quotation marks omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations

in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37.

"The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate [the] analysis' of both." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A.*, 126 F.3d at 376); *see Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Although the Court will consider the two requirements separately, both inquiries "serve as guideposts" for the class certification inquiry. *Falcon*, 457 U.S. at 157 n.13.

### 4. Adequacy

Finally, Rule 23(a) requires class representatives who "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In order for a class representative to meet the adequacy requirement, "the class members must not have interests that are antagonistic to one another," *Brown*, 609 F.3d at 479 (internal citation and quotation marks omitted), and class counsel must be "qualified, experienced, and able to conduct the litigation," *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. "In order to defeat a motion for certification, however, the conflict must be fundamental." *In re Flag Telecom Holdings*, 574 F.3d at 35 (internal quotation marks and citation omitted).

### B. Rule 23(b)(2) Requirements

Under Rule 23(b)(2), plaintiffs seeking class certification must also show that "the party opposing the class has acted or refused

to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Thus, "[t]he (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 162 (2d Cir. 2001). Although "the text of Rule 23(b)(2) is silent as to what extent – if at all – monetary relief may also be sought," *id.*, the advisory committee's note indicates that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages," Fed. R. Civ. P. 23(b)(2) advisory committee's note (1966).

In *Robinson v. Metro-North Commuter Railroad Company*, the Second Circuit adopted an ad hoc approach to evaluating predominance for purposes of Rule 23(b)(2). Under the *Robinson* balancing test, the district court should, at a minimum, determine that (1) reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought even in the absence of possible monetary recovery; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. 267 F.3d at 164. "Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id.*

C. Rule 23(b)(3) Requirements

Under Rule 23(b)(3), class certification is appropriate if common questions "predominate over any questions affecting only individual members" and if class resolution "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To alert class members to their right to "opt out," Rule 23 also requires "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see Amchem*, 521 U.S. at 617.

1. Predominance

"As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Brown*, 609 F.3d at 476 (quoting *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006)). "The predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *Cordes*, 502 F.3d 91, 107-08 (internal citation, quotation marks and alterations omitted). Although predominance "is a more demanding criterion than the commonality inquiry under Rule 23(a)," *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002), the mere existence of individualized defenses does not preclude a finding of predominance, *see Brown*, 609 F.3d at 485. "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Id.* at 483 (internal citations and quotation marks omitted).

2. Superiority

"For Rule 23(b)(3) certification to be proper, a class action also must be the most 'fair and efficient' method of resolving this case." *In re Nassau*, 461 F.3d at 230 (citing

10

Fed. R. Civ. P. 23(b)(3)). The superiority analysis requires courts to consider four nonexclusive factors: (1) the interest of the class members in controlling the litigation of separate actions; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

### D. Rule 23(g) Requirements

Rule 23(g) further provides that "a court that certifies a class must also appoint class counsel." Fed. R. Civ. P. 23(g)(1). In doing so, a court must consider the following: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

### III. DISCUSSION

Plaintiffs seek to certify eight Mass Arrest Subclasses, an Excessive Detention Class, and a Conditions of Confinement Class, each comprised of individuals who were arrested and detained by Defendants prior to or during the RNC.[7] In what follows, the Court considers each proposed class in the context of the certification requirements imposed by Rule 23.

### A. Standing

As a preliminary matter, Defendants contend that Plaintiffs lack standing to maintain a class action for (1) injunctive or declaratory relief under Rule 23(b)(2), and (2) First Amendment retaliation claims. Because whether a plaintiff has standing is "the threshold question in every federal case, determining the power of the court to entertain the suit," *In re Gucci*, 126 F.3d 380, 387-88 (2d Cir. 1997) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)), the Court will examine these standing challenges at the outset.

To satisfy constitutional standing requirements, a plaintiff must allege, *inter alia*, that he has suffered an "injury in fact" which is (1) concrete and particularized and (2) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The actual injury requirement is no less applicable to a class action than to other suits. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal citations and quotation marks omitted). Accordingly, if none of the named plaintiffs purporting to represent a class establishes the requisite injury, none may seek class action relief. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

---

[7]  "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5).

### 1.   Declaratory and Injunctive Relief

Under the aegis of Rule 23(b)(2), Plaintiffs seek both a declaratory judgment that the alleged policies, practices, and customs are unconstitutional and a permanent injunction against their continued implementation. (SAC ¶ 5.)  "In order to meet the constitutional minimum of standing to seek injunctive relief, [a plaintiff] must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'"  *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 101-02 (1983)).  In doing so, he "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future."  *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).  Accordingly, "a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent."  *Shain*, 356 F.3d at 216.

Here, Plaintiffs contend that a likelihood of future harm exists because the alleged arrest and detention policies are ongoing, and because several class representatives "plan to attend demonstrations in New York in the future." (Pls.' Reply 37-38.)  To support their assertion of likely future harm, Plaintiffs cite the depositions of RNC arrestees who have indeterminate future plans to participate in New York City protests (*see* Decl. of Clare Norins, July 23, 2007 ("Norins Decl."), Ex. 25, Steyert Tr. at 528:18-529:4) or do not plan "to avoid protest in New York City" (*id.* at Ex. 10, Fleischman Tr. at 367:21-25; *id.* at Ex. 24, Raimondi Tr. at 540:2-9).

Such conclusory allegations are insufficient to establish the likelihood of a future encounter with the NYPD likely to result in unconstitutional arrests and detentions.   That some Plaintiffs *may* participate in future demonstrations of unspecified date, duration, or scope does not translate into a "real and immediate threat of future injury."  *Shain*, 356 F.3d at 215; *see Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen . . . .")  The chain of inferences required to find a sufficient threat of future injury on these facts is "simply too speculative and conjectural to supply a predicate for prospective injunctive relief."  *Shain*, 356 F.3d at 216.  Accordingly, the Court finds that Plaintiffs have failed to demonstrate a likelihood of future harm and therefore lack standing to seek injunctive relief.  Because certification under Rule 23(b)(2) is appropriate only where injunctive or declaratory relief applies to the class as a whole, the Court denies the motion for class certification pursuant to Rule 23(b)(2).

### 2.  First Amendment Claims

Defendants also challenge the First Amendment standing of RNC arrestees who were not engaged in protest activity at the time of their arrests.   Specifically, Defendants note that Plaintiff Steketee of Subclass Three, Plaintiff Ali-Khan of Subclass Four, and Plaintiff Malanum of Subclass Six all testified they were not involved in the demonstrations and were merely passing through the Subclass locations immediately prior to their arrests. (Defs.' Opp'n at 35.)   Because these Plaintiffs "were not engaged in First Amendment activity," Defendants conclude that "they do not have standing to claim that [D]efendants acted in response to their exercise of First Amendment activity." (*Id.*)

What Defendants fail to consider are the First Amendment rights of the audience, which "has a primary interest i[n] having information readily available to it." *Loper v. N.Y. City Police Dep't*, 802 F. Supp. 1029, 1042 (S.D.N.Y. 1992). Because the First Amendment "protects and promotes" the interests of the audience as well as the speaker, *id.*, Plaintiffs who were present as observers of a political protest fall within the ambit of constitutional protection. In this case, Plaintiffs Steketee and Malanum were arrested while observing RNC protest activity (SAC ¶¶ 196, 183), while Plaintiff Ali-Khan was arrested while rollerblading for recreation and exercise (*id.* ¶ 101). Accordingly, the Court finds that Plaintiffs Steketee and Malanum have standing as audience members to pursue a First Amendment claim, but that Plaintiff Ali-Khan lacks standing to pursue a First Amendment claim on behalf of Subclass Four because she suffered no cognizable First Amendment injury.[8]

B. Mass Arrest Subclasses

With these threshold matters resolved, the Court now proceeds to examine the Mass Arrest Subclasses, beginning with the Rule 23(a) prerequisites to certification.

1. Rule 23(a) Analysis

a. Numerosity

As previously noted, the numerosity analysis begins with the presumption that a class comprising 40 or more members is generally sufficient. *See Consol. Rail Corp.*,

47 F.3d at 483 (noting that "numerosity is presumed at a level of 40 members"). Based on RNC arrest records produced during discovery (Pls.' Mem. 27), Plaintiffs here contend that each Mass Arrest Subclass comprises at least 40 putative class members (*id.* at 5-11).[9]

Defendants do not dispute the total number of RNC arrests, but instead challenge the numerosity of the Mass Arrest Subclasses based on the number of prospective class members who have filed suits on their own behalf. (Defs.' Opp'n 32.) Defendants argue that when each subclass is discounted by the number of class members who are named plaintiffs in other RNC actions, several subclasses drop below the presumptive threshold and no subclass is so numerous that joinder is impracticable. (Oral Arg. Tr., May 21, 2010 ("Tr."), at 56:20-57:25.) But Defendants supply no authority for the proposition that the existence of parallel actions should automatically reduce the number of prospective class members for purposes of the class certification inquiry. *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 305 (S.D.N.Y. 2003) (holding that "although scores of Individual Actions have been filed, the presence of those actions does not militate against class certification"). Under Rule 23, individuals are considered class members until they opt out of the suit, *see Cuzco v. Orion Builders, Inc.*, 477 F. Supp.

---

[8]   Other Plaintiffs, including Deirdre MacNamara, were similarly engaged in personal or recreational activities prior to their arrests. (*See* SAC ¶ 170-72.) However, only Subclass Four lacks a named Plaintiff who was engaged in some form of First Amendment activity. *See infra* Part III.B.1.d.

[9]   Specifically, Plaintiffs contend that Mass Arrest Subclass One comprises at least 40 individuals (Pls.' Mem. 5); Mass Arrest Subclass Two comprises at least 100 individuals (*id.* at 6); Mass Arrest Subclass Three comprises at least 50 individuals (*id.* at 7); Mass Arrest Subclass Four comprises at least 50 individuals (*id.*); Mass Arrest Subclass Five comprises at least 200 individuals (*id.* at 8); Mass Arrest Subclass Six comprises at least 300 individuals (*id.* at 9); Mass Arrest Subclass Seven comprises at least 75 individuals (*id.* at 10); and Mass Arrest Subclass Eight comprises at least 150 individuals (*id.* at 11).

2d 628, 632 n.2 (S.D.N.Y. 2007), and "the mere possibility that members of a potential class may choose to opt out in the future is not enough to preclude a finding of numerosity," *Gortat v. Capala Bros., Inc.*, No. 07 Civ. 3629 (ILG), 2010 WL 1423018, at *3 (E.D.N.Y. Apr. 9, 2010)). *See Sunrise Toyota, Ltd. v. Toyota Motor Co.*, 55 F.R.D. 519, 533 (S.D.N.Y. 1972). Accordingly, the Court adopts the subclass calculations derived from the RNC arrest records and the corresponding presumption that numerosity is satisfied.

Because a determination of practicability does not hinge on "mere numbers," Defendants also appeal to the *Robidoux* numerosity factors. *Robidoux*, 987 F.2d at 936. With respect to the first factor, they argue that the prevalence of parallel individual suits undermines the judicial economy of a class resolution. (Defs.' Opp'n 32.) As an initial matter, the Court notes that the case law on parallel claims by potential class members is not uniform. Some courts have identified the absence of individual claims as a factor weighing against class certification, *see Novella v. Westchester County*, 443 F. Supp. 2d 540, 546 (S.D.N.Y. 2006) (finding the fact that "no individual member of the prospective class has filed or threatened to file his own action" to constitute a factor weighing against class certification"), while others have reached the opposite result, *see Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410 (S.D.N.Y. 1998) (finding the "multiplicity of actions" already filed to constitute a factor weighing against class certification). Here, Defendants clearly ascribe to the latter view, arguing that "Plaintiffs have submitted 'no evidence that permitting this suit to go forward as a class action is necessary to avoid a multiplicity of redundant lawsuits.'" (Defs.' Opp'n 32 (citing *Ansari*, 179 F.R.D. at 115).)

The Court is unpersuaded that the existence of parallel actions by prospective class members defeats a finding of numerosity in this case. In addition to the raw number of plaintiffs included in each subclass, the class members appear to be geographically dispersed. According to the NYPD, 65 percent of the RNC arrestees were out-of-state residents. (Norins Decl., Ex. 51.) *Cf. Koss v. Wackenhut Corp.*, No. 03 Civ. 7679 (SCR), 2009 WL 928087, at *5 (S.D.N.Y. Mar. 30, 2009) (finding that dispersion "across seven New York counties and three states" supported a finding of numerosity). And the fact that some individuals within the Mass Arrest Subclasses possess the inclination and resources to pursue their own claims should not deprive those without such resources of the opportunity to pursue this action. *See In re WorldCom*, 219 F.R.D. at 306 ("Individual investors, small entities, and the many large investors who have not filed individual actions should not be deprived of their opportunity to pursue this [class] action simply because some larger litigants with greater financial resources are presently pursuing parallel actions.").

Although the remaining *Robidoux* factors are sparsely briefed, Plaintiffs have shown that the Mass Arrest Subclasses are sufficiently numerous to make joinder impracticable. Based on the numerosity presumption accorded to each Subclass, the geographic dispersion of class members, and the fact that separate actions or a multitude of joinder actions "would substantially increase the burden on the parties and courts," *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 121 (S.D.N.Y. 2001), the Court finds that the numerosity requirement is satisfied. Of course, in the event that a significant number of class members decide to opt out of the Mass Arrest Subclasses, the Court may alter, amend, or decertify those

classes pursuant to Rule 23(c)(1)(C).   *See* Fed. R. Civ. P. 23(c)(1)(C).

### b. Commonality

The Mass Arrest Subclasses also satisfy the commonality requirement, as numerous legal and factual issues unite the claims of the putative class members. *See Damassia*, 250 F.R.D. at 156. Plaintiffs characterize the class allegations as "replete with interwoven questions of law and fact," including: (1) whether, at the time, date, and location of each Subclass, Defendants conducted mass arrests without individualized probable cause; (2) whether Defendants issued audible dispersal orders followed by reasonable opportunities to disperse; and (3) whether Defendants acted pursuant to an unlawful policy or practice of indiscriminate mass arrest. (Pls.' Mem. 28-30.) In response, Defendants simply recite the standards for class relief and assert that "each of Plaintiffs' proposed classes fail to meet Rule 23(a) commonality and typicality requirements." (Defs.' Opp'n 34.)

The Court is persuaded that the grievances of the Mass Arrest Subclass members "share a common question of law or of fact," *Robinson*, 267 F.3d at 155, due to the alleged policy or practice of indiscriminate mass arrest. Whether Plaintiffs will ultimately carry the burden of demonstrating such a policy or practice is, of course, beyond the scope of the Rule 23 inquiry. But because the common question of the alleged policy or practice is "at the core of the cause of action," *Friedman-Katz*, 270 F.R.D. at 155, the Court finds that the commonality requirement is met with respect to each Mass Arrest Subclass.

### c. Typicality

For reasons that merge with the commonality analysis, *see Brown*, 609 F.3d at 475, the typicality requirement is also satisfied. Because each Subclass member was arrested at a particular time, date, and location in connection with real or perceived RNC protest activity, the Subclass injuries derive from a "unitary course of conduct." *Spicer*, 269 F.R.D. at 337 (quoting *Marisol A.*, 126 F.3d at 377). Because each Subclass member alleges that Defendants employed an unlawful policy or practice of indiscriminate mass arrest, the Subclass claims rely on "similar legal arguments to prove . . . liability." *In re Flag Telecom Holdings*, 574 F.3d at 35 (quoting *Robidoux*, 987 F.3d at 936).

The Court further notes that the status of various class members as protestors, observers, or bystanders does not render their claims atypical where, as here, "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented." *Robidoux*, 987 F.2d at 936-37. Accordingly, the Court concludes that typicality is met for the Mass Arrest Subclasses "irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 937.

### d. Adequacy

Finally, the Rule 23(a) adequacy prong requires the Mass Arrest Subclass representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). As previously stated, Plaintiff Ali-Khan experienced no cognizable First Amendment injury and therefore lacks standing to assert a First Amendment claim on behalf of Subclass Four. *See supra* Part III.A.2. Although framed as a standing challenge (Defs.' Opp'n 34-35), the absence

of First Amendment injury also carries implications for the adequacy of Subclass Four. Because an adequate class representative must "suffer the same injury as the class members," *Amchem*, 521 U.S. at 625-26, and the named Subclass Four representative lacks standing to bring a First Amendment claim, the Court finds that the First Amendment claims asserted by Subclass Four fail for lack of an adequate class representative.

The remaining Mass Arrest Subclasses suffer no such deficiency. Defendants have not identified interests of the named Plaintiffs that are antagonistic to those of the Subclass members. *See Baffa*, 222 F.3d at 60. Similarly, there is no dispute that if the named Plaintiffs prevail, the putative class members will also benefit, since all were subject to the same allegedly unconstitutional course of conduct. *See Hirschfeld v. Stone*, 193 F.R.D. 175, 183 (S.D.N.Y. 2000). Thus, it is clear that no "fundamental" conflict of interest impairs the representation of the remaining Mass Arrest Subclasses by the named Plaintiffs. *In re Flag Telecom Holdings*, 574 F.3d at 35.

The named Plaintiffs are, in turn, represented by attorneys from Beldock, Levine & Hoffman LLP.[10] Under Rule 23(g)(1), which governs adequacy of class counsel, the Court must consider "the work counsel has done in identifying or investigating potential claims in the action, . . . counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, . . . counsel's knowledge of the applicable law,

and . . . the resources counsel will commit to representing the class." Fed. R. Civ. P. 23(g). In this case, Plaintiffs contend that proposed class counsel is well-acquainted with the relevant facts, having represented Plaintiffs in this action since 2004. (Pls.' Mem. 35.) Plaintiffs further contend that the firms at issue bring a wealth of collective experience in complex federal litigation and a stated commitment to continued and vigorous pursuit of this litigation. (*Id.*) Defendants do not dispute these assertions. Accordingly, the Court finds that the proposed class counsel is "qualified, experienced, and able to conduct the litigation." *Baffa*, 222 F.3d at 60.

Because the named Plaintiffs and the proposed class counsel will fairly and adequately represent the putative class members, the Court concludes that with the exception of the First Amendment claims brought by Subclass Four, the Mass Arrest Subclasses satisfy the adequacy requirement.

### 2. Rule 23(b)(3) Analysis

After completing the Rule 23(a) inquiry and declining to certify under Rule 23(b)(2), the Court now proceeds to analyze the remaining Mass Arrest Subclasses under the rubric of Rule 23(b)(3).

### a. Predominance

It is well established that the predominance criterion of Rule 23(b)(3) is "more stringent" and "far more demanding" than the commonality requirement of Rule 23(a). *Amchem*, 521 U.S. at 609, 623-24. To satisfy Rule 23(b)(3) class certification requirements, a plaintiff must establish not only the existence of common questions, but the predominance of such questions over other issues that are subject only to

---

[10]  Although attorneys from Moore & Goodman, LLP also appear on the docket sheet for this case, Plaintiffs have represented to the Court that only Beldock Levine & Hoffman LLP will continue as class counsel.

individualized proof.  *See Cordes*, 502 F.3d at 107-08.  In conducting the predominance inquiry, the Court is also mindful that pursuant to Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues . . . ."  Fed. R. Civ. P. 23(c)(4).  District courts should "take full advantage of this provision to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies."  *Robinson*, 267 F.3d at 167 (internal citation, quotation marks, and alterations omitted).

### i.   Constitutional Claims

Plaintiffs argue that common questions regarding the alleged unconstitutional policy or practice of conducting indiscriminate mass arrests during the RNC "can only be answered with reference to the over[all] police conduct at each mass arrest site, and not by examining any one arrest in isolation."  (Pls.' Mem. 37.)  Plaintiffs further contend that the common questions at issue are subject to generalized proof because the police officers who made the arrest decisions made no individualized determinations of probable cause.  (*Id.* at 37-38.)

Defendants counter that individual issues "overwhelm" the Mass Arrest Subclasses because probable cause inquiries will be necessary to determine liability.  (Defs.' Opp'n 40.)  Since the existence of probable cause is a complete defense to an action for false arrest, *see Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citation and quotation marks omitted), Defendants argue that litigation of the Mass Arrest Subclasses will splinter into "mini-trials" regarding the facts and circumstances of individual arrest decisions.  (*See* Defs.' Opp'n 44.)  Based on the range of charges leveled at the RNC arrestees, Defendants

contend that the term "mass arrest" is simply a convenient gloss on a series of arrest decisions triggered by complex and variable circumstances.  (*Id.* at 43, 46.)

Upon careful consideration of the foregoing arguments and the relative cohesion of each Mass Arrest Subclass, *see In re Nassau County*, 461 F.3d at 225, the Court finds that Subclasses One and Three fail the predominance requirement.  Significantly, it appears that group arrests did not occur at the Subclass One and Three locations.  There were no police barricades (Pls.' Mem. 11), assigned arresting officers (*id.* at 13), or incident commanders making group arrest decisions (Tr. at 42:21-43:20).  Instead, the available facts indicate that the Subclass One and Three arrests were conducted by officers exercising individual discretion rather than following mass arrest orders.  (*See, e.g.*, Decl. of Jonathan C. Moore, July 20, 2007 ("Moore Decl."), Ex. 32 at 17:20-22;[11] *id.*, Ex. 39 at 7:15-19;[12] *id.*, Ex. 39 at 13:8-15.[13]).  Indeed, even Plaintiffs' counsel conceded at oral argument that Subclasses One and Three "are the least clean in terms of the facts." (Tr. at 113:4.)

---

[11] Testimony of Randall Steketee: "Q:  Did you see other people being handcuffed before you were handcuffed?  A:  No."  (Moore Decl., Ex. 32, 17:20-22.)

[12] Testimony of Phillip Ellmann: "Q:  Was there a police blockade when you reached that location?  A:  No, I think the street was blocked but there was no obvious police blockade visible."  (Moore Decl., Ex. 39, 7:15-19.)

[13] Testimony of Marcellas Hall: "Q:  How many people were in the group that you referred to at that time?  A:  Well, you know, I'm just talking about a clump of people that would have been able to hear that order . . . it's not that we were a cohesive group, it was a random group of people."  (Moore Decl., Ex. 39, 13:13-15.)

In the absence of group arrest decisions or procedures, the Court is persuaded that individualized probable cause inquiries would dictate the course of litigation with respect to Subclasses One and Three. Such a result would deprive the class action device of the efficiency and economy that form the principal purpose of the procedure. *See generally Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974) (holding that "the efficiency and economy of litigation . . . is a principal purpose of the [class action] procedure). Accordingly, the Court concludes that the Subclasses One and Three fail for lack of predominance.

By contrast, the record with respect to the remaining Subclasses manifests "a sufficient constellation of common issues bind[ing] class members together." *Brown*, 609 F.3d at 483 (internal citation and quotation marks omitted). At the remaining Subclass locations, police erected barricades or employed orange netting to corral and trap large groups of individuals who were thereafter arrested. (Pls.' Mem. 11.) Subclasses Two, Five, Six and Eight also involved an alleged procedure whereby an arresting officer was assigned to five arrestees "regardless of whether the officer had seen any of the five individuals prior to their arrest or had even been present at the scene when the decision to arrest was made." (*Id.* at 13.) The deposition testimony of various police officers further confirms that Defendants made arrest decisions based on group conduct at the remaining Subclass locations.[14]

Because the remaining Subclasses comprise individuals who were arrested as a group based on the alleged conduct of the group, the Court finds that common issues predominate with respect to liability. Although assessment of damages may ultimately require individualized inquiries, that possibility is no bar to class certification here. *See In re WorldCom*, 219 F.R.D. at 302 ("When liability can be determined on a class-wide basis, individualized damage issues are not ordinarily a bar to class certification."). Whether Defendants employed an unlawful mass arrest policy at the remaining Subclass locations is a fundamental question both common to the putative Subclass members and subject to generalized proof. *See Vodak v. City of Chi.*, No. 03 C 2463, 2006 WL 1037151, at *9 (N.D. Ill. Apr. 17, 2006) ("[I]f the decision to seize or arrest a class of individuals is based upon facts and circumstances common to the class then the issue may be adjudicated through a class action."). Accordingly, the Court finds predominance with respect to liability for the constitutional claims brought by Subclasses Two, Four, Five, Six, Seven, and Eight.

In so holding, the Court rejects the argument that individualized probable cause inquiries will overwhelm the remaining Mass Arrest Subclasses. Although probable cause is a complete defense to an individual false arrest claim, *see Weyant*, 101 F.3d at 852 (internal citation and quotation marks omitted), the predominant issue here turns not on the circumstances of particular arrests, but on the existence of a policy or practice of conducting mass arrests whether or not individualized probable cause existed. Thus, the fact that a probable cause defense "may arise and may affect different class

---

[14] (*See, e.g.*, Moore Decl., Ex. 44, 271:17-272:12 (Subclass Two); Norins Decl., Ex. 45, 281:10-25 (Subclass Four); Moore Decl., Ex. 50, 131:24-133:23 (Subclass Five); *id.* at Ex. 41, 159:22-160:20 (Subclass Six); Norins Decl., Ex. 35, 63:20-25, 67:3-18 (Subclass Seven); Moore Decl., Ex. 45, 324:18-325:23, 373:24-375:15 (Subclass Eight).) The Court notes that the examples of individualized probable cause proffered by Defendants primarily relate to

Subclass Three and non-Subclass arrests. (*See* Defs.' Sur-Reply 13-14.)

members differently does not compel a finding that individual issues predominate over common ones." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001), *overruled on other grounds by In re Initial Pub. Offerings*, 471 F.3d at 42 (internal citation omitted). Because the claim of an overarching policy unites the remaining Mass Arrest Subclasses, the Court is persuaded that common liability issues predominate. *See In re Nassau*, 461 F.3d at 229 (finding predominance based on "two broad common liability issues: whether the blanket policy existed and whether defendants are liable for its implementation").

The fact that the SAC includes as-applied challenges to the New York City parade ordinance[15] and New York state disorderly conduct statutes[16] does not defeat predominance with respect to the Mass Arrest Subclasses. Although Defendants devote their supplemental brief to the argument that Plaintiffs' as-applied claims may not be adjudicated on a class basis (*see* Defs.' Sur-Reply 6), their argument appears to rest on a premature assessment of the merits. Defendants claim that "[a]fter . . . years of exhaustive documentary and testimonial discovery in the Consolidated RNC Cases, plaintiffs can point to no evidence of an 'indiscriminate mass arrest policy' designed to retaliate against protestors based upon the content of their speech." (Defs.' Sur-Reply 8-9.) In the absence of such evidence, they argue, the Court will have to consider the particular circumstances of each RNC arrestee to determine whether the challenged statutes were unconstitutionally applied. (*Id.* at 9.) Thus, Defendants oppose the predominance of the as-applied claims primarily by disputing the existence of the alleged policy – and prematurely addressing the merits of the case. Because courts "should not assess any aspect of the merits unrelated to a Rule 23 requirement" on a motion for class certification, *In re Initial Pub. Offerings*, 471 F.3d at 41, the Court declines to do so here.[17]

The Court further notes that the fact of a conviction or guilty plea by a subset of RNC arrestees does not alter the foregoing predominance analysis. Citing *Heck v. Humphrey*, 512 U.S. 477 (1994), Defendants argue that false arrest claims by putative class members who were convicted or pled guilty are barred in the absence of proof that the conviction has been reversed, expunged, or otherwise declared invalid. (Defs.' Opp'n 48-49.) But because the names of the 178 RNC arrestees who were convicted or pled guilty are readily identifiable from discovery documents (Pls.' Reply 20 n.59, 21), the exclusion "is a purely ministerial issue that can be determined prior to trial and will not

---

[15]   New York City Administrative Code § 10-110 requires a permit to conduct a parade or procession on New York City streets. N.Y. City Admin. Code § 10-110.

[16]   N.Y. Penal Code § 240.20(5) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . he obstructs vehicular or pedestrian traffic."); *Id.* § 240.20(6) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . he congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse.").

[17]   Defendants also cite *Hudson v. City of Chicago* for the proposition that as-applied challenges fail the Rule 23(b)(3) predominance requirement because they "necessarily entail an analysis of how the [ordinance] was applied to each individual class member." (Defs.' Sur-Reply 11 (citing *Hudson*, 242 F.R.D. 496, 505 (N.D. Ill. 2007).) What Defendants neglect to disclose is that *Hudson* explicitly distinguished cases involving mass arrests. *Hudson*, 242 F.R.D. at 507.

19

predominate." *Dunn v. City of Chicago*, 231 F.R.D. 367, 377 (N.D. Ill. 2005).[18]   Thus, the *Heck* doctrine poses no bar to certification of the Mass Arrest Subclasses. To the extent that application of the *Heck* exclusion subsequently undermines the numerosity of particular Mass Arrest Subclasses, the Court may, of course, alter, amend, or decertify those classes as necessary. Fed. R. Civ. P. 23(c)(1)(C).

### ii. Other Claims

Despite the predominance of common issues with respect to the constitutional claims, the Court declines to grant class certification with respect to the remaining supervisory liability, *respondeat superior*, and pendent state law claims.   Although neither party briefs the predominance inquiry in this context, the Court is persuaded that each of these claims "bristles with individual issues" that render class certification improper. *Blyden v. Mancusi*, 186 F.3d 252, 271 (2d Cir. 1999).

With respect to the supervisory liability claims, the Court notes that a supervisor may not be held liable "simply because one or more of his subordinates committed a constitutional tort." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007).   Rather, a plaintiff must establish an affirmative causal link between the supervisor's inaction and his injury. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir.

2002).   Thus, Plaintiffs' supervisory liability claim would require the Court to separately determine the liability of approximately 40 individual Defendants.   Because such an inquiry involves "varying components as to each defendant," *Blyden*, 186 F.3d at 271 (2d Cir. 1999), the Court finds that individual issues overwhelm the supervisory liability claim.

The *respondeat superior* and pendent state law claims fail the predominance requirement for substantially similar reasons.   The *respondeat superior* claims asserts that the City is liable for the actions of approximately 60 individual Defendants because their conduct "occurred while they were on duty and in uniform, in and during the course and scope of their duties and functions" as members of the NYPD. (SAC ¶ 265.) The pendent state law claims assert that approximately 20 individual Defendants committed a host of mass torts, including assault and battery, trespass, false arrest and imprisonment, malicious prosecution, intentional infliction of emotional distress, and negligent hiring. (*See id.* ¶¶ 261-63.) Because these claims are susceptible to unique defenses that require extensive individualized inquiries, the Court declines to certify the *respondeat superior* and pendent state law claims.[19]

Since the foregoing analysis is not limited to the Mass Arrest Subclasses, the Court also excludes the supervisory liability, *respondeat superior*, and pendent state law claims from all proposed classes in order to "reduce the range of disputed issues in

---

[18]   In a pair of dueling footnotes, the parties dispute whether RNC arrestees who accepted adjournments in contemplation of dismissal (ACDs) are similarly barred from asserting false arrest claims. (*See* Defs.' Opp'n 49 n.210; Pls.' Reply 21 n.60.)   Because "favorable termination of the proceedings is not an element of [false arrest]," *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995), the Court finds that acceptance of an ACD does not bar Plaintiffs from pursuing false arrest claims or participating in the Mass Arrest Subclasses.

[19]   Although Plaintiffs are unlikely to prevail against the City on a *respondeat superior* theory, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."), the Court declines to decide "any aspect of the merits unrelated to a Rule 23 requirement," *In re Initial Pub. Offerings*, 471 F.3d at 41.

complex litigation and achieve judicial efficiencies." *Robinson*, 267 F.3d at 167 (internal citation and quotation marks omitted).

### b. Superiority

In addition to the predominance criterion, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As previously stated, factors relevant to the superiority analysis include: the interest of class members in controlling separate actions; the extent and nature of existing litigation concerning the controversy; the desirability or undesirability of concentrating litigation of the class claims in the particular forum; and the likely difficulties in managing a class action. *See id.*

In this case, some 565 RNC arrestees have clearly expressed interest in controlling separate actions by filing and pursuing approximately 80 parallel suits. (*See* Pls.' Mem. 44; *cf.* Defs.' Opp'n 73.) Nevertheless, given the length of time that has now elapsed since the underlying events occurred, it appears that the remaining putative class members have not expressed a similar interest by filing separate actions. The desirability of concentrating the RNC litigation in this forum is equally indeterminate as a superiority factor, since the related RNC cases would remain before this Court regardless of the outcome of the class certification motion. Finally, the Court concludes that the "management difficulties" that might accompany the proposed certification are certainly no greater than the management difficulties that would inevitably result from hundreds of separate trials. *See In re NASDAQ Market-Markers Antitrust Litig.*, 169 F.R.D. 493,

529 (S.D.N.Y. 1996) ("[D]ifficulties in management are of significance only if they make the class action a less 'fair and efficient' method of adjudication than other available techniques.").

In the end, the Court is persuaded that "[f]rom the standpoint of judicial economy, the only rational way to proceed is to concentrate the class[] claims in a single action, rather than have numerous separate trials on the same issue, based on the same evidence." *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 436-37 (S.D.N.Y. 2009). Certifying the Mass Arrest Subclasses for purposes of determining liability will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (internal citation and quotation marks omitted). Accordingly, the Court finds that a class action would be the most fair and efficient method of resolving the issues in this case.

### C. Excessive Detention Class

The Court next examines the Excessive Detention Class, which comprises all persons arrested during the Class Period and processed at Pier 57 pursuant to the MAPP. (SAC ¶ 52(b).)

#### 1. Section 23(a) Analysis

##### a. Numerosity

Numerosity is clearly met for the Excessive Detention Class. Plaintiffs contend that approximately 1,800 RNC arrestees were processed pursuant to the MAPP. (*See* Pls.' Mem. 26.) For reasons discussed below, the Court narrows the class to arrestees charged only with violations,

leaving approximately 1,480 putative class members. (*Id.* at 22 n.35.) The Court further subtracts the 102 arrestees who were not detained at Pier 57. (*Id.* at 16.) Defendants do not appear to dispute that joinder of nearly 1,400 class members is clearly impracticable.[20] *Cf. Consol. Rail Corp.*, 47 F.3d at 483 (noting that "numerosity is presumed at a level of 40 members"). Accordingly, the Court finds that the Excessive Detention Class satisfies the numerosity requirement.

### b. Commonality

The commonality of the Excessive Detention Class is not seriously disputed. Plaintiffs allege that because the MAPP unreasonably prolonged their time in custody, their injuries derived from a "unitary course of conduct by a single system." *Spicer*, 269 F.R.D. at 337 (quoting *Marisol A.*, 126 F.3d at 377). Because all class members were processed pursuant to the MAPP, they were subject to policies prohibiting the issuance of summonses and requiring mandatory fingerprinting and criminal background checks, even though Defendants failed to equip Pier 57 with the necessary facilities to timely process the RNC arrestees. (Pls.' Mem. 23.) In response, Defendants weakly assert that the Excessive Detention Class cannot satisfy the commonality requirement because the applicable legal standards will differ based on the length of the individual confinement. (*See* Defs.' Opp'n 36.) But commonality does not require identical claims or circumstances. *See Damassia*, 250 F.R.D. at 156. Rather, the requisite common questions of fact or law can derive from a "pattern of behavior that commonly affects

all of the proposed class members." *See Marisol A.*, 126 F.3d at 377.

Here, Plaintiffs claim that the Excessive Detention Class raises the following common questions: (1) whether Defendants detained the RNC arrestees for unreasonable periods of time; (2) whether such detainment violated the First, Fourth, or Fourteenth Amendments; and (3) whether such detainment resulted from a municipal policy or practice. (*See* Pls.' Mem. 40.) Because the challenged detention procedures primarily affected arrestees charged only with violations (who were otherwise eligible for summonses) and arrestees detained at Pier 57 (where no fingerprinting equipment was available), the Court limits the Excessive Detention Class to arrestees in those categories. With these provisos, it is clear that "at least one common question of fact or law is evident." *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 562 (S.D.N.Y. 2004). Accordingly, the Court finds that the commonality requirement is satisfied for the Excessive Detention Class.

### c. Typicality

Typicality is satisfied for substantially similar reasons. As previously stated, all members of the Excessive Detention Class were processed pursuant to the MAPP and detained at Pier 57. As a result, the excessive detention claims "arise[] from the same course of events" and depend on "similar legal arguments" to prove liability. *In re Flag Telecom Holdings*, 574 F.3d at 35 (citing *Robidoux*, 987 F.2d at 936). Although Defendants note that the prospective class members were detained for varying lengths of time, "[t]he typicality criterion does *not* require that the factual predicate of each claim be identical to that of all class members." *Shakhnes*, 740 F.

---

[20]   (*See* Defs.' Opp'n 33 (arguing only that "joinder of the remaining plaintiffs arrested *at the Proposed False Arrest Subclass Locations* . . . is not impracticable") (emphasis added).)

Supp. 2d at 625 (internal citations and quotation marks omitted). In this case, "the same unlawful conduct" affected both the named Plaintiffs and the prospective class members, because all were subject to the alleged policy or practice of unnecessarily detaining RNC arrestees. *Robidoux*, 987 F.2d at 936-37. Accordingly, the Court concludes that typicality is met with respect to the Excessive Detention Class. *Id.*

### d. Adequacy

Finally, the Excessive Detention Class easily satisfies the adequacy requirement. Because the named Plaintiffs were detained alongside the prospective class members, they clearly "possess the same interest and suffer[ed] the same injury." *Falcon*, 457 U.S. at 156. Defendants make no suggestion that the named Plaintiffs have interests antagonistic to the rest of the class, *see Brown*, 609 F.3d at 479, or are otherwise unable to "fairly and adequately protect the interest of the class," Fed. R. Civ. P. 23(a)(4). For the reasons previously stated, Plaintiffs' counsel will supply fully adequate legal representation. *See supra* Part III.B.1.d. In the absence of any indication that a "fundamental" conflict of interest impairs the proposed representation, *In re Flag Telecom Holdings*, 574 F.3d at 35, the Court finds that the adequacy requirement is satisfied as to the Excessive Detention Class.

### 2. Section 23(b)(3) Analysis

Because the Excessive Detention Class survives the Rule 23(a) inquiry, the Court now proceeds to the Rule 23(b)(3) analysis.

### a. Predominance

The predominance inquiry once again forms the crux of the class certification dispute. Plaintiffs argue that because the excessive detention claims all arise out of the design and implementation of the MAPP (*see* Pls.' Mem. 40-41), common questions and common legal theories predominate. In their view, the constitutionality of the MAPP detention procedures forms the nucleus of "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole." *Cordes*, 502 F.3d at 107-08.

In response, Defendants argue at length that the variance in the detention times of the RNC arrestees is fatal to the predominance inquiry. (*See* Defs.' Opp'n 65-71.) To that end, Defendants primarily rely on *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), in which the Supreme Court held that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement" and therefore "be immune from systemic challenges," *id.* at 56. Citing *County of Riverside*, Defendants argue that RNC arrestees who were detained for less than 48 hours have no constitutional claim unless "the arrested individual can prove that his or her probable cause determination was delayed unreasonably." (Defs.' Opp'n 66 (quoting *County of Riverside*, 500 U.S. at 56).) Because the majority of the RNC arrestees were processed and released within 48 hours, Defendants argue that "the Court would have to conduct mini-hearings for each arrestee" to establish the cause of the delay. (Defs.' Opp'n 69.) Thus, Defendants urge that "the class action mechanism is unsuitable" because "the primary issues to be litigated are subject to such individualized proof." (*Id.*)

This argument misunderstands the nature of the excessive detention claims at issue. The central and predominant focus of the class action suit is not the mere length of

detention for RNC arrestees, but the existence of a policy to detain them longer than would otherwise be required. Such a policy, if proven, would surely demonstrate that the probable cause determinations for individual RNC arrestees were unreasonably and deliberately delayed. Because class certification is appropriate where a "sufficient constellation of common issues binds class members together," *Brown*, 609 F.3d at 483, the Court is persuaded that claims based on an alleged policy of unlawful detention are suitable for class adjudication.

The Court also notes that Defendants' predominance argument derived from the *County of Riverside* holding applies only to Plaintiffs' Fourth Amendment claim. Additional common questions bind the Excessive Detention Class with respect to the First and Fourteenth Amendment claims, including: (1) whether Defendants intended to punish or deter First Amendment activity by subjecting the RNC arrestees to MAPP procedures; and (2) whether such practices breached the Equal Protection Clause of the Fourteenth Amendment. (Pls.' Reply 27.) Thus, even if Defendants were to prevail on the Fourth Amendment claim, the First and Fourteenth Amendment claims would survive the predominance requirement. Accordingly, the Court finds that the resolution of the excessive detention claims "can be achieved through generalized proof," and that the class-wide detention issues predominate over "issues subject only to individualized proof." *Moore*, 306 F.3d at 1252.

b. Superiority

The superiority analysis for the Excessive Detention Class closely tracks the superiority analysis for the Mass Arrest Subclasses outlined above. Once again, the

existence of parallel suits filed by a significant minority of RNC arrestees indicates some interest in controlling the prosecution of separate actions. Given the related status of all RNC actions, the inevitable concentration of the RNC litigation before this Court remains a neutral factor in the superiority analysis. Finally, the Court perceives little difficulty in managing the Excessive Detention Class on the issue of liability, since individualized inquiries will primarily relate to damages calculations.

The utility of the "pertinent" but nonexclusive superiority factors is admittedly limited in this instance. Fed. R. Civ. P. 23(b)(3)(A)-(D). Nonetheless, there can be no doubt that certifying the Excessive Detention Class will permit the Court to try common issues related to the alleged unlawful policy once, rather than dozens or hundreds of times, thereby simplifying and streamlining the litigation process. *See In re Nassau*, 461 F.3d at 230. Accordingly, the Court finds that the superiority criterion is met with respect to the Excessive Detention Class.

D.  Conditions of Confinement Class

Finally, the Court considers the Conditions of Confinement Class, which comprises all RNC arrestees who were handcuffed with plastic flex cuffs and detained at Pier 57. (SAC ¶ 52(c).)

1.  Section 23(a) Analysis

a.  Numerosity

The numerosity of the Conditions of Confinement Class is clear. Out of approximately 1,800 RNC arrestees, all but 102 arrestees were allegedly handcuffed with plastic flex cuffs and detained at Pier 57. (Pls.' Mem. 26.) Because the remaining

class comprises approximately 1,700 prospective members, the numerosity of the Conditions of Confinement Class is beyond serious dispute.[21] *Cf. In re WorldCom*, 219 F.R.D. at 305-06 ("Here, the class is massive: there is no question regarding numerosity or the impracticability of joinder.").

### b. Commonality

For the Conditions of Confinement Class, commonality is a "minimal burden" readily satisfied. *Lewis Tree Serv., Inc. v. Lucent Techs. Inc.*, 211 F.R.D. 228, 231 (S.D.N.Y. 2002). Plaintiffs contend that detention at Pier 57 subjected the prospective class members to a host of common conditions, including prolonged handcuffing, inadequate seating and sanitary facilities, and exposure to various chemicals. (Pls.' Mem. 15-19.) Defendants counter that "non[e] of these alleged conditions can be classified as common to the class, as none of the class representatives or potential class members were exposed to all of the alleged conditions." (Defs.' Opp'n 25.)

But Defendants' worn attempt to defeat commonality by mincing the prospective class claims once again fails. Although some degree of disparity in the detention experience of RNC arrestees is perhaps inevitable, factual variations in individual grievances do not preclude a finding of commonality where the injuries "derive from a unitary course of conduct by a single system." *Spicer*, 269 F.R.D. at 337 (quoting *Marisol A.*, 126 F.3d at 377). Here, the alleged injuries derive from the detention conditions at Pier 57. Because all class

members were subject to a common detention system at a single location, they share the following common questions: (1) whether the terms and conditions of confinement at Pier 57 were unreasonable and punitive; and (2) whether those conditions resulted from a municipal policy or practice. (Pls.' Mem. 29). That the deposed class members object to different combinations of detention conditions does not negate the fact "that common issues of fact or law affect all class members." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 175 (S.D.N.Y. 2008) (internal citations and quotation marks omitted). Accordingly, the Court finds that the commonality requirement is satisfied for the Conditions of Confinement Class.

### c. Typicality

Once again, the typicality requirement is satisfied for reasons that overlap with the commonality analysis above. *See Brown*, 609 F.3d at 475. As previously noted, all members of the Conditions of Confinement Class were handcuffed with plastic flex cuffs and detained at Pier 57. Thus, the conditions of confinement claims "arise[] from the same course of events" and pose similar legal and constitutional challenges. *In re Flag Telecom Holdings*, 574 F.3d at 35 (citing *Robidoux*, 987 F.2d at 936). Although Defendants protest that "the circumstances of the putative class representatives differ[ed] greatly" (Defs.' Opp'n 36), they provide no explanation or supporting citations for such an assertion. Instead, the evidence indicates that the prospective class members were treated "in the same general fashion," *Robidoux*, 987 F.2d at 937 (emphasis omitted), despite individual permutations of the detention narrative (*see* Pls.' Mem. 32, 42). Because the class claims arise from "the same unlawful conduct," *Robidoux*, 987 F.2d at

---

[21]   Because Defendants appear to confine their *Robidoux* numerosity arguments to the Mass Arrest Subclasses (*see* Defs.' Opp'n 33), the Court declines to reiterate the *Robidoux* analysis outlined in Part III.B.1.a above.

936, the Court finds that the Conditions of Confinement Class clears the "relatively low threshold" of typicality, *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 82 (E.D.N.Y. 2007).

### d.  Adequacy

Finally, the Conditions of Confinement Class also complies with the adequacy requirement. Because all class members were detained under substantially common conditions at Pier 57, the named Plaintiffs "suffer[ed] the same injury" as the absent class members. *Falcon*, 457 U.S. at 156. Because all class members share a common interest in establishing liability for their detention conditions, the interests of the named Plaintiffs and prospective class members are properly aligned. As previously stated and reiterated, class counsel is "qualified, experienced, and able to conduct the litigation." *Cordes*, 502 F.3d at 99; *see supra* Part III.B.1.d. Accordingly, the Court finds that the named Plaintiffs "will fairly and adequately protect the interests" of the Conditions of Confinement Class. Fed. R. Civ. P. 23(a)(4).

### 2.  Section 23(b)(3) Analysis

Because the Conditions of Confinement Class meets the Rule 23(a) requirements, the Court will now consider the Rule 23(b)(3) inquiry.

### a.  Predominance

Although Defendants nominally oppose the preceding Rule 23(a) analysis, they vigorously dispute that the Conditions of Confinement Class is "sufficiently cohesive" to satisfy the predominance requirement. *Brown*, 609 F.3d at 476. Plaintiffs contend that while the details of individual detention experiences may have varied, the overall conditions at Pier 57 were sufficiently

similar to warrant class adjudication. (Pls.' Mem. 42.) In response, Defendants parse the individual conditions of confinement and argue that claims based on each condition will require individualized inquiries to establish a constitutional violation. (Defs.' Opp'n 52-65.)

Plaintiffs identify key factual questions that unite the Conditions of Confinement Class by addressing the nature and severity of the alleged conditions. Did the substance on the floor of Pier 57 pose potential health hazards? Were requests for medical attention by RNC arrestees routinely ignored? How many toilets were provided per number of detainees? (*See* Pls.' Reply 32.) "The legal counterpart of these factual questions is the issue of whether and to what extent the existence of conditions of this severity – whether separately or in combination – constituted a violation of the [detainees'] constitutional rights." *Langley v. Coughlin*, 715 F. Supp. 522, 556 (S.D.N.Y. 1989). Under *Langley*, the relevant question is whether the "cumulative effect" of the alleged conditions was "sufficiently bad to have fallen below constitutional minima." *Id.* at 543, 556; *see, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention . . . , the proper inquiry is whether those conditions amount to punishment of the detainee.").

Defendants, in turn, assert that common questions do not predominate because determining the constitutionality of the confinement conditions will require "mini-trials" regarding the length of individual detention and the degree of individual injury. (Defs.' Opp'n 52-53.) But the fact that the eventual assessment of damages may require individualized proof of injury does not preclude class treatment of

allegations that the shared confinement conditions were unlawful. "That some detainees may have been more or less deprived . . . does not impede the court's ability to adjudicate whether the shared deprivations suffered by all [class] members . . . violated the Constitution." *Dunn*, 231 F.R.D. at 377. In one recent prison conditions case, a Massachusetts district court analyzed the common issues as follows:

> If the asserted injury is the denial of access to a bathroom at a specific moment of need then the government is correct that the plaintiffs have not demonstrated a likelihood that other inmates have suffered similarly. If, on the other hand, the injury arises simply out of being housed in a facility in which bathroom access is unreliable, then all of the approximately 4,000 inmates housed in Building 4 during the subject period share the claim.

*Tyler v. Suffolk County*, 253 F.R.D. 8, 10 (D. Mass. 2008). Here, the conditions of confinement claims clearly fall into the latter category, since Plaintiffs allege constitutional injury from being housed in a makeshift detention center unfit for human occupancy. (*See* Pls.' Mem. 16.)

Moreover, the primary cases Defendants cite to contest the predominance requirement do not address class certification. Instead, Defendants assemble a series of summary judgment and appellate opinions that address the merits of various conditions claims. (*See* Defs.' Opp'n 52-53.) Although the predominance inquiry may implicate the *elements* of prospective class claims, *see Freeland v. AT&T Corp.*, 238 F.R.D. 130, 142 (S.D.N.Y. 2006), courts are barred from considering "any

aspect of the merits unrelated to a Rule 23 requirement" on a motion for class certification, *In re Initial Pub. Offerings*, 471 F.3d at 41. Here, while Defendants purport to establish only the particular findings required to assess both liability and damages (Defs.' Opp'n 52), the analysis that follows frequently shades into forbidden merits territory.[22]

Defendants do identify a single case, *Burley v. City of N.Y.*, No. 03 Civ. 735 (WHP), 2005 WL 668789, at *8-9 (S.D.N.Y. Mar. 23, 2005), denying certification of a conditions class. (Defs.' Opp'n 54-55.) In *Burley*, the court declined to certify a putative "handcuff class" comprising all arrestees who were subject to "unreasonable" or "excessive" handcuffing with plastic cuffs. *Burley*, 2005 WL 668789, at *8. Because plaintiffs were unable to provide a clear definition of "unreasonable" cuffing, the court held that the class failed the implicit "definiteness" requirement of Rule 23. *Id.* at *8-9. Here, by contrast, the Conditions of Confinement Class is limited to RNC arrestees who were detained at Pier 57 and handcuffed with plastic flex cuffs. (SAC ¶ 52(c).) As such, the "definiteness" of the class is easily established, since the names of all RNC arrestees are readily ascertainable from records produced during discovery. (Pls.' Mem. 26 n.41, 27.) Because the class definition hinges on the fact that RNC arrestees were handcuffed, and not on "subjective determinations" about the

---

[22] (*See, e.g.*, Defs.' Opp'n 53 ("not a single class representative has produced any evidence of injuries suffered" due to the holding cells at Pier 57); *id.* at 59 ("48 of the 49 plaintiffs deposed thus far in the RNC litigations have admitted that they had access to bathroom facilities while in custody"); *id.* at 61 ("not a single class representative has produced any evidence, nor have they specifically alleged, any constitutional injuries resulting from the lack of telephones" at Pier 57).)

meaning of "excessive" handcuffing, *Burley*, 2005 WL 668789, at *9, the holding of *Burley* is inapposite.[23]

Upon careful consideration, the Court is persuaded that the common questions of fact and law identified above predominate over the individual questions implicated by the Conditions of Confinement Class. The core class allegation is that the RNC arrestees were improperly detained in a facility unfit for human occupancy. Whether the "cumulative effect" of the conditions at Pier 57 created a constitutional violation is an issue that unifies the Conditions of Confinement Class and satisfies the predominance requirement. *Langley*, 715 F. Supp. at 543-44.

### b. Superiority

The Conditions of Confinement Class satisfies the superiority requirement for reasons that parallel the analysis articulated and reiterated above. Because certifying as to liability will permit hundreds of RNC conditions claims to be resolved in a single proceeding, the Court concludes that proceeding as a class action is manifestly "superior to other available methods for fairly and efficiently adjudicating" the Conditions of Confinement claims. Fed. R. Civ. P. 23(b)(3).

### E. Appointment of Class Counsel

Having completed the Rule 23 class certification analysis, the only question that remains is whether Plaintiffs' counsel should be appointed counsel for the classes.

As discussed above in connection with the adequacy requirement of Rule 23(a), *see supra* Part III.B.1.d, Plaintiffs contend that proposed class counsel, Beldock Levine & Hoffman LLP, is experienced in handling complex federal litigation and committed to the vigorous pursuit of the class claims. Defendants do not dispute these assertions. Accordingly, the Court appoints Beldock Levine & Hoffman LLP as class counsel pursuant to Rule 23(g). Fed. R. Civ. P. 23(g).

### IV. CONCLUSION

For the foregoing reasons, the motion for class certification pursuant to Rule 23(a) and Rule 23(b)(3) is HEREBY GRANTED as to the following classes:

1) Mass Arrest Subclasses Two, Four, Five, Six, Seven and Eight, comprising all RNC arrestees from the foregoing Subclass locations, except that Subclass Four may not assert a First Amendment claim;

2) The Excessive Detention Class, comprising all RNC arrestees who were processed pursuant to the MAPP, detained at Pier 57, and charged only with violations; and

3) The Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs and detained at Pier 57.

Pursuant to Rule 23(c)(4), the Court certifies the foregoing classes to determine liability arising from the constitutional claims, but declines to certify the supervisory liability, *respondeat superior*, and pendent state law claims.

---

[23]   The Court notes, however, that in order to avoid the "mini-trial" phenomenon (*see* Defs.' Opp'n 55-56), the factfinding inquiry will be limited to the use of flex cuffs as a matter of policy rather than the allegedly "excessive" tightness of the flex cuffs as applied by individual NYPD officers to individual Plaintiffs.

The motion to certify Mass Arrest Subclasses One and Three is HEREBY DENIED due to lack of predominance. The motion for class certification pursuant to Rule 23(b)(2) is HEREBY DENIED due to lack of standing to pursue declaratory and injunctive relief. Plaintiffs in the certified classes and subclasses are appointed Class Representatives, and Beldock Levine & Hoffman LLP is appointed class counsel.

IT IS FURTHER ORDERED THAT: (1) Plaintiffs shall submit to the Court a proposed notice to all putative class members pursuant to Rule 23(c)(2)(B) no later than May 31, 2011; and (2) the parties in this action and all other consolidated RNC cases shall appear for a status conference in Courtroom 21C on June 6, 2011, at 4:30 p.m.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: May 19, 2011
    New York, New York

* * *

Plaintiffs are represented by Jonathan C. Moore and Clare Rivka Norins, Beldock Levine & Hoffman LLP, 99 Park Avenue, 16th Floor, New York, New York 10016. Defendants are represented by Michael A. Cardozo, Corporation Counsel of the City of New York, and Curt Peter Beck, Jeffrey Anthony Dougherty, Peter Gerard Farrell, Tonya Jenerette, and Raju Sundaran, Assistant Corporation Counsel of the City of New York, 100 Church Street, New York, New York 10007.