**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------- x
DEIRDRE MACNAMARA, et al., individually    x      04-CV-9216 (RJS) (JCF)
and on behalf of those similarly situated,

                      Plaintiffs,    x      ECF Case

                                x

    -against-

                                x

THE CITY OF NEW YORK, a municipal
entity, et al.,                         x

                    Defendants.    x

--------------------------------------------------------------- x

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS UPON**
**WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**
**PURSUANT TO LOCAL CIVIL RULE 56.1 FOR THE**
**16TH STREET ARRESTS ON AUGUST 31, 2004**

Pursuant to Local Civil Rule 56.1 the MacNamara Class Plaintiffs, as well as the

plaintiffs in Tikkun v. City of New York, 05 Civ. 9901, Bastidas v. City of New York, 05 Civ.

7670, Rigby v. City of New York, 07 Civ. 7751 and Concepcion v. City of New York, 05 Civ.

8501, submit the following statement of material facts upon which there is no genuine issue to be

tried:

**CLASS PLAINTIFFS IN MACNAMARA, et al., v. CITY OF NEW YORK, et al.**

<u>**Plaintiff Erika Biddle**</u>

1.      In the early evening on August 31, 2004, plaintiff ERIKA BIDDLE received a call

while working at midtown advertising agency McCann Erickson from a friend who reported a

large police presence near Union Square Park, in response to which Ms. Biddle left work on her

bicycle, bringing her videocamera in order to document police actions. (Biddle Tr. at pp. 9-11.)[1]

2.     Ms. Biddle was volunteering during the RNC as an I-Witness Videographer and working with the National Lawyers Guild (Biddle Tr. at pp. 9-10).

3.     Ms. Biddle graduated from Wesleyan University in Connecticut in 1997.  (Biddle Tr. at pp. 151-52).

4.     On arriving in the area of Union Square Park, rather than entering the park, Ms. Biddle walked her bicycle east down 16th Street and observed "a lot of people" – including a marching band - playing music on the south side of the 16th Street sidewalk, people carrying signs, and people dancing in the streets and sidewalks  - as well as a large police presence. (Biddle Tr. at pp. 12-13, 136).

5.     Ms. Biddle heard no police directives or instructions as she entered 16th Street. (Biddle Tr. at p. 14).

6.     Ms. Biddle was standing on the sidewalk with her bicycle in one hand and video camera in the other in approximately the middle of the block of 16th Street between Irving Plaza and Union Square East when a line of police officers armed with orange nets started walking west on 16th Street "and then that side was more aggressive and came in and started throwing people down." (Biddle Tr. at pp. 14-15).

7.     Ms. Biddle did not know that she would get "sequestered into 16th Street." (Biddle

---

[1]

All plaintiff transcript references are from their pretrial depositions and hereinafter will be referred to as, e.g., "Biddle Tr. at ___".  Excerpts from MacNamara plaintiffs' testimony are attached as exhibits to the Moore Declaration.  Excerpts from the depositions of plaintiffs' in consolidated actions are attached as exhibits to their counsel's declarations.  Pursuant to the Court's September 30, 2011 Order, class counsel are withholding from filing the deposition excerpts unless the defendants controvert the portion of the 56.1 statement to which they relate.

Tr. at p. 16).

8.      Police rushed in and attacked two very small-looking young people who had been dancing in the street for no apparent reason. (Biddle Tr. at pp. 17-19).

9.      After that, "it went from being pleasant, slightly calm, to people getting terrified, anxious, screaming." (Biddle Tr. at p. 19).

10.     Ms. Biddle saw people who tried to leave but were not allowed to. (Biddle Tr. at p. 20).

11.     Ms. Biddle saw the police destroy the band's instruments. (Biddle Tr. at p. 136).

12.     Ms. Biddle eventually approached a male NYPD officer, showed him a badge that identified her as a Legal Observer for the National Lawyers Guild and asked him to allow her to leave, and was told, "No, we hate you people." (Biddle Tr. at pp. 24-25, 83-84).

13.     Ms. Biddle was told to sit down, so she locked up her bicycle and sat down around the middle, slightly to the west, of the block, on the north side of the street/sidewalk.. (Biddle Tr. at pp. 25, 29).

14.     An officer near Ms. Biddle refused to answer her questions about why she was being arrested, how long she would be held, or anything else about what was going on. (Biddle Tr. at pp. 30-31).

15.     Ms. Biddle watched police handcuff and remove people for over an hour before she was led across the street and introduced to her assigned arresting officer. (Biddle Tr. at pp. 31-32).

16.     Her arresting officer put her in plastic handcuffs that were so tight he had to cut them off and re-cuff her. (Biddle Tr. at p. 33).

3

17.     Defendant James Essig ordered that everyone on 16th Street between Union Square East and Irving Place was to be arrested, including Erika Biddle.  (Essig Tr. at pp. 21, 84-85, 154,159-162; 167-168; 178-183; 201-202; 225; 268; 282, 731-732, 744, 755-756; Monahan Tr. at pp. 355-362, attached as Exhibits "W" and "X" to Moore 16th Street Declaration).

18.     Neither James Essig nor any other member of the New York City Police Department had any personal knowledge of the individual conduct of Erika Biddle that served as the basis for her arrest.  (Memorandum and Order signed by Judge Francis on November 28, 2006.  Attached as Exhibit "H   " to the Moore 16th Street Declaration).

19.     Ms. Biddle was then photographed with her assigned arresting officer, who put his arm around her in an inappropriate manner. (Biddle Tr. at p. 34).

20.     Ms. Biddle and the other arrestees provided the officer with their names, identification, and property, and were loaded onto a bus. (Biddle Tr. at pp. 35, 94-95).

21.     Ms. Biddle had difficulty getting onto the bus because her right leg is amputated below the knee. (Biddle Tr. at p. 38).

22.     After she was transported to Pier 57, Ms. Biddle experienced discomfort standing due to her amputated leg. (Biddle Tr. at p. 39).

23.     Ms. Biddle developed a burning rash on her chin after her sleeve touched the floor of the Pier and then touched her chin. (Biddle Tr. at p. 52).

24.     At Central Booking, a Department of Corrections Officer lifted up Ms. Biddle's skirt, noticed that she was wearing a prosthetic leg, said, "We got a crip here," and asked her to remove her leg, which she refused to do. (Biddle Tr. at pp. 92-93).

25.     Ms. Biddle was separated out from the other arrestees and put in a separate cell.

(Biddle Tr. at p. 93).

26.     Ms. Biddle was fingerprinted.. (Biddle Tr. at p. 93).

27.     Ms. Biddle was charged with parading without a permit in violation of New York City Administrative Code Section 10-110, with disorderly conduct under New York Penal Law Secion 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct under New York Penal Law Section 240.20(6) for failing to comply with a lawful order to disperse. (Criminal court complaint and certificate of disposition attached as Exhibit "R" to the Moore 16th Street Declaration).

28.     Ms. Biddle was not given a Desk Appearance Ticket, but rather was required to appear before a judge for arraignment before she was released. (Biddle Tr. at pp. 84-85).

29.     Ms. Biddle took an Adjournment in Contemplation of Dismissal at her arraignment. (Biddle Tr. at pp. 85-86, 134; Exhibit "   " to the Moore 16th Street Declaration).

**Plaintiff Sonia Chandra**

30.     On August 31, 2004, Plaintiff SONIA CHANDRA left her job working at Time, Inc. as a Production Assistant at the end of the workday to meet up with her roommate, Plaintiff Celine Malanum in midtown near the Time, Inc. offices. (Chandra Tr. at pp. 13, 15-17.)

31.     Ms. Chandra graduated from the University of Florida with a B.A. in Business Administration with a specialization in Mass Communications. (Chandra Tr. at p. 136, 268-269).

32.     Ms. Chandra and Ms. Malanum lived together at the time at 599 Lorimer Street, Apartment 1, Brooklyn, NY  11211. (Chandra Tr. at pp. 4, 18).

33.     The two took the subway downtown and got out at Union Square, planning to find something to eat in that area or on the Lower East Side. (Chandra Tr. at pp. 18-19).

34.     When they emerged from the subway station there were a lot of people in Union Square and Ms. Chandra  was very curious and interested in what was going on. (Chandra Tr. at p. 21).

35.     The two decided to walk around the area to find somewhere to eat. (Chandra Tr. at p. 21).

36.     After walking around in and sitting in the park for a few minutes, Ms. Chandra heard and saw a band walking north on the east side of Union Square Park, coming from downtown, so she and Ms. Malanum crossed briefly onto Union Square East from Union Square Park and then entered 16th Street after the band had already turned onto 16th Street to see what was going on and because she has a love of music. (Chandra Tr. at pp. 26-28, 35-38).

37.     There were no police blockades when Ms. Chandra turned onto 16th Street. (Chandra Tr. at p. 44).

38.     There were police on the corner, but they did not say, "Don't turn down there." (Chandra Tr. at pp. 110-111, 126).

39.     Rather, the police were directing and leading people down 16th Street. (Chandra Tr. at pp. 219-223).

40.     Ms. Chandra did not see any vehicular traffic on Union Square East or East 16th Street. (Chandra Tr. at p. 62).

41.     Zen Palate was located on the south side of East 16th Street, closer to Union Square East. (Chandra Tr. at p. 58).

42.     Ms. Chandra decided to go over to the band a few stores down past Zen Palate for a few minutes and then go eat dinner at Zen Palate. (Chandra Tr. at pp. 28-29, 32, 38-39, 41-42).

43.     She stopped on the south side of the sidewalk. (Chandra Tr. at p. 60).

44.     After watching the band for at most a few minutes, Ms. Chandra decided to try to leave. (Chandra Tr. at pp. 28-29).

45.     Within that few minutes, the block become more crowded. (Chandra Tr. at p. 35).

46.     Ms. Chandra decided to just try and get away from all the people and possibly walk downtown or outside of the block. (Chandra Tr. at p. 30).

47.     At around that time, police blocked 16th Street at Irving Plaza and Ms. Chandra could not exit the block that way.  (Chandra Tr. at pp. 43-44).

48.     Plaintiff Chandra asked police officers where she could go and was told that, though they could not cross the police line at Irving Place, they could exit from the other side of the street. (Chandra Tr. at pp. 43-44, 65, 70-72).

49.     Others were also asking police officers how to exit, and she saw some of them who turned to walk back toward Union Square East. (Chandra Tr. at p. 74).

50.     Defendant James Essig ordered that everyone on 16th Street between Union Square East and Irving Place was to be arrested, including Sonia Chandra.  (Essig Tr. at 21, 84-85, 154,159-162; 167-168; 178-183; 201-202; 225; 268; 282, 731-732, 744, 755-756; Monahan Tr. at pp. 355-362, attached as Exhibits "W" and "X" to Moore 16th Street Declaration).

51.     Neither James Essig nor any other member of the New York City Police Department had any personal knowledge of the individual conduct of Sonia Chandra that served as the basis for her arrest.  (Memorandum and Order signed by Judge Francis on November 28, 2006.  Attached as Exhibit "H" to the Moore 16th Street Declaration).

52.     She and Ms. Malanum turned around and walked west at which point they were

met by other officers who had lined up blocking the exit on that side. (Chandra Tr. at p. 66, 75).

53.     Ms. Chandra repeatedly asked different police officers questions such as, ""What is going on, how can we get out of here?", but the police told her, "Just sit to the side, we are just trying to get everyone under control and then we will let you out, but stay on the sidewalk", and ordered her to sit or stand on the north sidewalk. (Chandra Tr. at pp. 76-83, 91-92).

54.     Others were asking similar questions and as far as Ms. Chandra could tell the police were not letting anyone in or out of the block. (Chandra Tr. at pp. 84-85).

55.     For some time, she had the impression that she was not being arrested, but that there would be some sort of questioning and opportunity to tell her story and she would be allowed to go. (Chandra Tr. at pp. 84, 102-203, 109-110).

56.     Even as she saw people begin to be arrested on the other side of the block, Ms. Chandra did not believe she was being arrested because she had not done anything wrong. (Chandra Tr. at p. 110).

57.     There was no announcement that the group had no permit and must disperse. (Chandra Tr. at p. 189).

58.     If she had heard such an announcement, she would have dispersed. (Chandra Tr. at p. 189).

59.     She was trapped, blocked in, and arrested without having been given any opportunity to remove herself: by the time she walked to one end to get out and was told to turn around, the other end was blocked. (Chandra Tr. at p. 110).

60.     One officer flirted with her and offered to try to get her out, saying that he would sneak her out as long as a white-shirted officer did not see him. (Chandra Tr. at pp. 103-106).

61.     Ms. Chandra tried to get the attention of an officer in a white shirt to show her Time, Inc. pass, but she was repeatedly ignored. (Chandra Tr. at pp. 106-108).

62.     After what seemed like a few hours, a white-shirted officer came over and directed her to join a group of five people, where she was placed in plastic flex-cuffs and assigned an "arresting officer" with whom a Polaroid was taken before she was loaded onto a transport bus. (Chandra Tr. at pp. 103, 107, 121-122).

63.     Ms. Chandra complained that her cuffs were too tight and her complaints were ignored. (Chandra Tr. at pp. 128-131).

64.     Ms. Chandra was mocked on the bus by several NYPD officers. (Chandra Tr. at pp. 132-134).

65.     When Ms. Chandra arrived at Pier 57, she reiterated her complaints about her handcuffs, and an officer cut them off using scissors, drawing blood from her writs. (Chandra Tr. at pp. 137-138, 140).

66.     Ms. Chandra was at the pier until after 11:00AM on September 1, 2004. (Chandra Tr. at pp. 160-161).

67.     She was moved from one cell to another to a third. Between the second and third cells, her handcuffs were removed. At the third cell, an officer went to put her handcuffs back on, and when she asked him to put them on loosely because her wrists were already bruised from tight cuffing, the officer said, "You know you like it that way." (Chandra Tr. at pp. 165-166).

68.     Ms. Chandra was charged with parading without a permit in violation of New York City Administrative Code Section 10-110, with disorderly conduct under New York Penal Law Secion 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct

9

under New York Penal Law Section 240.20(6) for failing to comply with a lawful order to disperse. (Criminal court complaint and certificate of disposition attached as Exhibit " " to the Moore 16th Street Declaration).

69.     Ms. Chandra was fingerprinted. (Chandra Tr. at p. 194).

70.     Because she had valid identification on her, Ms. Chandra was given a Desk Appearance Ticket. (Chandra Tr. at pp. 86, 88).

71.     After having to make several appearances in criminal court all charges against Ms. Chandra were dismissed on speedy trial grounds. (See Certificate of Disposition and criminal court records attached as part of Exhibit " " to Moore Declaration).

**Plaintiff Deepa Majmudar**

72.     In August 2004, Plaintiff DEEPA MAJMUDAR worked at JP Morgan Chase as a Portfolio Manager and Quantitative Strategist. (Majmudar Tr. at p. 8).

73.     On August 31, 2004, Ms. Majmudar lived at 180 Riverside Boulevard, Apartment 15-S, New York, New York  10069, and she had a valid copy of her driver's license on her. (Majmudar Tr. at pp. 4, 205-206).

74.     Ms. Majmudar has a Ph.D. from Columbia University (Majmudar Tr. at pp. 12-13).

75.     On August 31, 2004, Ms. Majmudar shopped at a bookstore in the Union Square area and then remained in the area of the park, intending eventually to walk to a bus stop to take a bus home. (Majmudar Tr. at pp. 63-64).

76.     Prior to August 31, 2004, Ms. Majmudar had never been involved in any protest activity and had never been arrested. (Majmudar Tr. at p. 14).

77.     When Ms. Majmudar saw a band leaving the south end of Union Square Park, she walked up Union Square East behind the band. (Majmudar Tr. at pp. 67-68, 73-78).

78.     At the corner of Union Square East and East 16th Street, Ms. Majmudar saw the police blocking traffic and directing everyone onto East 16th Street. (Majmudar Tr. at pp. 78, 80-81).

79.     Ms. Majmudar went down East 16th Street on the north side of the sidewalk, in the same direction as the band and other people. (Majmudar Tr. at pp. 80, 85-86, 93).

80.     Ms. Majmudar had no communication with the police as she walked onto East 16th Street. (Majmudar Tr. at p. 81).

81.     Ms. Majmudar saw no vehicular traffic on 16th Street. (Majmudar Tr. at pp. 204-205).

82.     Defendant James Essig ordered that everyone on 16th Street between Union Square East and Irving Place was to be arrested, including Deepa Majmudar.  (Essig Tr. at 21, 84-85, 154,159-162; 167-168; 178-183; 201-202; 225; 268; 282, 731-732, 744, 755-756; Monahan Tr. at pp. 355-362, attached as Exhibits "W" and "X" to Moore 16th Street Declaration).

83.     Neither James Essig nor any other member of the New York City Police Department had any personal knowledge of the individual conduct of Deepa Majmudar that served as the basis for her arrest.  (Memorandum and Order signed by Judge Francis on November 28, 2006.  Attached as Exhibit "H" to the Moore 16th Street Declaration).

84.     Ms. Majmudar stopped walking when the group of people in front of her was prevented from exiting 16th Street by a police barricade at the end. At that time she believed that

they would eventually be allowed to leave in an organized fashion. (Majmudar Tr. at pp. 86-91).

85.    After waiting for a few minutes, Ms. Majmudar walked west on the northern sidewalk on 16th Street to see if she could leave the way she came in. (Majmudar Tr. at pp. 92-93).

86.    When Ms. Majmudar reached the west side of East 16th Street, the police had barricaded the street and were not allowing people to leave. (Majmudar Tr. at pp. 94-96, 104-106).

87.    Ms. Majmudar repeatedly asked the police officers barricading the street if she could leave and explained that she was just attempting to pass through, showed the police the books she had just purchased and asked to be allowed to leave, but the police officers refused to let her out, and said, "No, nobody can leave right now," and, "Stay here. Everybody just stay here." (Majmudar Tr. at pp. 104-108).

88.    The police then told everyone to sit down on the sidewalk, and everyone, including Ms. Majmudar, sat down. (Majmudar Tr. at p. 108).

89.    A police officer told Ms. Majmudar to wait and that she would be allowed to leave eventually. (Majmudar Tr. at pp. 108, 111-113, 115).

90.    Ms. Majmudar first realized she was being arrested when police officers arrived with handcuffs and began handcuffing people. (Majmudar Tr. at pp. 113, 121).

91.    At no time did Ms. Majmudar hear an order to disperse. (Majmudar Tr. at p. 206).

92.    When Ms. Majmudar asked why she was being handcuffed and asked to leave, an officer told her, "sorry, you got caught in the wrong place at the wrong time but I have to do this." (Majmudar Tr. at pp. 115, 125).

93.     Ms. Majmudar saw other people being arrested who tried to leave and were prevented from leaving and ignored by police. (Majmudar Tr. at pp. 125-126).

94.     Ms. Majmudar again tried to speak to police officers and ask to leave;this time others who were being arrested also advocated for her, but the police responded, "If you punks had stayed home, these people wouldn't be here. So don't you try to be her advocate."(Majmudar Tr. at pp. 125-129).

95.     Ms. Majmudar was fingerprinted. (Majmudar Tr. at p. 168).

96.     Ms. Majmudar was charged with parading without a permit in violation of New York City Administrative Code Section 10-110, with disorderly conduct under New York Penal Law Secion 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct under New York Penal Law Section 240.20(6) for failing to comply with a lawful order to disperse.  (Criminal court complaint, criminal court records and certificate of disposition attached as Exhibit "R" to the Moore 16th Street Declaration).

97.     Ms. Majmudar was released from 100 Centre Street at around 2:00PM on September 2, 2011 with a Desk Appearance Ticket. (Majmudar Tr. at pp. 167, 174).

98.     Ms. Majmudar's charges were eventually dismissed on the motion of the District Attorney's Office. (Criminal court complaint, criminal court records and certificate of disposition attached as Exhibit "R"  to the Moore 16th Street Declaration; Majmudar Tr. at p. 175).

**Plaintiff Celine Malunum**

99.     On the afternoon of August 31, 2004, while at Chelsea Piers, Plaintiff CELINE MALANUM made plans with her roommate, Ms. Chandra, to meet up for drinks and dinner after Ms. Chandra was done with her day's work. (Malanum Tr. at pp. 7-8, 192-194).

13

100.     At the time. Ms. Malanum was working at a restaurant named Raoul's located in SoHo. (Malanum Tr. at p. 54).

101.     Ms. Malanum has a B.A. in English Literature from San Francisco State University. (Malanum Tr. at p. 57).

102.     The two roommates met near the Time Warner Center and took the subway down to Union Square with the intent to have dinner. (Malanum Tr. at pp. 194-195, 198-199).

103.     When they arrived at Union Square they were talking and looking around and commenting on what was going on around them – there were a lot of people in the area, including police around the perimeter of Union Square Park, as well as music and noise. (Malanum Tr. at pp. 200-202, 206-210).

104.     Ms. Malanum did not see cars on Union Square East. (Malanum Tr. at pp. 205, 257-258).

105.     She did not hear any police officer give any instructions or warnings. (Malanum Tr. at pp. 210-211).

106.     Ms. Malanum saw a marching band going northbound on Union Square East. (Malanum Tr. at pp. 216-217).

107.     She and Ms. Chandra walked north on Union Square East on the east sidewalk, some distance behind the band. (Malanum Tr. at pp. 213-215, 256).

108.     At some point before the intersection of Union Square East and 16th Street, some police from among the large police presence began moving in the same direction as the band, but Ms. Malanum was not worried about the police because they did not seem aggressive. (Malanum Tr. at pp. 229-231).

109.    Other people were also walking on the sidewalks, but the only people she could say for certain she saw in the streets were police. (Malanum Tr. at p. 236).

110.    As she approached the intersection of Union Square East and 16th Street, the police did not seem concerned with the crowd and officers were talking to people and each other. (Malanum Tr. at p. 244).

111.    She turned east down 16th Street because police scooters were on Union Square East and "nobody was allowed to go anywhere else but onto 16th Street because of the police" on scooters who made it "impossible" for her to continue going north on Union Square East and forced her to turn east onto 16th Street. (Malanum Tr. at pp. 246-251).

112.    Defendant James Essig ordered that everyone on 16th Street between Union Square East and Irving Place was to be arrested, including Celine Malanum.  (Essig Tr. at 21, 84-85, 154,159-162; 167-168; 178-183; 201-202; 225; 268; 282, 731-732, 744, 755-756; Monahan Tr. at pp. 355-362, attached as Exhibits "W" and "X" to Moore 16th Street Declaration).

113.    Neither James Essig nor any other member of the New York City Police Department had any personal knowledge of the individual conduct of Celine Malunum that served as the basis for her arrest.  (Memorandum and Order signed by Judge Francis on November 28, 2006.  Attached as Exhibit "H" to the Moore 16th Street Declaration).

114.    She heard no police directions and no dispersal orders. (Malanum Tr. at p. 249).

115     She saw no vehicular traffic aside from police vehicles and she was sure that vehicular traffic could have proceeded if the police had not been blocking the street. (Malanum Tr. at pp. 257-260).

116.    The first time Ms. Malanum became worried about the police was later, when

15

"they barricaded her on 16th Street and did not let her leave" at Irving Plaza. (Malanum Tr. at p. 227, 246).

117.     Ms. Malanum was never standing in 16th Street itself – she remained on the sidewalks. (Malanum Tr. at pp. 287-288).

118.     She eventually observed a police barricade at Irving Place through which the police were not letting people leave. (Malanum tr. at p. 277, 285).

119.     She turned west toward Union Square East to try to exit the block that way, but observed another line of police officers barricading the Union Square East end of the street as well. (Malanum Tr. at pp. 278-279, 284).

120.     Ms. Malanum tried to get back to Union Square but the police were saying, "You can't go through here" and would not explain why they were blocking the street. (Malanum Tr. at pp. 280-281).

121.     At that point, Ms. Malanum stopped on the north side of the sidewalk, and she remained within around a five foot radius of that area for around the next three hours. (Malanum Tr. at pp. 286-287).

122.     During that time, Ms. Malanum repeatedly asked police why she could not leave, and got no answer. (Malanum Tr. at p. 291).

123.     A police officer eventually handcuffed Ms. Malanum, she was ordered to move across the street and sit down on the south sidewalk, and turned over to another NYPD officer who was apparently assigned to be her "arresting officer." (Malanum Tr. at pp. 340, 361-365).

124.     After arriving at Pier 57, Ms. Malanum was put in a series of cages with barbed wire at the top. The floor of the cages was black like charcoal. (Malanum Tr. at pp. 398-399,

16

402).

125.    Ms. Malanum was eventually transported to Central Booking and fingerprinted. (Malanum Tr. at p. 423-424).

126.    Because she had valid identification on her, Ms . Malanum was released from Central booking with a Desk Appearance Ticket at some time between 9:30AM and 11:30AM on September 2, 2011. (Malanum Tr. at pp. 424-425).

127.    Ms. Malanum was charged with parading without a permit in violation of New York City Administrative Code Section 10-110, with disorderly conduct under New York Penal Law Section 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct under New York Penal Law Section 240.20(6) for failing to comply with a lawful order to disperse.  (Criminal court complaint, criminal court records and certificate of disposition attached as Exhibit "R" to the Moore 16th Street Declaration; Malanum Tr. at p. 433).

128.    Ms. Malanum appeared in court several times before two of the charges, parading without a permit and failing to comply with a lawful order were dismissed outright, and following a two-day trial, she was acquitted of the remaining charge of blocking vehicular and pedestrian traffic. (Criminal court complaint, criminal court records and certificate of disposition attached as Exhibit "R" to the Moore 16th Street Declaration; Malanum Tr. at pp. 427-428, 433).

**Plaintiff Danielle Walsh**

129.    On August 31, 2004, Plaintiff DANIELLE WALSH had plans to meet her friend Caitlin at Virgin Records on 14th Street near Union Square after her day's work as a receptionist at a doctor's office on 68th Street and York Avenue. (Walsh Tr. at pp. 7, 13).

130.    Ms. Walsh lived at 47-30 61st Street, Apartlemtn 12G, Woodside, New York

17

11377. (Walsh Tr. at p. 4).

131.    At the time of the RNC, Ms. Walsh was studying Digital Art and Design at Queensborough Community College. (Walsh Tr. at pp. 8-10).

132.    Ms. Walsh had no plans to attend protests during the RNC. (Walsh Tr. at p. 12).

133.    On arriving in the area of Virgin Records at around 5:30 p.m., Ms. Walsh met her friend Caitlin and one of Caitlin's friends, and they browsed together in Virgin Records for around 15 minutes.  (Walsh Tr. at pp. 14-15).

134.    After leaving the store, they went to the east side of Union Square Park, where they noticed there were more people, and police, than usual. (Walsh Tr. at pp. 15-16).

135.    For the next half hour, they sat on a bench in the park (Walsh Tr. at pp. 16-17).

136.    The other two women left Ms. Walsh to see what was going on in the south side of Union Square Park, where they had seen people carrying signs on leaving Virgin Records. (Walsh Tr. at pp. 17-18).

137.    After about fifteen minutes, Ms. Walsh got up to look for them, and she eventually found them in the south end of the park. (Walsh Tr. at p. 19).

138.    At that point, Ms. Walsh wanted to leave, but the others wanted to stay. (Walsh Tr. at pp. 19-20).

139.    Her friends eventually began to walk behind a band that went north on Union Square East, so Ms. Walsh "just went." (Walsh Tr. at pp. 20-22).

140.    They walked on the sidewalk except when crossing the street at Union Square East. (Walsh Tr. at pp. 31-32, 81).

141.    Before entering East 16th Street, Ms. Walsh did not see any police barricades or

barriers. (Walsh Tr. at p. 82).

142.    On 16th Street, Ms. Walsh did not see any vehicular traffic. (Walsh Tr. at p. 30).

143.    Within a few minutes after entering 16th Street, Ms. Walsh saw that police had blockaded the street near Irving Plaza. (Walsh Tr. at pp. 32, 82, 84-85).

144.    Defendant James Essig ordered that everyone on 16th Street between Union Square East and Irving Place was to be arrested, including Danielle Walsh.  (Essig Tr. at 21, 84-85, 154,159-162; 167-168; 178-183; 201-202; 225; 268; 282, 731-732, 744, 755-756; Monahan Tr. at pp. 355-362, attached as Exhibits "W" and "X" to Moore 16th Street Declaration).

145.    Neither James Essig nor any other member of the New York City Police Department had any personal knowledge of the individual conduct of Danielle Walsh that served as the basis for her arrest.  (Memorandum and Order signed by Judge Francis on November 28, 2006.  Attached as Exhibit "H" to the Moore 16th Street Declaration).

146.    Ms. Walsh turned around and tried to exit the block on the west side of 16th Street and asked officers, "I'm not protesting, why are you blocking me in?", but the officers ignored her. (Walsh Tr. at pp. 26-27, 37, 83-85).

147.    She saw that the other end of the street was blocked with netting and officers. (Walsh Tr. at p. 83).

148.    She did not see anyone else allowed to leave. (Walsh Tr. at pp. 26-27, 85).

149.    She spoke to other officers who also ignored her. (Walsh Tr. at pp. 26-27, 37-38).

150.    Up until that point, Ms. Walsh had heard no police orders or directives. (Walsh Tr. at pp. 27-28).

151.    Eventually, an officer announced over a bullhorn that people were being arrested

and instructed people to "get on the sidewalk, out of the street" (though Ms. Walsh was already on the sidewalk). (Walsh Tr. at pp. 28-29, 32-33).

152.    Ms. Walsh spoke to officers attempting to leave both before and after the announcement was made. (Walsh Tr. at pp. 37, 56-57).

153.    Ms. Walsh observed police pull one woman who stayed in the street by her ponytail to the ground and mace her, as well as police taking band instruments and throwing them violently. (Walsh Tr. at pp. 33-34, 100).

154.    After around an hour, police put people into groups of five and assigned them arresting officers who handcuffed them. (Walsh Tr. at p.p. 40-41).

155.    In one of the cells at Central Booking, Ms. Walsh passed out from lack of water. When she asked for water, she was ignored. (Walsh Tr. at p. 51).

156.    Ms. Walsh had her New York State identification on her, but nobody asked her to produce it. (Walsh Tr. at p. 64).

157.    Ms. Walsh was fingerprinted at Central Booking. (Walsh Tr. at p. 64).

158.    Ms. Walsh was charged with disorderly conduct under New York Penal Law Secion 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct under New York Penal Law Section 240.20(6) for failing to comply with a lawful order to disperse. (Criminal court complaint and certificate of disposition attached as Exhibit "R" to the Moore 16th Street Declaration).

159.    Walsh eventually appeared before a judge and was offered and accepted an Adjournment in Contemplation of Dismissal. ((Criminal court complaint and certificate of disposition attached as Exhibit "R" to the Moore 16th Street Declaration; Walsh Tr. at p. 71).

**Plaintff Emily Friedman**

160.    On August 31, 2004, plaintiff EMILY FRIEDMAN was a 16 year old high school student and had never been arrested before. (Friedman Tr. at pp. 80, 212).

161.    On August 31, 2004, Ms. Friedman lived with her parents at 275 West 96th Street, New York, New York  10025. (Friedman Tr. at pp. 8-9).

162.    On August 31, 2004, Ms. Friedman was part of a radical cheerleading squad. Radical cheerleading is a form of performance art used at protests to help inspire crowds and to get people excited instead of just standing there. (Friedman Tr. at pp. 19-25).

163.    She and the other cheerleaders had made a very distinct plan to try very hard not to get arrested. (Friedman Tr. at pp. 174-175).

164.    On August 31, 2004, at around 4:00 pm, a friend of Ms. Friedman's received a text message informing her that there were people gathering at Union Square. (Friedman Tr. at pp, 173-174, 222-223.)

165.    Ms. Friedman and her friend then took the subway to Union Square to find out what was happening. (Friedman Tr. at pp. 224-225, 234-235).

166.    In Union Square Park, Ms. Friedman and other radical cheerleaders performed some cheers near the fountain area of the park. (Friedman Tr. at pp. 232-233).

167.    While Ms. Friedman was in Union Square Park, she saw a band moving up Union Square East. She did not know who they were or what their plans were. (Friedman Tr. at pp. 237-241, 252-253).

168.    Ms. Friedman went out of the park with a crowd of people moving in the same direction as the band. (Friedman Tr. at p. 241).

169.     Ms. Friedman walked up Union Square East on the sidewalk. (Friedman Tr. at pp.

242-244).

170.     After leaving Union Square Park, Ms. Friedman found herself surrounded by a

crowd that she felt was too large, and she wanted to leave. (Friedman Tr. at pp. 242, 255, 268).

171.     Ms. Friedman crossed from the west sidewalk on Union Square East over to the

east sidewalk on Union Square East at 15th Street in order to get away from the park. (Friedman

Tr. at pp. 250-251, 256).

172.     Ms. Friedman decided to continue up Union Square East until she reached a side

street that she could go down to get away from the crowd. (Friedman Tr. at p. 260).

173.     Ms. Friedman heard no police orders or directions. (Friedman Tr. at pp. 269, 279).

174.     Ms. Friedman saw no vehicular traffic on Union Square East. (Friedman Tr. at pp.

273-276).

175.     Ms. Friedman turned onto East 16th Street and walked to the end of the block in

order to get out of the crowd. (Friedman Tr. at pp. 283-284, 287-289).

176.     Defendant James Essig ordered that everyone on 16th Street between Union

Square East and Irving Place was to be arrested, including Emily Friedman.  (Essig Tr. at pp. 21,

84-85, 154,159-162; 167-168; 178-183; 201-202; 225; 268; 282, 731-732, 744, 755-756;

Monahan Tr. at pp. 355-362, attached as Exhibits "W" and "X" to Moore 16th Street

Declaration).

177.     Neither James Essig nor any other member of the New York City Police

Department had any personal knowledge of the individual conduct of Emily Friedman that served

as the basis for her arrest.  (Memorandum and Order signed by Judge Francis on November 28,

2006. Attached as Exhibit "H" to the Moore 16th Street Declaration).

178.    Ms. Friedman remained on the sidewalk at all times. (Friedman Tr. at pp. 265-266, 287).

179.    As she reached East 16th Street and Irving Place, Ms. Friedman was stopped by blue police barricades. (Friedman Tr. at pp. 288-290, 294).

180.    Ms. Friedman asked the police officers at the barricade if she could leave and was told no. She asked why not, and the police officers stopped speaking to her. (Friedman Tr. at pp. 294-295, 309).

181.    Ms. Friedman then turned around and walked west to try to exit at the other end of the street. (Friedman Tr. at p. 295).

182.    When Ms. Friedman reached the Union Square East side of East 16th Street, it was also blocked off by the police. (Friedman Tr. at p. 295).

183.    Ms. Friedman asked the police on that side if she could leave, and the police said no. (Friedman Tr. at p. 295, 312).

184.    Ms. Friedman walked up and down the north side of the street trying to enter the buildings and restaurants on the block, but there were police at every door preventing her from going in. (Friedman Tr. at p. 300).

185.    After Ms. Friedman learned that she could not leave the block, she stood on the sidewalk near the band and listened to them play. (Friedman Tr. at pp. 296-298, 308-309).

186.    As Ms. Friedman waited on the sidewalk, she saw the police "attack" the band, throwing members down, stepping on their heads, and taking their instruments and throwing them in the street. (Friedman Tr. at pp. 296-298, 324).

23

187.    At around 7:00pm, Ms. Friedman heard a police officer announce through a bullhorn that they were all under arrest. (Friedman Tr. at p. 301).

188.    At no time did Ms. Friedman hear any order to disperse from the police. (Friedman Tr. at pp. 269, 279, 315-321).

189.    Friedman would have complied with a dispersal order if one had been given and would have left the area if she had been given any opportunity to do so. (Freidman Tr. at p. 318).

190.    At some point, an officer walked up to Ms. Friedman and "arrested" her with a group of five people and put her in plastic handcuffs. (Friedman Tr. at p. 305, 354, 368).

191.    Ms. Friedman was at Pier 57 for almost 24 hours. (Friedman Tr. at p. 565).

192    Ms. Friedman's fingerprints were taken at Central Booking. (Friedman Tr. at p. 485).

193.    Ms. Friedman was ultimately released at around 7:00PM on September 2, 2011 and, because she had valid identification in her presence, given a Desk Appearance Ticket. (Friedman Tr. at pp. 8, 514).

194.    Ms. Friedman was charged with parading without a permit in violation of New York City Administrative Code Section 10-110 and with disorderly conduct under New York Penal Law Section 240.20(5) for blocking vehicular and pedestrian traffic.  (Criminal court complaint and certificate of disposition attached as Exhibit "R" to the Moore 16th Street Declaration).

195.    Ms. Friedman appeared in court around four times before the charges against her were ultimately dropped in January of 2005 by the Office of the District Attorney of New York County. (Criminal court complaint and certificate of disposition attached as Exhibit "R" to the

Moore 16th Street Declaration; Friedman Tr. at pp. 545-546).

### BASTIDAS v. CITY OF NEW YORK, 05 Civ. 7670

### Plaintiff Betty Bastidas

196.     Betty Bastidas is a professional photographer / photojournalist.  (Deposition transcript of Betty Bastidas, attached as Ex. 1  to the Rothman Decl., at 19:24; 22:8-15; 87:23-88:7; 101:16-103:10 (hereinafter Bastidas Tr.); See also, Newsday letter to Manhattan District Attorney's Office on behalf of Betty Bastidas, attached as Ex. 2  to the Rothman Decl.).

197.  Ms. Bastidas was arrested by the NYPD on the evening of August 31, 2004 on the block of East 16th Street between Union Square East and Irving Place (hereafter "E. 16[th] Street"). (Bastidas Tr. at 10:7-11:17).

198.     On August 31, 2004, Ms. Bastidas had professional press credentials with her, which she wore as badges hanging from her neck.  (Bastidas Tr. at 20:13-21:1; 22:23-23:16; See also, a copy of the press credentials, and an arrest Polaroid photo taken by the NYPD of Ms. Bastidas under arrest with her assigned "arresting officer", showing the press credentials around her neck, attached as Ex. 3  to the Rothman Decl.).

199.     Ms. Bastidas also had other photo identification, such as a driver's license, with her on August 31, 2004.  (Bastidas Tr. at 23:17-23:20).

200.     Earlier in the day and prior to her arrest, Ms. Bastidas was in Union Square working on a documentary project about the youth culture at Union Square.  (Bastidas Tr. at 11:18-11:24; 21:14-21:15; 122:5-124:5).

201.     Ms. Bastidas heard music coming from E. 16th Street, and so she went there, by herself, crossing over directly from Union Square Park onto 16th Street, sometime after a

procession of musicians and other people, and other people watching, were already on the block.

Ms. Bastidas went to E. 16th Street out of curiosity, and when she got close to the Irving Place

end of the block she saw the musicians and other people for the first time.  Ms. Bastidas did not

follow any group of people onto the block, and did not herself walk on Union Square East at all,

except to cross it directly from the park to get onto the block to find the source of the music.

(Bastidas Tr. at 17:23-18:23; 21:18-23; 129:2-130:14; 131:10-131:17; 148:13-148:24).

202.    There were many people on the block of E. 16th Street, both on the street and on

the sidewalk.  (Bastidas Tr. at 19:4-19:20).

203.    Ms. Bastidas had no idea, one way or the other, whether the people who were on

E. 16th Street had been issued a permit by the NYPD. (Bastidas Tr. at 21:24-22:3).

204.    Ms. Bastidas does not recall seeing any vehicular traffic on E. 16th Street in the

time prior to her arrest. (Bastidas Tr. at 30:16-30:19).

205.    Ms. Bastidas saw pedestrians on the sidewalks of E. 16th Street, watching what

was going on.  (Bastidas Tr. at 30:20-33:12).

206.    Ms. Bastidas was not aware that there was any potential problem with her

presence on E. 16th Street, and she approached E. 16th Street as she would any regular block in

New York.  (Bastidas Tr. at 28:17-28:19).

207.    It did not cross Ms. Bastidas' mind that she should leave the block in the time

prior to her arrest, because she was not doing anything wrong.  (Bastidas Tr. at 153:20-154:18).

208.    Ms. Bastidas never heard any order to disperse or other type of instruction to get

off of the block by the NYPD.  The only instruction she heard from the NYPD was to get on the

ground as part of the arrest process.  (Bastidas Tr. at 155:10-156:8).

209.    Ms. Bastidas wanted to get off of the block, and asked a police officer if she could exit the block, once she saw that people were being arrested, but she was unable to do so because the police did not permit her and the other people to exit the block.  (Bastidas Tr. at 156:9-157:6; 158:5-158:10).

210.    On E. 16th Street, in the period prior to her arrest, Ms. Bastidas - as a professional photographer - was photographing the people and the band that was playing music on E. 16th Street.  This required her to "work the situation" and move around the scene on the block, including briefly being in the street, in order to take photographs.  (Bastidas Tr. at 11:25-12:6; 17:3-17:12; 19:21-20:9; 106:15-107:5; 134:9-135:1).

211.    As a professional photographer, Ms. Bastidas is very aware of her surroundings and does not obstruct anybody when she is taking photographs.  (Bastidas Tr. at 140:13-141:3; 145:18-146:1).

212.    Ms. Bastidas observed the people on E. 16th Street make their way westward towards Union Square East because there was a line of police officers across E. 16th Street at the Irving Place end of the block.  (Bastidas Tr. at 131:4-131:9).

213.    Ms. Bastidas then observed another line of police officers across E. 16th Street near Union Square East blocking the people from proceeding westward towards Union Square East.  (Bastidas Tr. at 131:18-131:24; 133:11-133:14).

214.    Ms. Bastidas took photographs of the police line or lines that were preventing people from continuing westward from the block.  ((Bastidas Tr. at 135:11-136:9; See also photos marked as Bastidas Deposition Exs. 51-53, 56, 58, and 59, attached as Ex. 4 to the Rothman Decl.).

215.    The police instructed people to get on the sidewalk, which people complied with, and the police got aggressive and started throwing people to the ground and violently arresting people.  (Bastidas Tr. at 135:2-135:10; 136:10-136:14).

216.    Ms. Bastidas asked her assigned "arresting officer" why she was being arrested. (Bastidas Tr. at 24:2-24:16).

217.    The police told Ms. Bastidas and others to get down on their knees, and she and others remained crouching down for about two or three hours or so, at which point the police "flex-cuffed" people one by one until they got to her.  (Bastidas Tr. at 136:24-137:19; 141:4-141:11).

218.    Ms. Bastidas was fingerprinted by the NYPD during the time she was held in custody prior to her release.  (Bastidas Tr. at 192:16-193:8).

219.    Ms. Bastidas was held in NYPD custody for approximately forty hours, until she was released with a Desk Appearance ticket at approximately 10:28 a.m. on September 2, 2004. (Desk Appearance Ticket issued to Betty Bastidas, attached as Ex. 5 to the Rothman Decl.; See also Bastidas Tr. at 41:12-41:24).

220.    On October 5, 2004, when Ms. Bastidas went to the Criminal Court as required by the Desk Appearance Ticket, the Manhattan District Attorney's office declined to prosecute Ms. Bastidas.  The reason(s) set forth for the declination to prosecute was:

> Unable to Establish Necessary Element of the Crime – After investigation, the defendant appears to be a credentialed member of the press, and as such, the People would be unable to prove that defendant intended to cause public inconvenience annoyance or alarm, or recklessly created a risk thereof beyond a reasonable doubt.

(District Attorney of the County of New York Declination of Prosecution document, attached as Ex. 6 to the Rothman Decl.; See also Bastidas Tr. at 42:23-44:3).

221.    Betty Bastidas has never been arrested in her life other than during this incident on August 31, 2004 on E. 16th Street.  (Bastidas Tr. at 107:9-107:11).

**Plaintiff Lauren Caspar**

222.    Lauren Caspar was arrested by the NYPD on the evening of August 31, 2004 on the block of East 16th Street between Union Square East and Irving Place (hereafter "E. 16th Street").  (Deposition transcript of Lauren Caspar, attached as Ex. 7 to the Rothman Decl., at 11:1-11:22 (hereinafter Caspar Tr.)).

223.    Ms. Caspar was not participating in whatever demonstration activity was occurring on E. 16th Street or in the area.  (Caspar Tr. at 11:25-12:3, 16:2-19:2, 20:7-20:23, 151:22-152:7).

224.    Ms. Caspar was by herself on her way to her aunt's house, and wound up on E. 16th Street. (Caspar Tr. at 12:24-13:8, 16:19-16:24; 39:10-39:11; 41:4-41:13; 141:14-141:24; 148:21-149:2).

225.    There was a band on the block, and hundreds of people, but Ms. Caspar could not discern any organization among them. (Caspar Tr. at 13:12-14:16).

226.    Ms. Caspar had no idea, one way or the other, whether the people who were on E. 16th Street had been issued a permit by the NYPD. (Caspar Tr. at 16:2-16:7).

227.    Ms. Caspar had no reason to believe that she was doing anything wrong and that she should not go onto E. 16th Street, and she had no reason to believe when she entered E. 16th

Street that the police were going to trap the people who were on the block and arrest them (Caspar Tr. at 173:24-175:4).

228.   Other than if she lawfully crossed a street, Ms. Caspar was only on the sidewalk prior to the time when she was arrested.  (Caspar Tr. at 14:17-15:15).

229.   There were other pedestrians on the sidewalks, but it was not difficult for Ms. Caspar to navigate her way from one end of the block to the other in an attempt to leave the block.  (Caspar Tr. at 21:5-22:3, 157:19-157:23).

230.   At one point Ms. Caspar asked a police officer if she could stand where she was on the sidewalk, and he assured her that it was fine for her to stand there, and that she should stay back by the wall. (Caspar Tr. at 155:9-155:22).

231.   Ms. Caspar never heard any order to disperse or other type of instruction to get off of the block by the NYPD.  The only instruction she heard from the NYPD prior to being arrested was when she went to the east end of the block in an attempt to exit and was told, when she encountered a police line there, that she had to go to the west side of the block, where she encountered another police line and was told that they were not letting anyone exit the block there either.  The next order from the NYPD was to sit down.  (Caspar Tr. at 22:4-22:25, 151:6-152:7, 155:9-159:11, 166:8-166:23).

232.   Ms. Caspar tried to explain to the police that she had no connection with whatever was occurring on E. 16th Street, but to no avail. (Caspar Tr. at 166:8-166:23).

233.   After she and others were directed by the police to sit down, Ms. Caspar sat on the ground for a very long period of time, until she was placed into "flex cuff" handcuffs by the police. (Caspar Tr. at 176:7-176:20).

234.    Ms. Caspar had a valid New York State driver's license with her on August 31, 2004. (Caspar Tr. at 178:19-179:4).

234.    Ms. Caspar was fingerprinted by the NYPD during the time she was held in custody prior to her release. (Caspar Tr. at 205:3-205:5).

236.    Ms. Caspar believes that she was held in NYPD custody for approximately 31 hours, until she appeared before a judge and her case was dismissed by way of an adjournment in contemplation of dismissal at approximately 4:00 a.m. on September 2, 2004. (Caspar Tr. at 30:5-30:19).

**Plaintiff Gregg Ross**

237.    On August 31, 2001, Plaintiff Gregg Ross decided to pass by Union Square on his way home from work.  He worked several blocks away at the New School for Social Research. (Deposition transcript of Gregg Ross, attached as Ex. 1 to the Upton Decl., (hereinafter Ross Tr.) at 119:23-120:1; 118:15-19).

238.    Ross, alone, observed the goings on in the park for approximately 30-60 minutes at which time he heard and saw a group of people leave the park.  (Ross at 115:13-116:9; 116:13-17).

239.    Ross followed the group by crossing Union Square East and walking on the east sidewalk adjacent to Union Square East.  (Ross Tr. at 129:6-11).

240.    Due to a police line across Union Square East, Ross and the other persons were required to turn right at 16th St.  (Ross Tr. at 129:23-130:15).

241.    Ross continued to follow the group on the south sidewalk of 16th St.  Ross at 133:25-134:5.  He walked east until he observed, with one quarter of the block remaining, that

31

the block had been cordoned off by a line of police officers.  (Ross Tr. at 134:25-135:5).

242.    Ross then turned to walk back in the other direction to attempt to leave the block. (Ross Tr. at 136:23-137:2; 141:2-5).  As he got nearer to the Union Square East end of the block, he saw that it had also been sealed by a line of police stretching across 16th St. from building to building.  (Ross Tr. at 137:15-25).  He asked the police officers of the line if he could leave and received no verbal response, and no physical movement which could have permitted him to leave.  (Ross Tr. at 140:22; 148:23-149:17).

243.    Between the time he entered the block and was arrested, there was noise on the block from chanting and from music played by a band.  (Ross Tr. at 142:22-143:23).

244.    Ross remained on the sidewalk and at about this time police officers from the Union Square East line advanced and compacted and drove the civilians from the street to the buildings, and then directed them to sit down.  (Ross Tr. at 150:13-151:2).

245.    Ross was handcuffed by Police Officer Rufle.  (Ross Tr. at 151:21-23).

246.    Between the time that he followed the group and the time he was arrested, Ross had heard no directions from the police to leave the block, disperse, or other words to that effect. (Ross Tr. at 132:9-20).  To his recollection, the police were not saying anything, just standing. (Ross Tr. at 132:21-25).

247.    Ross had observed no vehicular traffic on Union Square East or 16th St. during the time he was on the sidewalk adjacent to those streets.  (Ross Tr. at 137:8-25).

248.    Ross had observed that there were pedestrians on 16th St. that were able to walk east and west as he did.  (Ross Tr. at 142:12-18).

249.    Ross was fingerprinted while in custody.  (Ross Tr. at 196:9-11).

32

250.    Ross had a driver's license with him at the time he was arrested.  (Ross Tr. at 172:20-22).

251.    Ross was released from Central Booking on Thursday night, September 2nd, after more than two days in custody.  (Ross Tr. at 197:24-198:13).

**Plaintiff Jarel Walden**

252.    On August 31, 2004, Jarel Walden went to Union Square Park with two friends to see what was going on there.  (Deposition transcript of Jarel Walden attached as Ex. 3 to the Upton Decl., (hereinafter"Walden Tr.") at 7:9-22; 90:23-91:3; 87:18-88:15).

253.    He arrived at Union Square between 3 to 3:30 pm.  (Walden Tr. at 92:5-7).  He walked around observing people, groups and performers.  (Walden Tr. at 96:4-7).  He also visited a store.  (Walden Tr. at 98:4-11).

254.    After returning to the park, he heard sounds from musical instruments and decided to follow the musicians.  (Walden Tr. at 101:17-20).

255.    At approximately shortly before 7 o'clock, the musicians left the park.  (Walden Tr. at 101:17-102:1).  Mr. Walden followed them out of the park, crossed Union Square East to the east side of Union Square East.  (Walden Tr. at 102:12-14).  Walden followed the musicians on the sidewalk.  (Walden Tr. at 14:3-11).

256.    The musicians and Walden turned right onto 16th St., due to a line of officers across Union Square East which blocked a continued path north on Union Square East.  (Walden Tr. at 106:4-8).

257.    He walked along the south sidewalk of 16th St.  (Walden Tr. at 107:7-9).

258.    Next, the band stopped moving and Mr. Walden saw a line of police at the eastern

33

end of the block at Irving Place. (Walden Tr. at 107:7-9; 110:1-6). When he saw the police line at Irving Place, he believed it was best to leave the block. (Walden Tr. at 110:13-16).

259.    After seeing the police line at Irving Place, Walden crossed to the north sidewalk of 16th St. and proceeded to the Irving Place end of the block with the intention of leaving the block. (Walden Tr. at 110:25-111:8).

260.    As he arrived at the Irving Place eastern end of 16th St., he saw and heard a woman request the police to leave the block. The police told her she had to go to the other end of the block to get out. (Walden Tr. at 111:13-25).

261.    Mr. Walden then walked west on the north side of the block, crossed the street to the other side and tried to get to the line of police at the west end of the block. (Walden Tr. at 112:4-10).

262.    Walden was unable to reach the line of police at the western end because as he approached them he saw that the police line was moving towards the center of the block, compressing the crowd. (Walden Tr. at 112:11-113:13).

263.    Walden never had a chance to ask to leave the block. (Walden Tr. at 114:1-3).

264.    Mr. Walden and the other civilians in his vicinity were then were pushed by the police up against the buildings on the south side of the street. (Walden Tr. at 114:20-25).

265.    Mr. Walden was later flex-cuffed and then handed over to Police Officer Salvatore DiMaggio. (Walden Tr. at 137:13-16).

266.    Between the time he followed the musicians out of Union Square Park until he was directed to the sidewalk, Walden only went on the street for the purpose of going from one sidewalk to another. (Walden Tr. at 15:17-25).

267.   Between the time he followed the musicians out of Union Square Park until he was directed to the sidewalk, Mr. Walden never heard a police announcement or order to disperse of any kind. (Walden Tr. at 20:24-21:23). Had he had an opportunity to disperse or leave he would have done so. (Walden Tr. at 133:25-134:1).

268.   Between the time he followed the musicians out of Union Square Park until he was directed to the sidewalk, Mr. Walden was not aware of whether or not the musicians or other persons following the musicians had a marching permit. (Walden Tr. at 18:7-17).

269.   Walden remembers no traffic being blocked on Union Square East. (Walden Tr. at 19:5-24).

270.   While Walden was adjacent to Union Square East, he remembers that pedestrians were able to use the sidewalk. (Walden Tr. at 19:25-6).

271.   While he was on 16th St., the sidewalk was not packed until after the police had closed off the block. (Walden Tr. at 117:25-118:5; 122:6-16).

272.   Walden did not see vehicles blocked by the crowd on 16th St. (Walden Tr. at 116:20-23).

273.   While in police custody, Mr. Walden was fingerprinted. (Walden Tr. at 159:22-24).

274.   Mr. Walden was released from custody on September 2, 2004, after being arraigned in Criminal Court. (Walden Tr. at 165:5-9).

**CONCEPCION v. CITY OF NEW YORK, 05 Civ. 8501**

**Plaintiff Jody Concepcion**

275.   Jody Concepcion was arrested by the NYPD on the evening of August 31, 2004

on the block of East 16th Street between Union Square East and Irving Place (hereafter "E. 16th

Street"). (12/19/06 deposition transcript of Jody Concepcion, attached as Ex. 8 to the Rothman

Decl., at 9:16-10:16, 24:10-25:1 (hereinafter "12/19/06 Concepcion Tr.").

276. Ms. Concepcion was on her way home when she came upon what appeared to her

to be festivities - people dancing, music playing - so she decided to take some photographs with

her camera. (12/19/06 Concepcion Tr. at 10:17-11:4, 12:2-13:3, 23:15-23:25).

277. Ms. Concepcion thought that there was a "really great vibe going on," that was

"really nice and very casual." (12/19/06 Concepcion Tr. at 135:17-136:11).

278. Ms. Concepcion saw musicians and other people leave Union Square Park, walk

in the roadway, and turn onto what she later found out was E. 16th Street. (12/19/06 Concepcion

Tr. at 126:3-126:16, 128:13-128:18).

279. Ms. Concepcion saw a police officer walking along with the people, which led her

to think that there was not anything problematic afoot. (12/19/06 Concepcion Tr. at 126:3-

126:25, 137:24-138:4).

280. Ms. Concepcion had no idea, one way or the other, whether the people who were

on E. 16th Street had been issued a permit by the NYPD. (1/25/07 deposition transcript of Jody

Concepcion, attached as Ex. 9 to the Rothman Decl., at 168:13-168:16 (hereinafter "1/25/07

Concepcion Tr.").

281. Ms. Concepcion followed the people and the music onto E. 16th Street. (12/19/06

Concepcion Tr. at 126:19-126:25, 129:23-130:1).

282. Other than if she lawfully crossed a street, Ms. Concepcion was only on the

sidewalk prior to the time when she was arrested. Ms. Concepcion never marched in the street.

(12/19/06 Concepcion Tr. at 18:7-19:10, 126:3-126:16, 129:3-129:8, 138:10-138:17, 178:1-178:5; 1/25/07 Concepcion Tr. at 179:22-180:2).

283.    There were a number of other people on the sidewalk as well. (12/19/06 Concepcion Tr. at 129:9-129:14; 1/25/07 Concepcion Tr. at 179:22-180:2).

284.    Once on E. 16th Street, Ms. Concepcion saw the people in the street proceed toward the Irving Place end of the block. (12/19/06 Concepcion Tr. at 130:2-130:8).

285.    Ms. Concepcion also walked towards the end of the block at Irving Place, when she saw police officers put up orange netting. (12/19/06 Concepcion Tr. at 130:10-130:14, 138:5-138:10).

286.    Ms. Concepcion asked to exit the block at the Irving Place side of the block. In response, she was at first told by a police officer to stay on the sidewalk, and then told she could exit the block at the other end (the Union Square East end) of the block. (12/19/06 Concepcion Tr. at 138:10-138:12, 140:15-141:16; 1/25/07 Concepcion Tr. at 148:12-149:6; 158:23-161:14).

287.    When Ms. Concepcion made her way back to the Union Square East end of the block, she encountered a "wall" of "riot police" who were "blocking it off" and preventing egress from that end of the block as well.  (12/19/06 Concepcion Tr. at 141:14-141:24, 142:14-142:15; 1/25/07 Concepcion Tr. at 149:7-149:21, 159:17-162:3).

288.    The sight of this wall of riot police blocking the exit from the Union Square East side of E. 16th Street terrified Ms. Concepcion. (12/19/06 Concepcion Tr. at 141:25-142:18; 1/25/07 Concepcion Tr. at 159:17-162:3).

289.    Ms. Concepcion never heard any instructions or warnings, or orders to disperse, from any members of the NYPD at any point prior to her arrest. (12/19/06 Concepcion Tr. at

136:23-137:23, 167:16-167:22, 168:21-169:3; 1/25/07 Concepcion Tr. at 146:20-147:24).

290.    The only instruction Ms. Concepcion heard the members of the NYPD give on E. 16th Street was to sit, once the people were already trapped on the block by the police and under arrest. (12/19/06 Concepcion Tr. at 142:8-142:21).

291.    If Ms. Concepcion had heard an order to disperse, she would have complied with it. (1/25/07 Concepcion Tr. at 148:1-148:19).

292.    Ms. Concepcion sat for a while, until she was eventually placed in "flexcuff" handcuffs by the police. (12/19/06 Concepcion Tr. at 145:24-147:1).

293.    Ms. Concepcion was fingerprinted by the NYPD during the time she was held in custody prior to her release. (1/25/07 Concepcion Tr. at 124:5-124:10).

294.    Ms. Concepcion was held in NYPD custody for approximately forty-eight hours, until she was released with a Desk Appearance ticket at approximately 7:16 p.m. on September 2, 2004. (12/19/06 Concepcion Tr. at 25:23-26:8; *See also*, Desk Appearance Ticket issued to Ms. Concepcion, attached as Ex. 10 to the Rothman Decl.).

**RIGBY v. CITY OF NEW YORK, 05 Civ. 7751**

**Plaintiff Theo Rigby**

295.    Theo Rigby, a professional freelance photographer and journalist, was at Union Square Park on August 31, 2001 to photograph the subjects of a story he was working on, and to cover the events in the park for possible publication. (Deposition transcript of Theo Rigby, attached as Ex. 2 to the Upton Decl., (hereinafter referred to as "Rigby Tr.") at 94:12-22; 172:21-173:16). Rigby submitted photographs to publications such as Newsweek magazine and the San Francisco Chronicle for potential publication. (Rigby Tr. at 67:20-69:1).

296.    Rigby arrived at the park alone in the early afternoon.    (Rigby Tr. at 152:12-19).

297.    At a certain point, Rigby saw a large group of people leaving the park.  He followed them to see what was going on and to take photographs.  (Rigby Tr. at 164:1-16).

298.    As the group exited the park, Rigby was on the park side sidewalk.  (Rigby Tr. at 180:21-181:1).

299.    Rigby crossed Union Square East at 16th St. in or close to the crosswalk.  (Rigby Tr. at 181:15-24; 195:24-196:8).

300.    Rigby was at the tail end of the group.  (Rigby Tr. at 182:20-23).

301.    Rigby followed the group into 16th Street and hurried to get to the front of the group so he could learn what was going on.  (Rigby Tr. at 200:6-13).

302.    Mr. Rigby walked quickly east on the south sidewalk of the block to get ahead of the moving group, so that he could get a photograph of the front of the group, until he reached the eastern end of the block at Irving Place.  (Rigby Tr. at 202:1-21).

303.    Rigby saw no vehicular traffic on 16th St. at this time.  (Rigby Tr. at 211:3-6).

304.    Due to a line of police officers across 16th St. at Irving Place, Rigby and the other civilians were unable to continue.  (Rigby Tr. at 201:5-17).

305.    Rigby turned and began taking photographs of the crowd.  (Rigby Tr. at 202:9-18).  He was approximately 5-10 feet from the protesters when he took the photographs and approximately 10-15 feet from police officers.   (Rigby Tr. at 213:14-23).

306.    No police tried to stop him from taking photographs.   (Rigby Tr. at 213:24-214:1).

307.    After he had taken photographs, Rigby noticed that the police at Irving Place had

taken out an orange net to block the intersection.  (Rigby Tr. at 205:10-15).

308.   Believing that things were getting violent, Rigby approached the police at Irving Place to attempt to leave the block but he saw that the police had blocked the entire space and were not permitting persons to leave the block.  (Rigby Tr. at 177:13-178:6).

309.   He immediately went to police officers in a line at the Union Square East end of the block.  He told an officer in the line that he was a photographer, not a protester, and that he requested to leave, but he was denied.    (Rigby Tr. at 206:17-207:7).

310.   Rigby testified that there was no difficulty moving on the sidewalk.  (Rigby Tr. at 243:9-16).

311.   Rigby photographed two arrests and was knocked to the ground by a police officer who was joining the arrest.  (Rigby Tr. at 217:4- 219:16).

312.   He immediately went to the sidewalk.  (Rigby Tr. at 220:9-19).

313.   Shortly thereafter, the police line at Union Square East proceeded east, compacting the civilians, and the civilians were directed to the sides.  (Rigby Tr. at  218:15-219:7).

314.   While he was on the sidewalk Rigby spoke to a white-shirted police captain or other high-ranking police officer, who was appeared to be designated to handle press credentials issues.  (Rigby Tr. at  171:7-172:4).

315.   Rigby showed the officer his business card and offered to call a senior national news editor from Newsweek to establish his professional status.  (Rigby Tr. at  172:21-173:5).

316.   As a freelance photographer without a specific assignment, Mr. Rigby was unable to obtain a New York City RNC press pass.  (Rigby Tr. at 173:17-175:24).

317.    The police official refused to recognize Rigby, and he and other professional photographers who did not have the NYPD RNC press pass were not allowed to leave the location and were arrested.   (Rigby Tr. at 173:13-176:12).

318.    From the time he entered 16th St. from Union Square East until the time he was taken into custody, Rigby heard no police instruction to leave or disperse.  (Rigby Tr. at 214:2-25; 222:18-223:15).

319.    The only instruction he heard was an instruction to the crowd to go to the sidewalk after the crowd had been compacted and cordoned off.  (Rigby Tr. at 222:18-223:15).

320.    Rigby had no knowledge as to whether or not the group had a parade permit. (Rigby Tr. at 268:18-269:9).

321.    Mr. Rigby was handcuffed by the police, and then placed in a bus 1.5 to 2 hours later.  (Rigby Tr. at 255:16-25; 257:14-25).

322.    Mr. Rigby was fingerprinted by the NYPD during the time he was held in custody prior to his release.  (Rigby Tr. at 299:11-13).

323.    In addition to his business card, Rigby was carrying a driver's license and a credit card.  (Rigby Tr. at 180:10-12).

324.    Mr. Rigby was held in NYPD custody for approximately 39-40 hours, until he was released with a DAT on September 2nd in the late morning or early afternoon.  (Rigby Tr. at 12:14-13:1; 13:2-6; 13:17-14:4).

**TIKKUN v. CITY OF NEW YORK, 05 Civ. 9901**

**Plaintiff Kaitlyn Tikkun**

41

325.    Plaintiff Kaitlyn Tikkun was arrested on August 31, 2004 on 16th Street East of Union Square. Ex. A To Ritchie Decl. (Tikkun Tr. at 7:12-22).

326.    Ms. Tikkun accompanied a friend of hers to Union Square in the afternoon of August 31st, 2004. She had no intention of participating in a protest, demonstration, or parade. (Tikkun Tr. at 9:25–10:17; 17:16-25; 136:18-20).

327.    When they arrived at Union Square, they saw a marching band playing in Union Square. They followed the marching band onto East 16th St. (Tikkun Tr. at 9:25–10:17; 17:16-25; 136:18-20).

328.    When leaving Union Square Park, Ms. Tikkun obeyed all traffic signals, making every effort to avoid arrest. (Tikkun Tr. at 21:24-22:13; 22:22-22:24).

329.    Ms. Tikkun followed the crowd following the marching band onto East 16th Street. She first became aware that she was trapped and could not leave when she observed police set up orange netting behind the crowd on the west side of East 16th Street. (Tikkun Tr. at 32:3–32:11).

330.    Ms. Tikkun never heard any orders to disperse. If she had heard an order to disperse, she would have dispersed. (Tikkun Tr. at 138:9-10).

331.    Ms. Tikkun had valid photo ID on her at the time of her arrest. She was never asked to produce it and was not taken up on her offer to produce it. (Tikkun Tr. at 16:4–17:6).

332.    Ms. Tikkun was fingerprinted. (Tikkun Tr. at 104:22-25).

333.    The charges against Ms. Tikkun were dismissed. (Tikkun Tr. at 126:16-17).

**Defendant NYPD Deputy Inspector James Essig**

334.    At the time of the RNC, Defendant JAMES ESSIG was a Deputy Inspector

("D.I.") in the NYPD, the Commanding Officer of the 41st Precinct, and was a supervisor in charge of one of the RNC "mobile field forces" in the area east of Fifth Avenue and south of 34th Street. (Essig Tr. at pp. 17, 61-62; 77-79).

335.    D.I. Essig arrived in the north end of the Union Square area some time before 7 p.m. and initially saw many people and police officers – but no unlawful activity - in the park. (Essig Tr. at pp. 95-97, 99).

336.    On arriving at Union Square East just north of 14th Street, D.I. Essig observed a "large, noisy" group of people heading north along Union Square East, the front of which was just reaching 16th Street. (Essig Tr. at pp. 94, 100-103, 262).

337.    D.I. Essig made the decision to arrest the people for disorderly conduct and parading without a permit as soon as he saw they had left Union Square Park. (Essig Tr. at pp. 21, 84-85, 154,159-162; 167-168; 178-183; 201-202; 225; 268; 282, 731-732, 744, 755-756).

338.    D.I. Essig did not see the people when they initially left the park. (Essig Tr.at pp. 99-100).

339.    D.I. Essig saw a line of police officers preventing the people from continuing northward past 16th Street and the officers were affirmatively diverting the people into the East 16th Street block at Union Square East and 16th Street. (Essig Tr. at pp. 101-102, 263-265).

340.    D.I. Essig never informed the officers who had formed a line across 16th Street at the Union Square East end of the block that he intended to allow certain people to leave the block. (Essig Tr. at pp. 760-762).

341.    D.I. Essig did not see any moving vehicular traffic on 16th Street, and the police were preventing vehicular traffic from entering 16th Street. (Essig Tr. at pp. 762-763).

342.    D.I. Essig did not tell anyone to leave the area or they would be arrested. (Essig Tr. at pp. 158-159).

343.    D.I. Essig did not want the people who were on 16th Street to leave the block, since they were to be arrested. (Essig Tr. at pp. 755-756; 781-786).

344.    D.I. Essig then passed the front of the people and onto Irving Place, where police officers formed a line across East 16th Street at its intersection with Irving Place. (Essig Tr. at p. 105).

345.    Essig gave an unamplified order for the band and the marchers to "stop." (Essig Tr. at pp. 115-116; 755-756).

346.    D.I. Essig ordered the arrests of everyone detained on East 16th Street between the two police lines on Union Square East and Irving Place. (Essig Tr. at pp. 293-297).

347.    D.I. Essig proceeded at a "half trot" to the East 16th Street block and positioned himself halfway down East 16th Street closer to Irving Place than to Union Square East. (Essig Tr.at pp. 102-103, 105, 263).

348.    D.I. Essig was trying to shout instructions, without the use of a bullhorn, for the crowd to stop, and to tell the crowd that they could not march that direction.  Essig did not know whether people could hear his instructions or not.  (Essig Tr. at pp. 112-113, 115-116; 144, 365).

349.    It was so loud on the block that people could not hear Essig's radio communications, and D.I. Essig "couldn't hear [himself] even talking at that point."  (Essig Tr. at pp. 123-124, 276).

350.    In a video that D.I. Essig reviewed prior to his deposition, he could not hear himself give the directives to stop he claims he gave at 16th Street and Irving Place.  (Essig Tr. at

pp. 247-248).

351.    "Because of the noise level and conditions on the street, "nobody could hear"

what D.I. Essig was saying. (Essig Tr. at pp. 120, 365-366, 490, 492-494, 752).

352.    The noise was so loud that, when Chief Terrence Monahan came later on scene

and gave instructions with a bullhorn to the arrestees that caused them to sit down, D.I. Essig

could not hear Monahan's instructions that were given through a bullhorn.  (Essig Tr. at pp. 144-

147, 370-371).

353.    D.I. Essig had a bullhorn on August 31, 2004, but he left it in the trunk of his car

when he was in the Union Square Park area, and at no point attempted to have anyone from the

NYPD retrieve it from the car for him to use on E. 16th Street.  (Essig Tr. at pp. 717-718; 758-

759).

354.    D.I. Essig's (inaudible) orders were limited to telling the people to stop.  D.I.

Essig never gave any orders to disperse, and never heard any other member of the NYPD give

any orders to disperse.  (Essig Tr. at pp. 121, 142-144, 148-149, 158-159, 740-744, 751-752,

778-780, 783, 790-782).

355.    Other than Essig's (inaudible) orders to the people telling them to stop, and Chief

Monahan's later instructions to the arrestees to sit down, Essig is not aware of any other orders

given by members of the NYPD. (Essig Tr. at p. 153).

356.    D.I. Essig got to 16th Street and Irving Place.  (Essig Tr. at p. 104).

357.    D.I. Essig, directed other officers who were present at 16th Street and Irving Place

to form a line of officers to stop people from leaving 16th Street by way of Irving Place, and the

people "stopped when they [saw] the line of police officers" at Irving Place.  (Essig Tr. at pp.

105, 110, 121).

358.     Eventually, D.I. Essig and other command officers on the scene, including D.I.

Dieckmann and then Inspector Galati, who had come on the scene, came together to develop

some sort of strategy to implement the mass arrest of the people in the block per Essig's direction

to do so. (Essig Tr. at pp. 125-128, 138-142, 155-156, 164-165, 170-175, 277, 281).

359.     The mass arrests were then effected from approximately 7:15 or 7:30 p.m. until

approximately 9:00 or 10:00 p.m., through the use of police "wedge formations" and orange

mesh netting.  (Essig Tr. at pp. 127, 129-136, 151).

360.     Once both ends of the block were sealed, everyone present on the block – other

than those with regard to whom the NYPD exercised its discretion to release – was arrested.

(Essig Tr. at pp. 295, 307, 489).

361.     D.I. Essig estimated that approximately 270 or so people were arrested on East

16th Street on August 31, 2004.  (Essig Tr. at p. 162).

362.     During RNC mass arrests, the NYPD's practice was for each "arresting officer"

who was assigned arrestees to be limited to taking a maximum of five arrestees to process.

(Essig Tr. at pp. 666-667).

363.     D.I. Essig made his decision to make the mass arrest of the people on the block

without knowing what conduct any particular individual had been doing or was engaged in.

(Essig Tr. at pp. 163-164, 184, 229, 297-303, 394, 536-540, 776-778, 780-781, 788; see also the

order of Magistrate Judge James C. Francis IV dated November 28, 2006, attached as Exhibit "  "

to the Moore 16th Street Declaration).

**Defendant NYPD Deputy Inspector Gerald Dieckmann**

364.     On August 31, 2004, DefendantGERALD DIECKMANN was a Deputy Inspector (D. I). whose regular duties were to oversee the 120th Precinct as its Commanding Officer. (Dieckmann Tr. at pp. 13-14).

365.     During the RNC, D.I. Dieckmann "was assigned to the mobile field forces." (Dieckmann Tr. at p. 40).

366.     D.I. Dieckmann arrived in the area of Union Square Park at some time in the afternoon of August 31, 2004. (Dieckmann Tr. at  p. 52).

367.     He parked his car on the north side of the park and "got out and walked around the park." (Dieckmann Tr. at p. 53).

368.     After he was there for a while "there appeared to be nothing really going on," so he went back to his police car to "drive around some more and see if other stuff was going on." (Dieckmann Tr. at pp. 55-57).

369.     He turned south onto Union Square East and as he got to about the intersection of Union Square East and 16th Street, he "observed a large crowd of people coming out of the southern tip of the park . . . northbound towards [him] on Union Square East blocking the entire roadway." (Dieckmann Tr. at p. 57).

370.     D.I. Dieckmann observed some scooters parked on 16th Street and Union Square East, and he "yelled to them to get across the street to block Union Square East." (Dieckmann Tr. at p. 58).

371.     The scooters "formed a makeshift line" to block Union Square East at 16th Street. (Dieckmann Tr. at  p. 58).

372.     Faced with the line of scooters, people were forced to go east on 16th Street as

47

directed. (Dieckmann Tr. at p. 62).

373.    D.I. Dieckmann believed that "immediately upon them coming out of the park and blocking Union Square East" everyone was committing disorderly conduct and parading without a permit. (Dieckmann Tr. at pp. 91-92, 110, 118-119).

374.    D.I. Dieckmann stayed on the corner for "probably not more than a minute or two" and then himself went East on 16th Street "trying to get in front." (Dieckmann Tr. at pp. 64-65).

375.    At that corner, D.I. Dieckmann did not see any civilian vehicular traffic. (Dieckmann Tr. at pp. 73-74).

376.    By the time D.I. Dieckmann got down about twenty feet away from the Irving Place side of 16th Street, he again saw D.I. Essig and "some police personnel at the end of the block" along with a "group" that had "stopped."( Dieckmann Tr. at p. 65).

377.    There was already a line of officers in the street running north to south blocking the exit from 16th Street through Irving Place. (Dieckmann Tr. at pp. 70, 99).

378.    At that point he "knew that [the people] were going to be placed under arrest" and he had a conversation with Essig "about how to do it . . . safely." (Dieckmann Tr. at p. 116).

379.    Eventually "reinforcements arrived" and the commanders "brought more officers on the block" and used them to "back up" people from Irving Place to somewhere around the middle of the block. (Dieckmann Tr. at p. 79).

380.    At some point the entire block of 16th Street between Irving Place and Union Square East was closed off at both ends by police personnel and D.I. Dieckmann intended to arrest everyone between those two police lines.  (Dieckmann Tr. at p. 155).

381.    At some point perhaps between 20 and 40 minutes after D.I. Dieckmann arrived on 16th Street, Deputy Chief Terence Monahan arrived and made an announcement to the crowd with a bullhorn that everybody was going to be placed under arrest. (Dieckmann Tr. at pp. 111-112).

382.    Prior to that moment, D.I. Dieckmann did not hear any other police officer make any announcement to or try to address the people, and he never heard any police warnings or orders to disperse. (Dieckmann Tr. at pp. 112-114).

**The Video Evidence**

383.    At about 6:58 PM, on August 31, 2004, a marching band left Union Square Park at the south east corner and, following a crowd in already in the street, proceeded north on Union Square East in the east side southbound traffic lane to 15th Street.  (Video: Hall, 18:57 to 18:59:15).

384.    At 15th Street the band reached the end of a large park like island separating the north and south board traffic lanes and followed the crowd over to the northbound traffic lanes of Union Square East to 16th Street.  (Video: Hall, 18:59:15 to 19:01).

385.    About one minute ahead of the band on Union Square East between East 15th and East 16th were puppets representing Wizard of Oz characters leading a large group of people north on Union Square East.  In front of the group of people in the street was an unmarked police car with emergency lights flashing and two ranking, 'white shirt,' officers of the NYPD.  (Video: Swimberge, 26:40 to 27:00).

386.    A line of police officers, on foot and on scooter, directed the group east on East 16th street.  The band turned east on East 16th Street at about 7:01 PM.  (Video: Hall, 19:01:00 to

19:01:15; Swimberge, 28:00 to 28:50; Rothman, 30:50 to 31:45; TARU 86, 19:00:42 to

19:01:15; TARU 87, 19:00:00 to 19:00:55; TARU 152, 30:00 to 30:05).

387.    At the rear of the procession was a NYPD Van and a score of NYPD officers on

foot.  There were numerous people accompanying the procession on the sidewalks on Union

Square East.  (Video: Vault, 30:50 to 31:40; TARU 87, 19:00:42; Hall, 18:59 to 19:01).

388.    There were NYPD scooters riding alongside the crowd.  (Video: Hall, 19:00:24;

Swimberge, 28:35).

389.    As the procession turned east on East 16th Street there were scores of people who

entered the block of East 16th Street between Union Square East and Irving Place.  (Video:

TARU 87, 19:00:30; Swimberge, 29:15; Vault, 31:40; Viertel, 31:20 to 31:45).

390.    At around 7:02 PM, a few moments after people were directed onto East 16th

Street, the officers directing them formed a line across East 16th near the Union Square East end

of the street, building line to building line, in order to physically prevent people from leaving the

block at that end. (Video: TARU 87, 19:01:06 to 19:01:54; Swimberge, 29:48 to 30:25; Vault,

32:05 to 33:15; Viertel, 31:00 to 32:50; Dinler, 30:08).

391.    At about the same time a group of officers blocked the Irving Place end of the

block.  (Video: Rothman, 32:30 to 33:15; Hall, 19:03; TARU 86, 19:04). (See Also Essig Tr. at

105:16-105:20; 108:5-108:23; 110:12-111:11; 274:18-275:12).

392.    A police lieutenant informed people that they could leave the block and go back to

Union Square Park as long as they used the sidewalk.  (Video: Rothman, 34:38 to 35:30).

393.    As the crowd turned back west toward Union Square Park, at around 7:06 PM, a

squad of uniformed officers ordered people out of the street and onto the sidewalks.  All or most

all of the people got onto the sidewalks.  (Video: TARU 63, 7:06:30; TARU 87, 19:07; Hall,

19:06; Vault, 36:12; Viertel, 33:00 to 36:00; Corley, 2:40 to 3:30; Dinler, 30:00 to 32:00; and

Rothman, 34:30 to 36:30).

394.   As the front of the processions, one on the north sidewalk and one on the south

sidewalk of East 16th Street, approached the line of officers at the Union Square East end of East

16th Street, they come to a stop.  The line of officers moved east from Union Square East at the

same time as the officers from Irving Place move west toward the crowds on the sidewalks.

(Video: TARU 108, 7:06:35;  Dinler, 31:30 to 35:00; TARU 94, 19:07:25-19:09:45; Hall,

19:08:45; TARU 92, 7:10; TARU 152, 33:30 to 34:45; Rothman, 36:55 to 37:30).

395.   The first people were placed in flexi-cuffs on East 16th Street at about 7:10 PM.

From 7:10 PM to 7:25 PM various people were taken out of the crowds with various levels of

force on the north and south sidewalks.  (Video: Dinler, 33:45-49:25; TARU 87, 19:09:48-19:25;

Hall, 19:10:45-19:22;  TARU 86, 19:11-19:20; TARU 87, 19:09:49-19:25;  Vault, 37:14 to

45:00; Black ,31:25 to 34:25; TARU 94, 19:11:10-19:25; Coppola, 01:55:00 to 2:02:30; TARU

92, 7:11-7:24; Viertel, 39:00-45:00; TARU 152, 33:30 to 45:15).

396.   During this time the crowd on the south sidewalk was consolidated as people on

the east and west ends were ordered to move to the middle.  (Video: Coppola, 1:57:00 to 2:02:30

(east end); Dinler, 35:40 to 40:30 (east end); TARU 87, 19:14 (east end); TARU 92, 7:15 (east

end); Hall, 19:12-19:14 west end)).

397.   During this time the crowd on the north sidewalk was mostly quiet and compliant.

(Video: TARU 64, 38:00 to 46:40; TARU 86, 19:14:50 to 19:17 30; TARU 94, 19:14:14,

19:22:17, 19:29:20; TARU 108, 7:14:30 to 7:15:35 PM; Vault, 37:00 to 45:00; Black, 31:21 to 34:25; Viertel, 40:25 to 45:00).

398.    At about 7:25 Chief Terence Monahan gave instructions to the crowd on the south sidewalk with a bullhorn to the arrestees that they were all under arrest for parading without a permit, the crowd then followed instructions to sit down and an orderly arrest processing began. (Video: TARU 87, 19:25-19:27; TARU 88, 19:25:03-19:28; TARU 92, 7:24PM-7:25PM; TARU 94, 19:25:10-19:28:30; TARU 108, 7:24:39PM-7:30:00PM;  Dinler 179 at 49:16-54:00; Hall, 19:27-19:32;  TARU 152, 45:10 to 48:00. See Also Essig Tr. at 144:21-147:17).

399.    At about 7:30 the same instructions were given on the north sidewalk.  (Video: Dinler, 54:18 to 55:40).

Dated:          October 3, 2011
                New York, NY

                                Respectfully submitted,

                                _____
                                JONATHAN C. MOORE, Esq.
                                GIDEON ORION OLIVER, Esq.
                                ELIZABETH LOGEMANN, Esq.

                                Beldock Levine & Hoffman, LLP
                                99 Park Avenue - 16th Floor
                                New York, New York    10016
                                (212) 277-5850

                                *Counsel for the Plaintiff Class in MacNamara*