**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------- x

**MICHAEL SCHILLER, et al.,**

                                                          **Plaintiff,**


                          -against-

**THE CITY OF NEW YORK, et. al,**                    **04-Civ-7922 (RJS)(JCF)**

                                                          **Defendants.**

-------------------------------------------------------------------------- x


**CONSOLIDATED RNC CASES**[1]                        **(RJS)(JCF)**


-------------------------------------------------------------------------- X



**DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT ON THE CITY'S "NO-SUMMONS
POLICY" AND "FINGERPRINTING POLICY" DURING THE 2004 RNC**

---

[1] This 56.1 Statement is being submitted in the following 42 cases: *Abdell v. City of New York,* 05-cv-8453; *Adams v. City of New York* 05-cv-9484; *Araneda v. City of New York* 05-cv-9738; *Bastidas v. City of New York* 05-cv-7670; *Biddle v. City of New York* 05-cv-1570; *Botbol v. City of New York* 05-cv-1572; *Bunim v. City of New York* 05-cv-1562; *Coburn v. City of New York* 05-cv-7623; *Cohen v. City of New York* 05-cv-6780, *Concepcion v. City of New York* 05-cv-8501; *Crotty v. City of New York* 05-cv-7577; *Dinler v. City of New York* 04-cv-7921; *Drescher v. City of New York* 05-cv-7541; *Dudek v. City of New York* 04-cv-10178; *Eastwood v. City of New York* 05-cv-9483; *Epstein v. City of New York* 05-cv-1563; *Galitzer v. City of New York* 05-cv-7669; *Garbini v. City of New York* 05-cv-1565; *Greenwald v. City of New York* 05-cv-1566; *Grosso v. City of New York* 05-cv-5080; *Jusick v. City of New York* 07-cv-7683; *Kennedy v. City of New York* 07-cv-7678; *Lee v. City of New York* 05-cv-5528; *Lalier v. City of New York* 05-cv-7580; *MacNamara v. City of New York* 04-cv-9216; *Manders v. City of New York* 07-cv-7752; *Meehan v. City of New York* 05-cv-5268;  *Moran v. City of New York* 05-cv-1571; *Pagoda v. City of New York* 05-cv-7546; *Phillips v. City of New York* 05-cv-7624; *Pickett v. City of New York* 05-cv-1567; *Portera v. City of New York* 05-cv-9985; *Rigby v. City of New York* 07-cv-7751; *Ryan v. City of New York* 05-cv-1564; *Schiller v. City of New York* 04-cv-7922*; Sikelianos v. City of New York* 05-cv-7673*; Sloan v. City of New York* 05-cv-7668; *Stark v. City of New York* 05-cv-7579; *Tikkun v. City of New York* 05-cv-9901; *Tremayne v. City of New York* 05-cv-1568; *Winkleman v. City of New York* 05-cv-2910; and *Xu v. City of New York* 05-cv-7672.

Defendants submit that, based upon the factual record in this case, the following facts are undisputed as contemplated by Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York:[2]

**The 2004 Republican National Convention**

1.     In early 2003, Mayor Michael Bloomberg announced that the 2004 Republican National Convention (the "RNC" or "Convention") would be held in New York City (the "City"). *Dinler v. City of New York*, 607 F.3d 923, 929 (2d Cir. N.Y. 2010); Deposition of Joseph Esposito ("Esposito Depo."), annexed to the Declaration of Jeffrey A. Dougherty ("Dougherty Decl.") as Exs. A-J, at 147:25, 148:2-7.

2.     The Convention was held between Monday, August 30, 2004 and Thursday, September 2, 2004.  The main venue of the Convention was Madison Square Garden ("MSG" or the "Garden") but Convention related activities and events also took place throughout the City during the days immediately preceding the RNC.  2004 RNC NYPD Executive Summary ("RNC Executive Summary"), annexed to Dougherty Decl. as Ex. N, at Bates Nos. 7079-83, 7120-30), Declaration of Bruce Smolka ("Smolka Decl.") at ¶ 2, annexed to the Dougherty Decl. as Ex. P.[3]

3.     The New York City Police Department (the "NYPD" or the "Department") was the lead local law enforcement agency with responsibility for security and

---

[2] To the extent Defendants have construed the facts for purposes of this motion in the light most favorable to the Plaintiffs, Defendants reserve their rights to put in evidence and argue otherwise in the event of any trial and for any purposes other than this motion.

[3] Defendants note that the Smolka Decl. was executed on December 1, 2008 in connection with dispositive briefing in a related RNC Consolidated action, *Marcavage v. City of New York*, 05 Civ. 4949 (RJS)(JCF).

public safety during the Convention.  RNC Executive Summary at Bates No. 7082; Smolka Decl. at ¶ 2; Declaration of David Cohen ("Cohen Decl.") at ¶¶ 5, 23.

4.      As many as 50,000 people were expected to participate in the Convention, including (a) 2,509 delegates, (b) 2,344 alternates, (c) 15,00 members of the media/press, (d) 15,000 donors, Governors, Congressional delegations and staff, and 15,000 family, friends and other RNC visitors.  RNC Executive Summary at Bates No. 7082; Smolka Decl. at ¶ 12; *Marcavage v. City of New York*, 05 Civ. 4949, 2010 U.S. Dist. LEXIS 107724, *4 (S.D.N.Y. Sept. 29, 2010)) (Sullivan, J.).

5.      In addition, the then incumbent Republican President and Vice President of the United States were expected to participate in the RNC.  The First Lady was also scheduled to address the assembly during the Convention.  RNC Executive Summary at Bates Nos. 7082-83; Smolka Decl. at ¶ 12; Cohen Decl. at ¶ 5.

6.      From the perspective of the Republican party and the delegates, one of the key missions of the Convention was to legally nominate President George W. Bush and Vice President Dick Cheney as the Republican party candidates for the upcoming national Presidential election.  RNC Executive Summary at Bates Nos. 7082-83; Deposition of William D. Harris, annexed to Dougherty Decl. as Ex. Q at 6:17-22, 7:1-5, 19-22, 230:12-22, 231:1; Deposition of David Cohen ("Cohen Depo."), annexed to Dougherty Decl. as Exs. K-M at 397:13-25, 398:1-25, 399:2-8.

7.      It was anticipated that New York City would see a volume of protest activity not seen in decades.  In fact, hundreds of thousands of protestors were expected to come to the City during the RNC to engage in protest activity and express various messages.  RNC Executive Summary at Bates No. 7082; Smolka Decl. at ¶ 7; Cohen Decl. at ¶ 5, End-User Reports incorporated by reference into Cohen Decl. at ¶¶ 10-13 ("End-User Reports"), RNC

Intelligence Appendix ("RNC Intelligence Appendix") annexed to Cohen Decl. as Ex. C at p. 11; Cohen Depo at 886:21-24; Esposito Depo. at 143:3-9, 787:3-16.

8.      Hundreds of thousands of people were expected to come to the City during the RNC to engage in protest.  (Cohen Decl. ¶5).

9.      It was believed that the overwhelming number of these individuals were coming to the City to express their First Amendment rights and engage in lawful protest activity. Cohen Depo. 884:4, 885:12-25, 886:3.

10.      Nevertheless, it was widely realized that based on the number of expected protestors expected and the various political and social views and issues they would be expressing that emotions would run high and RNC demonstrations would be highly charged. Cohen Decl. ¶ 7, Cohen Depo. 45:5-25, 46:2-25, 47:2; Smolka Decl. ¶ 7; *see also Marcavage*, 05 Civ. 4949 (RJS)(JCF), 2010 U.S. Dist. LEXIS 107724, *14 (S.D.N.Y. 2010) (recognizing tone of RNC demonstrations as "highly charged").

11.      The RNC quickly became a focal point for voicing opposition to the policies of the Bush administration.  Cohen Decl. ¶ 7.

12.      For example, Organizers from United for Peace and Justice, a coalition of local and national organizations opposing the American war against Iraq organized a large march and rally planned for August 29, 2004 and predicted that 250,000 people would participate. RNC Executive Summary at Bates No. 7082; Smolka Decl. ¶ 7; *United for Peace & Justice v. City of New York*, 243 F. Supp. 2d 19, 20 (S.D.N.Y. 2003).

**The NYPD Immediately Began Planning For The RNC To Ensure For Security And Safety During The RNC.**

13.      When it was announced that New York City would host the RNC, the NYPD immediately began developing plans to provide a safe and secure environment for (i) the participants in the Convention process including the President and Vice President of the United

States, (ii) the hundreds of thousands of people expected to come to the City to engage in protest activity, (iii) summer tourists, and (iv) City residents and businesses.  The NYPD's planning and preparations continued up and through the Convention.  Cohen Decl. ¶ 5; Smolka Decl. at ¶ 2; Esposito Depo. 147:25, 148:2-21, 899:16-25, 900:2-20.

14.     The Convention was the first political convention being held in New York City after 9/11 and in a post-9/11 tactical environment.  Deposition of John Colgan ("Colgan Depo.") at 71:13-15, Declaration of Brian M. Jenkins ("Jenkins Decl.") at ¶¶ 16, 19-20.

15.     In July of 2003, the RNC was deemed a National Special Security Event ("NSSE").  Cohen Decl. ¶5; Esposito Depo 268:16-18, 269:7-25, 270:2, 270:3-9; 597:19-23, 709:11-24, 712:6-23, 713:18-22.

16.     NSSE status is declared by the United States Department of Homeland Security for certain events, usually because an event may seem like an attractive target for terrorists or assassins due to the event's visibility or political connection.  (CRS Report for Congress - National Special Security Events". Congressional Research Service, Library of Congress. 2008-03-19.  http://opencrs.cdt.org/getfile.php?rid=63386; "Fact Sheet: National Special Security Events". Office of the Press Secretary, United States Department of Homeland Security.  2006-12-29.  http://www.dhs.gov/xnews/releases/pr_1167323822753.shtm;  Jenkins Decl. ¶¶23-24.

17.     The NSSE designation heightened the "level of concern" the NYPD had about securing the safety of the City and the RNC.  Esposito Depo. 712:6-23, 713:18-22.

18.     The RNC was one of the largest events ever policed by the NYPD in terms of resource deployment, the scope of the event, and the sheer volume of participants expected to be involved in all aspects of the Convention.  RNC Executive Summary at Bates No. 7082; Esposito Depo 728:20-25, 729:2-8; Smolka Decl. ¶ 12.

19.     In addition to the usual policing responsibilities posed by a large-scale political event, both the City and the RNC were prime targets for international terrorism, which compounded the challenge of maintaining public safety.  Cohen Decl. ¶5.

20.     The NYPD was mindful of the City's status as a prime target of international terrorism, and the NYPD was keenly aware that a large political event such as the RNC could attract anarchist violence and unlawful civil disobedience.  *Dinler v. City of New York*, 607 F.3d 923, 929 (2d Cir. N.Y. 2010); Cohen Decl. ¶¶ 7, 14-23; End-User Reports; RNC Intelligence Appendix; Commissioner Cohen's Talking Points ("Talking Points") annexed to Cohen Decl. as Ex. A and Commissioner Cohen's PowerPoint slide presentation ("PowerPoint") annexed to Cohen Decl. as Ex. B.

**In Order To Properly Prepare For The RNC The NYPD Intelligence Division Began To Investigate And Analyze Potential Threats Facing the City And The RNC.**

21.     In order to prepare for policing the Convention and to ensure the public safety of the people who live and work in New York, as well as the demonstrators and those involved in the Convention, the NYPD Intelligence Division (the "Intelligence Division"), under the leadership of Commissioner David Cohen began to gather and analyze intelligence information about potential threats facing the City.  Cohen Decl. ¶¶ 4-5, 6, 8-12; End-User Reports; Cohen Depo. 42:12-25, 43:1-8; 45:5-25, 46:2-25, 47:2; Esposito Depo. 358:13, 359:16-22, 361:17-25, 362:2-12, 713:9-11, 777:9-23.

22.     David Cohen has served as the NYPD's Deputy Commissioner of Intelligence since February 2002.  In that capacity, he has overall responsibility for the leadership and operation of the NYPD Intelligence Division, including the gathering and analysis of information about potential criminal activity and terrorism.  Prior to joining the NYPD, he served for 35 years with the United States Central Intelligence Agency ("CIA") holding positions in both its analysis and operational arms.  As the Director of the CIA's Directorate of Operations

6

from 1995-1997, he was responsible for the Agency's worldwide intelligence and information gathering operations.  As Associate Deputy Director of the Directorate of Intelligence from 1991-1995, he provided day to day leadership for the CIA's analysis program, including the substantive review of all CIA political, economic and military assessments prepared for the President of the United States and his senior national security advisors.  (Cohen Decl. ¶¶ 2-4; *MacWade v. Kelly*, 460 F.3d 260, 266 (2d Cir. N.Y. 2006)).

23.  The role of the Intelligence Division during the RNC was to collect information in order to identify and assess any threat to the safety and security presented by individuals or groups who viewed the RNC and the City as a target for terrorist acts, other acts of violence or civil disorder.  In that capacity, the Intelligence Division also collected information to learn about the extent and nature of expected demonstration activity.  Cohen Decl. ¶ 6; Cohen Depo. 42:12-25, 43:1-8; 45:5-25, 46:2-25, 47:2; 56:4-12; 799:12-21; Esposito Depo. 358:13, 359:16-22, 361:17-25, 362:2-12, 713:9-11, 777:9-23; *Dinler v. City of New York*, 607 F.3d 923, 929-30 (2d Cir. N.Y. 2010).

24.  The Intelligence Division gathered information from both non-confidential, open sources, such as the internet and from confidential sources.[4]  Cohen Decl. ¶4, 6, 8-11, End-User Reports; Esposito Depo. 360:2-12.

25.  Groups and individuals from across the country availed themselves of the communication potential of the internet for organizing protest.  Cohen Decl. ¶ 7.

26.  In connection with planning for the safety and security of the RNC, the Intelligence Division obtained information about potential unlawful activity by monitoring

---

[4] As this Court is aware, Defendants are <u>not</u> relying on the confidential intelligence in these cases.  All references to "intelligence" herein is to the open-source information.

publicly available websites and press reports ("Open-Sources") as well as by other lawful investigative means available to it.  Cohen Decl. ¶ 8.

27.　　Much of the Open-Source information was also widely and publicly disseminated.  Cohen Decl. ¶8, 10-11, End-User Reports.

28.　　Some declared an intent to engage in unlawful conduct ranging from civil disobedience at one end of the spectrum, to destruction of property and physical violence at the other.  Cohen Decl. ¶ 7; Esposito Depo. 357:20-25, 358:2-6, 365:2-7, 17-20, 744:7-16, 1080:25, 1081:2-7, 1104:10-25.

29.　　The threat of unlawful conduct was of great concern to Commissioner Cohen, Chief of Department Joseph Esposito and the NYPD because the history of protest in major cities, including the events in Seattle in 1999 during the meeting of the World Trade Organization, demonstrated that the police could be easily overwhelmed in the absence of adequate preparation.  Cohen Decl. ¶ 7; End-User Reports, Bates No 102564; Cohen Depo. 780:23-25, 781:2-17; Esposito Depo. 1225:17-25, 1226:2-16, 1234:21-25, 1235:2-14; 1226:17-25, 1490:5-25, 1491:2-25, 1492:2, 1942:11-25, 1943:2-10.

30.　　Throughout the preparation process, Commissioner Cohen was kept fully informed of the information being developed by his staff.  It was his duty to analyze that information and to brief the high-ranking members of the Department who were responsible for planning and coordinating the NYPD's overall efforts to provide security and ensure the public safety of the City during the Convention (the "RNC Executive Committee").  The RNC Executive Committee consisted of Police Commissioner Kelly, Chief of Department Joseph Esposito and various other NYPD executives.  Generally, these briefings concerned the nature and scope of expected demonstration activity and the threats to the security of the City during the RNC.  Cohen Decl. ¶ 9.

31.     Chief Esposito, as the Chief of Department, is the highest-ranking uniformed member of the NYPD.  He is responsible for directing and controlling the daily operations of the seven major enforcement bureaus within the NYPD.  Chief Esposito's tenure with the NYPD began in 1968 and he has served as Commanding Officer of the Strategic and Tactical Command (SATCOM), where he was in charge of all Patrol, Housing, Narcotics and Detective Operations in the Brooklyn North area.  He has also served as the Commanding Officer of the 34th Precinct, 66th Precinct and the 83rd Precincts.  Chief Esposito has earned some of the Department's highest medals and commendations, which include the Combat Cross, Medal of Valor and the Medal for Exceptional Merit.  Chief Esposito's substantial experience in planning for and policing demonstrations include the February 2002 Anti-War demonstration and the 2003 WEF demonstration, among numerous others.  *See* (http://www.nyc.gov/html/nypd/html/administration/department_co.shtml, last visited Oct. 3, 2011).

**Commissioner Cohen Was Aware Of Civil Disorder And Violence That Had Plagued Other Cities Hosting Large Events**

32.     Commissioner Cohen was aware of and analyzed large scale events occurring prior to the RNC that encompassed similar threats to those facing the RNC.  Cohen Decl. ¶ 7, 14, RNC Intelligence Appendix.

33.     Commissioner Cohen analyzed the record of major protest activity connected to large-scale events around the world between 1999 and 2004.  Cohen Decl. 7, 14, 22;  RNC Intelligence Appendix.

34.     Commissioner Cohen reviewed and analyzed the 1999 World Trade Organization's Ministerial Conference in Seattle, Washington ("WTO") which event became known as "The Battle of Seattle" based on the 50,000 – 100,000 protestors who utilized extremist elements to overwhelm law enforcement and were successful in causing the

cancellation and delaying of scheduled WTO events by various means including chaining themselves together in roadways.  Cohen Decl. ¶¶7, 14, 22  RNC Intelligence Appendix p. 8.

35.     The Battle in Seattle also involved acts of vandalism, violence, and property destruction including setting fires, overturning police vehicles and emergency vehicles, and vandalizing and looting local businesses.   Cohen Decl. ¶¶ 7, 20-24, RNC Intelligence Appendix p. 8.

36.     Commissioner Cohen also analyzed the violent protests during the Free Trade of the Americas meeting in Miami, Florida in 2003.  Cohen Decl. ¶¶ 7, 14, 20-24, RNC Intelligence Appendix.

37.     Commissioner Cohen also analyzed major city protests which occurred in Davos, Switzerland; Quebec City, Canada; Genoa, Italy; San Francisco, California; and Cancun, Mexico.  Cohen Decl. ¶¶ 7, 14, 22, RNC Intelligence Appendix at 8-11.

38.     Based upon Commissioner Cohen's analysis of these events, he surmised that it only takes a small number of extremist elements to trigger spiraling disorder, massive property damage, and violence at large-scale demonstrations.  Cohen Decl. ¶¶ 7, 20-24; RNC Intelligence Appendix; End-User Reports.

39.     Commissioner Cohen communicated his analysis to Commissioner Kelly and Chief Esposito.  Cohen Decl. ¶¶4-24; End-User Reports; Talking Points; PowerPoint; RNC Intelligence Appendix; Cohen Depo. 394:4-25, 395:2-25, 396:2-25, 397:2-25, 398:2-25, 399:3-15.

40.     Chief Esposito was also aware of the propensity for civil disorder to become violent and shut down an entire event and disrupt a city based on the history of demonstrations and events such as the Battle of Seattle and the Free Trade of the Americas Meeting in Miami.  Esposito Depo. 1490:5-25, 1491:2-6.

**The Intelligence Division Prepared End-User Reports Documenting The Threats Facing the City and The RNC**

41.     From October of 2003 through June 2004 Commissioner Cohen's staff prepared reports, usually weekly.  As the Convention approached, during July and August of 2004, reports were prepared with greater frequency.  During the week of the RNC, they increased to twice daily (collectively as the "End-User Reports").  The vast majority of information contained in the End-User Reports was drawn from Open-Sources.  Cohen Decl ¶ 10; End User Reports.

42.     Commissioner Cohen and his staff discussed the information contained in the End-User Reports as it was being developed, and it was considered part of the body of information being analyzed on a continuing basis by Commissioner Cohen and the NYPD.  Cohen Decl. ¶ 12.

43.     Commissioner Cohen met with the RNC Executive Committee regularly and with increasing frequency as the RNC approached.  Cohen Decl. ¶13; Cohen Depo. 507:24-25, 508:2-25, 509:2-25, 510:2-25, 511:2; Esposito Depo. 266:16-25, 267:7-18, 24-25, 268:2-7, 358:20-25, 359:2-15, 361:8-16 362:15-12, 396:3-8, 713:12-17 777:9-23, 778:2, 899:16-25, 900:2-23, 980 4-19; 988:24-25, 989:2-7, 1447:24-25, 1448:2-13.

44.     The intelligence provided to Chief Esposito and the NYPD in advance of the RNC and regarding the RNC was in written form and through oral communications.  Esposito Depo. 712:24-25, 713:8, 975:22-25, 976:2-17, 1413:18-24, 1416:11-18 1447:12-23; Cohen Depo. 274:20-25, 275:2-25, 276:2-4

45.     Commissioner Cohen also provided the RNC Executive Committee with the information contained in the End-User Reports and made the reports available to the RNC Executive Committee.  Cohen Decl. ¶¶ 10-13; Cohen Depo. 507:24-25, 508:2-25, 509:2-25, 510:2-25, 511:2; Esposito Depo. 266:16-25, 267:7-18, 24-25, 268:2-7, 358:20-25, 359:2-15,

361:8-16  362:15-12,  396:3-8,  713:12-17  777:9-23,  778:2,  899:16-25,  900:2-23,  980  4-19; 988:24-25, 989:2-7, 1446:4-17, 1447:24-25, 1448:2-13.

**Commissioner Cohen's Tripartite Threat Assessment**

46.     Based on the intelligence obtained in advance of the RNC that "[t]he Department had to be ready at every location" and in "every part of the City," Chief Esposito explained, "we had to be alert and aware of the potential for those illegal activities throughout the City during the time that the Convention was here."  Esposito Depo. 386:2-18; Cohen Decl. ¶¶ 7, 14-24;  End-User Reports; Talking Points; PowerPoint; Intelligence Appendix.

47.     Based on the culmination of all of the information gathered and the End-User Reports, Commissioner concluded that the City faced serious threats of violence and disorder similar to what had occurred in Seattle, Quebec, Genoa, Cancun, San Francisco and Miami.  Cohen Decl. ¶¶ 7, 14-24;  End-User Reports; Talking Points; PowerPoint; Intelligence Appendix.

48.     Commissioner Cohen believed these threats were compounded by the heightened status of the City as a target of terrorism during the RNC.  Cohen Decl. ¶ 14.

49.     Specifically, Commissioner Cohen concluded that during the RNC, the City faced a tripartite threat of: (1) international terrorism; (2) anarchist violence; and (3) wide-spread civil disobedience.  Cohen Decl. ¶¶ 14-15.

50.     Commissioner Cohen conveyed this multi-faceted threat assessment to the RNC Executive Committee.  Cohen Decl. ¶¶ 14-24.

51.     Commissioner Cohen believes the End-User Reports and his knowledge of prior disorder fairly and accurately reflect the information on which his threat assessment was made, as well as the substance of the information he provided to the RNC Executive Committee. Cohen Decl. ¶¶ 10-13; End User Reports; Cohen Depo. 272:2-11; 434:12-25, 435: 2-25, 436:2-

25, 437:2-25; 438:2-25; 439:2-21; 465:21-25, 466:2-12; 507:24-25, 508:2-25, 509:2-25; 510:2-25; 511:2; 645:2-25, 646:2-15; Esposito Depo. 1446:4-17, 1448:2-13.

**Commissioner Cohen's PowerPoint Presentation To Ranking Members of the NYPD**

52.     In or about August 2004, prior to the start of the RNC, Commissioner Cohen provided an intelligence briefing regarding the RNC to the leadership of the NYPD that included an oral briefing and PowerPoint slides explaining the tripartite threat facing the City during the RNC.   Cohen Decl. ¶¶ 16-19; Talking Points; PowerPoint; Cohen Depo 274:20-25, 275:2-25, 276:2-10, 618:25, 619:2-25, 620:2-10, 18-25, 621:2-25, 622:2-25, 623:2-25, 624:2-25, 625:2-25, 626:2-24.

53.     Commissioner Cohen also personally prepared talking points to highlight key facets of the presentation concerning the tripartite threat facing the City during the RNC Cohen Decl. ¶¶ 16-19; Talking Points; PowerPoint; Cohen Depo. 628:2-25, 629:2-25, 630:2-25, 631:2-25; 632:2-25; 633:2-25; 634:2-25; 635:2-5.

54.     The presentation was given in the auditorium at One Police Plaza and officers holding the rank of Captain and above were invited.   Several hundred members of the NYPD attended this presentation, including Commissioner Kelly and Chief Esposito.   Cohen Decl. ¶¶ 16-19; Talking Points PowerPoint; Cohen Depo 274:20-25, 275:2-25, 276:2-10, 618:25, 619:2-25, 620:2-10, 18-25, 621:2-25, 622:2-25, 623:2-25, 624:2-25, 625:2-25, 626:2-24).

55.     During the presentation, the PowerPoint slides were shown to the audience and the Talking Points summarized the accompanying oral presentation.   Cohen Decl. ¶¶ 16-19; Talking Points and PowerPoint Slides; Cohen Depo 274:20-25, 275:2-25, 276:2-10, 618:25, 619:2-25, 620:2-10, 18-25, 621:2-25, 622:2-25, 623:2-25, 624:2-25, 625:2-25, 626:2-24.

**The 2007 RNC Intelligence Appendix**

56.     In 2007, after the litigation of the Consolidated RNC Cases was underway, Commissioner Cohen created a twenty-six ("26") page document titled "The Republican National Convention" to reiterate and summarize what the Intelligence Division was seeing in terms of the threat environment facing the City during the RNC.  Cohen Decl. ¶¶ 20-24; RNC Intelligence Appendix; Cohen Depo. 394:4-25, 395:2-25, 396:2-25, 397:2-25, 398:2-25, 399:3-15.

57.     This 26-page document was appended to a declaration dated June 6, 2007 that Commissioner Cohen submitted previously in this litigation as part of the law enforcement privilege briefing (the "RNC Intelligence Appendix").  Cohen Decl. ¶¶ 20-24; RNC Intelligence Appendix; Cohen Depo. 394:4-25, 395:2-25, 396:2-25, 397:2-25, 398:2-25, 399:3-15.

58.     After completing the RNC Intelligence Appendix it was clear to Commissioner Cohen that its true utility was that it succinctly captured the extent and nature of the tripartite threat environment facing the citizens of New York, visitors to the City, the delegates coming to the Convention, and the hundreds of thousands of individuals coming to the RNC to engage in demonstration activity.  Cohen Decl. ¶¶ 20-24; RNC Intelligence Appendix; Cohen Depo. 394:4-25, 395:2-25, 396:2-25, 397:2-25, 398:2-25, 399:3-15.

59.     The content of the RNC Intelligence Appendix is derived from Commissioner Cohen's personal knowledge of the terrorist environment, his personal knowledge and analysis regarding events in other locations akin to the RNC (i.e. Seattle in 1999, Davos in 2000, Quebec City in 2001, Genoa in 2001, and Miami in 2003), Open-Source information and the End User Reports.  Cohen Decl. ¶¶ 20-24, RNC Intelligence Appendix; End-User Reports; Cohen Depo. 394:4-25, 395:2-25, 396:2-25, 397:2-25, 398:2-25, 399:3-15.

60.     Commissioner Cohen believes the RNC Intelligence Appendix articulates the multifaceted threat, the nature of that threat including the targets, tactics, weaponry, and the training that activists and anarchists were undertaking with enough specificity to render an understanding of the environment that was presented to the NYPD decision makers tasked with planning for policing the RNC and establishing policies to ensure the security and safety of the City at that time.   Cohen Decl. ¶¶ 20-24; RNC Intelligence Appendix; Cohen Depo. 394:4-25, 395:2-25, 396:2-25, 397:2-25, 398:2-25, 399:3-15.

61.     The information in the RNC Intelligence Appendix was both available to the Intelligence Division at the time it was gathering and analyzing information in preparation for the RNC and it was that threat environment that was communicated to Commissioner Kelly, Chief Esposito and the NYPD executives who made policy decisions regarding the policing of the RNC.   Cohen Decl. ¶¶ 20-24; RNC Intelligence Appendix; Cohen Depo. 394:4-25, 395:2-25, 396:2-25, 397:2-25, 398:2-25, 399:3-15.

**Specific Threats Faced The City and The Convention Itself During The 2004 RNC**

62.     In addition to the overall tripartite threat of (1) terrorism, (2) anarchist violence; and (3) wide-spread civil disobedience, Commissioner Cohen and the Intelligence Division identified the major threats facing the City and the Convention during the time period of the RNC.   Cohen Decl. ¶ 5-24; RNC Intelligence Appendix; End-User Reports; Talking Points; PowerPoint.

**Terrorism Concerns**

63.     Based on his threat assessment, Commissioner Cohen believed that "in the broad context of New York City" during the time period of the RNC, the City "was in midst of a war, in the midst of … 16 international and local terrorist events that ricocheted back on New York City" and was "in the midst of probably the most intense terrorist environment, certainly in

the period up until then, facing New York City."  Commissioner Cohen also expressed these concerns to the RNC Executive Committee.  Cohen Depo. 583:8-25, 584:2-16; Cohen Decl. ¶¶ 13, 14, 24.

64.     Commissioner Cohen provided information to Chief Esposito and the NYPD executive staff regarding the "international terrorist threat which had developed rapidly in the wake of 9/11" and an "essential subset of international terrorism [was] directed specifically at New York City" to allow the "decision makers" to "understand the full range, scope and dimension of the threat that was posed to New York City and the threat that the NYPD in its capacity of assuring public safety and security during the RNC would need" in order to make informed decisions regarding policing the RNC.  Cohen Depo. 274:20-25, 275:2-25, 276:2-10.

65.     The fact that arrests for a terrorist-related conspiracy to bomb the Herald Square subway station, which is just one block from Madison Square Garden, in the time period immediately preceding the RNC, raised the NYPD's concern about terrorism during the RNC. Cohen Decl. ¶ 5; Esposito Depo. 404:14-22, 506:20-25, 507:2; Cohen Depo. 507:24-25, 508:2-25, 509:2-25, 510:2-25, 511:2; 8-19, 586:13-25, 587:2; RNC Intelligence Appendix.

66.     Intelligence indicated that terrorism concerns surrounding the RNC were heightened because "the RNC coming to New York City [made] it a much more appealing target for terrorists."   Cohen Decl. ¶ 5; Esposito Depo. 184:8-11, 194 9:13, 709:11-24, 715:6-12, 1082:13-20; Cohen Depo 507:24-25, 508:2-25, 509:2-25, 510:2-25, 511:2.

67.     "[I]ntelligence" indicated that " known" and "convicted" "terrorists were going to be coming to New York City" during the RNC.  Esposito Depo. 899:16-25, 900:2-23, 1079:13-25, 1080:2-3, 1035:2-5.

68.     The NYPD "had specific information about specific people coming in[to the City for the RNC] who had a history of bombing [and] [t]hat is a terrorist [threat] as far as [they were] concerned."  Esposito Depo. 986:14-25, 987:2-4.

69.     Intelligence briefings regarding terrorism suggested "weapons of mass destruction" were "a concern … for a terrorist attack" during the RNC.  Esposito Depo. 715:6-12.

70.     The NYPD "looked upon" "the RNC in general" "as a bigger target for terrorism" because "the eyes of the world [were] on it" and felt it posed a "bigger threat" to being a terrorist target.  Esposito Depo. 407:11-19.

71.     The threat of terrorism during the RNC was memorialized in documents utilized by the NYPD.  The paragraph titled "Situation and Threat Assessment" in the document, "2004 Republican National Convention – New York City Police Department Executive Summary," which is dated 6/24/04, states, *inter alia*, that:

> [p]olitical conventions and elections are potential terrorist targets. The vehicle borne improvised explosive device remains one of the most readily available and frequently used tactics by terrorists worldwide.  The use of hazardous materials, including chemical and biological weapons, possesses a significant threat as well. RNC Executive Summary, Bates No. 000007082, Esposito Depo Ex. 15.

72.     Chief Esposito affirmed that the paragraph titled "Situation & Threat Assessment" "was accurate, the whole paragraph."  Esposito Depo. 787:3-16; RNC Executive Summary.

73.     Based on the intelligence information, the NYPD was concerned that every large gathering during the RNC, including demonstrations, would be "a wonderful target for terrorism because the eyes of the world [were] already on it."  Esposito Depo. 407:11-25, 408:2-24, 410:22-25, 411:2-16; Cohen Decl. ¶ 5.

74.     The terrorism concern was also focused on "trains, large gatherings," [m]ass transit" and "large groups."  Esposito Depo. 404:3-9, 410:6-15.

75.     The NYPD felt that "[t]he threat of terrorism is always [present]" at "any" "large gathering" because large gatherings are "appealing to the terrorists."  Esposito Depo. 406:4-18.

76.     The NYPD was specifically concerned about the threat of terrorism at demonstrations and whether they would "be the subject of the attack."  Esposito Depo. 405:21-25, 406:2-3, 1083:7-11.

77.     The NYPD was equally concerned that Madison Square Garden, certain hotels, transportation centers, and Convention related events and venues would be terrorist targets.  Esposito Depo. 410:22-25, 411:2-10; Cohen Depo. 866:3-25, 867:2-25, 868:2-12.

78.     In July 2004, a laptop computer of an Al Qaeda operative was recovered containing detailed reconnaissance plans – a prerequisite for attack – of the New York City Stock Exchange and Citigroup headquarters in midtown Manhattan.  RNC Intelligence Appendix at 2.

79.     Dhiren Barot, aka Aba Esi al-Hindi was convicted on November 7, 2006 and sentenced to life in prison for his role in plotting the destruction of London hotels, in addition to New York financial institutions. RNC Intelligence Appendix at 2.

**Anarchist Violence & Individuals Of Concern**

80.     Intelligence indicated that the City and the RNC faced distinct threats of anarchist violence.  Cohen Decl. ¶¶ 7, 14-15; RNC Intelligence Appendix; End User Reports; Talking Points; PowerPoint.

81.     The Intelligence Division gave briefings to Chief Esposito indicating "they had information on people that were going to come to New York during the Convention to

commit criminal acts" and engage in "criminal activity."  Esposito Depo. 367:6-18, 369:8-11, 16-20.

82.     The intelligence indicated that of a lot of people with past criminal histories would come in to the City during the RNC and attempt violent acts.  Esposito Depo. 184:8-11, 194 9:13, 367:6-18, 369:8-11, 16-20.

83.     Specifically, intelligence indicated that "known criminals" were coming to the RNC, "for instance there were a couple of names that were given out about people that had been arrested, some convicted of some criminal acts, whether it be bombings, assaults, things of that nature, and in fact the information was about some of those people actually coming to New York" and this was "discussed" in deciding to adopt a no-summons policy.  Esposito Depo. 968:13-25, 969:2-7; 986:14-25, 987:2-4.

84.     The "intelligence" the NYPD received indicated that "known anarchists" and "people who had been convicted and done time for bombings and arson were going to be coming to New York City to try and disrupt the City though unlawful conduct and disrupt the RNC through unlawful conduct."  Esposito Depo. 899:16-25, 900:2-23.

85.     The NYPD had information that "individuals who has a history of using explosive devices were coming to New York during the RNC" and felt there was "potential" that explosive devices may be used during the RNC.   Esposito Depo. 797:16-24.

86.     Based on the intelligence he received, Chief Esposito believed "that people with past criminal records, serious criminal records, records of bombing, assaulting officers, [and/or assaulting] elected officials were going to be coming to the City to engage in criminal activity."  Esposito Depo. 268:16-18, 269:7-25, 270:2, 270:3-9, 793:20-25, 784:2-5.

87.     The NYPD believed these types of individuals "were coming for the Republican National Convention" but they "didn't know exactly what location they were going to go to."  Esposito Depo. 793:20-25, 784:2-5.

88.     The paragraph titled "Situation and Threat Assessment" in the document, "2004 Republican National Convention – New York City Police Department Executive Summary," which is dated 6/24/04, provides, *inter alia*, that "Open Source information indicates that [during the RNC] there will be some individuals and groups, who advocate the use of violence in opposition to the government, seeking to engage in criminal conduct that could significantly endanger public safety."  RNC Executive Summary, Bates No. 7082.

89.     When presented with this document, Chief Esposito affirmed that the paragraph titled "Situation & Threat Assessment" "was accurate, the whole paragraph." Esposito Depo. 787:3-16, Esposito Depo. Ex. 15-RNC Executive Summary.

90.     Chief Esposito explained that, to a degree that document detailed the threat, "[o]pen sources indicate that there will be some individuals and groups who advocate the use of violence in opposing [and] in opposition to the government, seeking to engage in criminal conduct that could significantly endanger public safety."  Esposito Depo. 788:2-8.

91.     Intelligence also indicated that anarchist and extremist groups coming to the RNC were conducting martial arts training for those activists who were planning on engaging in civil disobedience during the RNC.  End User Reports, Bates No. 102596, 102598; Esposito Depo. 1254:15-25, 1255:2-13, 1257:22-25, 1258:2-16.

92.     Intelligence information revealed that anarchists and extremists intending on participating in protest demonstrations were targeting the 2004 Republican National Convention and would utilize "Nail Bomb" tactics.  End User Reports 102584-85; Esposito Depo. 1237:20-25, 1238:2-25, 1239:2-17.

93.     Information also described other specific "weapons" that anarchist groups had used in the past and may utilize during the RNC.  These included large puppets, gasmasks, spray paint, placards and shields, rocks, slingshots, Molotov Cocktails, ladders, bags of urine, projectile launchers, toxic and flammable liquids, grappling hooks, Sleeping Dragons, ball bearings, rolling barrels, and Super-Soakers filled with flammable liquids, chemical irritants, homemade pepper spray, and urine. End User Reports, Bates No. 102565, RNC Intelligence Appendix p. 14-18; Esposito Depo 1229:7-23, 1234:21-25, 1235:2-14; Cohen Depo. 551:11-25, 552:2-15.

94.     During intelligence briefings, Chief Esposito received and reviewed "pictures" of some of the individuals of concern.  Esposito Depo. 365:24-25, 366:2-3, 10-12.

95.     The NYPD also learned that "[s]ome of the individuals of concern were on the streets during the RNC."  Esposito Depo. 798:15-24.

**Destruction of Property & Attacking Businesses**

96.     The intelligence that the NYPD received regarding the potential that businesses would be attacked and property would be damaged during the RNC informed the decision to adopt the No-Summons Policy.  Esposito 712:6-23, 744:7-16, 1104:10-25; RNC Intelligence Appendix at 12-14; Cohen Decl. ¶¶ 7, 14, 23; Cohen Depo. 500:6-25, 501:2-22; RNC Intelligence Appendix; End User Reports.

97.     Chief Esposito explained that information and intelligence briefings received indicated people were "coming into the City" during the RNC "for the purpose of destroying property" and "attacking businesses."  Esposito Depo 712:6-23, 744:7-16.

**A Spectrum of Unlawful Activity Was Expected During The RNC Ranging From Large-Scale Civil Disobedience To Violence.**

98.     The NYPD believed "the violations were going to run the gamut" because "the information" obtained indicated people were going to try to "shut down the City, shut down

the RNC, attack businesses, attack people" and "ran the spectrum from terrorism to sitting in traffic."  Esposito Depo.744:7-16, 1080:25, 1081:2-7, 1104:10-25.

99.     The intelligence provided to the NYPD "articulated" "that groups were going to come into the City and engage in [un]lawful activity, a variety of unlawful activity" and "[e]verything was possible from bombings to assaults to civil disobedience."  (Esposito Depo. 357:20-25, 358:2-6, 365:2-7, 17-20).

100.    Based on this information, the NYPD believed it "had to be ready for all scenarios, including a full-scale riot" and/or "a full-scale terrorist attack."  (Esposito Depo 1079:13-25, 1080:2-3).

**Widespread, Continuous Unlawful Activity Geared At Shutting Down the City and the RNC Was Anticipated**

101.    The Intelligence Division provided information and briefings to Commissioner Kelly, Chief Esposito and the RNC Executive Committee indicating people were coming to the RNC to engage in continuous unlawful activity.  Cohen Decl. ¶¶ 10-13, 16-19; Esposito Depo. 357:2-11.

102.    Intelligence indicated that "many people" coming to the City for the RNC "were intent on shutting down the RNC, shutting down the City," by "engaging in continued criminal offenses."  Esposito Depo. 1079:13-25, 1080:2-3.

103.    Based on the intelligence the NYPD believed the purpose of the continuous unlawful conduct was to "shut down some venues, shut down the City, shut down the RNC" went "hand in hand with the continued criminal activity."  Esposito Depo. 972:25, 973:2-25, 974:2-5.

**Shutting Down the Convention Itself**

104.    The NYPD received specific intelligence indicating "people [were] coming into the City for the purpose of shutting the RNC [the Convention itself] down."

Esposito Depo. 184:8-11, 194:9-21, 712:6-23, 714:3-18, 715:6-9, 1001:11-25, 1002:2-9, 1829:6-13, 16-25, 1831:2-6.

105.   The "Intelligence Division" provided briefings to Chief Esposito and high-ranking NYPD officials "as they were getting information" about people who were coming to New York to shut down venues relating to the Republican National Convention.  Esposito Depo. 362:18-24, 1829:6-13, 16-25, 1831:2-6.

106.   During the RNC, the NYPD was "protecting everyone" and not just the delegates but "based on the intelligence we received, we knew that many of the venues that the delegates were going to go [attend] were going to be targeted for criminal activity."  Esposito Depo 377:6-18.

107.   The intelligence information indicated that "[s]ome of the conduct that would be used to shut down some of the venues, whether it was trying to enter some of the venues, trying to enter some of the hotels that delegates were staying at, taking over certain locations, preventing some of the venues from occurring, those types of things were discussed."  Esposito Depo. 968:13-25, 969:2-7.

108.   The "Intelligence Division" provided information to Chief Esposito about people wanting to shut down "the [Broadway] theaters that the delegates were to go to" and prevent ingress and egress to the theaters.  Esposito Depo. 363:25, 364:2-8.

109.   Intelligence also indicated that restaurants and hotels and Madison Square Garden were venues targeted for criminal activity.  Esposito Depo. 377:20-25, 378:2-6.

110.   The intelligence indicated people were going to be "[b]locking streets, blocking entrances [to] events that the delegates were going to go to, chaining themselves [together], [and] sitting down" at "[j]ust about every venue … that the delegates were going to be at."  Esposito Depo. 362:25, 363:2-15, 376:21-24.

**Shutting Down New York City**

111.    The NYPD obtained "information" "from [the] intelligence [division], [and] open sources that people were coming to the City during the RNC for the purpose of shutting down the City." Esposito Depo. 184:8-11, 194 9:13, 712:6-23, 1001:11-25, 1002:2-9.

112.    Intelligence indicated that "Times Square was mentioned a number of times" as a location that "could be targeted for mass demonstrations" or being "shut down." Esposito Depo. 504:4-12.

113.    Intelligence information provided to the NYPD indicated that Broadway theaters, restaurants and hotels were venues targeted for criminal activity.   Esposito Depo. 377:20-25, 378:2-6.

114.    Intelligence also indicated that Herald Square and Macy's were possible targets for being shut down.  Esposito Depo. 506:10-19.

115.    Intelligence indicated there was a threat to disrupt the normal flow of vehicular traffic during the RNC.  Cohen Depo. 515:11-25, 516:2-22; End-User Reports, Bates No. 102549-50; Esposito Depo. 1224:11-25, 1225:2-15; RNC Intelligence Appendix.

116.    Some of the tactics to disrupt traffic were expected to include (a) hundreds of people getting in cabs at the same time and directing them in the same location, such as Madison Square Garden; (b) hundreds of people on bicycles riding slowly five abreast to clog vehicle traffic; and (c) people abandoning cars at designated points to clog traffic.  End User Reports, Bates No. 102549-50; Esposito Depo. 1224:11-25, 1225:2-15; Cohen Depo. 515:25, 516:2-22.

117.    The NYPD also received intelligence advising them to "expect large numbers" of bicyclists on the Friday during the RNC and possibly throughout the Convention generally.  Esposito Depo. 507:5-13.

118.    The intelligence specifically indicated, "the bicyclists' strategy would be employed to block streets" or "shut down some of the traffic, clog up traffic in the theater district."  Esposito Depo. 507:20-23.

119.    The NYPD also had information regarding tactics that may be employed to shut down the City, which included the "Sleeping Dragon" technique.  Esposito Depo.  969:8-20, 1101:14-20, 1102:7-12.

120.    The "Sleeping Dragon" technique involved using "fortified sections of pipe (plastic or metal)" with a "securing device" that "is anchored in the center of the pipe" and "a strong chord" is "looped" around an extremist's "wrist" "to secure the extremist to the Sleeping Dragon" and "once the device is secure, the extremist cannot easily be moved."  End User Reports, Bates No. 102593-94, Esposito Depo. 1251:12-25, 1252:2-3.

## August 31st 2004 Was Hailed As "A/31" And Designated For Widespread Civil Disobedience And Known As "A Day of Rage"

121.    Intelligence provided to Chief Esposito and Commissioner Kelly in advance of the RNC indicated that activists were planning a day of "Direct Action" for August 31, 2004.  End User Reports, Bates Nos. 102711, 102719-20, 102731, 102754, 102761, 102765-66, 102776-77, 102792, 102835, 102871, 102893; Esposito Depo. 1377:18-25, 1378:2-25, 1379:2-4.

122.    The intelligence information provided to Chief Esposito and the Executive Committee, indicated "Direct Action can best be described as large-scale civil disobedience, which *incorporates a physical resistance* that often results in conflict with the police."   Esposito Depo Ex. 25; End User Reports, Bates No. 102617-18 (emphasis in the original);  Esposito Depo 1270:15-25, 1271:2-25, 1272:2-6.

123.     Individuals who planned on engaging in unlawful conduct on August 31, 2004 called the day "A/31."  This day was also hailed as the "Day of Rage" or the "Day of Anarchy."  A/31Flyer, annexed to Dougherty Decl. as Ex. P; Colgan Depo. 860:20-24.

**Many Individuals Coming to the RNC Were Expected To Have False Identification Or No Identification**

124.     The NYPD intelligence revealed that people who were coming to New York City to engage in unlawful activity "were being encouraged to bring fake identification or no identification."  Esposito Depo. 99:16-25, 100:2-20, 712:6-23, 990:25, 991:2-11, 1001:11-25, 1002:2-9, 1028:13-25, 1029:2-9, 1756:9-25, 1757:2-5, 1829:6-13, 16-25, 1831:2-6.

125.     The intelligence suggested "a lot of open source material [was] recommending that if you come to New York to be engaged in unlawful activity, you should bring fake, phony identification."  Esposito Depo. 99:16-25, 100:2-20, 991:12-22.

126.     The NYPD was also concerned that "people would have phony New York City or New York State identification"  Esposito Depo. 1028:13-25, 1029:2-9.

127.     Briefings from the NYPD Intelligence division also suggested the "purpose" of "bringing false I.D." was to "confuse the police."  Esposito Depo. 373:19-23, 374:24-25, 375:2-3.

128.     The intelligence also indicated that false identification would be used during interactions with the police and "would be used when asked to be produced."  Esposito Depo. 375:15-21.

129.     The intelligence suggested one purpose of bringing false identification was that "if they were taken into custody or detained they could possibly avoid prosecution."  Esposito Depo. 1756:9-25, 1757:2-15.

130. An additional concern was that suspected terrorists or persons with histories of bombings would use false identification or not have identification. Esposito Depo. 990:11-24, 986:14-25, 987:2-4, 1034:20-24.

131. The NYPD also "knew that terrorists had their eye on [the RNC] and the NYPD did not believe terrorists "would be carrying real identification." Esposito Depo. 100:4-20, 102:2-15.

132. The NYPD believed that, "that terrorists would tend to hide their true identity when looking to perpetrate acts of terrorism, and they would have false ID, they would have no ID." Esposito Depo. 985:8-23.

133. The intelligence provided to the NYPD also indicated "a terrorist could" initially be "involved with lesser offenses" including summons eligible offenses. Esposito Depo. 1836:8-16.

134. The intelligence also indicated there was a "substantial risk" that persons who fell into any of the three arenas relating to the overall tripartite threat – the terrorist threat, the anarchist threat, and those intent on "perpetrat[ing] unlawful civil disobedience" would utilize false identification or not carry any identification during the RNC. Cohen Depo. 645:2-25, 646:2-15.

135. Additionally, Chief Esposito indicated that "if a person" or "a terrorist, a person who was committed to continuous unlawful activity, was that committed to his or her cause … obtaining quality phony identification would not have been that hard and probably would have been part of their strategy." Esposito Depo. 1025:19-25, 1026:2-18.

**The Ease Of Obtaining False Identification**

136. Driver's licenses are the most commonly used form of identification and are  the most frequently falsified.  "False" drivers' licenses fall into two general categories:

authentic driver's licenses which contain false information, and fake driver's licenses.  Jenkins Declaration ¶ 45.

137.    Authentic driver's licenses may be sold by corrupt state officials to individuals wishing to establish a new identity.  Individuals may also lie to state authorities when applying for a driver's license, providing false information or concealing true information about themselves.  To obtain driver's licenses, they may provide falsified documents such as birth certificates. Jenkins Decl. ¶ 46.

138.    Instructions are available on the Internet on how to create aliases, obtain, and alter birth certificates or create other fake paperwork in order to get authentic driver's licenses. Jenkins Decl. ¶ 47.

139.    Driver's licenses rely on "breeder documents" to confirm the applicant's identity.  Such documents typically include birth certificates, which are easily counterfeited.  There are in the United States thousands of jurisdictions issuing birth certificates.  Those jurisdictions, in turn, use over 6,000 different forms, and there is no easy way to confirm their authenticity.  Instructions on the Internet tell readers how to obtain and alter a birth certificate, which can then be used to obtain an authentic driver's license.  Jenkins Decl. ¶ 48.

140.    Another common breeder document is a driver's license from another state.  Some states' licenses are easier to replicate than others, and some states are less rigorous in confirming applications.  Virginia, for example, was seen as a state where it was easy to obtain driver's licenses.  This enables one to easily graduate from a state with a less rigorous system to one with a more rigorous system.  Jenkins Decl. ¶ 49.

141.    A 2003 General Accounting Office study reported that GAO agents operating undercover in seven states and the District of Colombia, using fake identification documents, meant to be obviously recognizable as fakes, were nonetheless able to obtain driver's

licenses in every jurisdiction.  Even when authorities spotted problems with the phony documents, the fake paperwork was never confiscated and law enforcement was never notified. In some cases, the GAO agents merely left the office, fixed the documents, reapplied, often on the same day, and still managed to successfully obtain driver's licenses.  Jenkins Decl. ¶ 51.

142.   Authentic driver's licenses containing false information, fake or counterfeit driver's licenses can also be obtained.  These are available on the Internet and, although described as novelty items, are also promoted as authentic or real-looking with holograms and other confirming markers.  The replica is clearly marked on the back that it is not a state document, but it can be re-laminated and used as an authentic document. Templates for state driver's licenses are also available on the Internet, allowing individuals to "photo-shop" their photo and individual information to produce convincing replicas.  Jenkins Decl. ¶ 55.

143.   Fake driver's licenses can also be obtained from illegal street vendors in most cities.  The locations where the vendors do business are as widely known as are the locales for prostitution or purchasing drugs.  In Los Angeles, for example, there are 15 to 20 "mills" continuously operating and constantly moving to avoid police detection.  They cater primarily to illegal aliens and are often operated by illegal aliens themselves.  The documents they produce are very good, containing the state logo, real license numbers (chosen at random) and real holograms or a glittering facsimile of a hologram.  The entire process, from approaching a runner on the street to receiving the complete set of documents, takes about two hours.  A good quality California driver's license goes for about $50, but for $70, one may obtain a complete set of counterfeit documents including a Social Security card, an immigration card, and a driver's license.  Although this is a technically-sophisticated organized crime, albeit cottage level industry, prosecutors are reluctant to prosecute individual cardholders.  The resources required,

given the volume of the crime, are too extensive.  When they can be apprehended, counterfeit producers are prosecuted.  Jenkins Decl. ¶ 56.

144.    Individuals may also use various graphics programs and desktop publishing to create reasonable facsimiles of genuine documents.  Computer savvy teenagers have provided this service for their classmates.  Stolen and altered driver's licenses -- a combination of real and fake—add to the population of false driver's licenses.  Jenkins Decl. ¶ 57.

145.    Readily available online instructions and templates of driver's licenses, computer graphics, and high quality color printers, and laminating equipment have facilitated copying and altering authentic licenses and creating counterfeit documents.  This technology was available in 2004.  As a result, law enforcement faced in 2004 and continues to face a huge problem of fraud based upon convincing supporting documents (letters of credit, bearer bonds, shares, etc.), counterfeit goods (pharmaceuticals with packaging so convincing that legitimate companies find it hard to distinguish their product from the fakes), and false identification documents.  Jenkins Decl. ¶ 58.

**The Convention's Status As a National Special Security Event**

146.    Specifically, the NYPD felt that the NSSE designation "raise[d] the level of concern" regarding the "possibilities of … shutting down an event, terrorism, continuous criminal activity," people with "criminal histories coming in[to] [the City for the RNC]." Esposito Depo. 1490:5-25, 1491:2-16.

147.    Chief Esposito explained that for example, "when the federal government declare[d]" the RNC a "national security event" it "shows the concern for it becoming something like the Seattle incident" where certain activists "shut the city down" or the G8 events "around

the world" where [certain activists "destroy[ed] property and lives."  (Esposito Depo 1490:5-25, 1491:2-6; Cohen Decl. ¶¶ 7, 14; RNC Intelligence Appendix.

148.    Additionally, the NYPD felt that because of the NSSE designation, "some of the people, who attempted to burn down Seattle [during the WTO protests], shut down other venues like the G8 and other [political] conventions and other World Economic Forums" would be more likely to come to the RNC – the  NYPD felt "some of those folks would make this trip to New York."  Esposito Depo. 1490:5-25, 1491:2-25, 1492:2.

**The NYPD Adopted A No Summons Policy And A Fingerprinting Policy In Response To All Of The Specific Threats & Because Of The Overall Tripartite Threat**

149.    There were special meetings of high-level NYPD officials that took place prior to the RNC and focused specifically and exclusively on RNC issues and planning for policing and ensuring public safety during the RNC.  Esposito Depo. 81:12-19 561:22-25, 562:2-7, 689:13-24, 874:5-17, 901:24-25, 1051:12-19 1420:13-25, 1421:2-25, 1422:2-8; 1431:18-25, 1432:2-6.

150.    Both Chief Esposito and Commissioner Kelly were present at these RNC planning meetings.  Esposito Depo. 181:2-15, 182:3-12, 689:13-24, 874:5-17, 876:8-17, 879:20-25, 880:2-17, 1052:12-15, 1053:2-11, 1419:24-25, 1420:2-8.

151.    The NYPD implemented a policy of not issuing summonses to individuals engaged in criminal conduct that was related to the RNC in favor of custodial arrest (the "No Summons Policy").  Esposito Depo. 958:23-25, 959:2-17, 960:4-9, 961:24-25, 962:3, 967-2-25, 968:2-25, 969:2-7.

152.    Individuals arrested pursuant to the "No Summons Policy" would either receive a desk appearance ticket ("DAT") if they qualified or be arraigned. (Esposito Depo. 192:6-11, 199:19-25, 200:2-22, 687:20-25, 688:2-3, 1809:16-25, 1810:2-13; Deposition of Gary Galperin ("Galperin Depo."), annexed to Dougherty Decl. as Ex. Q, at 24:24-25, 25:2-7).

153.     A policy related to the No-Summons Policy was implemented by the NYPD that all RNC arrestees and all individuals arrested pursuant to the were to be fingerprinted as part of their arrest processing (the "Fingerprinting Policy") (collectively the "Policies"). Esposito Depo. 199:19-25, 200:2-22; Galperin Depo. 24:24-25, 25:2-7.

154.     The NYPD analyzed the RNC as a whole event and took all of the intelligence into consideration including the tripartite threat identified by Commissioner Cohen in deciding to adopt the Policies.  (Esposito Depo. 183:11-25, 184:2-21, 195:5-13, 711:12-15, 712:2-5, 899:16-25, 900:2-23, 1035:2-5, 1083:7-21, 1211:19-25, 1212:2-5; Cohen Depo. 645:2-25, 646:2-15; Cohen Decl. ¶¶ 5-24; End-User Reports; Intelligence Appendix; Talking Points; PowerPoint.

155.     The decision regarding the Policies "was an evolving process" "[a]nd as information kept coming in about unlawful activity, attempts to shut down the RNC, shut down the City, about known criminals coming in with histories of anarchy and bombings, and attacks on establishments[,] [a]s all of that was coming forward, ultimately that decision was made." Esposito Depo. 891:19-25, 892:2-25, 893:2-11.

156.     Chief Esposito participated in the decision to adopt the Policies, but ultimately that decision was approved by Commissioner Kelly.  Esposito Depo. 185-86, 193:11-14, 271:6-10; 559:4-10, 1052:12-15, 1053:2-11, 1071:18-25, 1072:2-10, 1419:24-25, 1420:2-8.

157.     Chief Esposito explained the process for decision making regarding the RNC, which encompassed making the decision to adopt the Policies:

> When [New York City was] awarded the RNC, committees were formed, meetings were held.  At those meetings there are working groups and plans were formulated and they evolved. … So we talked about a lot of things and a lot of things were presented at us throughout the whole course of that over a year getting ready for the RNC.  But ultimately the final decisions are made very close to when the RNC was going to happen. There was a final presentation, okay, we're ready to go, its game day, let's go.

Esposito Depo. 890:24-25, 891:2-18.

158.    The "decision" to adopt the Policies, "as all the decisions of the RNC, would have been made on that final game-day meeting … we made final decisions as close to the convention as possible."  Esposito Depo. 891:19-25, 892:2-25, 893:2-11, 1030:22-25, 1031:2-3, 1423:6-13.

159.    The final meeting in which the NYPD made the "final, ultimate decision" to adopt the Policies occurred "close to when the Convention was starting."  Esposito Depo. 884:3-19, 891:19-25, 892:2-25, 893:2-11, 948:10-16, 1072:11-17.

160.    Chief Esposito believes that final decision making meeting took place in August of 2004.  Esposito Depo. 884:3-19, 948:20-25, 949:2-12, 960:4-9, 961:24-25, 962:3, 1071:18-25,1072:2-10, 1420:13-25, 1421:2-25, 1422:2-8.

**Processing RNC Arrestees For DATs And Fingerprinting**

161.    Eligibility for a Desk Appearance Ticket ("DAT") encompassed obtaining information on the DAT Investigation Worksheets used at the time of the RNC.  That entailed obtaining the following information regarding the arrestee: (1) First, last and middle name; (2) Complete address including county of residence; (3) Date of Birth; (4) Driver's License No.; (5) Social Security No.; (6) Employment Status – including name, address and telephone number of employer; (7) Social Status (i.e. single, married, etc.); (8) Who arrestee resides with; (9) whether there is a co-defendant and whether the co-defendant received a DAT; (10) Home telephone number and any additional contact numbers; (11) If given a DAT whether someone will attend arraignment with defendant and name/relationship of that individual; and (12) Warrant check information.  Sample DAT Investigation Worksheet, annexed to Dougherty Decl. as Ex. Q.

162.    The identification check for issuing a DAT is more thorough than what is required to issue a summons and requires fingerprints to be taken.  Fingerprints are also required

when processing an arrestee for arraignment.  Esposito Depo. 112:6-25, 113:11-21, 127:25-128:2, 118:18-19, 285:3-18, 710:4-21.

163.    It is routine NYPD practice to fingerprint for custodial arrests.  O'Connell Depo. 68:7-10.

164.    The fingerprint records for all individuals arrested in Manhattan during the time period of the RNC, August 25, 2004 to September 4, 2004, for whom a violation was the top charge were deleted from the NYPD's Automated Fingerprint System and the NYPD Archival System on October 25, 2004.  Declaration of James Simon, annexed to Dougherty Decl. as Ex. P.

## "RNC-Related" Unlawful Conduct

165.    The Policies were directed at "all illegal activity directly related to the RNC."  Esposito Depo. 1142:20-25, 1143:2-3.

166.    For purposes of determining whether illegal conduct was RNC-related and subject to the Policies, the NYPD focused on "the illegal activity" to "determine[ ] [if it] was geared toward the RNC" and "not the demonstration."  Esposito Depo. 174:5-14.

167.    Chief Esposito explained that for purposes of the Policies, criminal acts were RNC-related if they involved criminal activity or violations of law that revolved around the RNC or was connected to the RNC.  Esposito Depo. 173:9-13, 175:4-15.

168.    "RNC-related" conduct was linked to the intelligence that was gathered about anticipated unlawful conduct during the RNC and if certain anticipated unlawful conduct "materialized" it "would have been considered RNC related."   Esposito Depo. 175:16-22, 387:19-25, 388:2-14.

169.    For example, the NYPD "gathered" "information [and] intelligence … that people coming to the City during the course of the RNC would target certain stores, certain

places for attack" and "if that materialized" it "would have been considered RNC related" conduct.  Esposito Depo. 175:16-22.

170.    The crucial distinction in determining whether unlawful conduct was "RNC-Related" and therefore, subject to the Policies was "the intelligence [the NYPD] had regarding RNC-related conduct, the potential was there, the threat was there, the intelligence was there that people were going to … be involved in terrorism … to be involved in civil disobedience, attempting to shut down the City, attempting to shut down the RNC, attacks on police, attacks on businesses in the City."  Esposito Depo. 387:19-25, 388:2-14.

171.    Only those individuals whose unlawful activity was "RNC-Related" were subject to the Policies.  Esposito Depo. 174:5-14, 387:19-25, 388:2-14, 1142:20-25, 1143:2-3.

172.    The Policies applied during the time period of the RNC.  Esposito Depo. 860:12-21.

**The NYPD Believed The Policies Addressed The Specific Threat Environment Facing The During The RNC**

173.    The Policies were adopted based on the specific threats and because of the overall tripartite threat environment facing the RNC, including the City and the RNC.  (Esposito Depo 85:4-12, 183:11-25, 184:2-21, 194 9:13, 195:5-13, 268:16-18, 269:6-25, 270:2, 365:2-7, 17-20, 367:6-18, 369:8-11, 16-20, 403:19-25, 404:2-25, 405:21-25, 406:2-25, 407:2-25, 408:2-25, 410:6-15, 708:25, 709:2-24, 710:2-21, 711:12-15, 712:2-25, 713:2-17, 714:23-25, 715:2-12, 744:7-16, 899:16-25, 900:2-23, 972:20-25, 973:2-5, 974:2-5, 985:8-23, 986:14-25, 987:2-4, 990:11-24, 1009:10-22, 1010:5-18, 1027:11-20, 1028:13-25, 1029:2-9, 1030:19-25, 1031:2-3, 1033:17-25, 1034:20-24, 1080:25, 1081:2-7, 1104:10-25, 1211:19-25, 1212:2-25, 1213:2-3; Cohen Depo 274:20-25, 275:2-25, 276:2-10; 583:8-25, 584:2-25, 585:2-12; 645:2-25, 646:2-15; Cohen Decl. 7, 14-19; End-User Reports; Cohen PowerPoint; RNC Intelligence Index).

174.    The NYPD believed that summonsed individuals could "continue" in their "criminal activity," "produce false identification" and more easily avert "responsibility" for their "criminal activity because of the false identification."  Esposito Depo. 710:4-21, 995:12-18

**Combating Continuous Unlawful Activity And Clearing The Unlawful Condition**

175.    Chief Esposito explained that the NYPD adopted the Policies because the NYPD "want[ed] to stop any criminal activity from occurring," "[i]t could be breaking a window, it could be attacking people, it could be anything."  Esposito Depo. 733:23-25, 734:2-13.

176.    The intelligence regarding "the threat of continuous and repetitive unlawful activity" also informed the decision to adopt the Policies.  Esposito Depo. 1211:19-25, 1212:2-18, 1829:6-13, 16-25, 1831:2-6.

177.    One specific issue "discussed" in deciding to adopt the Policies was information "from intelligence … that people were stating that they were going to come to New York City and engage in "continuous unlawful behavior" and "continuous, recurring unlawful civil disobedience" "and, through unlawful acts"  shut down the City of New York and the RNC. Esposito Depo. 194:9:13, 714:3-18, 715:6-9, 899:16-25, 900:2-23, 1104:10-25. 1211:19-25, 1212:2-18, 1829:6-13, 16-25, 1831:2-6.

178.    The NYPD believed the threat of "continued illegal activity" was a "paramount" concern.  Esposito Depo. 1011:4-1.

179.    In making the decision to adopt the Policies another factor considered was that the intelligence indicated RNC-related "criminal activity" would continue after a summons was issued.  Esposito Depo. 349:17-25, 350:2-3, 729:9-21.

180.    The intelligence also suggested that it was "very likely" that people who were not "remove[d]" from the scene would "just continue in the[ir] illegal activity"  Esposito Depo. 87: 20-25, 88: 2-5, 1801:13-21.

181.    Chief Esposito explained that "if a person is committing criminal activity and perhaps is eligible for a C summons, if we were to issue that C summons right there on the scene, which is in many cases what we would do under normal circumstances, then that person could just continue his or her criminal activity, which may be resulting in a venue being shut down, a hotel being shut down."  Esposito Depo. 973:6-25, 974:2-5.

182.    Chief Esposito explained that the NYPD "want[ed] to stop the criminal activity from continuing" and he believed "many times" issuing a "summons is not the best way to do that."  Esposito Depo. 184:8-11, 194 9:13.

183.    The NYPD believed issuing summonses did not address the threat of continuous unlawful conduct because  "[a] C-Summons can be issued right there at the scene" but "that person can go right back and engage in the same criminal activity."  Esposito Depo. 729:22-25, 730:2-8, 1801:13-21.

184.    The NYPD felt an inherent problem with issuing summonses during the RNC was that after being issued a summons the individual "could almost immediately come back" and engage in illegal activities.  Esposito Depo. 87: 20-25, 88: 2-5, 1801:13-25, 1802:2-14.

185.    By way of example, a "person could get a summons at 12 o'clock in the afternoon, be issued a C summons by 12:05 and start continuing his criminal activity at 12:10." Esposito Depo. 993:21-25, 994:2-4.

186.    Because the NYPD "knew that the criminal activity was meant to be ongoing and continuous in an attempt to shut down the City and shut down the RNC," the NYPD

"felt" processing RNC arrestees for DATs would "combat" that threat.  Esposito Depo. 709:11-24.

187.    The NYPD believed the Policies addressed their concern regarding the threat of continuous unlawful activity because it could prevent escalating disorder, repetitive violations, as well as escalating offenses such as violations followed by misdemeanors, felonies or acts of terrorism.  Esposito Depo 87:20-25, 88: 2-5, 347:24-25, 348:2-7, 1006:20-25, 1007:2-25, 1008:3-23, 1801:13-25, 1802:2-14.

188.    The Policies required "removing that person for a period of time" and the NYPD felt that therefore, it was "more difficult" for them to "re-engage in that criminal activity in a timely fashion."  Esposito Depo. 729:22-25, 730:2-8.

189.    Chief Esposito explained that "removing the law-breaker from the scene, [and] issuing a desk appearance ticket, prevents that law-breaker from coming back to that scene and engaging in any type of criminal activity from bomb throwing, to blocking traffic, it runs the gamut."  Esposito Depo. 733:23-25, 734:2-13.

190.    Chief Esposito explained that "besides the crime that they were committing, which may just be laying down in the street, blocking an entrance to a location," the no summons policy "could also prevent [an] act of terrorism if we get them early enough, [or prevent] that other felony of misdemeanor."  Esposito Depo. 1006:20-25, 1007:2-22.

191.    The NYPD believed that "a DAT policy, [and] a no C-Summons policy would be the best policy to … combat" the concern about shutting down the City.  Esposito Depo. 709:11-24, 1211:19-25, 1212:2-25, 1213:2-10.

192.    The NYPD believed the Policies addressed their concerns regarding the threat of people engaging in continuous unlawful activity or engaging in subsequent greater offense because arrest "remove[d] them for a time period, it takes them off the location [and]

verify their identity, you in fact have a good idea of who they are and that makes it less likely they will come back" and continue in additional or greater illegal conduct.  Esposito Depo 1801:13-25, 1802:2-14.

193.    The concern about the potential impact false identification would have on the threat of continuous unlawful conduct informed the decision to adopt the no summons policy. Esposito Depo. 992:18-25, 993:2-20, 994:5-12, 1005:6-21.

194.    The NYPD decision makers were concerned that issuing summonses would not address their concerns about the threat of continuous unlawful activity and the prevalence of demonstrators with false identification because they felt if they issued "C summonses" to people with "phony identification" and who were from outside New York who could return to their home state or country without penalty and that it foster more continued unlawful activity.  Esposito Depo. 100:4-20, 992:18-25, 993:2-20.

195.    The NYPD believed that issuing summonses was not the most efficacious way to address their concerns regarding the RNC because "[a] C-Summon many times can be issued right at the scene" so the individual is not removed "from the scene" and the "identification check is not as thorough as with a desk appearance ticket [or being processed online]."  Esposito Depo. 710:4-21, 995:12-18

**Strain On Police Resources**

196.    The NYPD felt that in the context of the RNC, issuing summonses to would create a strain on police manpower and resources.  Esposito Depo. 1802:15-25, 1803:2-8.

197.    Chief Esposito explained that "if your taking in hundreds of people for C summonses … that volume removes allot of officers from the scene" who have "to write those summonses [and] check the IDs."  Esposito Depo. 1802:15-25, 1803:2-8, 24, 1804:2-25, 1805:2-3.

198.    This process "could take hours" and could result in NYPD officers being "off the scene for a lengthily period of time" before they "can go back out and continue policing the RNC."  Esposito Depo. 1802:15-25, 1803:2-8, 24, 1804:2-25, 1805:2-3.

199.    "In an arrest situation, it was distinctly possible to lodge the prisoners and have the officer go back to the location … and do police work again." Esposito Depo. 1802:15-25, 1803:2-8, 24, 1804:2-25, 1805:2-3.

**Fraudulent Identification & No Identification**

200.    The NYPD did not want to issue summonses during the RNC to individuals without identification or with false identification because they "would want to make sure [they] could find out for certain who that person is."  Esposito Depo. 986:14-25, 987:2-4.

201.    The NYPD believed the more thorough identification process resulting from the Policies could lead to identifying known terrorists.  Esposito Depo. 1835:21-25, 1836:2-3.

202.    The Policies addressed the concerns regarding false identification because, "if there's a no C summons policy, people were going to [be processed] online and be fingerprinted" so the NYPD would better be able "to determine their true identity."  Esposito Depo. 995:12-18.

203.    Chief Esposito explained that "one set of facts that helped us decide there would be [a] no-C-summons policy" was "the information" the NYPD received indicating people coming to the RNC that were planning on engaging in unlawful acts would have "no identification, [and] people would come with phony identification."  Esposito Depo. 99:16-25, 100:2-20, 184:8-11, 194 9:13, 709:11-24, 971:9-22, 1003:4-20, 1034:2-19, 1211:19-25, 1212:2-18.

204.    Processing for a DAT requires " a more stringent policy …  for getting proper identification, getting thorough identification, than there is for a C summons."  Esposito Depo. 996:3-10, 22-25, 997:2-5.

205.    Unlike the process in issuing a summons "part of the process to [issue] a DAT" included "verify[ing] whether the information [and] the identification given" to the NYPD "is fake or not" and the NYPD felt a no-summons policy was a more effective way to address their concerns regarding identification.  Esposito Depo. 716:6-17, 184:8-11, 194 9:13, 709:11-24, 971:9-22, 1003:4-20, 1211:19-25, 1212:2-18.

206.    The NYPD believed, "the [DAT] process itself would lend toward more accurate identification."  Esposito Depo. 996:3:10.

207.    The intelligence indicating people coming to the City to engage in unlawful conduct would be using false identification "played into the strategy of [offering] desk appearance tickets and no C summonses" during the RNC.  Esposito Depo. 99:16-25, 100:2-20, 102:2-15.

208.    Chief Esposito believed that attempting to determine whether identifications were false during the RNC would have been "very difficult."  Esposito Depo. 1025:19-25, 1026:2-18.

209.    The NYPD believed "determ[ining] whether "an out of city, out of state, out of country IDs were in fact valid or not valid would have been a tremendous undertaking" during the RNC.  Esposito Depo. 1009:10-25, 1010:2-4, 1025:19-25, 1026:2-18.

210.    Based on the intelligence information, the NYPD was "anticipating large numbers" of individuals coming to the RNC "from outside the City and outside the state" or even from "other parts of the world" for the purpose of participating in RNC related events.  Esposito Depo. 1027:11-20, 1212:20-25, 1213:2-10.

211.   Some of these individuals would commit unlawful acts at RNC-related events.  Esposito Depo. 183:11-25, 184:2-20, 1009:10-22, 1010:5-13, 1027:11-20, 1212:20-25, 1213:2-10.

212.   An additional "issue[ ] discussed that supported [the Policies]" was information "from intelligence" that people coming to the RNC "were going to be coming with no ID, in an attempt to jam up the criminal justice system" and "people were going to be coming with phony ID to try and deceive the Criminal Justice Bureau" or "device law enforcement." Esposito Depo. 268:16-18, 269:7-25, 270:2, 270:3-9, 899:16-25, 900:2-23.

213.   "[N]o ID and bad ID is going to lead to poor, inaccurate identification and prosecution."  Esposito Depo. 990:25, 991:2-5, 992:18-25, 993:2-20. 971:23-24, 972:2-3, 8-14.

214.   The NYPD believed that issuing summonses was not the most efficacious way to address their concerns regarding the RNC because "[a] C-Summon many times can be issued right at the scene" so the individual is not removed "from the scene" and  the "identification check is not as thorough as with a desk appearance ticket [or being processed online]."  Esposito Depo. 710:4-21, 995:12-18

**The NYPD Wanted To Ensure The Best Possible Criminal Prosecutions**

215.   The "intelligence" the NYPD received indicated that "people who live outside the City and state who are issued summonses are less likely to come back and answer that C summons" when compared to being arrested.  Esposito Depo. 1831:7-25, 2-7.

216.   The NYPD was also concerned that if out-of-state individuals were issued summonses they would have the "mindset" that the NYPD would not pursue a criminal prosecution once they returned "to their home state." Esposito Depo. 1010:5-13.

217.    The NYPD was also concerned that out-of-state individuals "would continue in their illegal activity" with the "mindset" that they "could [commit criminal acts] over and over" without consequence.  Esposito Depo. 1010:5-25, 1011:2-3, 20-25, 1012:2.

218.    The NYPD was concerned with the prospect that out-of-state individuals would not return to New York for prosecution if they received a summons.  Esposito Depo. 1010:19-25, 1011:2-3.

219.    The issue of obtaining "a proper identification" was also a concern with out of state individuals because "a proper identification is necessary to go forward" with "the best possible [criminal] prosecution" which was a special consideration during the RNC, because many "of these people were coming in from out of the City [and state]."  Esposito Depo. 184:12-21.

220.    Based on the intelligence received, the NYPD was concerned that individuals with false identification or no identification would not be prosecuted because they may "not show up for a return date [and] because" the NYPD did not "have the proper identification, there [would be] no  prosecution."  Esposito Depo. 990:25, 991:2-5, 992:18-25, 993:2-20

221.    The NYPD wanted to ensure a proper criminal prosecutions of those who engaged in illegal conduct during the RNC.  Esposito Depo. 1211:19-25, 1212:2-18.

222.    In "respon[ding] [to and] analy[zing]" the intelligence received regarding the RNC, the NYPD focused on the fact that in order "to make a better criminal case" they needed "good identification."  Esposito Depo. 100:4-20, 102:2-15, 1211:19-25, 1212:2-18.

223.    Based on the intelligence indicating the prevalence of "fake" identification, "continuous unlawful activity, shutting down the RNC, deceiving the police, the tactics of defeating [the NYPD's] strategies [and] methods of policing, all of that came into play"

in making the NYPD "believe" that people issued summonses would be less likely to return for criminal court appearances.  Esposito Depo. 1832:8-19.

224.    "NYPD intelligence sources" indicated that people "from outside New York City" were "being advised to come to New York" during the RNC and "demonstrate" and "commit illegal acts, shut down the RNC" and "bring fake ID" so "based on [that] intelligence" it was "the opinion of the NYPD" and Chief Esposito that "a number of the people coming [to New York] for the RNC who were going to engage in continuous unlawful activity would be less likely to come back and answer for their [criminal] court date[s]" if they were issued summonses.  Esposito Depo. 100:4-20, 1829:6-13, 1830:16-25, 1831:2-6, 1832:8-19

225.    Chief Esposito explained, that during the RNC, the NYPD was "looking to make the best case for criminal activity if [they made] arrests" and accordingly, "felt the desk appearance ticket" or processing online "would have been the best option."  Esposito Depo. 710:4-21, 995:12-18

226.    The fact that "a proper identification" is necessary to go forward" with "the best possible [criminal] prosecution" was a special consideration during the RNC, because many of the people who were expected to engage in unlawful conduct "were coming in from out of the City" outside the state, and would be carrying false identification or no identification. Esposito Depo. 99:16-25, 100:2-20, 102:2-15, 184:12-21.

**The NYPD's Mission In Planning For The RNC Included Facilitating The Right of the People To Assemble and Express Their First Amendment Rights.**

227.    "The high point of the NYPD's actions was the department's handling of the United for Peace and Justice (UFPJ) antiwar march on Sunday, August 29, [2004], when as many as half a million people peacefully marched past Madison Square Garden, largely without incident, and with generally good cooperation." Christopher Dunn et al., Rights and Wrongs at the RNC 1 (New York Civil Liberties Union 2005).

228.   "Over the course of the RNC, tens of thousands of protesters engaged in anti-war, labor, human rights, and other political rallies within the demonstration area.  News reports also documented various protests in Chelsea, Harlem, Midtown, Queens, Union Square, and other locations across the City."  *Marcavage*, 2010 U.S. Dist. LEXIS 107724 at *22.

229.   Commissioner Cohen testified that nearly 800,000 people engaged in protest during the RNC.  (Cohen Depo. 775:23-25, 776:2-25, 777:2-20, 826:18-25, 827:2-25, 828:2-8).

230.   There were approximately 1,800 RNC related arrests.

231.   In planning for the RNC, the NYPD's mission included the following four objectives:  (1) "Ensure the safety of the citizens of New York and its visitors"; (2) "Provide for the security of the RNC"; (3) "Minimize the inconvenience to commuters, residents and merchants"; and (4) "Facilitate the rights of others to lawfully protest against the convention." RNC Executive Summary, Bates 7082; RNC Training Materials, Bates 7025, annexed to the Dougherty Decl. as Ex. N; NYPD Officers' Guide to the RNC, Bates 7302, annexed to the Dougherty Decl. as Ex. N; Demonstration Area Sub-Committee After Action Report, Bates 127466, annexed to the Dougherty Decl. as Ex. N (the City's objective was to "provide a safe and orderly venue for rally participants, visitors and spectators", "[m]aintain the flow of pedestrian and vehicular traffic", and to "[m]aintain a business as usual atmosphere in the immediate area").

232.   The policy of the NYPD was to protect the right of people to protest Thomas Graham Depo. at 582:11-16, annexed to the Dougherty Decl. as Ex. O; Thomas Galati Depo. at 458:17-20, annexed to the Dougherty Decl. as Ex. N.

233.    In addition to concerns about illegal activity that may occur, in planning for the Convention, the NYPD was "also concerned about legal activities" and wanted to "protect the rights" of lawful demonstrators.   Esposito Depo. at 1105:2-16.

234.    In planning for the RNC, "the process [the NYPD] put in place" encompassed a "mission" to protect the First Amendment rights [of] the people who were [in New York City] to demonstrate legally against the RNC."  Esposito Depo. 1813:11-25, 1814:2-5.

235.    The NYPD made preparations to ensure that the rights of others to lawfully assemble and protest was done "in a lawful manner that [was] respectful of other citizens' rights."  RNC Executive Summary, Bates 7090.

236.    One measure taken by the City to "facilitate the rights of others to lawfully protest against the convention" included the training and education of law enforcement officials on First Amendment rights. No Summons Policy Video Compilation (hereinafter "NSPV") at Ch. 1, annexed to the Dougherty Decl. as Ex. R.

237.    A second measure included the establishment of a Demonstration Area. Demonstration Area Sub-Committee.  After-Action Report, Bates 127466; Smolka Decl. ¶8.

238.     A third measure included the issuance of parading permits in accordance with the laws of the City of New York.  N.Y.C. Admin. Code § 10-110(a) (2004); Kerry Sweet Depo. 35:18-25, annexed to the Dougherty Decl. as Ex. P.

239.    In addition, City officials met with demonstration organizers, including representatives from the New York Civil Liberties Union (NYCLU), in preparation of large-scale demonstration activity.  RNC Executive Summary, Bates 7090.

240.    A fourth measure included accommodating unplanned marches to proceed with their demonstrations.  NSPV at Ch. 1.

241.    The goal of the NYPD was to have demonstrations and marches with no unlawful behavior and no arrests.  Thomas Graham Depo. at 414:15-20; 419:3-6.

**The City Educated and Trained Law Enforcement Personnel To Facilitate First Amendment Activity**

242.    The NYPD's key responsibilities included maintaining order, protecting persons and property, and impartially enforcing the law during protests and demonstrations. NYPD Officers' Guide to the RNC, Bates 7306.

243.    The NYPD provided training to its Members of Service in how to protect the rights of others to lawfully protest against the RNC.  RNC Training materials, Bates 7024-7025.

244.    The role of the Police Department includes protecting the right of protesters to express their views and protecting the rights of non-protesters to go about their daily life unaffected by public disorder.  Police Student's Guide, Maintaining Public Order, Bates 8222, annexed to the Dougherty Depo. as Ex. P.

245.    Officers were trained it is the policy of the New York Police Department to protect the rights of assembly and free speech, as well as the right of safe and unhindered passage for all people.  The successful implementation of this policy requires a balance between the Department's mandate to preserve public order and its obligation to protect the First Amendment rights of varied and often competing groups.  Executive Development, May 2004 Cycle Course, "Civil Disturbance," Bates 7052, annexed to the Dougherty Decl. as Ex. Q.

246.    Prior to the RNC, NYPD officers were trained in policing the RNC.  No Summons Policy Video ("NSPV") at Ch. 1; Deposition of Thomas Doepfner ("Doepfner Depo."), annexed to Dougherty Decl. as Ex. O at 33:15-36:18.

247.    Officers were instructed on the laws concerning demonstration activity and other protected First Amendment activity, such as observing. NSPV at Ch. 1; Doepfner Depo. at 33:15-36:18.

248.    Officers were trained that participants in the RNC could exercise their First Amendment rights.  NSPV at Ch. 1, Thomas Doepfner Depo. at 33:15-22, 36:4-12.

249.    Officers were trained to be neutral in their policing of any demonstrations that would arise during the RNC. NSPV at Ch. 1- TARU Tape 159 at 11:11 and TARU Tape 160 at 1:30.

250.    Officers were trained to expect pop-up demonstrations during the RNC and to facilitate any such demonstrations by working with organizers, if possible to safely do so. NSPV at Ch. 1- TARU Tape 159 at 4:10.

**The City Established a Demonstration Area by the Convention**

251.    The NYPD established a "free speech" zone at 31st Street and 8th Avenue, directly adjacent to the southwest corner of Madison Square Garden.  Diagram of Safety Zone, Bates 10558; *Marcavage*, 05 Civ. 4949, 2010 U.S. Dist. LEXIS 107724, at *5-6 (S.D.N.Y. Sept. 29, 2010).

252.    Madison Square Garden occupies the entire area from 31st Street to 33rd Street and from 7th Avenue to 8th Avenue.  Diagram of Safety Zone, Bates 10558, annexed to the Dougherty Decl. as Ex. Q.

253.    The demonstration area encompassed 8th Avenue from West 32nd Street to West 14th Street, with cut-off posts on 7th and 9th Avenues from West 31st Street to West 14th Street. Demonstration Area Sub-Committee After-Action Report, Bates 127472.

254.    The demonstration area was established in order to provide a safe and orderly venue for rally participants, visitors, and spectators, while maintaining the flow of

pedestrian and vehicle traffic in the area. Demonstration Area Sub-Committee After-Action Report, Bates 127466.

255. This space was monitored by NYPD to ensure it remained safe for everyone who wished to participate. *Marcavage*, 2010 U.S. Dist. LEXIS 107724, at *5-6.

**The City Issued Parade Permits For Demonstrations Scheduled To Take Place During the RNC Period**

256. Groups who wished to parade, or conduct events otherwise governed by N.Y.C. Admin. Code §10-110, could apply for permits from the NYPD. N.Y.C. Admin. Code §10-110, 38 R.C.N.Y. §19-01, et seq.

257. Permit applications for RNC-related events were generally granted. Kerry Sweet Depo. 36:8-9, annexed to the Dougherty Decl. as Exhibit P.

258. NYPD would meet with any group that wished to speak with the NYPD regarding the planning for each event. Bruce Smolka Depo. at 413:18-24, annexed to the Dougherty Decl. as Ex. P.

259. In the absence of a written permit, permission to go forward with a parade may be granted orally on the scene by the ranking NYPD officer. Deposition of Bruce Smolka ("Smolka Depo."), annexed to the Dougherty Decl. as Ex. P at 54:20-55:6.

260. This oral permission is granted provided the group abides by the conditions set by the NYPD. Kerry Sweet Depo. at 40:6-19; 43:7-9.

**Planned Parenthood March – 8/28/04**

261. On May 26, 2004, Planned Parenthood of New York City applied for a parade permit for a march of approximately 10,000 people to be held on August 28, 2004. Permit Materials, Bates 91505, annexed to the Dougherty Decl. as Ex. P.

262.     The organizers requested that the march begin in Camden Plaza, in Brooklyn, then proceed over the Brooklyn Bridge pedestrian walkway, turning onto Park Row, then Broadway, and terminating in Battery Park.  Permit Materials, Bates 91505.

263.     Representatives of Planned Parenthood met with representatives of NYPD Patrol Borough Manhattan South Operations, and negotiated changes to the proposed parade route, resulting in the parade's conclusion at City Hall Park rather than Battery Park.  Permit Materials, Bates 91503.

264.     On June 15, 2004, the NYPD granted Planned Parenthood's permit application with the route modification.  Permit Materials, Bates 91504.  The City of New York issued a parading permit to Planned Parenthood.  List of Scheduled Events, Bates No. 15969, annexed to the Dougherty Decl. as Ex. P.

265.     The Planned Parenthood March took place on August 28, 2004.  MACC RNC Daily Briefing Sheets, Bates 7174, annexed to the Dougherty Decl. as Ex. Q; NSPV at Ch. 5.

266.     The event began at approximately 10:00 in Brooklyn, and concluded at approximately 5:00 p.m. MACC RNC Daily Briefing Sheets, Bates 7174.

267.     It was estimated that between 7,000 – 15,000 people participated in the event. NSPV at Ch. 5, List of Scheduled Events Bates No. 15969; MACC RNC Daily Briefing Sheets, Bates 7174; NYPD Emergency Operations Center RNC Daily Reports (hereinafter "EOC Daily Reports"), Bates 7243, annexed to the Dougherty Decl. as Ex. Q.

268.     There were about 30 counter-protesters. EOC Daily Reports, Bates 7243.

269.     There were no arrests during the march except for 2 arrests for criminal possession of knives.  List of Scheduled Events Bates No. 15969; MACC RNC Daily Briefing Sheets, Bates 7174; EOC Daily Reports, Bates 7243.

**United For Peace And Justice March – 8/29/04**

270.    On August 29, 2004, the organization United for Peace and Justice ("UPJ") held a demonstration march that ran from 7th Avenue and 33rd Street to Union Square Park.  List of Scheduled Events, Bates 15970.

271.    UPJ had previously obtained a permit for this event.  List of Scheduled Events, Bates 15970.

272.    Video footage of the event clearly depicts thousands of people marching with no interference from the NYPD.  NSPV at Ch. 3.

**NYC Central Labor Council Protest—9/1/04**

273.    On Wednesday, September 1, 2004, approximately 25,000 people participated in a NYC Central Labor Council rally in the "demonstration area" with no incidents.  Demonstration Area Sub-Committee After-Action Report, Bates 127469; List of Scheduled Events Bates No. 15972.

274.    There was a sound permit issued for this event.  List of Scheduled Events Bates No. 15972.

275.    The event lasted from 4:00 p.m. to 7:00 p.m. List of Scheduled Events Bates No. 15972.

276.    There were no arrests. Emergency Operations Center Documents, Bates 7282.

277.    In addition, the City issued permits to numerous other events.  See e.g. MACC RNC Daily Briefing Sheets, Bates 7156 (Paul Revere Bike Ride); MACC RNC Daily Briefing Sheets, Bates 7160 (UPJ rally outside New York State Supreme Court building), (Not in Our Name press conference); NSPV at Ch. 13 (Hilton Hotel, Halliburton "Billionaires for Bush" demonstration); MACC RNC Daily Briefing Sheets, Bates 7190, NSPV at Ch. 4, EOC Daily Reports, Bates 7256 (AIDS March, "Still We Rise").

## NYPD Also Facilitated Parades That Did Not Have Permits

### DNC2RNC "Times Up" Event - 8/26/04

278.    On August 26, 2004, there occurred the DNC2RNC Times Up event. NSPV at Ch. 2; List of Scheduled Events Bates No. 15968.

279.    This event was facilitated by the NYPD although no parade permit had been issued.  NSPV at Ch. 2; List of Scheduled Events Bates No. 15968. Monahan Depo. at 127:2-3

280.    Organizers informed NYPD officers that they wished to march on Broadway through Times Square, past Madison Square Garden to Union Square Park  NSPV at Ch. 2 at 00:00-7:15, Monahan Depo. at 125:13-21.

281.    Police officers on the scene agreed to this route and provided one lane of Broadway for the event because the march was traveling with the flow of traffic.  Monahan Depo. 125:21-25.

282.    Organizers also planned for participants to put on masks in front of a theater on Broadway, stamp their feet, and then remove the masks.  The NYPD did not object to this despite it being a violation of the Penal Law because, after talking to the march organizer, Monahan was "comfortable that this was all they were going to do.  He told me that they would remove the masks right after they passed the theater," and Monahan was present during this portion of the march.  Monahan Depo.  126:2-16.

283.    The march began in the Central Park, to Columbus Circle, then down Broadway, to Madison Square Garden to Union Square.  NSPV at Ch. 2, Galati Depo. at 713:6-23.

284.    No arrests were made during this event.  Galati Depo. at 718:24-719:6.

**Union Square To Madison Square Garden Pop- Up March –9/2/04**

      285.    On September 2, 2004 a pop up demonstration occurred at Union Square Park.  NSPV at Ch. 12.

      286.    Participants were at Union Square Park by 8:30 p.m.  NSPV at Ch. 12.

      287.    Participants wanted to march to Madison Square Garden.  NSPV at Ch. 12.

      288.    No permit had been previously sought or obtained for this march.  NSPV at Ch. 12 at 9:24.

      289.    NYPD officers negotiated with event organizers and facilitated the march to go forward.  NSPV at Ch. 12.

      290.    Event organizers can be seen cooperating with NYPD.  NSPV at Ch. 12.

      291.    Hundreds of people participated in this event.  NSPV at Ch. 12.

      292.    The route of the march was to go west on 15th Street, and then North on 8th Avenue until reaching Madison Square Garden.  NSPV at Ch. 12.

293.     In addition, numerous events went forward during the RNC with little or no incident.  EOC Daily Reports, Bates 7229 (UPJ rally to overturn City's denial of a second permit application for a Central Park demonstration-8/29/04); List of Unscheduled Events, Bates No. 15974, annexed to the Dougherty Decl. as Ex. Q (Mothers Against Bush pop-up demonstration-8/29/04), (Police/Fire Union Rally of 8/29/04), (pop-up event at Lincoln Center-8/29/04), (pop-up event at Pier 57-8/29/04), (pop-up event at Amsterdam Theater- 8/29/04); List of Unscheduled Events, Bates No. 15975 (Crow Bar event-8/30/04), (Union Square pop-up event- 8/30/04), (Pop-up demonstration at Cipriani's Restaurant-8/30/04), (Lincoln Center pop-up event- 8/31/04), (Tavern on the Green pop-up event- 8/31/04 (see also NSPV at ch. 7)), (pop-up demonstration on Lexington Avenue- 8/31/04), (pop-up demonstration at Times Square-8/31/04); List of Unscheduled Events, Bates No. 15976 (pop-up Philadelphia Cluster Demonstration- 8/31/04), (pop-up demonstration at the Exxon Building); (pop-up demonstration at Washington Square Park-8/31/04), (pop-up demonstration on 40th Street and 6th Avenue-8/31/04); List of Unscheduled Events, Bates No. 15978 (pop-up demonstration on 37th Street between 6th and 7th Avenues-8/31/04), (pop-up demonstration on Broadway between 48th and 49th Streets-8/31/04), (pop-up demonstration on 34th Street and Broadway-8/31/04), (Pier 57 pop-up demonstration- 9/1/04), (pop-up demonstration at 36th Street and Broadway-9/1/04), (pop-up demonstration at 40th Street and 3rd Avenue-9/1/04), (pop-up demonstration at 34th Street and 9th Avenue- 9/1/04); NSPV at Ch. 6 (Financial Center/Ground Zero demonstration-8/29/04); NSPV at Ch. 9 (Plaza Hotel Demonstration-8/31/04); NSPV at Ch. 10 (Regency Hotel Protest- 8/30/04); NSPV at Ch. 11 ("March on the Media" Event- 9/1/04); NSPV at Ch. 12 (Union Square to Madison Square Garden pop-up march- 9/2/04); NSPV at Ch. 14 (pop-up demonstration at corner of Centre and Worth Streets, see also Monahan Depo. 149:2-150:2); List of Unscheduled Events, Bates No. 15979 (pop-up demonstration at 34th Street and the FDR-

9/2/04), (pop-up demonstration at 100 Centre Street- 9/2/04), (pop-up demonstration at 6th

Avenue and 42nd Street-9/2/04), (pop-up demonstration at Union Square- 9/2/04, see also EOC

Daily Reports, Bate 7291).

Dated: New York, New York
      October 3, 2011

                Respectfully submitted,

                MICHAEL A. CARDOZO
                Corporation Counsel of the City of New York
                  Attorneys for Defendants
                100 Church Street, Room 3-143
                New York, New York 10007
                Tel: 212-788-8342
                Fax: 212-788-9776

      By:             /s/
                Jeffrey A. Dougherty