UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEIRDRE MACNAMARA, et al., individually and on behalf of those similarly situated, | 04-CV-9216 (KMK) (JCF) |
| Plaintiffs, | ECF Case |
| -against- | |
| THE CITY OF NEW YORK, a municipal entity, et al., | |
| Defendants. | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS UPON WHICH THERE IS NO GENUINE ISSUE TO BE TRIED PURSUANT TO LOCAL CIVIL RULE 56.1 FOR THE FULTON STREET ARRESTS ON AUGUST 31, 2004**

Pursuant to Local Civil Rule 56.1 the Macnamara Class Plaintiffs submit the following statement of material facts upon which there is no genuine issue to be tried:

**Plaintiff Simon Harak**

1. At the time of the 2004 Republican National Convention plaintiff Simon Harak was a Catholic priest and was the national anti-militarism coordinator of the War Resisters League ("WRL"). Harak deposition transcript, p. 5-6, attached as Exhibit "1" to the Moore declaration, hereinafter cited as "Harak Tr. at " "". He had no role in coordinating the WRL march on 8/31/04. Harak Tr. at 7-8.

2. Father Harak traveled alone to Church and Fulton on August 31, 2004. Harak Tr. at 38. He was wearing his priest's collar. Harak Tr. at 51. He arrived at that location sometime after 3:00 p.m. Harak Tr. at 38. When he arrived he saw a large crowd of people, some who

appeared to be tourists and some who had banners or posters. Harak Tr. at 38.

3. At some point he asked Ed Hedemann "what are we doing" and Mr. Hedemann told him the "police are going to lead us across the street and we're going to go two by two." Harak Tr. at 40, 41-42. He doesn't recall the police saying anything to the crowd at this point. Harak Tr. at 40.

4. When the march was about to start there was a policeman directing him and others across Church street on to Fulton. Harak Tr. at 39, 167.

5. There was about 200 people at the march. Harak Tr. at 46.

6. When the march started people starting moving towards the crossing area. The police were there and started directing people across the street. Harak Tr. at 41.

7. The crowd crossed the street in small groups as the policemen were waiving them across the street; they would wait and if the policeman would wave them, a bunch would cross. Harak Tr. at 42.

8. When he crossed Church, Father Harak was on the northside of Fulton on the sidewalk. Harak Tr. at 43.

9. After he crossed the street Father Harak heard word that the march had been stopped. Harak Tr. at 46. Because of that the crowd stopped moving and people bunched together. Harak Tr.. At 44-45, 46. He only went about 100-150 feet before the march was stopped. Harak at 168.

10. Shortly after hearing that, the police pulled out webbing and surrounded them. Harak Tr. at 46. Harak saw an officer in a white shirt running down towards back of the people saying "seal them off." Harak Tr. at 46.

11. Harak asked a policeman at that point "am I free to leave" and the officer said no. Harak Tr. at 46. Shortly thereafter he was pulled out and flex-cuffed with his hands behind his back. Harak Tr. at 46, 48.

12. Defendant Terence Monahan ordered that everyone on the sidewalk north of Fulton Street back to the corner of Church Street was to be arrested, including Father Harak. Monahan Tr. at 190:11-191:21. (Attached as Exhibit "4" to the Moore Fulton Street Declaration).

13. Neither Terrence Monahan nor any other member of the New York City Police Department had any personal knowledge of any conduct on the part of Simon Harak at the Fulton Street march which served as the basis for that plaintiff's arrest. Memorandum and Order signed by Magistrate Judge James C. Francis, IV, on November 28, 2006, attached as Exhibit "5" to the Moore Fulton Street Declaration).

14. The flex-cuffs were tight, especially on the left side. Harak complained to an officer about this but the officer did not loosen the cuffs. Harak Tr. at 49.

15. Harak waited about 2 and ½ hours on Fulton after being cuffed. Harak Tr.. At 50.

16. Father Harak was carrying his identification, a New York state driver's license as well as an MTA card, on the day of his arrest. Harak Tr. at 50, 51, 73. During that time a police officer asked him for his identification and Harak produced a New York state driver's license that gave his address at 220 West 98th Street, New York, New York. Harak Tr. at 50, 51.

17. After he was arrested, Father Harak was taken to Pier 57, where he estimates he stayed for 12 to 13 hours. Harak Tr. at 54-55, 65.

18. He was startled by the cages with razor wire that people were put in. Harak Tr. at

56. The floor was gritty and dirty and smelled like at old garage. There was oil and waste products on the floor. Wherever you sat you got dirty. Harak Tr. at 57.

19. He was very sad at the pier because he did not think that in the United States someone could be arrested without probable cause. Harak Tr. at 61. When he was arrested Father Harak was not doing anything illegal. Harak Tr. at 61.

20. Father Harak was taken from Pier 57 to Central Booking. Harak Tr. at 72. He arrived at or about 8:30 a.m. Harak Tr. at 74.

21. At Central Booking he was fingerprinted and had his picture taken. Harak Tr. at 74.

22. Father Harak was released on September 1st at around 1:30 p.m., after he signed some papers saying he agreed he would appear in court. Harak Tr. at 81.

23. On August 31, 2004, the plaintiff Simon Harak obeyed all police orders. Harak Tr. at 111.

24. Harak did not hear any instructions from the police that the people on Fulton Street were blocking the sidewalk before the march was stopped. Harak Tr. at 168.

25. He was never given nor did he hear any order to disperse. Harak Tr. at 111, 168.

26. Father Harak knew there was no permit for this march, but he understood that if you were just walking on the sidewalk you didn't need a permit. Harak Tr. at 109-110.

27. At no time did Harak intend to block pedestrian trafic. Harak Tr. at 168. In fact, he remembers stepping aside so pedestrians coming from other direction could pass. Harak Tr. at 168. He remembers 6 to 8 pedestrains going the opposite direction of the march. Harak Tr. at 169. He saw other marchers step aside to let pedestrians pass along the sidewalk. Harak Tr. at

169.

28. Harak was charged with parading without a permit in violation of New York City Administrative Code Section 10-110, with disorderly conduct under New York Penal Law Secion 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct under New York Penal Law Section 240.20(6) for failing to comply with a lawful order to disperse. See, criminal complaint, court records and certificate of disposition attached as Exhibit "6" to the Moore Fulton Street Declaration.

29. All charges against Father Harak were dismissed on the motion of the District Attorney's Office and he did not have to appear in criminal court. Harak Tr. at 120; Exhibit "6 " to the Moore Fulton Street Declaration.

30. Harak does not recall any police officers with bullhorns on August 31. Harak Tr. at 158. Nor does he recall receiving any warnings from the police while he was on Fulton Street. Harak Tr. 159.

**Plaintiff Diana Raimondi**

31. At the time of the 2004 Republican National Convention plaintiff Diana Raimondi was a resident of the City of New York. She resided at 295 DeGraw Street, Brooklyn, New York, 11231. Raimondi deposition transcript, p. 9, attached as Exhibit "2" to the Moore declaration, hereinafter cited as "Raimondi Tr. at " "". She is a 1986 graduate of Johns Hopkins University. Raimondi Tr. at 53-54. She spent 16 years as the lower school librarian at St. Anne's School in Brooklyn, New York. Raimondi Tr.. at 55.

32. Prior to her arrest on August 31, 2004, Raimondi had never been arrested. Raimondi Tr. at 267.

33. Raimondi arrived at Church and Fulton on August 31, 2004 sometime between 2 and 3 pm. Raimondi Tr. at 345.

34. Her plan for the day was to participate in the WRL march, going up possibly to Union Square or up until a point where it seemed that there might be a problem with the police, then leave. Raimondi Tr. at 350.

35. She believed that as long as she obeyed orders from the police, stayed on the sidewalk and did not block traffic there would be no reason to arrest her. Raimondi Tr. at 351, 370-71.

36. She understood from listening to the negotiations going on between Ed Hedemann and Inspector Galati that as long as the demonstrators remained on the sidewalk and didn't cross against the red light she would not be arrested. Raimondi Tr. at 354, 362-63, 370-71.

37. She heard a police office say that the group could walk east on Fulton to Broadway and walk north and that they should walk two by two on the sidewalk. Raimnodi Tr. at 359, 362, 370.

38. Raimondi recalled the march started around 4 pm. Raimondi Tr. at 371-372. She crossed Church Street and walked east on Fulton. Raimondi Tr. at 372.

39. Her group crossed with the light with the assistance of police officers who helped scoot them up the sidewalk. Raimondi Tr. at 390-93

40. Given the volume of people she does not believe it would have been difficult for pedestrians to walk against the flow of the march. Raimondi Tr. at 404. It would not have been appreciably more difficult than walking down any street in New York City. Raimondi Tr. at 406.

41. Raimondi walked approximately 20 yards east of the intersection of Church and

Fulton before the crowd stopped. Raimondi Tr. at 376-77.

42. She remained in that location until she was arrested. Raimondi Tr. at 377-378. At some point orange fencing was put up to prevent anyone from leaving. Raimondi Tr. at 378.

43. Raimondi heard no warnings or instructions given by the police over bullhorns before the march was stopped. Raimondi Tr. at 413. She did not hear any officer warning the crowd that they were blocking the sidewalk. Ramondi Tr. at 414.

44. She did not hear an order to disperse. Raimondi Tr. at 419. If she had heard such an order she would have left the march. Raimondi Tr. at 421.

45. At one point Raimondi walked over to a line of police officers on bicycles and asked Monahan if she could leave and he only said "proceed, proceed." Raimondi Tr. at 424, 440. Soon after that officers told her she was under arrest. Raimondi Tr.. At 424-25, 440.

46. Raimondi tried to walk past the line of the police to disperse but she was prevented from doing so. Raimondi Tr. at 426-27.

47. Defendant Terrence Monahan ordered that everyone on the sidewalk north of Fulton Street back to the corner of Church Street was to be arrested, including Diana Raimondi. Monahap Tr. at 190:11-191:21. (Attached as Exhibit "4" to the Moore Fulton Street Declaration).

48. Neither Terrence Monahan nor any other member of the New York City Police Department had any personal knowledge of any conduct on the part of Diana Raimondi at the Fulton Street march which served as the basis for that plaintiff's arrest. Memorandum and Order signed by Magistrate Judge James C. Francis, IV, on November 28, 2006, attached as Exhibit "5" to the Moore Fulton Street Declaration).

49. Raimondi was placed in flex-cuffs by Officer Boyle. Raimondi Tr. at 441. After she was cuffed she sat on the curb for about an hour. She tried to loosen the cuffs because she was in "excruciating pain." Raimondi Tr. at 442-43.

50. At Pier 57 the floors were covered with a black oily film and what she believed were puddles of antifreeze. Raimondi Tr. at 476. The air smelled like chemicals and like a car repair store. Raimondi Tr. at 489-91.

51. At Central Booking Raimondi was fingerprinted. Raimondi Tr. at 500-03.

52. Raimondi was released from custody on September 2, 2004 at around 7:30 pm after being issued a desk appearance ticket to appear in court at a later date, which means that she had valid identification on her when she was arrested. Raimondi Tr. at 516, 518-19.

53. Raimondi was charged with parading without a permit in violation of New York City Administrative Code Section 10-110, with disorderly conduct under New York Penal Law Secion 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct under New York Penal Law Section 240.20(6) for failing to comply with a lawful order to disperse. See criminal court complaint, criminal court records and certificate of disposition attached as Exhibit "6" to the Moore Fulton Street Declaration.

54. Raimondi at no time was violating the law and believes that she was intentionally arrested based solely on her political views and that she was deliberately kept in unhealthy and toxic conditions and held for an excessively long period of time. Raimondi Tr. at 536.

55. After making two appearances in court, all charges against Diana Raimondi were dismissed on the motion of the District Attorney's Office. Raimondi Tr. at 532; see also, Exhibit "6" to the Moore Fulton Street Declaration.

**Plaintiff William B. Steyert, Jr.**

56. At the time of the 2004 Republican National Convention plaintiff William B. Steyert was a resident of the City of New York residing at 67-41 Burns Street, Forest Hills, Queens, New York. Steyert deposition transcript, p. 11, attached as Exhibit "4" to the Moore declaration, hereinafter cited as "Steyert Tr. at " '". He spent four years on active duty in the United States Navy from 1964 to 1968. Steyert Tr. at 18. He earned a bachelor or arts degree in speech from Concordia College in 1972. Steyert Tr. at 62-63, 66-67.

57. At the time of his arrest Steyert was receiving social security payments for a disability. Steyert Tr. at 77.

58. On August 31, 2004, Steyert traveled alone to Church St. Steyert Tr. at 388. He arrived around 3 pm. Steyert Tr. at 388.

59. He lined up on the sidewalk with other people along the west side of Church Street to hold a silent vigil. Steyert Tr. at 392. The vigil lasted until 4pm. Steyert Tr. at 393.

60. When the march started Steyert was near the front. Steyert Tr. at 397. The march proceeded east across Church to the northside of Fulton only after a police officer told them they had permission to proceed. Steyert at 397-98.

61. The marchers were proceeding basically two abreast as they had been told. Steyert Tr. at 402. There were hardly any pedestrians coming down from Broadway. Steyert Tr. at 402.

62. Steyert heard no police officers giving orders from the time when the march started to when it was stopped by the police. Steyert Tr. at 404.

63. Steyert didn't hear any orders over a bullhorn other than one at the beginning of

the march where an officer on Church Street said that although the march was not permitted, it would be allowed to proceed if the marchers walked two abreast and didn't block traffic. Steyert Tr. at 404, 433.

64. The march was a very orderly procession. Nobody was running. He didn't hear any police officers say slow down or walk two abreast. Steyert Tr. at 410.

65. The banner at the front of the march was carried sideways parallel to the cemetery so it wouldn't be blocking the sidewalk or the street. Steyert Tr. at 411.

66. At one point Steyert heard an officer tell the crowd they were blocking the street or the sidewalk. He interpreted this as a statement not a warning. The officer said the banner was blocking the street or blocking traffic. Steyert, who was not far away from the officer, said to the officer, "you could see this banner didn't block the street." Steyert Tr. at 434-35. The officer ignored him and was saying all these people would be arrested. Steyert Tr. at 434.

67. Steyert did not hear any officer tell the crowd to disperse. Steyert Tr. at 439. He heard no order to disperse and was not given an opportunity to disperse. Steyert Tr. at 445.

68. If he had been allowed the opportunity to disperse he and the others would have done so. No one was given a chance to disperse. Steyert Tr. at 439.

69. Steyert heard an officer yell that everyone was under arrest but never heard him say disperse or you will be arrested. Steyert Tr. at 434-41.

70. The march was proceeding in a peaceful and orderly manner when suddenly an officer screamed out about the banner that he saw with his own eyes was parallel and not blocking the street. Steyert Tr. at 442.

71. After the march was stopped the police surrounded the marchers with bicycles.

Steyert Tr. at 477. He knew they were going to get arrested. Steyert Tr. at 480. He saw an older gentleman come up and argue with an officer wanting to be let go but the officer refused. Steyert Tr. at 480.

72. When he was arrested Steyert was not engaged in civil disobedience. He was not blocking pedestrian or vehicular traffic. There was space on the sidewalk for others to pass. He was following all police instructions. Steyert Tr. at 542-43.

73. Defendant Terence Monahan ordered that everyone on the sidewalk north of Fulton Street back to the corner of Church Street was to be arrested, including William Steyert. Monahan Tr. at 190:11-191:21. (Attached as Exhibit " " to the Moore Fulton Street Declaration).

74. Neither Terrence Monahan nor any other member of the New York City Police Department had any personal knowledge of any conduct on the part of William Steyert at the Fulton Street march which served as the basis for that plaintiff's arrest. Memorandum and Order signed by Magistrate Judge James C. Francis, IV, on November 28, 2006, attached as Exhibit "5" to the Moore Fulton Street Declaration).

75. His arrest was illegal and unjust because he was following orders, he was not bunched up with other marchers and there were not others who were bunched up and they were not blocking anyone. Steyert Tr. at 486.

76. He got to Pier 57 around 6:30 pm. Steyert Tr. at 488. The pens he was placed in were wire fences with barbed wire coiled on top. Steyert Tr. at 492.

77. The floors were grimy and greasy. There were grease spots everywhere. Steyert Tr. at 508-09.

78. He was fingerprinted and photographed at Central Booking. Steyert Tr. at 514-15.

79. He was eventually given a desk appearance ticket, which means he had valid identification with him on that day, and released. Steyert Tr. at 516.

80. Steyert was charged with disorderly conduct under New York Penal Law Secion 240.20(5) for blocking vehicular and pedestrian traffic and disorderly conduct under New York Penal Law Section 240.20(6) for failing to comply with a lawful order to disperse. See, criminal court complaint, criminal court records and certificate of disposition attached as Exhibit "6" to the Moore Fulton Street Declaration.

81. He eventually appeared in court and the charges were dismissed on the motion of the District Attorney's Office. Steyert Tr. at 520; see also Exhibit "6" to the Moore Fulton Street Declaration.

**<u>Defendant Terence Monahan</u>**

82. As of August 31, 2004, defendant Terence Monahan was a Deputy chief in the New York City Police Department and served as the Executive Officer of the Bronx Borough Command. Monahan Deposition transcript, pp. 22-23, attached as Exhibit "4" to the Moore declaration, hereinafter cited as "Monahan Tr. at " ""

83. During the Republican National Convention Deputy Chief Monahan was the commanding officer of the mobile field forces. Among the unit's responsibilities was the policing of demonstrations. Monahan Tr. at 32, 35-36.

84. On August 31, 2004, Deputy Chief Monahan arrived at the World Trade Center site near the intersection of Church and Fulton Streets, where he observed numerous people gathered. Monahan Tr. at 52-54, 154-55.

85. Deputy Chief Monahan had a discussion with five or so people, including a person he understood to be the leader of the planned marach, about the conduct of the event. The hundreds of other people were just milling around. Monahan Tr. at 155-162.

86. At some time after the march started Deputy Chief Monahan made his way to the front of the march. Monahan Tr. at 175.

87. When he got to the front of the march Deputy Chief Monahan stopped the march and subsequently ordered that everyone on the sidewalk north of Fulton Street back to the corner of Church Street was to be arrested. Monahan Tr. at 190-91.

88. Two hundred and twenty-seven people were arrested at the Fulton Street location on August 31, 2004. **CITE**

89. Pursuant to the City's no-summons policy for RNC-related arrests, everyone arrested at the Fulton Street location on August 31, 2004 was transported to Pier 57 for processing. Monahan Tr. at 194.

**Video Evidence Concerning the Events at Fulton and Church Streets**

90. Class Plaintiffs in *MacNamara* incorporate by reference the undisputed facts from the video evidence set forth in the *Abdell* plaintiffs' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1.

Dated: October 3, 2011
New York, NY

Respectfully submitted,

JONATHAN C. MOORE, Esq.
GIDEON ORION OLIVER, Esq.
ELISE LOGEMANN, Esq.

Beldock Levine & Hoffman, LLP
99 Park Avenue - 16th Floor
New York, New York 10016
(212) 277-5850

Counsel for the Plaintiff Class in MacNamara